1               IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND

2                   SOUTHERN DIVISION

3  UNITED STATES OF AMERICA,      )
                          )

4         Plaintiff,      )
      vs.                 )

5                       ) CRIMINAL NO.:
  RONALD EUGENE WATSON,        ) 8:21-cr-00449-TDC-1

6                       )
         Defendant.      ) **VOLUME II**

7  _____)

8

                             Greenbelt, Maryland

9                           February 28, 2023
                           9:00 a.m.

10

11              TRANSCRIPT OF PROCEEDINGS
                   **JURY TRIAL**

12      BEFORE THE HONORABLE THEODORE D. CHUANG

13  <u>For the Plaintiff:</u>

14      Gary Michael Morgan, Esquire
        Office of the United States Attorney

15        6406 Ivy Lane, Suite 800
        Greenbelt, MD 20770

16

17      Matthew L. Cofer, Esquire
        U.S. Department of Justice

18        Tax Division, Northern Criminal Enforcement Section
        150 M Street NE

19        Washington, DC 20002

20  <u>For the Defendant:</u>

21      Gerald C. Ruter, Esquire
        Law Office of Gerald C. Ruter PC

22        9411 Philadelphia Road, Suite O
        Baltimore, MD 21237

23

24  Also Present: Special Agent Charles Weishaar, IRS
                 Paralegal Eric Mahoney, DOJ

25      (Computer-aided transcription of stenotype notes)

1                              INDEX

2

WITNESS FOR THE GOVERNMENT                              Page

3

4  **Thomas Bolus**

5     Direct Examination By Mr. Cofer ........................... 4

6     Cross-examination By Mr. Ruter ........................... 25

7     Redirect Examination By Mr. Cofer......................... 33

8  **Darlene Hall**

9     Direct Examination By Mr. Morgan.......................... 35

10    Cross-examination By Mr. Ruter ........................... 62

11    Redirect Examination By Mr. Morgan ....................... 95

12  **Karen Butler**

13    Direct Examination By Mr. Morgan.......................... 98

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2        (9:08 a.m.)

 3             THE COURT:  Thank you, everyone.  Please be seated.

 4             THE CLERK:  The matter now pending before this Court

 5   is Criminal Action No. TDC-21-0449, United States of America

 6   versus Ronald Eugene Watson.  We are here today for the purpose

 7   of a jury trial.

 8             Counsel, please identify yourselves for the record.

 9             MR. MORGAN:  Good morning, Your Honor.  Michael

10   Morgan on behalf of the United States.  I'm joined at counsel

11   table by Matt Cofer from the Tax Division of the Department of

12   Justice.  Also we are joined by Special Agent Charles Weishaar

13   from the IRS and Tax Division paralegal Eric Mahoney.

14             THE COURT:  Good morning.

15             MR. RUTER:  Gerald Ruter on behalf of Mr. Ronald

16   Watson.  Good morning, Your Honor.

17             THE COURT:  Good morning.  Good morning,

18   Mr. Watson.

19             THE DEFENDANT:  Good morning.

20             THE COURT:  Unfortunately the jurors did not all get

21   here on time.  I appreciate everyone else making the effort to

22   get here on time.  But I think we're ready to bring them in; is

23   that correct?

24             MR. MORGAN:  Yes, Your Honor.

25             MR. RUTER:  Yes, Your Honor.
```

```
 1              THE COURT:  Thanks.  Let's do that.
 2        (Jury entered the courtroom at 9:10 a.m.)
 3              THE COURT:  Thank you, everyone.  Please be seated.
 4   Ladies and gentlemen, welcome back.  I appreciate you coming
 5   back today.  We are, again, having a short day of 9:00 to 12:00
 6   so we're going to get started right away.  The Government has
 7   the burden of proof so they can go first.  I'm going to ask the
 8   Government to call their first witness now.
 9              MR. COFER:  Your Honor, the Government calls Tom
10   Bolus.
11              THE COURT:  Thank you.
12              THE CLERK:  Sir, please raise your right hand.
13          THOMAS BOLUS, GOVERNMENT'S WITNESS, SWORN
14              THE CLERK:  You may be seated, sir.  Speak clearly
15   into the microphone.  Please state your first and last name.
16              THE WITNESS:  Thomas Bolus.
17              THE CLERK:  Spell your first and last name for the
18   record.
19              THE WITNESS:  T-h-o-m-a-s B-o-l-u-s.
20              THE CLERK:  Thank you, sir.
21                      DIRECT EXAMINATION
22   BY MR. COFER:
23   Q    Good morning, Mr. Bolus.
24   A    Good morning, sir.
25   Q    Where do you work?
```

Direct - Bolus                              Vol. II-5

1    **A**     I work for the Internal Revenue Service, Criminal

2    Investigation Division, in Scranton, Pennsylvania.

3    **Q**     And what is the Internal Revenue Service?

4    **A**     The Internal Revenue Service is an agency under the

5    Department of Treasury organized by the United States Congress

6    to collect revenue and taxes and also enforce tax laws.

7    **Q**     Is it also known as the IRS?

8    **A**     Yes, it is.

9    **Q**     How long have you worked at the IRS?

10   **A**     For 17 years.

11   **Q**     What is your current role?

12   **A**     I am a court witness coordinator.

13   **Q**     And how long have you been doing that?

14   **A**     For seven years.

15   **Q**     Could you describe your duties as a court witness

16   coordinator.

17   **A**     As a court witness coordinator, I primarily represent the

18   Commissioner of the Internal Revenue Service in the

19   Commissioner's custodial duties.  So I'm tasked with gathering

20   and retrieving tax returns and other tax-related documents, and

21   I have those documents certified.  I certify those documents

22   and bring them into federal criminal trials as evidence.

23   **Q**     In how many trials have you testified in as a court

24   witness coordinator?

25   **A**     66.

1   **Q**    Through your duties, have you become familiar with various

2   IRS records and systems?

3   **A**    Yes, I have.

4   **Q**    I would like to generally ask you about a handful of such

5   records and systems that will be discussed in this case.

6   Generally what's a Form 1040?

7   **A**    A Form 1040 is a U.S. Individual Income Tax Return.  And

8   the Form 1040 is used for taxpayers to reconcile their taxes,

9   and it's due by April 15 of the following year, and that the

10  taxpayers use that form to go through all of the income they

11  received and taxes that were taken out to basically verify if

12  they're due a refund by the IRS because they overpaid or if

13  they owe the IRS money because they didn't pay enough into

14  taxes.

15  **Q**    How many individual tax returns, Form 1040s, are filed

16  each year with the IRS?

17  **A**    Well, for 2021, we had 264 million filed.

18  **Q**    When someone files a Form 1040, does the IRS keep a record

19  of that?

20  **A**    Yes, they do.

21  **Q**    Are there other types of IRS forms that are used to help

22  complete a Form 1040?

23  **A**    Yes, there are.

24  **Q**    Can you name some examples?

25  **A**    There's instructions and publications that assist the

1    taxpayer to prepare their taxes.  There's also schedules and

2    addendums that the taxpayer would use if they're entitled to

3    other exemptions or deductions that they can claim to reduce

4    their taxable income.

5    **Q**    What is an account transcript?

6    **A**    An account transcript is a historical running transcript

7    of any transaction that takes place on a particular taxpayer

8    based on their social security or business entity, based on a

9    particular tax form, based on a particular tax year or tax

10   period.

11   **Q**    How are new entries made onto account transcripts?

12   **A**    Some of the entries are made automatically by computer

13   updates and also by individual IRS employees updating a

14   particular transaction that happens because of an action that

15   takes place from the taxpayer between the IRS and the

16   taxpayer.

17   **Q**    What is a tax preparer information report?

18   **A**    A tax preparer information report would be a particular

19   report that shows the taxpayer -- or the tax preparer.  It

20   shows their information, when they applied for a preparer tax

21   identification number, and their address and where they're

22   doing business at.

23   **Q**    And how are those updated?

24   **A**    So they're updated once the tax preparer is issued a PTIN

25   or a Preparer Tax Identification Number, so that information is

1    contained in the return preparer database as a system of the

2    IRS, and that information is updated as the tax preparer has to

3    complete annual certifications.  And also under the preparer's

4    tax identification number as the preparer sends in tax returns

5    under their PTIN, those reports are updated also.

6    **Q**    I think you mentioned a PTIN a couple times.  What's an

7    EFIN?

8    **A**    An EFIN is Electronic Filing Identification Number.

9    That's a six-digit number that's owned by the business or the

10   electronic return originator that is -- has been authorized by

11   the IRS to send tax returns to the IRS electronically over the

12   internet.

13   **Q**    How do you get one?

14   **A**    The business owners would apply to the IRS, and they would

15   be issued an EFIN by the IRS.

16   **Q**    What is the Integrated Data Retrieval System?

17   **A**    The Integrated Data Retrieval System is the IRS's

18   mainframe computer system.  It stands for -- IDRS is the

19   acronym for it.  It has the information, both business master

20   file and individual master file, as well as it has information

21   return's stored data in it that the third party payers are

22   required to tell the IRS when they issue a W-2 or a 1099 or

23   other forms of payment to inform the IRS that they've made

24   payments to persons or taxpayers.

25   **Q**    Can you create reports based on information from the

 1   IDRS?

 2   **A**     Yes, I can.

 3   **Q**     So all of the records you just described that we've went

 4   through, is it the regular practice of the IRS to make and keep

 5   such records as part of its administration of the revenue

 6   system?

 7   **A**     Yes, it is.

 8   **Q**     In addition to finding and certifying IRS records as part

 9   of your duties, are you sometimes asked to determine whether

10   the IRS does not possess certain records such as when someone

11   has not filed a tax return?

12   **A**     Yes, sir.

13   **Q**     Do you have full authority and access to search all of the

14   IRS's databases?

15   **A**     Yes, I do.

16   **Q**     Is there a way to either certify that the IRS lacks

17   certain records?

18   **A**     Yes, there is.

19   **Q**     What does that entail?

20   **A**     So the IRS has a form, Form 3050, and it's a Certificate

21   of Lack of Record form.  So that form is basically, I can go

22   through all of my queries and I can list everything that I did

23   to find out if a tax form was, in fact, filed or not, and I

24   could list the taxpayer's name and information, the forms that

25   I searched for and the tax years and taxpayers that I looked

Direct - Bolus                          Vol. II-10

1  for those forms.  If I did not find any, I could then certify

2  that those records do not exist in the IRS's data.

3  **Q**    Were you asked to review IRS records in connection with

4  this trial?

5  **A**    Yes, I was.

6  **Q**    And were you also asked to search for the absence of

7  records?

8  **A**    Yes, I was.

9  **Q**    There should be a few binders sitting in front of you

10  containing documents that are marked with exhibit numbers.

11  **A**    Yes, sir.

12  **Q**    Have you looked at these binders before?

13  **A**    Yes, I have.

14  **Q**    Could you please take a moment and review the documents

15  that are marked 1 through 51.  Just let me know when you're

16  finished.

17  **A**    (Reviewing documents.)

18       Okay.

19  **Q**    Do you recognize these exhibits?

20  **A**    Yes, I do.

21  **Q**    Generally what are they?

22  **A**    So it contains tax returns, U.S. Form 1040s, U.S. income

23  tax returns.

24  **Q**    Is each of those exhibits an individual return?

25  **A**    Yes, they are.

1    **Q**    And some of those exhibits, I believe, are divided between

2    A and B.  For example, 4A and 4B.  Are exhibits marked that

3    way -- is that one individual return, or is that two different

4    returns?

5    **A**    So that would be one entire return.

6    **Q**    Why is it divided up like that?

7    **A**    It's divided because in the beginning of this particular

8    tax year, the system was updated, but it did not include

9    or allow the IRS employees to download more than 15 pages at a

10   time for each tax return that we queried.  So I have to print

11   larger tax returns that involve more pages on two separate

12   downloads.

13   **Q**    So these documents, are these documents that you were

14   asked to review for this trial in your role as an IRS

15   custodian?

16   **A**    Yes, they are.

17   **Q**    And are these true and accurate copies of IRS records?

18   **A**    Yes, they are.

19   **Q**    How do you know that?

20   **A**    Because I've reviewed each one of them.

21   **Q**    And did you compare it to anything?

22   **A**    Yes, I did.  I reviewed and compared the information to

23   the data that they represent.  As these are electronically

24   filed tax returns, they're really just a picture of the

25   electronic data that's contained in the IRS's IDRS system, so I

1    reviewed that IDRS system against the printouts to verify that

2    the information is correct and true.

3    **Q**    I'd like you now to review the documents marked as 52A

4    through 52H.  Again, just let me know when you've finished.

5    **A**    (Reviewing documents.)

6         Yes, sir.

7    **Q**    Do you recognize these documents?

8    **A**    Yes, I do.

9    **Q**    What are these generally?

10   **A**    So Exhibits 52A through 52H are account transcripts.

11   **Q**    Are they true and accurate copies of IRS records?

12   **A**    Yes, they are.

13   **Q**    How do you know that?

14   **A**    And, again, I verified the information that's contained on

15   it against the IRS's computer database.

16   **Q**    All right.  Could you please now review Exhibits 53

17   through 70.

18   **A**    I'm sorry, 53 through?

19   **Q**    70.  53 through 70.

20   **A**    (Reviewing documents.)

21        Okay.

22   **Q**    Do you recognize these documents?

23   **A**    Exhibits 53 through 70 contain printouts of publications

24   and instructions for particular tax returns and other schedules

25   and attachments for the tax years 2015, '16 and 2017.

1    **Q**    Is that what you were describing earlier, for example,

2    when you were talking about instructions and publications that

3    come with Forms 1040, for example?

4    **A**    Yes, sir.

5    **Q**    Are these types of instructions publicly available?

6    **A**    Yes, they are.

7    **Q**    How can you get them?

8    **A**    So you could go into IRS.gov on the internet, request or

9    download it or view it.  You could also call the IRS's toll

10   free number, or you could come into any IRS office and ask for

11   the publication and they'll provide you one.

12   **Q**    From your review of those exhibits, are those the same as

13   the ones that are publicly held?

14   **A**    Yes, they are.

15   **Q**    Next could you please review documents marked 82A through

16   82D.

17   **A**    (Reviewing documents.)

18        Okay.

19   **Q**    What are these?

20   **A**    Exhibits 82A through 83A are Certification of Lack of

21   Records form.

22   **Q**    I'm sorry, just to clarify, is it 82A through 82D?  I

23   think you said 83 --

24   **A**    I went a little further, I guess.

25   **Q**    That's okay.

1   **A**    82D.  Yeah, they are certification of lack of records.

2   **Q**    We're talking about 82A through 82D, correct?

3   **A**    Yes.

4   **Q**    And, again, what are these?

5   **A**    These are certified -- Certification of Lack of Record

6   Form 3050.

7   **Q**    Did you help prepare these certifications?

8   **A**    Yes, I did.

9   **Q**    Did you follow the process you described previously --

10  **A**    Yes, I did.

11  **Q**    -- when searching for lack of records?

12       All right.  Next could you now please review the single

13  document marked as Exhibit 83A.

14  **A**    83A?

15  **Q**    Yes.

16  **A**    83A is a tax preparer information report for a PTIN.

17  **Q**    Is that a true and accurate IRS record?

18  **A**    Yes, it is.

19  **Q**    How do you know that?

20  **A**    Because it's been retrieved from the IRS's return preparer

21  data system.

22  **Q**    Is that something you verified?

23  **A**    Yes, it is.

24  **Q**    Now please look at Exhibit 83B.  And what's that?

25  **A**    Exhibit 83B is a certification of the IRS's e-file

1    application summary for an EIN.

2    **Q**    Is that a true and accurate IRS record?

3    **A**    Yes, it is.

4    **Q**    How do you know?

5    **A**    Because I verified it from the IRS's employee user

6    portal.

7    **Q**    Please now look at 83C.  What's that?

8    **A**    So 83C, Exhibit 83C is a preparer information report.

9    **Q**    Is that also a true and accurate IRS record?

10   **A**    Yes, it is.

11   **Q**    How do you know that?

12   **A**    Because I verified it from the IRS's return preparer data

13   system.

14   **Q**    Please look at what is marked as Exhibit 84.  What is that

15   generally?

16   **A**    So Exhibit 84 contains printouts from the Integrated Data

17   Retrieval System.

18   **Q**    Is that a true and accurate IRS record?

19   **A**    Yes, it is.

20   **Q**    How do you know?

21   **A**    Again, I verified the information that's contained -- even

22   though some of it's historical, I was able to verify the

23   information in the IDRS system.

24   **Q**    Finally, could you please look at what are marked as

25   Exhibits 85A through 85C.

1    **A**     Yes, sir.

2    **Q**     What are these documents generally?

3    **A**     These are -- Exhibits 85A through 85C are publications

4    related to business expenses and depreciation and other things

5    for a business.

6    **Q**     Are these the publications you talked about earlier that

7    the IRS makes publicly available?

8    **A**     Yes, they are.

9    **Q**     And do you recognize these specific exhibits to be the

10   same as the publicly available publications that the IRS

11   provides --

12   **A**     Yes, I do.

13          MR. COFER:  Your Honor, Court's indulgence one

14   moment, please.

15          Your Honor, at this time the Government moves to

16   admit the following exhibits into evidence:  Exhibits 1 through

17   6B, 9 through 11B, 14 through 15, 18A through 22B, 29 through

18   31, 33 through 34, 37 through 38B and 41 through 43.

19          One more moment, please.  That's it, Your Honor.

20          THE COURT:  Any objection?

21          MR. RUTER:  No, sir.

22          THE COURT:  So Exhibits 1 through 6B, 9 through 11B,

23   14 and 15, 18A through 22B, 29 through 31, 33, 34, 37 through

24   38B, and 41 through 43 are in evidence.

25          MR. COFER:  Thank you, Your Honor.

1          THE COURT:  Are you offering any of the other ones?

2    Those are all just marked for identification at this point?

3          MR. COFER:  Those are all just marked for

4    identification at this point, Your Honor.  If I may have one

5    moment to confer with co-counsel, please.

6          Yes, that's it for now, Your Honor.

7          THE COURT:  Okay.

8    BY MR. COFER:

9    **Q**    Mr. Bolus, what are the different ways that an individual

10   taxpayer can submit their tax return to the IRS?

11   **A**    So the two basic ways that tax returns are submitted and

12   received by the taxpayers to the IRS are either on paper filed

13   where they're mailed to the IRS, or they're filed

14   electronically and sent to the IRS over the internet.

15   **Q**    I'd like to now turn your attention to Exhibit 2, and

16   we're going to pull that up on the screen.

17         MR. COFER:  Mr. Mahoney, could we please publish

18   Exhibit 2 to the jury.

19   **Q**    Mr. Bolus, can you see Exhibit 2 on the screen.  I think

20   maybe to your left it should be showing up.  Sorry, not on the

21   binders, Mr. Bolus.  On the screen to your left.

22   **A**    Oh, I didn't notice that.

23   **Q**    Sorry, switching it up.  Is that showing up for you

24   there?

25   **A**    Yes, sir.

1   **Q**    Looking at Exhibit 2, is this an individual return?

2   **A**    Yes, it is.

3   **Q**    Can you tell from looking at it how this return was

4   filed?

5   **A**    Yes, I can.

6   **Q**    How was it filed?

7   **A**    This return was filed electronically.

8   **Q**    How does the IRS process returns that are filed

9   electronically?

10  **A**    So the IRS receives the tax return over the internet and

11  then the tax return -- I'm sorry, the IRS receives tax return

12  data over the internet, so the byline information that's

13  contained on what would be a 1040 if you did it on paper is

14  received in data at the IRS's front-end computer system in

15  Martinsburg, West Virginia.  That's after it's been transmitted

16  over the internet.  Then it's placed into a tax return data

17  file and then can be retrieved later either by data or in a

18  graphic picture-looking view that we see this printout as.

19  **Q**    So this return we're looking at here, that's a graphical

20  representation of an electronically-filed return?

21  **A**    Yes, it is.

22  **Q**    So looking at Exhibit 2 here on the first page, I see in

23  the top, right corner, there's a number preceded by "DLN."

24  What does that mean?

25  **A**    Yes, sir.  DLN is the document locator number.  That's a

1    14-digit serial number that the IRS issues or places on each

2    tax return, particular tax return, after it has been received

3    and finished processing and is included now on the IRS's data

4    system.

5    **Q**    Just to clarify, is that a unique identifier for each

6    return?

7    **A**    Yes, sir, it's unique to this tax return.

8                MR. COFER:  Mr. Mahoney, could we please turn to

9    page 4.

10   **Q**    Mr. Bolus, in the box there -- in the box there that says

11   "sign here," there appear to be some asterisks under what says

12   "your signature."  What do those asterisks signify?

13   **A**    So the asterisks under the sign-here block represent the

14   taxpayer's personal identifying number.  Because the IRS -- tax

15   preparer can't see the taxpayer's PIN or personal identifying

16   number, the IRS masks that so nobody knows what the taxpayer's

17   true PIN is.

18   **Q**    Why do we see that instead of a real signature?

19   **A**    To protect the taxpayer's identity.

20   **Q**    Is that a specific feature of electronically-filed

21   returns?

22   **A**    Yes, it is.

23   **Q**    Looking at the box just below that that says "paid

24   preparer use only," what is that box for?

25   **A**    That box would be completed if the taxpayer went to a

1    preparer who's been authorized and sanctioned by the IRS to use

2    official tax software to file their taxes to the IRS

3    electronically.

4    **Q**    I see there's a box for, it says "preparer's signature."

5    This one appears blank.  Do you know why that is?

6    **A**    Because this was sent into the IRS using a PTIN or

7    preparer tax identifying number.

8    **Q**    So should we be seeing a signature there?

9    **A**    No, sir.

10   **Q**    Is that another feature of electronically filed returns?

11   **A**    Yes, it is.

12   **Q**    I think you mentioned PTIN, you might have told us a

13   little bit about it before.  Looking at the box kind of in the

14   middle on the right, it says "PTIN."  Can you remind us what a

15   PTIN is again.

16   **A**    Yeah.  So the PTIN is the individual number that the IRS

17   has issued to a particular preparer to allow that preparer to

18   prepare taxes in the community for a fee, and then they're able

19   to generate that tax return electronically eventually to come

20   to the IRS over the internet.

21   **Q**    If you're a preparer, can you file a tax return on behalf

22   of someone else without a PTIN?

23   **A**    No, you cannot.

24        MR. COFER:  If we could turn back to page 1, please,

25   Mr. Mahoney.

1  **Q**    So, Mr. Bolus, I'd now like to ask you a little bit about

2  the Form 1040, using this one here as an example just to orient

3  the jury to what they'll be looking at over the course of this

4  trial.  So, again, you told us about a Form 1040 but looking at

5  it now, can you just describe very generally how does it

6  work?

7  **A**    Yes, sir.  So the Form 1040 lists the form number of the

8  year and it has the taxpayer's personal identifying number --

9  I'm sorry, personal identifying information.  Then it lists

10 their filing status, exemptions.  Then they just go through the

11 form from lines 7 through the end to calculate their taxes that

12 they may owe or may be due back to them.

13         MR. COFER:  Can we please look at page 3.

14 **Q**    Mr. Bolus, at the bottom there, it looks like you see a

15 line 78 and 79 in the box called "amount you owe."  You're

16 describing how this works; if you start back up at line 7 or 1,

17 how do you get down to line 78?  What do you need to do?

18 **A**    You would complete all of the blocks preceding line 78

19 with your information to arrive at -- if you owed money, then

20 it would be included in this line 78.

21 **Q**    So does the form itself, if you start at line 7, for

22 example, will it kind of show you how to get to line 78?  Do

23 you just follow it?

24 **A**    Yes, sir.  If you just follow the form down, you'll arrive

25 at the last section.

1         MR. COFER:  If we could zoom out, please.

2    **Q**    Just the above "the amount you owe" box, see a box called

3    "refund."  What's a refund?

4    **A**    Refund would be the amount of money due to the taxpayer if

5    they had, like, too much taxes taken out of their tax, out of

6    their income during the year, so then the IRS would owe that

7    taxpayer a refund.

8    **Q**    So looking at this exhibit in line, I guess 76a, could you

9    read lines 76a, please.

10   **A**    Yes, sir.  So line 76a says, "Amount of line 75 you want

11   refunded to you.  If Form 8888 is attached, check here."  Then

12   it has the income amount 76a of $10,766.

13   **Q**    So that $10,766, that's what is on this return requesting

14   a refund?

15   **A**    Yes, it is.

16         MR. COFER:  All right.  Mr. Mahoney, could we please

17   go back to page 1.  Could we zoom in on line 12, please.

18   **Q**    Mr. Bolus, could you please read line 12 of the return.

19   **A**    Yes, sir.  So line 12 is "Business income or loss and

20   attach Schedule C or C-EZ."

21   **Q**    On this return in the box to the right of line 12, what's

22   the amount there?

23   **A**    It lists the loss of negative $33,739.

24   **Q**    All right.  This line refers to a Schedule C.

25         MR. COFER:  Mr. Mahoney, could we please turn to

1    page 23.

2    **Q**    Mr. Bolus, are we looking at a Schedule C?

3    **A**    Yes, we are.

4    **Q**    What's a Schedule C?

5    **A**    So the Schedule C is a profit or loss statement or profit

6    or loss from a business that is a sole proprietorship business

7    of that person.  In other words, not a corporation or a

8    partnership-type business.  It's a personal, like usually a

9    smaller business that the person owns themself.

10   **Q**    So is this form, is that used to get the number that's on

11   line 12 of the 1040?

12   **A**    Yes, it is.

13          MR. COFER:  All right.  Could we please now,

14   Mr. Mahoney, return to page 3 of the exhibit.  Can we zoom in

15   on line 40 there at the top.

16   **Q**    All right.  Mr. Bolus, could you please read line 40.

17   **A**    "Itemized deductions from Schedule A or your standard

18   deduction."  That explains the standard deduction in the left

19   margin.

20   **Q**    I'm going to pause there for a second.

21          MR. COFER:  Mr. Mahoney, can we zoom back out and

22   could we do the entire box so we see that whole standard

23   deduction box on the left.  I'm sorry, let me give better

24   instructions.  Take your cursor, please, from the top left of

25   Tax and Credits and take that back all the way down to line 56.

1   Perfect, right there.

2   **Q**    So Mr. Bolus, I had you read line 40.  So you mentioned a

3   standard deduction.  Is that what's described here in this left

4   box?

5   **A**    Yes, it is.

6   **Q**    And the amounts listed there, I think I see 6,300, 12,600,

7   9,300, are those the amounts of the standard deduction for this

8   year?

9   **A**    Yes, sir.

10  **Q**    So it says, "Itemized deductions or your standard

11  deduction."  What's an itemized deduction?

12  **A**    So an itemized deduction would be particular deductions

13  that the taxpayer would be allowed to claim, and then they

14  would have to submit a Schedule A to list those deductions in

15  particular so that they could attach that.

16  **Q**    So reading the box or the amount that's in the box next to

17  line 40, could you please read that amount.

18  **A**    It's $25,629.

19  **Q**    Does that appear that this return is taking the itemized

20  deductions or the standard deduction?

21  **A**    The itemized deduction, sir.

22  **Q**    And next to itemized deduction, reading at line 40 again,

23  it says "from Schedule A."

24       MR. COFER:  Mr. Mahoney, could we please now turn to

25  page 21 of this exhibit.

1   **Q**    Mr. Bolus, are we looking at a Schedule A?

2   **A**    Yes, we are.

3   **Q**    What's a Schedule A?

4   **A**    So the Schedule A is the itemized deduction schedule.

5   **Q**    Okay.  So similar to Schedule C, do you use Schedule A to

6   calculate the itemized deductions that are going to appear on

7   line 40 of the Form 1040?

8   **A**    Yes, sir.

9          MR. COFER:  Your Honor, could I have one more moment,

10  please.

11         Your Honor, no further questions.

12         THE COURT:  Okay, thank you.  Mr. Ruter, any

13  cross-examination?

14         MR. RUTER:  If I could.  Thank you, Your Honor.

15         THE COURT:  Yes, of course.

16                       **CROSS-EXAMINATION**

17  **BY MR. RUTER:**

18  **Q**    Good morning, Mr. Bolus.

19  **A**    Good morning, sir.

20  **Q**    You explained what an account transcript is just a few

21  moments ago; is that correct?

22  **A**    Yes, sir.

23  **Q**    When you look at that account transcript which is a part

24  of the records kept by the IRS, can you know whether or not the

25  numbers on that account transcripts are accurate?

Cross - Bolus

1    **A**    Yes, sir.  They come from the information that we

2    receive.

3    **Q**    Okay.  Whether or not the information you received is

4    accurate, you would not know that, would you?

5    **A**    Not personally, sir.

6    **Q**    All right.  You indicated that one applies for an EFIN

7    number?

8    **A**    Yes, I did, sir.

9    **Q**    Could a taxpayer who's doing his or her own records apply

10   for an EFIN number just for themselves?

11   **A**    No, they couldn't, sir.  They would have to be an

12   established business to do --

13   **Q**    So they would have to be a tax preparer, as an example?

14   **A**    Yes, sir.

15   **Q**    How would the tax preparer go about getting an EFIN

16   number?

17   **A**    So they would apply on the internet through the IRS's

18   portal and provide their information about their business,

19   their location, the makeup of their business, and that would go

20   through a suitability check which is a basic background check

21   of the business.  If everything looks okay or checks out okay,

22   the IRS would then issue the six-digit EFIN number to that

23   electronic return originator or the owner of the business.

24   **Q**    Could you then describe, for lack of a better phrase, the

25   background check, the suitability check?  What does that

1    consist of before the EFIN number can be actually given to the

2    person who's seeking it?

3    **A**    Yes, sir.  So that background check is kind of a minimal

4    background.  Of course, tax compliance is a priority of the

5    background or suitability check, just to verify that the

6    business exists and that's there's no -- anything that would

7    preclude that business from operating properly in the

8    community.

9    **Q**    Okay.  Could you give us some examples of information that

10   would cause the IRS not to award an EFIN number to a person

11   because they were not suitable?

12   **A**    Perhaps if the person that owns the business may be a

13   felon, a convicted felon, that could prevent them from

14   obtaining an EFIN.

15   **Q**    Is there anything in that suitability check that has to do

16   with the credentials of the taxpayer in terms of his or her

17   knowledge of the tax laws, as an example?

18   **A**    Not particularly, sir.

19   **Q**    Okay.  Then you talked about a PTIN number, right?

20   **A**    Yes, sir.

21   **Q**    That's the actual preparer's identification number, the

22   tax preparer's identification number; is that right?

23   **A**    Yes, it is.

24   **Q**    What are the requirements for a tax preparer to receive

25   the PTIN designation?

1   **A**    So similar to the EFIN application, they can apply online,

2   submit their information, that they want to prepare taxes in

3   the community for a fee, and then the IRS would conduct a

4   suitability check on that person based on their Social Security

5   number and other background information and grant the PTIN or

6   not.

7   **Q**    Would that suitability check be almost identical to the

8   EFIN suitability check?

9   **A**    It's very similar, sir.  We're not talking about like a

10  classified security check, you know, suitability check or

11  background investigation but just basic information, such as if

12  you were applying to be a soccer coach in the community.  Some

13  of that information would be similar.

14  **Q**    You give that as an analogy.  With that analogy, it would

15  be true, as an example, that if you wanted to be a soccer

16  coach, what you're saying is a suitability check may do with

17  whether or not that person is a convicted felon but perhaps not

18  whether or not he's suited to be a coach?

19  **A**    Yeah, I mean, some systems are not 100 percent reliable or

20  accurate.  But regardless if the PTIN was issued, it passed the

21  test --

22  **Q**    Yes, sir.  I want to make sure, Mr. Bolus, that I'm

23  understanding it properly.  What you're saying, if I understand

24  it, is that there's no check as far as the IRS is concerned per

25  the EFIN and PTIN to check whether or not that person is really

1    qualified with knowledge about how to go about preparing

2    somebody's tax returns.  Is that a fair statement?

3    **A**    Yes, it is, sir.

4    **Q**    Okay.  You've already testified that -- and there's

5    evidently some documents that you examined that indicate when a

6    taxpayer has not filed returns; is that right?

7    **A**    That's correct, sir.

8    **Q**    In your experience, has there ever been any time where tax

9    returns were actually received by the IRS but for whatever

10   reason, such as perhaps employees of the IRS throwing tax

11   returns in a basket or trash can, that the actual returns never

12   did get recorded?

13   **A**    I don't personally know of any instances of that, sir.

14   **Q**    Okay.  You testified there's a new system at the IRS which

15   does not permit the IRS employees to batch more than 15 pages

16   at a time.

17   **A**    It's a temporary glitch in the system.  It's more like --

18   because the system was -- updates every year to prepare us for

19   the new tax year of batches coming into us.  So the system

20   didn't quite allow us to print more or voluminous tax

21   returns.

22   **Q**    Okay.  Without getting too technical about it, would it be

23   better, if you would, that the system would allow every single

24   page of a particular return to be printed in one batch rather

25   than in segments of 15?

1   **A**     Well, I mean, it's less of a headache.

2   **Q**     Right --

3   **A**     -- the person that's downloading the information.  Because

4   now we have to click on the brackets of information and then go

5   back and click the second bracket to gain the additional

6   pages.

7   **Q**     Perhaps that glitch may be fixed by the time we get around

8   to the next tax year?

9   **A**     Yes, sir.  My group in particular is pushing hard to get

10  this resolved.

11  **Q**     Understood.  You examined, if I understand it -- this is

12  in Exhibit 53, I believe.  You were asked to look at that

13  Exhibit 53 and, if I understand it, it's a publication?

14  Exhibit 53 is a publication?

15  **A**     Yes, sir, it is.

16  **Q**     And do you recall what that publication was for?

17  **A**     I believe it was the 2015 Form 1040.

18  **Q**     Okay.  Am I accurate to say that publication is 105 pages

19  long?

20  **A**     If I remember right, it is, sir.

21  **Q**     Yeah.  And that's a publication that all of us could get

22  in order for us to figure out how to use the 1040?

23  **A**     Yes, sir.

24  **Q**     106 pages.

25  **A**     Yes, it is.

Cross - Bolus                                    Vol. II-31

1   **Q**    Then Exhibit 54 is another publication.  I think that's

2   for the 1040 as well but for a subsequent year?

3   **A**    Yes, it is for 2016.

4   **Q**    2016.  And that one is 106 pages long?

5   **A**    You're probably right on that one, sir.  I can't recall

6   the actual amount.

7   **Q**    Again, that's a publication so all of us can sit down and

8   read 106 pages to figure out how to fill out the 1040; is that

9   accurate?

10  **A**    Yes, sir.

11  **Q**    And then I think the same thing for 2017?

12  **A**    Yes, it is.

13  **Q**    If I understand it, Exhibit 85A, which you looked at, was

14  a publication for business expenses?

15  **A**    Yes, sir.

16  **Q**    That publication is 52 pages long; is that right?

17  **A**    Yes, sir.

18  **Q**    Exhibit 85B, if I understand it, is for home business

19  expenses; is that correct?

20  **A**    Yes, it is, sir.

21  **Q**    That's 34 pages long?

22  **A**    Yes, sir.

23  **Q**    And again, that is -- for those who want to read it --

24  it's to help those people understand through those 34 pages how

25  to fill out another form which deals with home business

1    expenses; is that right?

2    **A**    Yes, it is, sir.

3    **Q**    Exhibit 85C, I believe, is a form that deals with -- or

4    publication that deals with how and when to take

5    depreciation --

6    **A**    The instructions --

7    **Q**    Is that right?

8    **A**    Yes, sir.

9    **Q**    And that's 113 pages long; is that right?

10   **A**    Yes, it is, sir.

11   **Q**    And that publication is designed to help all of us,

12   through reading 113 pages, figure out how it is and what it is

13   that we're able to depreciate on our tax returns; is that

14   right?

15   **A**    Yes, sir.

16   **Q**    You had been shown by counsel some documentation as to a

17   taxpayer named Debra Cannon.  Do you recall that just a few

18   minutes ago?

19   **A**    Yes, I do, sir.

20   **Q**    You have no knowledge at all as to the accuracy of any

21   numbers that were shown to you this morning; is that right?

22   **A**    That's correct.  I only know what was submitted to the IRS

23   over the internet.

24   **Q**    Yes, sir.

25          MR. RUTER:  With that, I have no other questions.

1    Thank you, sir.

2              THE COURT:  Thank you very much.  Any redirect?

3              MR. COFER:  One moment, please, Your Honor.

4              Just briefly, Your Honor.

5              THE COURT:  Okay.

6              MR. COFER:  Could we please, Mr. Mahoney, pull up

7    Exhibit 4A.

8                       **REDIRECT EXAMINATION**

9    **BY MR. COFER:**

10   **Q**    Mr. Bolus, you were describing the issue with some of the

11   returns where it's 15 pages at a time?

12   **A**    Yes, sir.  We had to split up the download basically.

13   **Q**    Right.  Could you please look up at the top right corner

14   of this one.  This is Exhibit 4A.

15   **A**    Yes, sir.

16   **Q**    Could you read the page range there.

17   **A**    Yes, page 1 of 53.

18   **Q**    Could you look at the DLN as well.

19   **A**    The DLN begins with 14, ends with 4766.

20             MR. COFER:  Mr. Mahoney, could we please publish

21   Exhibit 4B, that first page.

22   **Q**    Mr. Bolus, could you read the DLN again for this exhibit.

23   **A**    Yes, sir.  It starts with 14 and ends with 4766.

24   **Q**    Is that the same DLN as the previous exhibit?

25   **A**    Yes, it is.

 1   **Q**    So 4A and 4B, we're talking about the same return?

 2   **A**    Yes, sir.

 3   **Q**    Is it possible that the chunks for some employees could go

 4   up to around 50 pages?

 5   **A**    Yes, sir.  15 is what the system tells us, but if we click

 6   them all it may include subsections or subschedules so that

 7   they all get in the print bracket.

 8   **Q**    Okay.  So just to clarify, 4A and 4B are the same

 9   return?

10   **A**    Yes, they are, sir.

11            MR. COFER:  All right.  Nothing further, Your

12   Honor.

13            THE COURT:  Nothing else?

14            MR. RUTER:  No, thank you.

15            THE COURT:  Thank you, Mr. Bolus.  We appreciate you

16   coming to testify.  You can step out now.

17            Ladies and gentlemen, as I mentioned, we take a

18   mid-morning and mid-afternoon break, but when we're changing

19   witnesses, there's sometimes an opportunity to stand up and

20   stretch, move around a little bit, get the circulation going so

21   you can always feel free to do that.

22            While you're doing that, Mr. Morgan, is there another

23   witness?

24            MR. MORGAN:  The United States calls Darlene Hall.

25            THE COURT:  Okay.

```
 1              THE CLERK:  Ms. Hall, please come forward.  Please

 2   walk towards me.  Remain standing and please raise your right

 3   hand.

 4              DARLENE HALL, GOVERNMENT'S WITNESS, SWORN

 5              THE CLERK:  You may be seated, please.  Speak clearly

 6   into the microphone.  Please state your first and last name.

 7              THE WITNESS:  Darlene Hall.

 8              THE CLERK:  And spell your first and last name for

 9   the record.

10              THE WITNESS:  D-a-r-l-e-n-e, Hall, H-a-l-l.

11              THE CLERK:  Thank you, ma'am.

12              THE COURT:  Go ahead, Mr. Morgan.

13              MR. MORGAN:  Thank you, Your Honor.

14                         DIRECT EXAMINATION

15   BY MR. MORGAN:

16   Q    Good morning, Ms. Hall.

17   A    Good morning.

18   Q    Are you currently employed?

19   A    No, I'm retired.

20   Q    When did you retire?

21   A    In 2009.

22   Q    Prior to your retirement, where did you work?

23   A    U.S. Department of Housing and Urban Development, Office

24   of Inspector General.

25   Q    What did you do there?
```

1   **A**   I was the Freedom of Information Act officer.

2   **Q**   In that role, what were your duties?

3   **A**   Well, the public write in for particular documents, and I

4   reviewed them and redact them accordingly.

5   **Q**   Are you married?

6   **A**   Yes, I am.

7   **Q**   Did your husband work?

8   **A**   Yes.

9   **Q**   Is he working currently?

10   **A**   He's retired as well.

11   **Q**   When did he retire?

12   **A**   In 2015.

13   **Q**   How far did you get in school?

14   **A**   High school, graduated from high school, one year of

15   business school.

16   **Q**   Did you ever receive any specific training in taxes and

17   tax preparation?

18   **A**   No.

19   **Q**   Did you ever take any classes about taxes or tax

20   preparation?

21   **A**   No.

22   **Q**   Have you ever prepared your own taxes?

23   **A**   No.

24   **Q**   So do you use a tax preparer?

25   **A**   Yes.

1   **Q**    Why do you use a tax preparer rather than doing it

2   yourself?

3   **A**    Because I don't know anything about taxes.  I don't know

4   how to do them.

5   **Q**    Do you know an individual named Ronald Watson?

6   **A**    Yes.

7   **Q**    Do you see him here in the courtroom today?

8   **A**    Yes.

9   **Q**    Could you please identify him by an article of clothing.

10  **A**    Sitting with a black suit on.

11         MR. MORGAN:  Your Honor, I would ask that the record

12  reflect that the witness has identified the defendant,

13  please.

14         THE COURT:  Yes.

15         MR. RUTER:  No objection, Your Honor.

16         THE COURT:  Yes, it will.

17         MR. MORGAN:  Thank you.

18  BY MR. MORGAN:

19  **Q**    How do you know him?

20  **A**    He was referred to me to do my tax one year.

21  **Q**    By whom was he referred?

22  **A**    He was referred to me by my brother.

23  **Q**    And do you remember about how long he was your tax

24  preparer?

25  **A**    He was for several years.

1  **Q**   Can you describe your relationship with Mr. Watson.  Did

2  you know him outside of tax preparation?

3  **A**   No, I did not.

4  **Q**   About how many times per year would you speak with him?

5  **A**   Just once a year whenever he did my taxes.

6  **Q**   Where did you meet with him?

7  **A**   The first -- I think it was the very first time he came to

8  my house.  After that, I always met with him at his office in

9  Landover.

10  **Q**   That's here in Maryland?

11  **A**   Yes.

12  **Q**   Do you live here in Maryland as well?

13  **A**   Yes.

14  **Q**   The office, can you describe what the office looks like.

15  **A**   You come in -- I forgot what floor it was on, but there

16  was a receptionist there.  It was a well-established business.

17  Receptionist there; I went in and gave her my name and sat down

18  and wait for Mr. Watson to come out and bring me in.

19  **Q**   When you came to his office each year, did you bring any

20  paperwork with you?

21  **A**   Yes, I brought my taxes, my --

22  **Q**   Like what kind of documents would you bring with you from

23  your house to the office?

24  **A**   Like the -- my mortgage interest and paperwork that showed

25  that I gave to charity and, you know, things like that.

1    **Q**    When you were in the office, did you ever work with

2    anybody other than Mr. Watson?

3    **A**    It was only Mr. Watson.

4    **Q**    And approximately how long did these meetings last?

5    **A**    About 40, 45 minutes.

6    **Q**    Did you file your taxes jointly with your husband?

7    **A**    Yes.

8    **Q**    Was your husband with you during these meetings as well?

9    **A**    No.

10   **Q**    During those meetings, did you ever see Mr. Watson, to

11   your recollection, take any notes?

12   **A**    Yeah, sometimes he would write down something, or else he

13   would turn around and do whatever he do on the computer.

14   **Q**    Were you able to see what he was writing on the notes?

15   **A**    No.

16   **Q**    When you say turn around and use the computer, describe

17   the office itself.

18   **A**    When you walk in, it was a small office.  His computer was

19   in the back of him.  When he talked to me, he had to turn

20   around and face me.

21   **Q**    Was this a desk in between the two of you?

22   **A**    There was a desk, yeah.

23   **Q**    Were you able to read the text clearly that was on the

24   computer screen behind him?

25   **A**    No.

1   **Q**   So were you able to tell what information he was putting

2   into the computer?

3   **A**   No, I was not.

4   **Q**   Did you have a business?

5   **A**   No.

6   **Q**   And how were you earning money or getting money in 2015,

7   2016 and 2017?

8   **A**   I was retired from the federal government.

9   **Q**   Did you get any money any other way?

10  **A**   Every so often -- I was babysitting for my daughter and

11  she would give me money here and there, but it wasn't nothing

12  substantial.

13  **Q**   Can you describe -- when you talk about babysitting your

14  grandchildren, can you describe what you did for them

15  specifically?

16  **A**   Well, I picked them up from school every day, Monday

17  through Friday, brought them to my house or else took them to

18  their house and fed them.  That was the extent of it.

19  **Q**   And for how long did you do that?

20  **A**   For years.  My oldest is 17 so I practically did it the

21  whole time, you know, when she first started school pretty

22  much.

23  **Q**   Are you still doing it to this day?

24  **A**   Yes.

25  **Q**   Would you pick them up from school every day of the week

1    typically?

2    **A**    Yeah, Monday through Friday, uh-huh.

3    **Q**    Where is their school?

4    **A**    It's in D.C.

5    **Q**    How far --

6    **A**    Over the years it's been several places, but right now

7    it's in D.C.

8    **Q**    That was true for 2015 and '16 and '17 as well --

9    **A**    Yeah, I think so, yeah.

10   **Q**    Approximately how long would it take you to get from your

11   house to the school?

12   **A**    Maybe about 35 to 40 minutes.

13   **Q**    And approximately when would you pick them up?

14   **A**    Around 3:30, quarter to 4:00.

15   **Q**    Then you would take them back to your house?

16   **A**    Mm-hmm.

17   **Q**    Or sometimes you would take them to their own house?

18   **A**    Mm-hmm.

19   **Q**    If you took them back to your own house, approximately

20   what time would your daughter come to pick up your

21   grandchildren?

22   **A**    Maybe around 6:30, 7:00.

23   **Q**    Okay.  So you would typically watch the children for about

24   two to three hours; is that what you're saying?

25   **A**    Uh-huh.

1   **Q**    Were you paid for this?

2   **A**    No.  Like I said, every once in a while, my daughter gave

3   me money in cash but I never -- you know, nothing

4   substantial.

5   **Q**    Would you be able to approximate how much you received

6   from your daughter?  Could you guess about how much?

7   **A**    Somewhere around -- she would give me like $100 a month

8   but it wasn't every month.  So maybe around 6-, 700, if that.

9   **Q**    Why did you do this?  Why did you pick up the children and

10  watch them after school?

11  **A**    Well, they're my grandkids and that's what my daughter --

12  she needed the help.

13  **Q**    So you weren't doing it to make money?

14  **A**    No.

15  **Q**    You weren't doing it to operate a business?

16  **A**    No.

17  **Q**    Would you have done it for free?

18  **A**    Of course, yeah.

19  **Q**    So did you tell Mr. Watson about this activity?

20  **A**    Yes, I did.

21  **Q**    Can you please describe those conversations that you had

22  with him about that.

23  **A**    Well, when we sat down, first thing he asked me if I had a

24  business.  I said no.  I said, "Only thing I do is take care of

25  my grandchildren; I have two."  That's what the extent of it,

1    you know.  I don't have a business.

2    **Q**    Did he ask you about any expenses that you might have had

3    related to taking care of your grandkids?

4    **A**    Yes.

5    **Q**    Tell us about --

6    **A**    So I tried to tell him what expenses that I had because he

7    specifically asked me, you know.

8    **Q**    Can you give some examples of the types of expenses that

9    he would ask about?

10   **A**    Basically how much gas did I use going back and forth, how

11   far was the school.  If I used, like, electricity or different

12   things in the household, you know.

13   **Q**    Would you sometimes feed the children as well?

14   **A**    Yeah, uh-huh.

15   **Q**    Would he ask about expenses related to that?

16   **A**    Well, he just asked whatever expenses I incurred in taking

17   care of my grandchildren.

18   **Q**    So typically after you have these conversations with

19   Mr. Watson during your meeting, what happened at the end?

20   Would you receive paperwork?

21   **A**    Yes, he would fix my tax papers up and give them to me to

22   sign or whatever.

23   **Q**    Did you sign it?

24   **A**    Yeah.

25   **Q**    And did he go over the tax return with you before you

1   signed it?

2   **A**     No, no.

3   **Q**     What, if anything, did he say to you during this

4   process?

5   **A**     Well, really wasn't saying anything.  He just did my tax

6   papers and asked me to sign it, you know.  I didn't really

7   review it, you know.  He didn't go over step by step what he

8   was doing.

9   **Q**     Would he tell you how much, if any, refund you were going

10  to get back?

11  **A**     Yeah, it was on the tax paper.  Uh-huh.

12  **Q**     Do you recall how he got paid for this service?

13  **A**     You know, I'm not sure because I don't know whether he got

14  paid before I got my tax stuff.  I don't know how he got paid,

15  I really don't.  Because I didn't write him a check or anything

16  like that.

17  **Q**     How did you receive your refund if you --

18  **A**     It went directly to my bank.

19  **Q**     I'd like to please show you Exhibit No. 29.

20          MR. MORGAN:  If we could enlarge the top portion,

21  please, from where it says 1040 down through -- that's fine,

22  thank you.

23  **Q**     Do you see this, ma'am?

24  **A**     Uh-huh, yes.

25  **Q**     Do you see at the top where it says Form 1040, U.S.

1   Individual Tax Return, 2015?

2   **A**    Uh-huh.

3   **Q**    Under that there are some names listed.  Do you see the

4   names?

5   **A**    Robert W. and Darlene Hall.

6   **Q**    Is that your name and your husband's name?

7   **A**    Yes.

8           MR. MORGAN:  If we could please enlarge line 12.

9   **Q**    Do you see here this Income section and line 12, do you

10  see line 12?

11  **A**    Yes.

12  **Q**    Could you please read the text next to line 12.

13  **A**    "Business income or loss.  Attach Schedule C or C-EZ."

14  **Q**    Is there an amount in the box associated with number 12

15  for business income or loss?

16  **A**    $37,929 negative.

17  **Q**    Negative 37,929?

18  **A**    Uh-huh.

19  **Q**    Did you provide Mr. Watson with this number?

20  **A**    No.

21  **Q**    Did he explain anything to you about business losses?

22  **A**    No.

23          MR. MORGAN:  Could we please go to page 22 of

24  Exhibit 29, please.  At the top, please enlarge the portion

25  there, please.  Thank you.

1    **Q**    Do you see this at the top where it's Schedule C, Form

2    1040, Profit or Loss From Business, year 2015?  Do you see the

3    top?

4    **A**    Yes.

5    **Q**    Underneath that there's a box that says "name of

6    proprietor".  Do you see where it says name of proprietor?

7    **A**    Yes.

8    **Q**    Who is the proprietor of the business for this

9    Schedule C?

10   **A**    Darlene D. Hall, me.

11   **Q**    Underneath that on line A where it says, "Principal

12   business or profession, including product or service," is there

13   something entered in there?

14   **A**    It says, "Child day care services."

15   **Q**    For the business name at line C, is there a business name

16   listed there?

17   **A**    Darlene Hall.

18          MR. COFER:  If we could scroll down to the Expenses

19   section -- actually, please stop there.

20   **Q**    Do you see Part I where it's titled Income?

21   **A**    Yes.

22   **Q**    Line 1 says, "Gross receipts or sales."  Do you see that

23   portion?

24   **A**    Yes.

25   **Q**    For box No. 1, is there an amount listed there for gross

1    receipts or sales --

2    **A**    It's $600.

3    **Q**    Thank you.

4            MR. MORGAN:  Moving down, Mr. Mahoney, to Part II,

5    Expenses.

6    **Q**    Do you see Part II where it says Expenses, "Enter expenses

7    for business use of your home only on line 30"?  Do you see

8    that at the top?

9    **A**    Yes.

10   **Q**    I'd like to turn your attention to line No. 15.  Do you

11   see that there on the left?

12   **A**    Yes.

13   **Q**    What's the text next to line 15?

14   **A**    "Insurance, other than health."

15   **Q**    Is there a number associated with the insurance in box

16   15?

17   **A**    2,000.

18   **Q**    Did you have any insurance related to taking care of your

19   children in --

20   **A**    No, I did not.

21   **Q**    What kind of insurance did you have at all that year?

22   **A**    I had health insurance, my husband and I, and of course

23   mortgage insurance.

24   **Q**    Did you speak with Mr. Watson about your homeowner's

25   insurance or mortgage?

1   **A**    No, no.

2   **Q**    Did you provide him with that $2,000 figure for this?

3   **A**    No.

4   **Q**    Do you remember him discussing that $2,000 of expenses

5   there with you?

6   **A**    No, no.

7   **Q**    Next I'd like to direct your attention, please, over to

8   line 20.  Do you see line 20 where it says "rent or lease,"

9   sort of on the right-hand side?

10  **A**    Yes.

11  **Q**    For 20b where it lists "other business property," do you

12  see that line as well?

13  **A**    Yeah.

14  **Q**    Is there an amount associated with 20b in that box?

15  **A**    $4,500.

16  **Q**    All right.  Did you rent or lease anything at all in

17  2015?

18  **A**    No.

19  **Q**    Did you tell Mr. Watson that you rented or leased $4,500

20  worth of other business property for a business or profession

21  for child day care services?

22  **A**    No.

23  **Q**    Did Mr. Watson tell you he was putting that number on the

24  form?

25  **A**    No.

1   **Q**   Did he review this form with you before it was filed?

2   **A**   No.

3   **Q**   Do you own your home?

4   **A**   Yes.

5   **Q**   Do you own your car?

6   **A**   Yes.

7   **Q**   Line 27a where it says "other expenses," do you see that,

8   ma'am?

9   **A**   Yes.

10   **Q**   Is there an amount associated with 27a?

11   **A**   $2,010.

12   **Q**   27a says "other expenses from line 48."  So let's take a

13   look at line 48.  If we go down to page 23 of this exhibit,

14   which I believe is just the next page.  Down at the bottom,

15   Part V.  This is Part V, Other Expenses; do you see that?

16   **A**   Yes.

17   **Q**   What's listed here in this table?

18   **A**   Groceries, 360.  Gas, 360.  Materials and supplies, 90.

19   And cell phone, 1,200.

20   **Q**   Are these some of the things Mr. Watson asked you about

21   that you were mentioning earlier?

22   **A**   Yes, uh-huh.

23   **Q**   So you would provide him with some of the numbers --

24   **A**   Yes.

25   **Q**   -- for some of your expenses?

1    **A**    Uh-huh.

2    **Q**    What's the total expense there listed down at line --

3    **A**    2,010.

4    **Q**    Are these amounts listed here, are those amounts of

5    expenses that you incurred taking care of your grandchildren,

6    or are these just your total bills for the year for any of

7    that?

8    **A**    I think it might have been a percentage of what I did to

9    take care of my -- take care of the kids, but I provided them

10   because he asked me to, you know.

11   **Q**    Okay, thank you.

12   **A**    I don't think -- it wasn't $2,000 worth, but I probably

13   did provide him some.

14   **Q**    Did he ever speak with you about something called

15   depreciation?

16   **A**    No.

17          MR. MORGAN:  If we could please go to Exhibit No. 29,

18   page 12, and enlarge the top portion, please.  Thank you.

19   **Q**    Do you see at the top where it says Form 5642 [sic],

20   Depreciation and Amortization for 2015?

21   **A**    Uh-huh.

22   **Q**    Do you see that?

23   **A**    Uh-huh.

24   **Q**    Underneath names, what are the names listed there?

25   **A**    Robert W. and Darlene D. Hall.

 1    **Q**    The next box says, "Business or activity to which this

 2    form relates."  What is the business or activity?

 3    **A**    "Child day care services."

 4    **Q**    Again, did you have a child day care service?

 5    **A**    No, just my grandchildren.

 6    **Q**    Part I, line No. 6.

 7          MR. MORGAN:  Could we scroll down to see line 6 a

 8    little better, please.  Thank you.

 9    **Q**    It says 6a, "description of property."  What is the

10    description of the property there?

11    **A**    Lexus.

12    **Q**    In column (b) do you see where it says, "Cost, business

13    use only"?  What's listed there?

14    **A**    38,000.

15    **Q**    And in (c) the "elected cost"?

16    **A**    10,000.

17    **Q**    Is this the vehicle that you would use to pick up your

18    grandchildren?

19    **A**    Yes.

20    **Q**    Did you use any other car in 2015 for your own purposes?

21    **A**    No, basically just my car.

22    **Q**    Did you use this vehicle for anything other than picking

23    up your children -- grandchildren?

24    **A**    It was the only car I had, yeah.  I used it for whatever

25    else I needed to do, uh-huh.

1    **Q**    About what percentage of your use of the car do you think

2    you used in order to pick up your grandchildren and take them

3    where they needed to go?

4    **A**    Compared to all my daily tasks, I guess it's maybe 5

5    percent or something, I don't know.

6    **Q**    Okay.  Do you recall having a discussion with Mr. Watson

7    about this, about the Lexus?

8    **A**    Yeah, he asked me certain questions about the car.  Like I

9    said, anything that I used for the children, you know.

10            MR. MORGAN:  I'd like now to turn to Exhibit 30.

11   Please enlarge that.  Thank you.

12   **Q**    Do you see here at the top, this is Form 1040 for U.S.

13   Individual Income Tax Return for the year 2016; do you see

14   that?

15   **A**    Uh-huh, yes.

16   **Q**    And the name underneath there?

17   **A**    Robert W. and Darlene D. Hall.

18   **Q**    If we could scroll down, please, to line 12.  In the

19   Income section here, do you see line 12, "Business income or

20   loss"?  Do you see that?

21   **A**    Yes.

22   **Q**    And it says, "Attach Schedule C."  Do you see that?

23   **A**    Yes.

24   **Q**    And the amount associated with line 12 that's in box 12?

25   **A**    Negative $22,921.

1    **Q**    Did you have a business in 2016?

2    **A**    No.

3    **Q**    Did you tell Mr. Watson that you had a business in 2016?

4    **A**    No, I did not.

5    **Q**    Did you have business losses of $22,921?

6    **A**    No.

7    **Q**    Did you tell Mr. Watson that you had losses of that for --

8    **A**    No, I did not.

9    **Q**    -- for some sort of business that year?  Did Mr. Watson

10   tell you that he had put this number here on the 1040 form?

11   **A**    No.

12   **Q**    Did he go over this 1040, the numbers on the 1040 with you

13   at all?

14   **A**    No.

15            MR. MORGAN:  This same Exhibit 30, please go to page

16   20, please, to see the Schedule C.  At the top, if we could

17   enlarge that.  Thank you.

18   **Q**    Do you see here this is Schedule C Form 1040 for Profit or

19   Loss from Business for the year 2016.  Do you see that at the

20   top?

21   **A**    Uh-huh, yes.

22   **Q**    Here I'd like again to look, is there anything written

23   under "name of proprietor"?

24   **A**    Darlene D. Hall.

25   **Q**    And in line A, the "principal business or profession,

1   including product or service," what's listed there?

2   **A**    Child day care services.

3   **Q**    And line C where it says, "Business name.  If no business

4   name, leave blank," is there anything written there?

5   **A**    Darlene Hall.

6              MR. MORGAN:  If we could remove the enlargement for a

7   second.

8   **Q**    Did you yourself have any business expenses at all that

9   year?

10  **A**    No.

11  **Q**    I'm going to take a look at several of them in Expenses

12  section, Part II, that are listed here on this form.

13  Specifically again, line 20 where it says "rent or lease" and

14  then 20b where it says "other business property," can you

15  please tell the jury what number is in 20b.

16  **A**    $4,500.

17  **Q**    Did you rent or lease anything at all that year --

18  **A**    No.

19  **Q**    -- for any purpose?

20  **A**    No.

21  **Q**    Did you tell Mr. Watson that you had rented or leased

22  something for $4,500?

23  **A**    No.

24  **Q**    Or did you have any business property that was rented or

25  leased or anything?

1    **A**     No.

2    **Q**     Do you recall Mr. Watson speaking with you about anything

3    having to do with renting business property or leasing business

4    property?

5    **A**     No.

6    **Q**     The line right underneath of that, line 21, do you see

7    that there?  What does that say?

8    **A**     "Repairs and maintenance, $950."

9    **Q**     Did you have $950 worth of any kinds of repairs or

10   maintenance related to some business --

11   **A**     No, no.

12   **Q**     -- or business expense?

13   **A**     No.

14   **Q**     Did you have $950 of repairs and maintenance related to

15   taking care of your grandchildren?

16   **A**     No.

17   **Q**     Do you recall speaking with Mr. Watson about this

18   figure --

19   **A**     No.

20   **Q**     -- or anything having to do with repairs or maintenance

21   for a business or looking after the grandchildren?

22   **A**     No.

23   **Q**     Did you know that he had put these numbers on the form?

24   **A**     No.

25          MR. MORGAN:  If we could please turn to Exhibit 31.

1    At the top, please, if we can enlarge.

2    **Q**    Again, do you see at the top here this is a Form 1040,

3    U.S. Individual Income Tax Return for the year 2017?  Do you

4    see this form?

5    **A**    Yes.

6    **Q**    And the name listed there in the box underneath of it?

7    **A**    Robert W. and Darlene D. Hall.

8         MR. MORGAN:  If we can scroll down to line 12,

9    please.  Actually, if we could stop there for just one

10   second -- no, thank you.  Line 12 is great.

11   **Q**    Line 12 says, "Business income or loss, attach

12   Schedule C."  Is there a number there for business income or

13   loss in box 12?

14   **A**    Negative $26,487.

15   **Q**    Did you incur a business loss in 2017 of $26,487?

16   **A**    No.

17   **Q**    Did you have a business at all that year?

18   **A**    No.

19   **Q**    Did you tell Mr. Watson that you had?

20   **A**    No.

21        MR. MORGAN:  Please turn to page 34 of this

22   Exhibit 31.  I'm sorry, if we could scroll up to the

23   Schedule C, please.  Thank you.  This is page 26 of Exhibit 31.

24   **Q**    Schedule C, Form 1040, the Profit or Loss from Business

25   for tax year 2017.  Do you see this form?

1    **A**    Yes.

2    **Q**    Is there a name of proprietor listed there?

3    **A**    Darlene D. Hall.

4    **Q**    The principal business or profession?

5    **A**    Child day care services.

6    **Q**    And business name?

7    **A**    Darlene Hall.

8    **Q**    Did you speak with Mr. Watson about any business expenses

9    at all related to child day care -- day care services?

10   **A**    No.  None other than when he asked me about and I would

11   tell him, like, groceries or whatever and picking them up back

12   and forth, you know.  That's the only thing that I had.

13   **Q**    To look after your grandchildren?

14   **A**    Uh-huh.

15   **Q**    But did he tell you that he was putting this on a

16   Schedule C for Profit or Loss from Business?

17   **A**    No.

18   **Q**    And that he was -- did he tell you that he put on line A

19   that the principal business or profession was child day care

20   services?

21   **A**    No.

22        MR. MORGAN:  If we could scroll down to line 15,

23   please.  I apologize, if we could go back up to Part I here.

24   Thank you.

25   **Q**    Do you see Part I where it says Income?

1   **A**    Yes.

2   **Q**    And line 7 where it says "gross income," is there an

3   amount of income listed there in box 7?

4   **A**    800.

5   **Q**    Please scroll down to Part II, Expenses, "Enter expenses

6   for business use of your home only on line 30."  So looking at

7   line 15, did you have any insurance apart from your homeowner's

8   insurance?

9   **A**    No.

10  **Q**    And auto insurance?

11  **A**    No.

12  **Q**    Did you have any insurance related to taking care of the

13  children?

14  **A**    No.

15  **Q**    Do you recall telling Mr. Watson that you had $2,300 worth

16  of insurance related to this activity?

17  **A**    No.

18  **Q**    Line 27, "other expenses," is there an amount there in

19  27a?  Do you see that?

20  **A**    Yes.

21  **Q**    What is the amount in box 27a?

22  **A**    6,800.

23  **Q**    If we could scroll down, please, to the next page.  And

24  the box down at the bottom, Part V, where it says Other

25  Expenses, do you see those?

1    **A**     Yes.

2    **Q**     Are these some of the expenses that you would discuss with

3    Mr. Watson regarding taking care of your grandchildren?

4    **A**     He would ask me groceries, gas and cell phone, and he was

5    doing percentages, you know.  I don't -- but I never saw these

6    amounts.

7    **Q**     Okay.  Did you ask Mr. Watson to put these numbers on this

8    form and submit it to the IRS?

9    **A**     No, because I didn't look at the form.  I didn't see the

10   form.

11   **Q**     And he didn't go over it with you?

12   **A**     No.

13          MR. MORGAN:  Thank you.  You can take this down.

14          THE COURT:  Mr. Morgan, I think it might be time for

15   the mid-morning break.  Is that okay with you?

16          MR. MORGAN:  Your Honor, I have maybe about two

17   minutes' worth of questions, and then I'll be done with my

18   direct.

19          THE COURT:  Okay, we can do that.

20          MR. MORGAN:  Thank you.

21   BY MR. MORGAN:

22   **Q**     Did you think your taxes were done correctly?

23   **A**     I thought they were because I thought he was doing

24   whatever -- being that I didn't look at anything, I thought he

25   was doing -- it was his expertise.  I didn't know anything at

1    all about taxes so I just thought that I trusted him.

2    **Q**    So what happened at the end of each meeting?  Did you sign

3    the documents that he showed you?

4    **A**    Excuse me?

5    **Q**    Did you sign the documents at the bottom --

6    **A**    Yes, uh-huh.

7    **Q**    Were you aware of the sentence above your signature about

8    perjury?

9    **A**    I didn't look at -- I just signed the documents.  He

10   brought them to me and that was fine print.  And I know you

11   should read the fine print but I didn't.

12   **Q**    Okay.

13   **A**    And besides that, I didn't know -- I just trusted him and

14   thought it was right anyway.

15   **Q**    When is the last time you spoke with him?

16   **A**    The last tax that he did for me.

17   **Q**    And did he file your Maryland taxes as well as your

18   federal taxes?

19   **A**    Yes.

20   **Q**    Were you ever audited by the IRS?

21   **A**    Yes.

22   **Q**    Could you just briefly tell us what happened.

23   **A**    I was audited.  I was really quite surprised about it.

24   For federal, I had to pay over $10,000 and for state, something

25   around six.

1   **Q**    Did you pay that back?

2   **A**    Yes.

3          MR. MORGAN:  Thank you.  No further questions, Your

4   Honor.

5          THE COURT:  Okay.  We'll pick up with

6   cross-examination after the break so, ladies and gentlemen,

7   we'll take our mid-morning break.  Given that it's a short day,

8   we're going to try to keep it pretty tight.  We'll see you back

9   here at 10:45 ready to go, and we'll take it till no later than

10  noon.

11         Again, don't discuss the case among yourselves, or

12  don't do any outside research.  Just enjoy the break.  Thank

13  you.

14         THE CLERK:  All rise for the jury.

15     (Jury left the courtroom at 10:34 a.m.)

16         THE COURT:  We'll see you at 10:45.

17     (Recess taken at 10:34 a.m., until 10:45 a.m.)

18         THE COURT:  Thank you, everyone, for coming back

19  promptly.  I guess we will call the jury in.

20         MR. RUTER:  Your Honor?

21         THE COURT:  Yes.

22         MR. RUTER:  Before the jury is called, I want to

23  alert the Court that what I intend on doing is showing the

24  witness, without the jury seeing, some documents.  If she can

25  identify them, then I'll move for them to be admitted.  I want

1   to make sure that you understand there will be some documents I

2   put on the ELMO that are not for everyone's --

3           THE COURT:  So we will keep the jury's screen off

4   initially.

5           MR. RUTER:  Yes.  I think, Judge, the witness binder

6   is so big and heavy, it may be difficult for the witness to

7   find --

8           THE COURT:  That's fine.  Just say out loud who you

9   want to see the screen.

10          MR. RUTER:  Yes, Judge.

11          THE COURT:  Thank you.

12      (Jury entered the courtroom at 10:49 a.m.)

13          THE COURT:  Thank you, everyone.  Please be seated.

14   Welcome back.  We're about to begin the cross-examination of

15   Ms. Hall.  Mr. Ruter, go ahead when you're ready.

16          MR. RUTER:  Thank you, Your Honor.

17                      **CROSS-EXAMINATION**

18   **BY MR. RUTER:**

19   **Q**   Good morning, Ms. Hall.

20   **A**   Good morning.

21   **Q**   My name is Gerry Ruter, and I represent Mr. Watson.  Have

22   you and I ever met or spoken?

23   **A**   Excuse me?

24   **Q**   Have you and I ever met or spoken?

25   **A**   No.

1   **Q**    You have met with the Government, have you not, in order

2   to prepare for today's testimony?

3   **A**    Yes.

4   **Q**    When was the last time you met with the Government?

5   **A**    Last Tuesday, I believe.

6   **Q**    And that was with the prosecutors here?

7   **A**    Yes.

8   **Q**    And maybe one of the IRS agents; is that right?

9   **A**    Yes.

10  **Q**    Okay.  Nothing wrong with that, nothing inappropriate.

11  I'm just asking, about last Tuesday; is that right?

12  **A**    Uh-huh.

13  **Q**    Ma'am, you told us where you had worked before you

14  retired.  You also said that your husband has retired, but what

15  did he retire from?

16  **A**    From FEMA.  He worked at FEMA.

17  **Q**    What does FEMA stand for?

18  **A**    Federal Emergency Management Agency.

19  **Q**    Do you know what he did there?

20  **A**    He was a financial analyst.

21  **Q**    Okay.  Would it be fair to say he was a man who dealt with

22  numbers?

23  **A**    Not like that.  He was more on the management side.

24  **Q**    Okay.  So it's kind of -- let's say this.  Maybe it's a

25  bit too complex to have a conversation this morning about what

1    he did?

2    **A**    Well, I know his title was financial analyst.  I'm not

3    sure what he did -- he basically trained people on a program

4    that they had there.  And he went around different parts of the

5    country and trained them on the software.  That's what he

6    did.

7    **Q**    Understood.  Ma'am, how long did you work for HUD?

8    **A**    I think I worked for HUD about 16, 17 years, I think.  I'm

9    not sure.

10   **Q**    Okay.

11   **A**    Because I worked for three agencies during my whole

12   government tenure.

13   **Q**    So prior to HUD, you worked for a different -- was it a

14   federal agency?

15   **A**    Yeah.

16   **Q**    What agency would that have been?

17   **A**    I worked for Office of Management and Budget.  I did work

18   on the budget side, but I was mostly secretary at that time.

19   **Q**    How many years did you do that?

20   **A**    Oh, I don't know.  Something like 13 years, I believe.

21   **Q**    And then you worked for a different federal agency before

22   that?

23   **A**    Federal Home Loan Bank Board.

24   **Q**    How many years did you work there?

25   **A**    I think seven.

1    **Q**    How many?

2    **A**    Seven, I think.

3    **Q**    I am not good at adding, but that's about 37 to 40 years.

4    **A**    Yeah, I worked -- I believe it was 38 years in the federal

5    government.

6    **Q**    Okay.  Ma'am, during that entire time frame then, I think

7    it's your testimony that you never prepared your taxes on any

8    of those about 40 years?

9    **A**    No.

10   **Q**    And during those 40 years, did you then have a

11   professional tax preparer prepare those taxes, or did some

12   family member or some acquaintance help you?

13   **A**    It was different professional tax people during the

14   course, down through the years.

15   **Q**    Okay.  You told us that you had had Mr. Watson as your tax

16   preparer for several years; is that right?

17   **A**    Uh-huh.

18   **Q**    And that for most of the years, you went to his office; is

19   that also correct?

20   **A**    Yes.

21   **Q**    Do we understand that you met with a person other than him

22   or a receptionist, I guess, out front --

23   **A**    I just met with him.  I reported to the receptionist.

24   **Q**    Yes.  So when you showed up, you would report to a

25   receptionist who then would do what?  Was it a he or she --

1   **A**    Announced that I'm here.

2   **Q**    I'm sorry?

3   **A**    Announced that I was here.

4   **Q**    Okay.  Then you would just go back yourself or would she

5   take you back, or would Mr. Watson come out and get you?

6   **A**    Mr. Watson would come out and get me.

7   **Q**    If I understand it, it was kind of a small office?

8   **A**    Yes.

9   **Q**    And do you recall what was contained inside the office?

10  **A**    No, I don't recall.

11  **Q**    Would it be fair to say, however, you know there was a

12  chair that you sat upon?

13  **A**    Oh, yeah, a chair and a desk.  I don't even remember if --

14  I'm sure he had some certificates on the wall, whatever, but I

15  don't recall at the time what they exactly were.

16  **Q**    Right.  Can you recall about how large the desk would have

17  been that he sat behind?

18  **A**    I don't know.  I don't know measurements.  I'm not good

19  with numbers or measurements or anything.  It was just a

20  regular desk.  Nothing unusual or, you know.  Just a regular

21  medium-size desk.

22  **Q**    All right.  This is going to be another measurement

23  question.  About how many feet apart --

24  **A**    Oh, I don't know.  I don't know.

25  **Q**    All right.  You testified on direct, Ms. Hall, that you

1    would see him jotting down something on a piece of paper.

2    **A**    Uh-huh.

3    **Q**    And when you saw him jotting down something on a piece of

4    paper, can you tell us when he was doing that, would he do it

5    after he had asked you some kind of a question about

6    something?

7    **A**    Yes, uh-huh.

8    **Q**    So part of the engagement you had with him was him asking

9    you questions and you providing him answers?

10   **A**    Uh-huh, yes.

11   **Q**    Can you recall today what kinds of questions he asked

12   you?

13   **A**    Well, of course he asked me about a business.  I told him

14   I did not have a business; I do take care of my two

15   grandchildren.  Then it progressed to, well, what expenses do

16   you incur and that sort of thing.  But I don't remember

17   anything specific other than he was asking me about, you know,

18   what expenses.

19   **Q**    Okay.  Do you know what the definition of a business is?

20   **A**    Yeah, I know what a definition of a business is.

21   **Q**    And what is it?

22   **A**    Well, I mean, I know -- I can't say it in words, but I

23   know when somebody has a business.  But I told him I did not

24   have a business.  And whatever I provided to Mr. Watson was

25   what he asked for.

1   **Q**    Okay.  And you already told us some of the things that he

2   asked for.

3   **A**    Uh-huh.

4   **Q**    And you provided those to him?

5   **A**    Yes, some of the things I did --

6   **Q**    Yes.

7   **A**    Yeah, uh-huh.

8   **Q**    Did there ever come a time when you yourself prepared

9   numbers for him before you got to his office?

10  **A**    Well, I told him that -- when he asked me, I would -- I

11  had a sheet that I would give him of things that, you know, but

12  only upon his request when he asked me.  And I tried to provide

13  whatever he asked of me.

14  **Q**    Okay.  So, Ms. Hall, does that mean then that you and

15  Mr. Watson would have had perhaps a phone call before you came

16  in with a document, with things listed?

17  **A**    No, no.

18  **Q**    So when would you prepare the document?

19  **A**    It was all -- when he asked me and then each year, I

20  guess -- he asked me grocery, asked me electric bill and my

21  car, those sort of things.  That's what I figured he wanted.

22  The first couple of years, I didn't provide him with anything

23  like that.

24  **Q**    Okay.  So what you're saying is there came a time when,

25  without talking to Mr. Watson, you prepared documentation that

1    you thought he might want to have?

2    **A**    Well, yeah, with my -- he already had like my interest on

3    my home and the normal documents that you give.  I do charity

4    work -- I mean charity, my church and things like that that I

5    would give him.

6    **Q**    Yes, yes.  And you were still receiving some money from

7    your daughter; is that right?

8    **A**    Yeah, but that wasn't in the very beginning.  That's only

9    when he asked me if I had, you know, mm-hmm.

10   **Q**    But then there came a time without him asking you, you

11   prepared a document for him with notations about the fact that

12   you'd received money from your daughter?

13   **A**    That's because he originally asked me, and every year,

14   that's what I expected he wanted.  That's the only reason.

15   That's the only reason why if I prepared any documents, it's

16   because I knew that's what he would ask me for.

17   **Q**    Yes, ma'am, okay.  And, therefore, the numbers that you

18   have placed on the piece of paper or piece of papers in

19   subsequent years, those didn't come from him?  They came from

20   you?

21   **A**    No, not the numbers that I saw on these documents --

22   **Q**    Right.

23   **A**    -- as far as my loss and all that.  It wasn't nothing

24   extraordinary.  Whatever I provided to him, they were just

25   normal stuff taking care of my grandkids.

1   **Q**    Yes, understood.

2   **A**    Mm-hmm.

3   **Q**    We understand, I think, from your direct testimony that

4   when you were finished speaking with Mr. Watson and he was

5   working on that computer, he then gave you a finished tax

6   return with various papers attached to it; is that accurate?

7   **A**    Yes.

8   **Q**    Is it also accurate that he would then give you some kind

9   of a packet --

10  **A**    Yeah --

11  **Q**    -- where it may have had sleeves in it, and he put all the

12  paperwork inside that and then gave you the documents; is that

13  correct?

14  **A**    Yes.

15  **Q**    And to your knowledge, ma'am, did that repeat itself year

16  after year as you used his services?

17  **A**    Yes.

18  **Q**    Okay.  And you worked for about 40 years, and you had a

19  lot of tax materials that you had from year to year, all those

20  years, right?  You filed returns probably all 38 years you

21  worked?

22  **A**    Oh, yes, uh-huh.

23  **Q**    Did you keep any documentation as it relates to all those

24  tax years back in the '60s and '70s and '80s?

25  **A**    No.

1   **Q**    Okay.  Did you keep any of the documentation that

2   Mr. Watson had given you in 2015 or 2016 or 2017?

3   **A**    No, because I thought after like three years or something,

4   you could destroy them.  That's what I thought, yeah.

5   **Q**    Okay.  So when it comes to Mr. Watson's returns that he

6   did for you, to the best of your recollection, you don't have

7   today --

8   **A**    No.

9   **Q**    -- any documents at all --

10  **A**    No.

11  **Q**    -- that dealt with his preparation of those years 25,

12  26 [sic], 2017?

13  **A**    No.

14  **Q**    And you're pretty sure about that?

15  **A**    Yes.

16  **Q**    Okay.  As a matter of fact, I think you were asked by the

17  prosecutor -- tell me if I'm wrong -- and/or the agents as they

18  were speaking with you from time to time, they asked you

19  whether or not you had any documents, didn't they?

20  **A**    Yes.

21  **Q**    What did you tell them?

22  **A**    I told them I would go home and look to see what I had,

23  but I didn't have it.

24  **Q**    And you did look?

25  **A**    Yes.

1   **Q**   And you didn't find anything?

2   **A**   No.

3   **Q**   Ma'am, did your husband, Robert, ever attend the meetings

4   with Mr. Watson when the taxes were prepared?

5   **A**   No.  My husband is disabled and he's deaf, so most of the

6   time it was me going -- well, all the time.  I don't think my

7   husband ever went.

8   **Q**   Okay.  I think, Ms. Hall, I've seen some tax returns with

9   both your signature and your husband's signature.  Would that

10   be correct?

11   **A**   Yes.

12   **Q**   You always have filed a joint tax return with each

13   other?

14   **A**   Yes, yes.

15   **Q**   And that's true when Mr. Watson prepared those returns in

16   those three years I just mentioned; is that also correct?

17   **A**   Yes, uh-huh.

18   **Q**   Can you explain to the jurors how was it that Mr. Hall got

19   his signature on the return if he wasn't there when Mr. Watson

20   prepared the return?

21   **A**   Well, he authorized me that I could do that.

22   **Q**   Okay.  So you actually signed his name?

23   **A**   Yes.  My husband -- being that he's deaf, I'm authorized

24   to do a lot of things for my husband, even medical or

25   whatever --

1    **Q**    Yes, ma'am.

2    **A**    -- I'm authorized to do.

3    **Q**    I'm not faulting you, ma'am.  I'm just trying to figure

4    out how it happened.  Did you -- you signed the return while

5    you were in Mr. Watson's --

6    **A**    Yes, yes.

7    **Q**    -- presence, correct?

8    **A**    Yes.

9    **Q**    Then you signed your husband's signature as well; is that

10   correct?

11   **A**    Yes, uh-huh.

12   **Q**    You told us that you never paid Mr. Watson by check or by

13   cash?

14   **A**    No.

15   **Q**    Rather the money was taken out of the --

16   **A**    I guess -- I don't know how he was paid.  I never

17   physically paid him.

18   **Q**    Did he, to your knowledge, did he ever explain to you how

19   he was being paid?

20   **A**    No.

21   **Q**    Okay.  Did you know how much he was being paid?

22   **A**    No.

23   **Q**    You were shown Exhibit 29, and it was a 1040 form.  It

24   indicated that you had experienced a business loss of $37,929.

25   Do you remember that?

1    A    Uh-huh.

2    Q    And you told these folks that you did not have any kind of

3    a loss for two reasons --

4    A    Right.

5    Q    Number one, you testified you didn't have a business; is

6    that right?

7    A    Yes.

8    Q    And number two, you said you didn't lose that much

9    money?

10   A    Right.

11   Q    Is that right?

12   A    Right.

13   Q    Is it fair to say that you did not spend in real dollars

14   $37,929 while you were taking care of your children --

15   A    That's fair to say, yes.

16   Q    You didn't spend actual money?

17   A    That's fair to say, uh-huh.

18        MR. RUTER:  Your Honor, with your permission, I'd

19   like to show the witness, for identification only, a document.

20        THE COURT:  Okay.  Just for the witness then.

21   BY MR. RUTER:

22   Q    Ms. Hall, I placed before you what appears to be part of a

23   tax return.  Can you see it all, ma'am?

24   A    Uh-huh.

25   Q    Can you see it?

1    **A**    Yes.

2    **Q**    Can you see the bottom of the document?

3    **A**    Yes.

4    **Q**    Can you identify the signature?

5    **A**    It's my signature and Mr. Watson's signature.

6            MR. RUTER:  This document was for identification,

7    Your Honor, Exhibit 287.  I would now move for its admission.

8            MR. MORGAN:  No objection, Your Honor.

9            THE COURT:  Exhibit 287 is in evidence.

10   BY MR. RUTER:

11   **Q**    Ms. Hall, right above your signature, you see in the

12   smaller type where it says -- starting with this right here,

13   where it says "under penalties of perjury," do you see that?

14   **A**    Uh-huh.

15   **Q**    I'm just going to read part and then ask you a question or

16   a couple of questions.

17        When you signed this document, did you understand that you

18   were signing it under the penalties of perjury?

19   **A**    No, I did not because it was small print, and I actually

20   didn't even read it.

21   **Q**    Okay.  Did you understand that when you signed this

22   document, that you were declaring that you have examined this

23   return and the accompanying schedules and statements?  Did you

24   know that?

25   **A**    I did not realize it meant I had examined it.  All I know

1    is the document was prepared like any other preparer and I

2    signed it because my tax preparer, who's an expert who gets

3    paid to do this, I trusted him in doing it, and I just thought

4    it was right.

5    **Q**   Yes, ma'am.

6    **A**   I didn't know about all those other figures he was putting

7    on it to give me, you know, the refund or whatever I had.

8    **Q**   Okay.  Ms. Hall, would you agree with me that had you

9    viewed the accompanying forms, then you may have known what was

10   actually on the return?  Would that be a fair statement?

11   **A**   If I had reviewed it but I -- I have never reviewed.  My

12   taxpayer do something and say it's correct, then I sign it.  I

13   didn't review all those documents, Schedule Cs.  I didn't know

14   all that stuff was there and all those numbers were there.

15   **Q**   Yes, ma'am.  Then it says, ma'am, "And to the best of my

16   knowledge and belief, they are true, correct and

17   complete."  Did you know you were swearing to that?

18   **A**   Well, no.  I knew that -- he prepared my tax return, I

19   knew I had to sign it.  I did not read any of that fine print.

20   **Q**   Yes, ma'am.

21       I'd like to show you another document for identification

22   only, if I could.

23   **A**   Mm-hmm.

24   **Q**   I think this is as small as it gets.

25       I'm asking you whether or not you can identify what has

1    been marked for identification only as Exhibit 288.  Can you

2    identify this document, ma'am?

3    **A**    Yes, that's the document that I prepared of my tithes and

4    offering and my medicals and my charity.

5            MR. RUTER:  Your Honor, I'd offer this as a defense

6    exhibit, move it into evidence.

7            MR. MORGAN:  No objection, Your Honor.

8            THE COURT:  Exhibit 288 is in evidence.

9    BY MR. RUTER:

10   **Q**    So do we understand then, Ms. Hall, this is a document

11   that you prepared for your 2015 taxes?

12   **A**    Okay, yeah.

13   **Q**    Am I right?

14   **A**    Yes.

15   **Q**    So you were at home and you got on your typewriter, and

16   you prepared this document?

17   **A**    Yes.

18   **Q**    So you have different items for church -- and I recognize

19   and I apologize it's not the best copy, but it's the best we

20   can do.  We can all see this line kind of going right down

21   here, and you can see there are things missing, I apologize.

22   **A**    Mm-hmm.

23   **Q**    But there's church, there's medical, I think the next

24   segment is -- is this more charities?

25   **A**    Yeah.  Faith Christian School.  Ralph Bunche Community

1    Center which I'm very active in currently.

2    **Q**    Can you tell as I'm pointing with this pen, Ms. Hall, what

3    this actually says?

4    **A**    I don't know what it says.  I write down -- Ralph Bunche

5    Community Center is where I grew up, and I'm about 30-some

6    miles away but I still go down.  I was going down very

7    frequently every week to do what I had to do with the

8    community.

9    **Q**    Okay.  Did you make this particular page as a result of

10   conversations you may have had with Mr. Watson prior to you

11   actually doing this?

12   **A**    Yes, yes -- well, I had to let him know about my charity

13   so that's the only way I knew how to put a page in to let him

14   know what expenses I incurred or what charity amount that I

15   gave to all these.  So yeah, I did, yeah.

16   **Q**    Understood.  What I want to make sure that I understand

17   though, hopefully for the jury's benefit, is that you did this,

18   though, as a result of prior conversations you had had with

19   Mr. Watson.  Is that true or not true?

20   **A**    Well, only maybe at the bottom where I put down the miles

21   and everything back and forth from my church or from Ralph

22   Bunche.  But my other stuff, like my tithes and offerings, I

23   knew I could do that in my charity.

24   **Q**    Okay.  So do I understand then that what you're saying is

25   that prior to speaking with Mr. Watson, you did not realize

 1   that, at least according to him, you were entitled to use

 2   mileage that you had driven to and from charitable type

 3   events?

 4   **A**    Well, I think with this one, he had mentioned it, that I

 5   could do that.

 6   **Q**    Okay.  Is it your recollection that he talked to you about

 7   that prior as an example when you were preparing your 2014 tax

 8   returns or other returns?

 9   **A**    We had talked prior because otherwise I would have never

10   put down the mileage --

11   **Q**    Yes, ma'am.

12   **A**    -- because I've been doing that for years, going back and

13   forth.  And I never before put it down for anybody else.  But I

14   always put down my tithes and offering, my medical expense and

15   charity.

16   **Q**    Thank you.  For identification only, I'd like to show you

17   this paper which has been marked for identification as Exhibit

18   289 and ask you, ma'am, whether or not you can identify this

19   document.

20   **A**    No.  That's not my handwriting.

21   **Q**    Okay.  You feel confident about that?

22   **A**    Right, that's not my handwriting.

23   **Q**    You've never seen it before?

24   **A**    No.

25   **Q**    Okay.  Mr. Watson prepared your...

1            MR. RUTER:  Excuse me, Your Honor.  Mr. Mahoney, can

2   I see Exhibit 29 and specifically the Schedule C, Part V.

3   Thank you very much, appreciate it again.

4   Q    So you were shown this earlier, Ms. Hall, and this is part

5   of your Schedule C.  Do you recall that?

6   A    Yes, from earlier when they showed it to me.

7   Q    Okay.  And can you tell me where each of those numbers

8   came from to your recollection?

9   A    I don't know.  All I know, he asked -- I may have gave him

10  some numbers.  Now whether these are the correct numbers or

11  not, I don't know, but I did give him some numbers because he

12  asked for groceries, gas and cell phone.  I don't know about

13  materials and supplies.  I remember specifically he asked about

14  groceries, gas and my cell phone.

15  Q    Right.  Do you recall what your cell phone bill was?  It's

16  a long time ago.

17  A    Yeah, it probably was 100 and some dollars.  It was just

18  at that time my husband and I on the plan.

19  Q    Okay.  So would it be fair to say then that, number one,

20  these numbers and entries -- groceries, gas and so on -- they

21  were actually placed onto the return by Mr. Watson here?

22  A    Yes.

23  Q    And is it also fair to say that the numbers that are

24  associated with those entries came from you?

25  A    Probably some of the numbers.  I don't know these are the

1  specific numbers.  But any number that came from me is numbers

2  that were asked of me by Mr. Watson.

3  **Q**    Yes.

4  **A**    I mean, he probably didn't know the numbers.  I would give

5  him numbers if he asked me, but I don't know if these

6  specifically were the numbers.

7  **Q**    Understood.

8           MR. RUTER:  Mr. Mahoney, could we see Schedule C,

9  line 13, please.

10 **Q**    You see line 13 where it says depreciation?

11 **A**    Uh-huh.

12 **Q**    And the amount of that depreciation is $26,800?

13 **A**    Uh-huh.

14 **Q**    Do you see that?

15 **A**    Uh-huh.

16 **Q**    Could we then go to Form 4562, line 6.  Did you own a

17 Lexus back then?

18 **A**    Yes.

19 **Q**    Do you know what you paid for it?

20 **A**    I think it was 40 something.

21 **Q**    Okay.  Do you agree with me the word "Lexus" and those

22 dollar amounts were placed on the return by Mr. Watson here?

23 **A**    Well, I'm seeing it now.  But like I said, when he gave me

24 the package, I didn't look through all that to see what figures

25 he was putting down for anything.

1    **Q**    No, and I'm not faulting you, Ms. Hall.  We understand

2    that.  But do you know where he received the knowledge to put

3    down the word Lexus on this return?

4    **A**    He asked me, so I gave it to him.

5    **Q**    And how about the $38,000?

6    **A**    I don't know.  I think he put down that figure.  I don't

7    know what -- that's what it said my Lexus cost or whatever?

8    **Q**    It does say cost and it says business use only.

9    **A**    He put down the figures, you know.

10   **Q**    Okay.  But your recollection is that the cost of that car

11   to you was about $40,000?

12   **A**    Yeah, 42, something like that.

13   **Q**    That's your recollection, okay.

14          And you paid the car insurance on that car, didn't you?

15   **A**    Yes.

16   **Q**    And how much was that?

17   **A**    I don't know.  For my car and my husband's car, I think we

18   paid like three something a month or something like that,

19   uh-huh.

20   **Q**    Okay.  So together you're talking well over $3,000 a year

21   in car insurance?

22   **A**    Yeah.

23   **Q**    Is that right?

24   **A**    Uh-huh.

25   **Q**    You may not recall this, but if you do, what kind of car

 1    did your husband have in 2015?

 2    **A**    I think he had a -- I can't think of the name of it.  It

 3    was a truck.  He now has a Jeep.  I can't think of the name of

 4    the truck that he had, I'm sorry.

 5    **Q**    Okay.  Mr. Watson prepared your 2016 tax return; is that

 6    right?

 7    **A**    Uh-huh.

 8            MR. RUTER:  Again, for identification only, Your

 9    Honor.

10            THE COURT:  Okay.  What number?

11            MR. RUTER:  This is Exhibit 290.  I'm not too sure

12    why I'm not lit up here.

13    BY MR. RUTER:

14    **Q**    Do you see this document that's been marked for

15    identification as Exhibit 290, ma'am?

16    **A**    Uh-huh.

17    **Q**    And do you see the name up here?

18    **A**    Yes.

19    **Q**    And you see what it says here?

20    **A**    Yes.

21    **Q**    And do you see the signatures below?

22    **A**    Yes.

23    **Q**    And you recognize this document is yours?

24    **A**    Yes.

25            MR. RUTER:  I would move for its admission, Your

 1    Honor.

 2              MR. MORGAN:  No objection.

 3              THE COURT:  Exhibit 290 is in evidence.

 4    BY MR. RUTER:

 5    **Q**    I'm not going to repeat my questions, Ms. Hall, but the

 6    same -- for lack of a better word, we'll call it a warning, I

 7    guess -- is contained above your signature; is that correct?

 8    **A**    Yes.

 9    **Q**    Do you recall giving Mr. Watson a tax bill, a real estate

10    tax bill, giving him one?

11    **A**    Real estate tax bill?

12    **Q**    Yeah, to look at?

13    **A**    I gave him how much money we paid in county tax, that sort

14    of thing, yeah.

15    **Q**    Okay.

16         For identification only, Your Honor.

17         Let me show you what's been marked for identification as

18    Exhibit 291 and ask you if you can identify this document?

19    **A**    Yes.

20              MR. RUTER:  I move for its admission.

21              MR. MORGAN:  No objection.

22              THE COURT:  Exhibit 291 is in evidence.

23    BY MR. RUTER:

24    **Q**    Was this a document that you gave to Mr. Watson?

25    **A**    Yes.

1  **Q**    Did he ask for it?

2  **A**    I don't think he specifically asked for it, but I think

3  that's one of the documents that I know supposed to go into

4  my -- to go, you know, to the taxpayer every year.

5  **Q**    That's just by experience --

6  **A**    Uh-huh.

7  **Q**    -- you thought he might need it.  Whether he did or not

8  you're not too sure, are you?

9  **A**    Well, I guess he needed -- he needed to know how much

10  county tax that I paid, uh-huh.

11  **Q**    Okay.  Do you know, Ms. Hall, where that would be

12  important on a 1040 form?  Do you know about real estate taxes,

13  where it would actually appear on a tax return if it was

14  allowed?

15  **A**    No, I don't.

16  **Q**    I don't think I do either.

17          MR. RUTER:  For identification purposes only, Your

18  Honor.

19  **Q**    Let me show you what's been marked for identification as

20  Exhibit 292 and ask you, ma'am, whether you can identify this

21  document?

22  **A**    Yes.

23  **Q**    Is that a document that you helped prepare the tax return

24  for --

25  **A**    Yes.

1    **Q**    -- tax year 2016?

2    **A**    Mm-hmm.

3            MR. RUTER:  I move for its admission.

4            MR. MORGAN:  No objection.

5            THE COURT:  Exhibit 292 is in evidence.

6    BY MR. RUTER:

7    **Q**    Ms. Hall, this is almost identical to what you had given

8    Mr. Watson in 2015; would that be a fair statement?

9    **A**    Uh-huh.

10   **Q**    I mean the numbers are different, right?

11   **A**    Uh-huh.

12   **Q**    Once again, there's the issue of charitable contributions

13   and there's medicals and child care.  The child care actually

14   said received in payment $1,280.  Is that all correct?

15   **A**    Uh-huh, uh-huh.

16   **Q**    You're the one that prepared this document?

17   **A**    Yes.

18   **Q**    And you did that so you could give it to Mr. Watson?

19   **A**    Uh-huh.

20   **Q**    And underneath that, we all see that there's this

21   designation output for children, and there are various kinds of

22   expenses, but I don't see any numbers attached to it.  Am I

23   right?

24   **A**    Right.

25   **Q**    Can you tell us, you're the one who prepared this paper?

1    **A**    I didn't put any numbers on it.  I only put on it because

2    I knew he was going to ask me about these things.  I didn't

3    know what kind of numbers to put on it.  I didn't know --

4    that's why you don't have any numbers on it.  Because I didn't

5    know whether he wanted to use percentages.  I just didn't put

6    any numbers on it because I didn't know.  I didn't know.

7    **Q**    Okay.  For identification only, marked as Exhibit 293, I

8    ask you whether you can identify this, ma'am?

9    **A**    Yes.

10   **Q**    Was it also prepared for Mr. Watson?

11   **A**    Yes.

12           MR. RUTER:  I move for its admission.

13           MR. MORGAN:  No objection.

14           THE COURT:  What was the number again?

15           MR. RUTER:  This would be 293, Your Honor.

16           THE COURT:  Exhibit 293 is in evidence.

17   BY MR. RUTER:

18   **Q**    And again, Ms. Hall, this is part of the same document

19   that we just showed the jurors, and this, again, just shows

20   some of your volunteer work that you gave to Mr. Watson; is

21   that right?

22   **A**    Uh-huh.

23   **Q**    And you even noted down here some items for church and

24   community center, paper, bulletins and ink as an example,

25   correct?

1   **A**    Uh-huh.

2   **Q**    Did you provide these items, ma'am?

3   **A**    Yes.

4   **Q**    After having spoken to Mr. Watson --

5   **A**    Yes.

6   **Q**    -- about the fact they might be tax deductible?

7   **A**    Yes.

8   **Q**    Would we also understand that maybe prior to you speaking

9   to Mr. Watson, you wouldn't have known even if these things

10  were tax deductible; is that fair?

11  **A**    That's right, uh-huh.

12           MR. RUTER:  If we could have Exhibit 31, Mr. Mahoney,

13  once again perhaps looking at line 1.  This is a Schedule C.  I

14  really thank you, Mr. Mahoney, for doing this.

15  **Q**    Line 1, do you see where it says gross receipts, Ms. Hall?

16  **A**    Uh-huh.

17  **Q**    And it says $800?

18  **A**    Uh-huh.

19  **Q**    Where did that number come from?

20  **A**    I have no idea.

21           MR. RUTER:  The jury can't see what's on the screen

22  I'm told.  Can you-all see it?

23     (Jurors nod affirmatively.)

24  BY MR. RUTER:

25  **Q**    If we could back away, this is the 2017 tax return and the

1    Schedule C specifically, and you don't know where the $800 came

2    from.  Is that what you're saying?

3    **A**    No.

4    **Q**    Okay.  On line 15, Ms. Hall -- we're still looking at the

5    same exhibit -- there is notation of insurance and it says

6    $2,300.  Do you see that?

7    **A**    Yes.

8    **Q**    Do you know where that figure came from?

9    **A**    No.

10   **Q**    Did you and Mr. Watson have any discussions about it, that

11   you can recall?

12   **A**    No.  I don't recall any discussion about that figure.

13           MR. RUTER:  Thank you, Mr. Mahoney, very much.

14           For identification only, Your Honor.

15   **Q**    For identification only marked as 296, can you identify

16   this document, Ms. Hall?

17   **A**    Yes.

18           MR. RUTER:  I move for its admission.

19           MR. MORGAN:  No objection.

20           THE COURT:  Exhibit 296 is in evidence.

21   BY MR. RUTER:

22   **Q**    Would it be fair to say again, Ms. Hall, that you did not

23   read above -- where it says "sign here," you did not read these

24   two lines that I've already read once and I will not read

25   again?

1   **A**    No, I did not.

2   **Q**    Thank you, ma'am.

3        For identification only, showing you what's been marked as

4   Exhibit 298.  I'm asking you whether or not you can identify

5   this document?

6   **A**    Yes, I can identify that document.

7   **Q**    Did you prepare it for the tax season to give to

8   Mr. Watson?

9   **A**    Yes.

10            MR. RUTER:  I move for its admission.

11            MR. MORGAN:  No objection.

12            THE COURT:  Exhibit 298 is in evidence.

13   BY MR. RUTER:

14   **Q**    So you see at the top, there's offerings for the church

15   and there's medicals?

16   **A**    Uh-huh.

17   **Q**    Underneath that it says child care.  And how much money is

18   that?

19   **A**    Well, I put whatever I spent in groceries and he was

20   supposed to take a percent of whatever figure that was down

21   there.  These are figures in, like I said, groceries, electric,

22   water, heat, always asked about --

23   **Q**    I appreciate that but let's go a little higher first.  I

24   was referring to where it says "received in payment for child

25   care" and says $800?

1   **A**    I told you my daughter paid me.  It wasn't every time but

2   she paid me like $100 a month in cash for child care.

3   **Q**    Yes, ma'am, I understand.  But remember just a minute

4   ago --

5   **A**    Yeah, I didn't know what that $800 was on that particular

6   form.

7   **Q**    Okay.

8   **A**    Okay.

9   **Q**    So you didn't understand we were looking at a

10  Schedule C --

11  **A**    No.

12  **Q**    -- and it said gross receipts --

13  **A**    No.

14  **Q**    -- and it said $800, and above that it had your name --

15  **A**    Uh-huh.

16  **Q**    -- and it said child care services?

17  **A**    No, I didn't understand what that was on that particular

18  form.

19  **Q**    Yes, ma'am, okay.  But now would it be fair to say you

20  gave this number to Mr. Watson?

21  **A**    Yes.

22  **Q**    All right.  Then we get down, ma'am, to the next section

23  which deals with groceries and automotive gas?

24  **A**    Uh-huh.

25  **Q**    And you wrote output, and then in parens, you said

1    percentage of these numbers for child care.  Is that --

2    **A**    Yes.

3    **Q**    -- a proper thing?

4    **A**    Uh-huh.

5    **Q**    Okay.  Again, there's no number next to that but we'll get

6    to that in a moment.

7        We come to electric.  We know evidently you have solar,

8    your provider is Pepco, $150 a month.  You have a water bill, a

9    natural gas bill, cell phones and mortgage, right?

10   **A**    Uh-huh.

11   **Q**    Underneath that we have car insurance of $4,600 a year.

12   It says for a Lexus and a Jeep, right?

13   **A**    Yes.

14   **Q**    So remember a minute ago I showed you a Schedule C which

15   had the name "insurance" written on it, and it had the amount

16   of $2,300.  Remember that?

17   **A**    But I didn't know that meant for car insurance.  I didn't

18   know what that insurance -- like I said, I don't understand

19   these documents.  He didn't -- when he gave me the package, he

20   didn't explain this is what this is for or whatever.

21   **Q**    Yeah.  Mr. Hall --

22   **A**    But the figures you see is what he actually asked me

23   for --

24   **Q**    I understand that.  I'm not faulting you in the least.  I

25   just want to make sure -- do you agree with me that if you took

1    $4,600 and you divide it by two, you get $2,300 which is what

2    appears on your Schedule C under the word "insurance"?

3    **A**    Like I said, I didn't understand any of it.  I only --

4    **Q**    Understood.

5    **A**    I only gave what he asked me for.

6    **Q**    Understood.  Then it goes on, charities and the like.

7         Finally just to complete this document, for identification

8    only, marked as 297, can you identify this document?

9    **A**    Okay, yes.

10   **Q**    That's also in preparation of your tax return?

11   **A**    Uh-huh.

12            MR. RUTER:  I move for its admission.

13            MR. MORGAN:  No objection.

14            THE COURT:  Hold on one second.  This is 297?

15            MR. RUTER:  It is, Your Honor.

16            THE COURT:  Exhibit 297 is in evidence.

17            MR. RUTER:  Thank you.

18            THE COURT:  Ma'am, if you could just, when you're

19   asked a question, if you could just say yes or no when it's

20   asked --

21            THE WITNESS:  Okay.

22            THE COURT:  Thank you.

23   BY MR. RUTER:

24   **Q**    Once again, ma'am, this again concerns items of your

25   charity work; is that right?

1    **A**    Yes.

2         MR. RUTER:  Exhibit 31, can we once again on

3    Schedule C, see Part V of that document.

4    **Q**    You see the document -- the designation "groceries" with a

5    dollar sign behind it, ma'am?

6    **A**    Uh-huh.

7    **Q**    Okay.  Would you agree with me that we just looked at the

8    numbers that you provided Mr. Watson as it relates to

9    groceries; it was $4,565.57 --

10   **A**    Yes.

11   **Q**    -- and that number here is just about the same number?

12   It's about 40-some cents off, is that right, on groceries?

13   Same number?

14   **A**    For the year.

15   **Q**    For the year, yes, ma'am.

16   **A**    Yes, uh-huh.

17   **Q**    It has gas of $1,034?

18   **A**    Uh-huh.

19   **Q**    That's the same number you had given him?

20   **A**    Uh-huh.

21   **Q**    Is that a fair statement?  Is that accurate?

22   **A**    Yes, uh-huh.

23   **Q**    Then it also shows cell phone of $1,200 and on the

24   documentation -- specifically we're talking about Exhibit

25   298 -- you wrote down cell phone, $100 a month.  Is that true,

1    is that accurate?

2    **A**    Yes.

3           MR. RUTER:  If I could have one moment, Your Honor.

4        (Defendant conferred with his counsel.)

5           MR. RUTER:  No further questions, Judge.  Thank

6    you.

7           THE COURT:  Thank you.  Any redirect?

8           MR. MORGAN:  Briefly, Your Honor.  Thank you.

9                    **REDIRECT EXAMINATION**

10   **BY MR. MORGAN:**

11   **Q**    The $100 a month or so from your daughter, was that a fee

12   you were charging her?

13   **A**    No, I wasn't really charging her, but that's what she

14   normally gave me, you know.  It wasn't every single month, you

15   know.

16   **Q**    Was that to help cover the costs of what you paid for,

17   taking care of the children?

18   **A**    I really didn't look at it like that because they were my

19   grandchildren, but she just gave me something because she knew

20   she would have to put out a lot more if she went somewhere

21   else, you know, to somewhere else to take care of the kids.

22   **Q**    Did you tell Mr. Watson that it was a fee that you were

23   charging her?

24   **A**    Yeah, I told him that sometimes my daughter gives me $100

25   a month --

1    **Q**    Not that she gives you $100 a month but that you are

2    charging her a fee, did you tell --

3    **A**    I actually didn't charge her.  This is what she gave me,

4    you know.

5    **Q**    Understood, thank you.

6          I'd like to take a look at, this is one of the defense

7    exhibits you just went over, Defense Exhibit No. 288.  Do you

8    remember this one?

9    **A**    Yes.

10   **Q**    Do you see the total for church up there?

11   **A**    Uh-huh.

12   **Q**    What's that number there?

13   **A**    $5,061.

14   **Q**    And this section here, is this charities?  Is that what

15   that says?

16   **A**    Medical?

17   **Q**    No, underneath "charities" --

18   **A**    -- uh-huh.

19   **Q**    And the total for charities?

20   **A**    Yes.

21   **Q**    What is the total there for charities?

22   **A**    Uh-huh.

23   **Q**    Could you please read the number.

24   **A**    Oh.  $1,041.62.

25          MR. MORGAN:  Your Honor, I'd ask the Court to take

 1    judicial notice, please, that 5,061 plus $1,041.62 is

 2    $6,102.62.

 3             THE COURT:  No.  The jury can do the math

 4    themselves.

 5             MR. MORGAN:  Okay.  Mr. Mahoney, if we can please

 6    bring up Exhibit No. 29, page 20, please.  If we could enlarge

 7    the gifts to charity portion.

 8    BY MR. MORGAN:

 9    **Q**    Ma'am, do you see this section here?

10    **A**    Yes.

11    **Q**    Do you see for gifts to charity, line 16, gifts by cash or

12    check; do you see that line?

13    **A**    16, uh-huh.

14    **Q**    What is the amount there for the total listed?

15    **A**    $8,222.

16             MR. MORGAN:  Thank you, Your Honor.  No further

17    questions.

18             THE COURT:  Anything else just on that, Mr. Ruter?

19             MR. RUTER:  No, Judge.  Thank you very much.

20             THE COURT:  Okay.  Ms. Hall, thank you very much for

21    your testimony.  You can step down now.  We appreciate it.

22             THE WITNESS:  Thank you.

23             THE COURT:  Who's our next witness?

24             MR. MORGAN:  Your Honor, the Government next calls

25    Karen Butler.

```
 1              THE CLERK:  Ms. Butler, please come forward.  Please
 2   walk towards me.  Please take the witness stand.  Remain
 3   standing and please raise your right hand.
 4              KAREN BUTLER, GOVERNMENT'S WITNESS, SWORN
 5              THE CLERK:  You may be seated, please.  Speak clearly
 6   into the microphone.  Please state your first and last name.
 7              THE WITNESS:  Karen with a K, last name Butler.
 8              THE CLERK:  If you could get closer to the microphone
 9   for me, Ms. Butler, I'd appreciate it.  Please spell your first
10   and last name for the record.
11              THE WITNESS:  It's Karen with a K, a-r-e-n.  Last
12   name Butler, B-u-t-l-e-r.
13              THE CLERK:  Thank you, ma'am.
14                        DIRECT EXAMINATION
15   BY MR. MORGAN:
16   Q    Good morning.
17   A    Good morning.
18   Q    Are you currently employed?
19   A    No, I'm retired.
20   Q    Where did you work previously?
21   A    At the Veterans Hospital in Washington, D.C.
22   Q    What did you do at the Veterans Hospital?
23   A    I was a secretary in Voluntary Services.
24   Q    When did you retire?
25   A    It was 2020.
```

Direct - Butler

1   **Q**   Are you married?

2   **A**   Yes.

3   **Q**   What's your spouse's name?

4   **A**   John.

5   **Q**   Does he work?

6   **A**   No, he's retired.

7   **Q**   What did he do prior to his retirement?

8   **A**   He was a driver for the Secretary of the Veterans

9   Affairs.

10  **Q**   How far did you get in school?

11  **A**   Twelfth.

12  **Q**   Did you ever receive any training specifically in taxes

13  and tax preparation?

14  **A**   No.

15  **Q**   Did you ever take any classes about taxes or tax

16  preparation?

17  **A**   No.

18  **Q**   Have you ever prepared your own taxes?

19  **A**   No.

20  **Q**   So do you use a tax preparer?

21  **A**   Yes.

22  **Q**   Why do you use a tax preparer rather than doing it

23  yourself?

24  **A**   Because I don't know how.

25  **Q**   Do you know an individual named Ronald Watson?

1    **A**    Yes.

2    **Q**    And how do you know him?

3    **A**    He did my taxes.

4    **Q**    How did you learn about Mr. Watson?

5    **A**    Through my son-in-law and my daughter.

6    **Q**    Did you know Mr. Watson in any other way other than

7    through tax preparation?

8    **A**    No.

9    **Q**    How many times per year would you see him?

10   **A**    Three.

11   **Q**    Per year, how many times per year did you see him?

12   **A**    Just once per year.

13   **Q**    And approximately how long would that meeting last with

14   him each year?

15   **A**    Maybe about an hour, hour and a half.

16   **Q**    All right.  Did you and your husband meet with him

17   together?

18   **A**    Yes.

19   **Q**    Did you ever work with anyone else in the office, or was

20   it just Mr. Watson?

21   **A**    No, just Mr. Watson.

22   **Q**    And where did you meet with him?

23   **A**    He had an office off of -- in Landover or Largo in

24   Maryland.

25   **Q**    Did you ever meet with him anywhere else?

1    **A**    No.

2    **Q**    Can you describe his office?

3    **A**    It was like a -- maybe a six-story building.  It had

4    offices in it.  His office was just a single office.

5    **Q**    When you went to visit Mr. Watson, did you bring some

6    paperwork with you?

7    **A**    Yes.

8    **Q**    What kind of paperwork did you bring with you?

9    **A**    It was my taxes.  Paperwork that I can use to claim for my

10   taxes.

11   **Q**    Such as -- do you remember anything in particular?

12   **A**    Probably the property taxes... probably donation slips.

13   **Q**    Do you own a business?

14   **A**    No.

15   **Q**    Did you tell Mr. Watson that you had a business?

16   **A**    No.  Unless you want to say we rent a house out, if you

17   want to consider that as a business.

18   **Q**    So you had a rental property?

19   **A**    Yes.

20   **Q**    Tell the jury about your rental property.

21   **A**    It's a home in D.C., and we moved out almost eight years

22   ago, and we put the house up for rental.

23   **Q**    And how long have you owned that house in D.C. as well

24   approximately?

25   **A**    Over 40 years.

1    **Q**    And so have you been able to rent it out?

2    **A**    Yes.

3    **Q**    And do you manage the property yourself?

4    **A**    No.  We have property managers.

5    **Q**    Did Mr. Watson ask you about this property?

6    **A**    He could have.

7    **Q**    Could you please describe for the jury the process, the

8    meeting you had with Mr. Watson.  How did it look?  You met

9    with him first in the office and then what happened?

10   **A**    We would meet him in his office, and he would ask us for

11   our papers, and we would hand him our papers.

12   **Q**    What would he do with those?

13   **A**    He, I guess he just looked over them, but he really never

14   asked us anything about them.

15   **Q**    Did you ever see him taking any notes?

16   **A**    No, I can't say I have.

17   **Q**    Did you ever see him using a computer?

18   **A**    Yes.

19   **Q**    How did he use the computer?

20   **A**    Well, his computer would be on his desk, and we would be

21   behind him.  His back would be towards us.

22   **Q**    Were you able to see what he was putting into the

23   computer?

24   **A**    No.

25   **Q**    Did he speak with you during the meeting?

1    **A**    He could have, you know, asked us a few things.

2    **Q**    Do you remember anything about what he may have spoken to

3    you about?

4    **A**    No.

5    **Q**    So after he put the numbers into the computer, then what

6    would happen?

7    **A**    Then he would just tell us that he was done and we could

8    sign the papers, and this is how much we was getting back, and

9    this is what he was getting.

10   **Q**    Okay.  Then did you sign those papers?

11   **A**    Yes.

12   **Q**    Did you get a copy of the paperwork?

13   **A**    Yes.  He put them all in a folder, handed it to us.

14   **Q**    Do you know how he got paid?

15   **A**    It would be through our taxes because I didn't -- we

16   didn't give him any cash or write him a check or anything.

17   **Q**    Do you remember how much it was he was taking out of the

18   taxes?

19   **A**    No.

20   **Q**    How did you get your refund, if you were getting a

21   refund?

22   **A**    It was entered into our account, a banking account.

23          MR. MORGAN:  I'd like to show you Exhibit 4A, please.

24   If we could enlarge the top section.

25   **Q**    Do you see this Form 1040, U.S. Individual Tax Return for

1    2015?

2    **A**    Yes.

3    **Q**    Is there a first name -- is there a name and initial as to

4    there?

5    **A**    Yes, it's John and Karen Butler.

6    **Q**    Is that your name and your husband's name?

7    **A**    Yes.

8    **Q**    Let's go down to line 7, please.  Do you see line 7 there

9    in the Income section where it says, "Wages, salaries and

10   tips"?

11   **A**    Yes.

12   **Q**    What was the amount listed in line 7, box 7, for wages,

13   salaries and tips?

14   **A**    65,465.

15   **Q**    And scrolling down, please, to line 17, where it says,

16   "Rental real estate, royalties, partnerships, S Corps, attach

17   Schedule E."  Do you see that line, line 17?

18   **A**    Yes.

19   **Q**    Is there a number associated with the box for line 17

20   there?

21   **A**    This is in line 17?

22   **Q**    Yes.

23   **A**    It says minus 10,714.

24          MR. MORGAN:  If we could please pull up Exhibit 4B.

25   If we could please enlarge the top section.

1    **Q**    Do you see this Schedule E, Form 1040, the Supplemental

2    Income and Loss, and underneath it says, "From rental real

3    estate, royalties, partnerships, S corporations, estates,

4    trusts, REMICs, etc." for the year 2015?  Do you see this

5    form?

6    **A**    Yes.

7    **Q**    Are there any names written in the box underneath that?

8    **A**    It says John and Karen Butler.

9    **Q**    And do you see in box A, city and state for box A?

10   **A**    Yes.

11   **Q**    What is that?

12   **A**    It says -- it's checked "no."

13   **Q**    I'm sorry, under 1a where it says "physical address of

14   each property" and then below that it says capital A, do you

15   see that?

16   **A**    Oh, yes.

17   **Q**    What's listed there?

18   **A**    It says Washington, D.C. 20001.

19   **Q**    I'd like to scroll down to line 3, please.  Do you see

20   where it says "income" and underneath of it there's the

21   number 3 and it says "rents received."  Do you see that?

22   **A**    Uh-huh.

23   **Q**    Are there any figures for line 3, rents received, in

24   columns A, B or C on this form?

25   **A**    No.

1   Q    Down, please, now to line 24.  You see line 24 where it

2   says "income"?

3   A    Yes.

4   Q    Is there anything in the box associated with the income in

5   box 24?

6   A    No.

7   Q    Losses on line 25, do you see where it says "losses"?

8   A    Yes.

9   Q    Is there a number associated with that for box 25?

10  A    Yes.

11  Q    What's that number?

12  A    It says 10,714.

13  Q    Thank you.

14          MR. MORGAN:  If we could, please, go back to Exhibit

15  4A.  And line 12, please.  If you can enlarge that section.

16  Q    Do you see line 12 where it says, "Business income or

17  loss"?

18  A    Yes.

19  Q    And is there a number associated with the box for box

20  12?

21  A    Yes.

22  Q    Can you please read the number that is there.

23  A    It says minus 34,236.

24          MR. MORGAN:  Turning to page 45, please.  Can you

25  please enlarge the top portion only.

Direct - Butler                           Vol. II-107

1    **Q**     Do you see this at the top where it says Schedule C, Form

2    1040, Profit or Loss from Business for year 2015; do you see

3    that?

4    **A**     Yes.

5    **Q**     And is there a name of the proprietor for this form?

6    **A**     It says "John Butler."

7    **Q**     What is it right underneath in line A, what's listed for

8    the principal business or profession?

9    **A**     It says "real estate property managers."

10   **Q**     Line C, is there a business name listed?

11   **A**     It just says "rental."

12   **Q**     Did you or your husband have a principal business or

13   profession as real estate property managers?

14   **A**     No.

15             MR. MORGAN:  Your Honor, I see our time --

16             THE COURT:  Yes, it's time to break for the day.

17   Thank you very much, Mr. Morgan.

18             Ladies and gentlemen, as I said, today is a short

19   day.  Gives you a taste of what we're going to be dealing with

20   over the next few days except on subsequent days, we'll have a

21   lunch break and have an afternoon session.  This was sort of

22   just to get you warmed up into the process here.  We're going

23   to let you go for the day.  We expect to see you back here

24   tomorrow morning, ready to start at 9:00.

25             Again, don't discuss the case among yourselves or

1    with anyone else.  Don't do any outside research.  Just either

2    enjoy the afternoon or do whatever else you need to get done

3    this afternoon, and we'll see you back here tomorrow morning.

4    Thank you very much.

5         THE CLERK:  All rise for the jury.

6      (Jury left the courtroom at 11:59 a.m.)

7         THE COURT:  Thank you, everyone.  Please be seated.

8    Ms. Butler, you can step out and we'll look forward to seeing

9    you tomorrow morning.

10        I want to ask about the schedule but I know

11   Mr. Watson has to leave.  If he is willing to let me talk to

12   the lawyers about the schedule, I'm happy to have him step out

13   now.

14        MR. RUTER:  He elects to leave, Your Honor.  He knows

15   we're going to talk about scheduling.

16        THE COURT:  That's all we're going to talk about.

17        MR. RUTER:  9:00 tomorrow morning for him to be here?

18   Am I correct, Your Honor?

19        THE COURT:  I'd like to again be ready at 8:45 if we

20   can.

21        MR. RUTER:  Yes, sir.  8:45 it is.

22        THE COURT:  Thank you.  You may leave now,

23   Mr. Watson.  Again, our condolences to your family.

24        THE DEFENDANT:  Thank you.

25        THE COURT:  Mr. Morgan, can you give me a sense of

```
 1   what we're dealing with for tomorrow and whether you've had a
 2   chance to confer with Mr. Ruter about any issues that may
 3   arise?
 4           MR. MORGAN:  Yes, Your Honor.  I anticipate obviously
 5   we'll be continuing with Ms. Butler tomorrow.  I do anticipate
 6   that she may be slightly longer than our first taxpayer
 7   witness.
 8           THE COURT:  Okay.
 9           MR. MORGAN:  After that we anticipate calling
10   Mr. Stanley Jones.
11           THE COURT:  Same category of witness?
12           MR. MORGAN:  Yes, Your Honor.  Then Rana Johnson.
13           THE COURT:  Also a taxpayer?
14           MR. MORGAN:  Yes, Your Honor.  Then Charlene Jones,
15   also a taxpayer.
16           THE COURT:  Okay.
17           MR. MORGAN:  And Maurice Brown most likely would
18   be after that.
19           THE COURT:  So all taxpayers --
20           MR. MORGAN:  Yes, the entire day will be client
21   taxpayers.
22           THE COURT:  Are they all same types of documents?
23   We've already gotten some of the returns, although you didn't
24   offer every document that the first witness dealt with.
25   Mr. Ruter, you're going to have some similar documents as to
```

1    what you had with Ms. Hall?

2              MR. RUTER:  Yes, sir.

3              THE COURT:  Hopefully everyone can -- it went

4    relatively smoothly today so if there's any communications that

5    can be had to keep it on track or be efficient about it, I

6    appreciate that.  Is there anything that anyone knows about for

7    those witnesses that could be something to discuss?

8              MR. RUTER:  I am not aware, Your Honor.

9              MR. MORGAN:  No, Your Honor.  Thank you.

10             THE COURT:  Okay.  So we'll see you -- let's plan to

11   be ready at 8:45.  And if there's anything that comes up

12   between now and then, shoot us an email and we'll be ready to

13   talk about it at 8:45, or we'll even -- if the parties think it

14   requires discussion before 9:00, we can agree to come at 8:30

15   if it's helpful.  I would just have to stop any discussions

16   right at 9:00 or when the jury gets here, which hopefully will

17   be the same time, but I don't know for sure.

18             Okay.  We'll see you then tomorrow morning.

19             MR. RUTER:  Thank you, Your Honor.

20             LAW CLERK:  All rise.  This Honorable Court is now

21   adjourned.

22        (Proceedings concluded at 12:03 p.m.)

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia G. Mitchell, Registered Merit Reporter, Certified Realtime Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 11th day of April 2023.


*Patricia G. Mitchell*

_____
Patricia G. Mitchell, RMR, CRR
Federal Official Reporter

**< Dates >.**
**April 15** 6:9.
**April 2023.** 111:10.
**February 28, 2023**
    1:17.
**$1** 86:14, 94:17, 94:23,
    96:24, 97:1.
**$10** 22:12, 22:13,
    60:24.
**$100** 42:7, 91:2, 94:25,
    95:11, 95:24, 96:1.
**$150** 92:8.
**$2** 48:2, 48:4, 49:11, 50:12,
    58:15, 89:6, 92:16,
    93:1.
**$22** 52:25, 53:5.
**$25** 24:18.
**$26** 56:14, 56:15,
    81:12.
**$3** 82:20.
**$33** 22:23.
**$37** 45:16, 73:24,
    74:14.
**$38** 82:5.
**$4** 48:15, 48:19, 54:16,
    54:22, 92:11, 93:1,
    94:9.
**$40** 82:11.
**$5** 96:13.
**$6** 97:2.
**$600** 47:2.
**$8** 97:15.
**$800** 88:17, 89:1, 90:25,
    91:5, 91:14.
**$950** 55:9, 55:14.
**$950."** 55:8.
.
.
**< 0 >.**
**00** 1:18, 4:5, 41:14, 41:22,
    107:24, 108:17, 110:14,
    110:16.
**000** 47:17, 48:2, 48:4,
    50:12, 51:14, 51:16,
    60:24, 82:5, 82:11,
    82:20.
**010** 49:11, 50:3.
**03** 110:22.
**034** 94:17.
**041.62** 96:24, 97:1.

**061** 96:13, 97:1.
**08** 3:2.
.
.
**< 1 >.**
**1** 10:15, 16:16, 16:22,
    20:24, 21:16, 22:17,
    33:17, 46:22, 46:25,
    49:19, 88:13, 88:15.
**1-cr-00449-tdc-1** 1:10.
**10** 4:2, 51:16, 61:9, 61:15,
    61:16, 61:17, 62:12,
    104:23, 106:12.
**100** 28:19, 80:17.
**102.62** 97:2.
**1040** 6:6, 6:7, 6:8, 6:18,
    6:22, 13:3, 18:13, 21:2,
    21:4, 21:7, 23:11, 25:7,
    30:17, 30:22, 31:2, 31:8,
    44:21, 44:25, 46:2,
    52:12, 53:10, 53:12,
    53:18, 56:2, 56:24,
    73:23, 85:12, 103:25,
    105:1, 107:2.
**1040s** 6:15, 10:22.
**105** 30:18.
**106** 30:24, 31:4, 31:8.
**1099** 8:22.
**11** 108:6.
**113** 32:9, 32:12.
**11B** 16:17, 16:22.
**11th** 111:10.
**12** 4:5, 22:17, 22:18, 22:19,
    22:21, 23:11, 24:6, 45:8,
    45:9, 45:10, 45:12,
    45:14, 50:18, 52:18,
    52:19, 52:24, 56:8,
    56:10, 56:11, 56:13,
    106:15, 106:16, 106:20,
    110:22.
**13** 64:20, 81:9, 81:10.
**14** 16:17, 16:23, 33:19,
    33:23.
**14-digit** 19:1.
**15** 11:9, 16:17, 16:23,
    29:15, 29:25, 33:11,
    34:5, 47:10, 47:13,
    47:16, 57:22, 58:7,
    89:4.
**150** 1:35.

**16** 12:25, 41:8, 64:8, 97:11,
    97:13.
**17** 5:10, 40:20, 41:8, 64:8,
    104:15, 104:17, 104:19,
    104:21.
**18A** 16:17, 16:23.
**1a** 105:13.
.
.
**< 2 >.**
**2** 17:15, 17:18, 17:19, 18:1,
    18:22, 47:17, 50:3.
**20** 48:8, 53:16, 54:13,
    97:6.
**200** 49:19, 94:23.
**20001** 105:18.
**20002** 1:36.
**2009** 35:21.
**2014** 79:7.
**2015** 12:25, 30:17, 36:12,
    40:6, 41:8, 45:1, 46:2,
    48:17, 50:20, 51:20,
    71:2, 77:11, 83:1, 86:8,
    104:1, 105:4, 107:2.
**2016** 31:3, 31:4, 40:7,
    52:13, 53:1, 53:3, 53:19,
    71:2, 83:5, 86:1.
**2017** 12:25, 31:11, 40:7,
    56:3, 56:15, 56:25, 71:2,
    71:12, 88:25.
**2020** 98:25.
**2021** 6:17.
**20770** 1:30.
**20b** 48:11, 48:14, 54:14,
    54:15.
**21** 24:25, 55:6.
**21237** 1:43.
**22** 45:23.
**222** 97:15.
**22B** 16:17, 16:23.
**23** 23:1, 49:13.
**236** 106:23.
**24** 106:1, 106:5.
**25** 21:11, 71:11, 106:7,
    106:9.
**26** 56:23, 71:12.
**264** 6:17.
**27** 58:18.
**27a** 49:7, 49:10, 49:12,
    58:19, 58:21.

**28** 111:5.
**280** 86:14.
**287** 75:7, 75:9.
**288** 77:1, 77:8, 96:7.
**289** 79:18.
**29** 16:17, 16:23, 44:19,
    45:24, 50:17, 73:23,
    80:2, 97:6.
**290** 83:11, 83:15, 84:3.
**291** 84:18, 84:22.
**292** 85:20, 86:5.
**293** 87:7, 87:15, 87:16.
**296** 89:15, 89:20.
**297** 93:8, 93:14, 93:16.
**298** 90:4, 90:12, 94:25.
.
.
**< 3 >.**
**3** 21:13, 23:14, 41:14,
    105:19, 105:21,
    105:23.
**30** 41:14, 41:22, 52:10,
    53:15, 110:14.
**30"** 47:7.
**30-some** 78:5.
**30.** 58:6.
**300** 24:6, 24:7, 58:15, 89:6,
    92:16, 93:1.
**3050** 9:20, 14:6.
**31** 16:18, 16:23, 55:25,
    56:22, 56:23, 88:12,
    94:2.
**33** 2:13, 16:18, 16:23.
**34** 16:18, 16:23, 31:21,
    31:24, 56:21, 61:15,
    61:17, 106:23.
**35** 2:17, 41:12.
**360** 49:18.
**37** 16:18, 16:23, 45:17,
    65:3.
**38** 51:14, 65:4, 70:20.
**38B** 16:18, 16:24.
.
.
**< 4 >.**
**4** 2:9, 19:9, 41:14.
**40** 23:15, 23:16, 24:2,
    24:17, 24:22, 25:7, 39:5,
    41:12, 65:3, 65:8, 65:10,
    70:18, 81:20,

101:25 .
**40-some** 94:12 .
**41** 16:18, 16:24 .
**42** 82:12 .
**43** 16:18, 16:24 .
**45** 39:5, 61:9, 61:16, 61:17,
    106:24, 108:19, 108:21,
    110:11, 110:13 .
**4562** 81:16 .
**465** 104:14 .
**4766** 33:19, 33:23 .
**48** 49:13 .
**48.** 49:12 .
**487** 56:14, 56:15 .
**49** 62:12 .
**4A** 11:2, 33:7, 33:14, 34:1,
    34:8, 103:23,
    106:15 .
**4B** 11:2, 33:21, 34:1, 34:8,
    104:24 .
    .

< 5 > .
**5** 52:4, 97:1 .
**50** 34:4 .
**500** 48:15, 48:19, 54:16,
    54:22 .
**51** 10:15 .
**52** 31:16 .
**52A** 12:3, 12:10 .
**52H** 12:4, 12:10 .
**53** 12:16, 12:18, 12:19,
    12:23, 30:12, 30:13,
    30:14, 33:17 .
**54** 31:1 .
**56** 23:25 .
**5642** 50:19 .
**565.57** 94:9 .
**59** 108:6 .
    .
    .
< 6 > .
**6** 24:6, 41:22, 51:6, 51:7,
    58:22, 81:16 .
**6-** 42:8 .
**600** 24:6, 92:11, 93:1 .
**60s** 70:24 .
**62** 2:19 .
**629** 24:18 .
**6406** 1:29 .

**65** 104:14 .
**66** 5:25 .
**6a** 51:9 .
**6B** 16:17, 16:22 .
    .
    .
< 7 > .
**7** 21:11, 21:16, 21:21,
    41:22, 58:2, 58:3, 104:8,
    104:12 .
**70** 12:19, 12:23 .
**70.** 12:17 .
**700** 42:8 .
**70s** 70:24 .
**714** 104:23, 106:12 .
**739** 22:23 .
**75** 22:10 .
**753** 111:5 .
**766** 22:12, 22:13 .
**76a** 22:8, 22:9, 22:10,
    22:12 .
**78** 21:15, 21:17, 21:18,
    21:20, 21:22 .
**79** 21:15 .
    .
    .
< 8 > .
**8** 108:19, 108:21, 110:11,
    110:13, 110:14 .
**800** 12:19, 58:4, 58:22,
    81:12 .
**80s** 70:24 .
**82A** 13:15, 13:20, 13:22,
    14:2 .
**82D** 13:16, 13:22, 14:1,
    14:2 .
**83** 13:23 .
**83A** 13:20, 14:13, 14:14,
    14:16 .
**83B** 14:24, 14:25 .
**83C** 15:7, 15:8 .
**84** 15:14, 15:16 .
**85A** 15:25, 16:3, 31:13 .
**85B** 31:18 .
**85C** 15:25, 16:3, 32:3 .
**8888** 22:11 .
**8:** 1:10 .
    .
    .
< 9 > .

**9** 1:18, 3:2, 4:2, 4:5, 16:17,
    16:22, 24:7, 107:24,
    108:17, 110:14,
    110:16 .
**90** 49:18 .
**921** 52:25, 53:5 .
**929** 45:16, 45:17, 73:24,
    74:14 .
**9411** 1:42 .
**95** 2:21 .
**98** 2:25 .
**[sic]** 50:19, 71:12 .
    .
    .
< A > .
**a-r-e-n** 98:11 .
**A.** 24:23 .
**a.m.** 1:18, 3:2, 4:2, 61:15,
    61:17, 62:12, 108:6 .
**able** 15:22, 20:18, 32:13,
    39:14, 39:23, 40:1, 42:5,
    102:1, 102:22 .
**above** 22:2, 60:7, 75:11,
    84:7, 89:23, 91:14 .
**above-entitled** 111:7 .
**absence** 10:6 .
**access** 9:13 .
**accompanying** 75:23,
    76:9 .
**according** 79:1 .
**accordingly** 36:4 .
**account** 7:5, 7:6, 7:11,
    12:10, 25:20, 25:23,
    25:25, 103:22 .
**accuracy** 32:20 .
**accurate** 11:17, 12:11,
    14:17, 15:2, 15:9, 15:18,
    25:25, 26:4, 28:20,
    30:18, 31:9, 70:6, 70:8,
    94:21, 95:1 .
**acquaintance** 65:12 .
**acronym** 8:19 .
**Act** 36:1 .
**Action** 3:5, 7:14 .
**active** 78:1 .
**activity** 42:19, 51:1, 51:2,
    58:16 .
**actual** 27:21, 29:11, 31:6,
    74:16 .
**Actually** 27:1, 29:9, 46:19,

    56:9, 72:22, 75:19,
    76:10, 78:3, 78:11,
    80:21, 85:13, 86:13,
    92:22, 96:3 .
**addendums** 7:2 .
**adding** 65:3 .
**addition** 9:8 .
**additional** 30:5 .
**address** 7:21, 105:13 .
**adjourned** 110:21 .
**administration** 9:5 .
**admission** 75:7, 83:25,
    84:20, 86:3, 87:12,
    89:18, 90:10, 93:12 .
**admit** 16:16 .
**admitted** 61:25 .
**Affairs** 99:9 .
**affirmatively.** 88:23 .
**afternoon** 107:21, 108:2,
    108:3 .
**agencies** 64:11 .
**Agency** 5:4, 63:18, 64:14,
    64:16, 64:21 .
**Agent** 1:46, 3:12 .
**agents** 63:8, 71:17 .
**ago** 25:21, 32:18, 80:16,
    91:4, 92:14, 101:22 .
**agree** 76:8, 81:21, 92:25,
    94:7, 110:14 .
**ahead** 35:12, 62:15 .
**alert** 61:23 .
**allow** 11:9, 20:17, 29:20,
    29:23 .
**allowed** 24:13, 85:14 .
**almost** 28:7, 86:7,
    101:21 .
**already** 29:4, 68:1, 69:2,
    89:24, 109:23 .
**although** 109:23 .
**America** 1:5, 3:5 .
**among** 61:11, 107:25 .
**Amortization** 50:20 .
**Amount** 21:15, 22:2, 22:4,
    22:10, 22:12, 22:22,
    24:16, 24:17, 31:6,
    45:14, 46:25, 48:14,
    49:10, 52:24, 58:3,
    58:18, 58:21, 78:14,
    81:12, 92:15, 97:14,
    104:12 .

**amounts** 24:6, 24:7, 50:4, 59:6, 81:22 .
**analogy** 28:14 .
**analyst** 63:20, 64:2 .
**and/or** 71:17 .
**Announced** 66:1, 66:3 .
**annual** 8:3 .
**answers** 67:9 .
**anticipate** 109:4, 109:5, 109:9 .
**anybody** 39:2, 79:13 .
**anyway** 60:14 .
**apart** 58:7, 66:23 .
**apologize** 57:23, 77:19, 77:21 .
**appear** 19:11, 24:19, 25:6, 85:13 .
**appears** 20:5, 74:22, 93:2 .
**application** 15:1, 28:1 .
**applied** 7:20 .
**applies** 26:6 .
**apply** 8:14, 26:9, 26:17, 28:1 .
**applying** 28:12 .
**appreciate** 3:21, 4:4, 34:15, 80:3, 90:23, 97:21, 98:9, 110:6 .
**approximate** 42:5 .
**Approximately** 39:4, 41:10, 41:13, 41:19, 100:13, 101:24 .
**arise** 109:3 .
**Around** 30:7, 34:4, 34:20, 39:13, 39:16, 39:20, 41:14, 41:22, 42:7, 42:8, 60:25, 64:4 .
**arrive** 21:19, 21:24 .
**article** 37:9 .
**assist** 6:25 .
**associated** 45:14, 47:15, 48:14, 49:10, 52:24, 80:24, 104:19, 106:4, 106:9, 106:19 .
**asterisks** 19:11, 19:12, 19:13 .
**Attach** 22:20, 24:15, 45:13, 52:22, 56:11, 104:16 .
**attached** 22:11, 70:6,

86:22 .
**attachments** 12:25 .
**attend** 72:3 .
**attention** 17:15, 47:10, 48:7 .
**Attorney** 1:28 .
**audited** 60:20, 60:23 .
**authority** 9:13 .
**authorized** 8:10, 20:1, 72:21, 72:23, 73:2 .
**auto** 58:10 .
**automatically** 7:12 .
**automotive** 91:23 .
**available** 13:5, 16:7, 16:10 .
**award** 27:10 .
**aware** 60:7, 110:8 .
**away** 4:6, 78:6, 88:25 .

**< B >.**
**B-o-l-u-s** 4:19 .
**B-u-t-l-e-r** 98:12 .
**B.** 11:2 .
**babysitting** 40:10, 40:13 .
**background** 26:20, 26:25, 27:3, 27:4, 27:5, 28:5, 28:11 .
**Baltimore** 1:43 .
**Bank** 44:18, 64:23 .
**banking** 103:22 .
**based** 7:8, 7:9, 8:25, 28:4 .
**basic** 17:11, 26:20, 28:11 .
**Basically** 6:11, 9:21, 33:12, 43:10, 51:21, 64:3 .
**basket** 29:11 .
**batch** 29:15, 29:24 .
**batches** 29:19 .
**become** 6:1 .
**begin** 62:14 .
**beginning** 11:7, 69:8 .
**begins** 33:19 .
**behalf** 3:10, 3:15, 20:21 .
**behind** 39:24, 66:17, 94:5, 102:21 .
**belief** 76:16 .

**believe** 11:1, 30:12, 30:17, 32:3, 49:14, 63:5, 64:20, 65:4 .
**below** 19:23, 83:21, 105:14 .
**benefit** 78:17 .
**besides** 60:13 .
**best** 71:6, 76:15, 77:19 .
**better** 23:23, 26:24, 29:23, 51:8, 84:6 .
**big** 62:6 .
**bill** 68:20, 80:15, 84:9, 84:10, 84:11, 92:8, 92:9 .
**bills** 50:6 .
**binder** 62:5 .
**binders** 10:9, 10:12, 17:21 .
**bit** 20:13, 21:1, 34:20, 63:25 .
**black** 37:10 .
**blank** 20:5, 54:4 .
**block** 19:13 .
**blocks** 21:18 .
**Board** 64:23 .
**Bolus** 2:7, 4:10, 4:13, 4:16, 4:23, 17:9, 17:19, 17:21, 19:10, 21:1, 21:14, 22:18, 23:2, 23:16, 24:2, 25:1, 25:18, 28:22, 33:10, 33:22, 34:15 .
**bottom** 21:14, 49:14, 58:24, 60:5, 75:2, 78:20 .
**bracket** 30:5, 34:7 .
**brackets** 30:4 .
**break** 34:18, 59:15, 61:6, 61:7, 61:12, 107:16, 107:21 .
**Briefly** 33:4, 60:22, 95:8 .
**bring** 3:22, 5:22, 38:18, 38:19, 38:22, 97:6, 101:5, 101:8 .
**brother** 37:22 .
**brought** 38:21, 40:17, 60:10 .
**Brown** 109:17 .
**Budget** 64:17, 64:18 .

**building** 101:3 .
**bulletins** 87:24 .
**Bunche** 77:25, 78:4, 78:22 .
**burden** 4:7 .
**Butler** 2:23, 97:25, 98:1, 98:4, 98:7, 98:9, 98:12, 104:5, 105:8, 108:8, 109:5 .
**Butler.** 107:6 .
**byline** 18:12 .

**< C >.**
**C-EZ.** 22:20, 45:13 .
**C.** 1:40, 1:41, 22:24, 41:4, 41:7, 52:22, 53:16, 56:12, 80:5, 88:13, 98:21, 101:21, 101:23, 105:18, 111:5 .
**calculate** 21:11, 25:6 .
**call** 4:8, 13:9, 61:19, 68:15, 84:6 .
**called** 21:15, 22:2, 50:14, 61:22 .
**calling** 109:9 .
**calls** 4:9, 34:24, 97:24 .
**Cannon** 32:17 .
**capital** 105:14 .
**car** 49:5, 51:20, 51:21, 51:24, 52:1, 52:8, 68:21, 82:10, 82:14, 82:17, 82:21, 82:25, 92:11, 92:17 .
**care** 42:24, 43:3, 43:17, 46:14, 47:18, 48:21, 50:5, 50:9, 51:3, 51:4, 54:2, 55:15, 57:5, 57:9, 57:19, 58:12, 59:3, 67:14, 69:25, 74:14, 86:13, 90:17, 90:25, 91:2, 91:16, 92:1, 95:17, 95:21 .
**case** 6:5, 61:11, 107:25 .
**cash** 42:3, 73:13, 91:2, 97:11, 103:16 .
**category** 109:11 .
**cause** 27:10 .
**cell** 49:19, 59:4, 80:12,

80:14, 80:15, 92:9,
94:23, 94:25 .
**Center** 78:1, 78:5,
87:24 .
**cents** 94:12 .
**certain** 9:10, 9:17,
52:8 .
**CERTIFICATE** 9:20,
111:1 .
**certificates** 66:14 .
**Certification** 13:20, 14:1,
14:5, 14:25 .
**certifications** 8:3,
14:7 .
**Certified** 5:21, 14:5,
111:3 .
**certify** 5:21, 9:16, 10:1,
111:4 .
**certifying** 9:8 .
**chair** 66:12, 66:13 .
**chance** 109:2 .
**changing** 34:18 .
**charge** 96:3 .
**charging** 95:12, 95:13,
95:23, 96:2 .
**charitable** 79:2, 86:12 .
**charities** 77:24, 93:6,
96:14, 96:17, 96:19,
96:21 .
**charity** 38:25, 69:3, 69:4,
77:4, 78:12, 78:14,
78:23, 79:15, 93:25,
97:7, 97:11 .
**Charlene** 109:14 .
**Charles** 1:46, 3:12 .
**check** 22:11, 26:20, 26:25,
27:3, 27:5, 27:15, 28:4,
28:7, 28:8, 28:10, 28:16,
28:24, 28:25, 44:15,
73:12, 97:12,
103:16 .
**checked** 105:12 .
**checks** 26:21 .
**Child** 46:14, 48:21, 51:3,
51:4, 54:2, 57:5, 57:9,
57:19, 86:13, 90:17,
90:24, 91:2, 91:16,
92:1 .
**children** 41:23, 42:9,
43:13, 47:19, 51:23,

52:9, 58:13, 74:14,
86:21, 95:17 .
**Christian** 77:25 .
**CHUANG** 1:22 .
**chunks** 34:3 .
**church** 69:4, 77:18, 77:23,
78:21, 87:23, 90:14,
96:10 .
**circulation** 34:20 .
**city** 105:9 .
**claim** 7:3, 24:13,
101:9 .
**clarify** 13:22, 19:5,
34:8 .
**classes** 36:19, 99:15 .
**classified** 28:10 .
**clearly** 4:14, 35:5, 39:23,
98:5 .
**CLERK** 3:4, 4:12, 4:14,
4:17, 4:20, 35:1, 35:5,
35:8, 35:11, 61:14, 98:1,
98:5, 98:8, 98:13, 108:5,
110:20 .
**click** 30:4, 30:5, 34:5 .
**client** 109:20 .
**closer** 98:8 .
**clothing** 37:9 .
**co-counsel** 17:5 .
**coach** 28:12, 28:16,
28:18 .
**COFER** 1:32, 2:9, 2:13,
3:11, 4:9, 4:22, 16:13,
16:25, 17:3, 17:8, 17:17,
19:8, 20:24, 21:13, 22:1,
22:16, 22:25, 23:13,
23:21, 24:24, 25:9, 33:3,
33:6, 33:9, 33:20, 34:11,
46:18 .
**collect** 5:6 .
**column** 51:12 .
**columns** 105:24 .
**comes** 71:5, 110:11 .
**coming** 4:4, 29:19, 34:16,
61:18 .
**Commissioner** 5:18,
5:19 .
**communications**
110:4 .
**Community** 20:18, 27:8,
28:3, 28:12, 77:25, 78:5,

78:8, 87:24 .
**compare** 11:21 .
**Compared** 11:22, 52:4 .
**complete** 6:22, 8:3, 21:18,
93:7 .
**complete.** 76:17 .
**completed** 19:25 .
**complex** 63:25 .
**compliance** 27:4 .
**computer** 7:12, 8:18,
12:15, 18:14, 39:13,
39:16, 39:18, 39:24,
40:2, 70:5, 102:17,
102:19, 102:20, 102:23,
103:5 .
**Computer-aided** 1:49 .
**concerned** 28:24 .
**concerns** 93:24 .
**concluded** 110:22 .
**condolences** 108:23 .
**conduct** 28:3 .
**confer** 17:5, 109:2 .
**Conference** 111:9 .
**conferred** 95:4 .
**confident** 79:21 .
**conformance** 111:8 .
**Congress** 5:5 .
**connection** 10:3 .
**consider** 101:17 .
**consist** 27:1 .
**contain** 12:23 .
**contained** 8:1, 11:25,
12:14, 15:21, 18:13,
66:9, 84:7 .
**containing** 10:10 .
**contains** 10:22, 15:16 .
**continuing** 109:5 .
**contributions** 86:12 .
**conversation** 63:25 .
**conversations** 42:21,
43:18, 78:10, 78:18 .
**convicted** 27:13,
28:17 .
**coordinator** 5:12, 5:16,
5:17, 5:24 .
**copies** 11:17, 12:11 .
**copy** 77:19, 103:12 .
**corner** 18:23, 33:13 .
**corporation** 23:7 .
**corporations** 105:3 .

**Corps** 104:16 .
**correct** 3:23, 12:2, 14:2,
25:21, 29:7, 31:19,
32:22, 65:19, 70:13,
72:10, 72:16, 73:7,
73:10, 76:12, 76:16,
80:10, 84:7, 86:14,
87:25, 108:18,
111:6 .
**correctly** 59:22 .
**Cost** 51:12, 51:15, 82:7,
82:8, 82:10 .
**costs** 95:16 .
**Counsel** 3:8, 3:10,
32:16 .
**counsel.** 95:4 .
**country** 64:5 .
**county** 84:13, 85:10 .
**couple** 8:6, 68:22,
75:16 .
**course** 21:3, 25:15, 27:4,
42:18, 47:22, 65:14,
67:13 .
**courtroom** 4:2, 37:7,
61:15, 62:12, 108:6 .
**cover** 95:16 .
**create** 8:25 .
**credentials** 27:16 .
**Credits** 23:25 .
**Criminal** 1:9, 1:34, 3:5, 5:1,
5:22 .
**CROSS-EXAMINATION**
2:11, 2:19, 25:13, 25:16,
61:6, 62:14, 62:17 .
**CRR** 111:16 .
**Cs** 76:13 .
**current** 5:11 .
**currently** 35:18, 36:9, 78:1,
98:18 .
**cursor** 23:24 .
**custodial** 5:19 .
**custodian** 11:15 .
.

**< D >** .
**D-a-r-l-e-n-e** 35:10 .
**D.** 1:22, 46:10, 50:25,
52:17, 53:24, 56:7,
57:3 .
**daily** 52:4 .

**Darlene** 2:15, 34:24, 35:4, 35:7, 45:5, 46:10, 46:17, 50:25, 52:17, 53:24, 54:5, 56:7, 57:3, 57:7 .

**Data** 8:16, 8:17, 8:21, 10:2, 11:23, 11:25, 14:21, 15:12, 15:16, 18:12, 18:14, 18:16, 18:17, 19:3 .

**database** 8:1, 12:15 .

**databases** 9:14 .

**Dated** 111:10 .

**daughter** 40:10, 41:20, 42:2, 42:6, 42:11, 69:7, 69:12, 91:1, 95:11, 95:24, 100:5 .

**day** 4:5, 40:16, 40:23, 40:25, 46:14, 48:21, 51:3, 51:4, 54:2, 57:5, 57:9, 57:19, 61:7, 107:16, 107:19, 107:23, 109:20, 111:10 .

**days** 107:20 .

**DC** 1:36 .

**deaf** 72:5, 72:23 .

**dealing** 107:19, 109:1 .

**deals** 31:25, 32:3, 32:4, 91:23 .

**dealt** 63:21, 71:11, 109:24 .

**Debra** 32:17 .

**declaring** 75:22 .

**deductible** 88:6, 88:10 .

**deduction** 23:18, 23:23, 24:3, 24:7, 24:11, 24:12, 24:20, 24:21, 24:22, 25:4 .

**deduction.** 23:18, 24:11 .

**deductions** 7:3, 23:17, 24:10, 24:12, 24:14, 24:20, 25:6 .

**DEFENDANT** 1:12, 1:38, 3:19, 37:12, 95:4, 108:24 .

**Defense** 77:5, 96:6, 96:7 .

**definition** 67:19,

67:20 .

**Department** 1:33, 3:11, 5:5, 35:23 .

**depreciate** 32:13 .

**Depreciation** 16:4, 32:5, 50:15, 50:20, 81:10, 81:12 .

**describe** 5:15, 21:5, 26:24, 38:1, 38:14, 39:16, 40:13, 40:14, 42:21, 101:2, 102:7 .

**described** 9:3, 14:9, 24:3 .

**describing** 13:1, 21:16, 33:10 .

**description** 51:9, 51:10 .

**designation** 27:25, 86:21, 94:4 .

**designed** 32:11 .

**desk** 39:21, 39:22, 66:13, 66:16, 66:20, 66:21, 102:20 .

**destroy** 71:4 .

**determine** 9:9 .

**Development** 35:23 .

**different** 11:3, 17:9, 43:11, 64:4, 64:13, 64:21, 65:13, 77:18, 86:10 .

**difficult** 62:6 .

**DIRECT** 2:9, 2:17, 2:25, 4:21, 35:14, 48:7, 59:18, 66:25, 70:3, 98:14 .

**directly** 44:18 .

**disabled** 72:5 .

**discuss** 59:2, 61:11, 107:25, 110:7 .

**discussed** 6:5 .

**discussing** 48:4 .

**discussion** 52:6, 89:12, 110:14 .

**discussions** 89:10, 110:15 .

**District** 1:1, 1:2, 111:4 .

**divide** 93:1 .

**divided** 11:1, 11:6, 11:7 .

**Division** 1:3, 1:34, 3:11, 3:13, 5:2 .

**DLN** 18:25, 33:18, 33:19,

33:22, 33:24 .

**DLN.** 18:23 .

**documentation** 32:16, 68:25, 70:23, 71:1, 94:24 .

**documents** 5:20, 5:21, 10:10, 10:14, 11:13, 12:3, 12:7, 12:22, 13:15, 16:2, 29:5, 36:3, 38:22, 60:3, 60:5, 60:9, 61:24, 62:1, 69:3, 69:15, 69:21, 70:12, 71:9, 71:19, 76:13, 85:3, 92:19, 109:22, 109:25 .

**documents.** 10:17, 12:5, 12:20, 13:17 .

**doing** 5:13, 7:22, 26:9, 34:22, 37:1, 40:23, 42:13, 42:15, 44:8, 59:5, 59:23, 59:25, 61:23, 67:4, 76:3, 78:11, 79:12, 88:14, 99:22 .

**DOJ** 1:47 .

**dollar** 81:22, 94:5 .

**dollars** 74:13, 80:17 .

**donation** 101:12 .

**done** 42:17, 59:17, 59:22, 103:7, 108:2 .

**download** 11:9, 13:9, 33:12 .

**downloading** 30:3 .

**downloads** 11:12 .

**driven** 79:2 .

**driver** 99:8 .

**due** 6:9, 6:12, 21:12, 22:4 .

**During** 22:6, 39:8, 39:10, 43:19, 44:3, 64:11, 65:6, 65:10, 65:13, 102:25 .

**duties** 5:15, 5:19, 6:1, 9:9, 36:2 .

**.**

**< E >.**

**e-file** 14:25 .

**E.** 104:17 .

**earlier** 11:6, 16:6, 49:21, 80:4, 80:6 .

**earning** 40:6 .

**efficient** 110:5 .

**effort** 3:21 .

**EFIN** 8:7, 8:8, 8:15, 26:6, 26:10, 26:15, 26:22, 27:1, 27:10, 27:14, 28:1, 28:8, 28:25 .

**eight** 101:21 .

**EIN** 15:1 .

**either** 9:16, 17:12, 18:17, 85:16, 108:1 .

**elected** 51:15 .

**electric** 68:20, 90:21, 92:7 .

**electricity** 43:11 .

**Electronic** 8:8, 8:10, 11:25, 26:23 .

**electronically** 8:11, 11:23, 17:14, 18:7, 18:9, 20:3, 20:10, 20:19 .

**electronically-filed** 18:20, 19:20 .

**elects** 108:14 .

**ELMO** 62:2 .

**email** 110:12 .

**Emergency** 63:18 .

**employed** 35:18, 98:18 .

**employee** 15:5 .

**employees** 7:13, 11:9, 29:10, 29:15, 34:3 .

**end** 21:11, 43:19, 60:2 .

**ends** 33:19, 33:23 .

**enforce** 5:6 .

**Enforcement** 1:34 .

**engagement** 67:8 .

**enjoy** 61:12, 108:2 .

**enlarge** 44:20, 45:8, 45:24, 50:18, 52:11, 53:17, 56:1, 97:6, 103:24, 104:25, 106:15, 106:25 .

**enlargement** 54:6 .

**enough** 6:13 .

**entail** 9:19 .

**Enter** 47:6, 58:5 .

**entered** 4:2, 46:13, 62:12, 103:22 .

**entire** 11:5, 23:22, 65:6, 109:20 .

**entitled** 7:2, 79:1 .

entity 7:8 .
entries 7:11, 7:12, 80:20,
    80:24 .
Eric 1:47, 3:13 .
Esquire 1:27, 1:32,
    1:40 .
established 26:12 .
estate 84:9, 84:11, 85:12,
    104:16, 105:3, 107:9,
    107:13 .
estates 105:3 .
etc. 105:4 .
Eugene 1:10, 3:6 .
events 79:3 .
eventually 20:19 .
everyone 3:3, 3:21, 4:3,
    61:18, 62:2, 62:13,
    108:7, 110:3 .
everything 9:22, 26:21,
    78:21 .
evidence 5:22, 16:16,
    16:24, 75:9, 77:6, 77:8,
    84:3, 84:22, 86:5, 87:16,
    89:20, 90:12, 93:16 .
evidently 29:5, 92:7 .
exactly 66:15 .
EXAMINATION 2:9, 2:13,
    2:17, 2:21, 2:25, 4:21,
    33:8, 35:14, 95:9,
    98:14 .
examined 29:5, 30:11,
    75:22, 75:25 .
example 11:2, 13:1, 13:3,
    21:2, 21:22, 26:13,
    27:17, 28:15, 79:7,
    87:24 .
examples 6:24, 27:9,
    43:8 .
except 107:20 .
Excuse 60:4, 62:23,
    80:1 .
exemptions 7:3,
    21:10 .
Exhibit No. 44:19, 50:17,
    96:7, 97:6 .
Exhibits 10:19, 10:24,
    11:1, 11:2, 12:10, 12:16,
    12:23, 13:12, 13:20,
    15:25, 16:3, 16:9, 16:16,
    16:22, 96:7 .

exist 10:2 .
exists 27:6 .
expect 107:23 .
expected 69:14 .
expense 50:2, 55:12,
    79:14 .
Expenses 16:4, 31:14,
    31:19, 32:1, 43:2, 43:6,
    43:8, 43:15, 43:16,
    46:18, 47:5, 47:6, 48:4,
    49:7, 49:12, 49:15,
    49:25, 50:5, 54:8, 54:11,
    57:8, 58:5, 58:18, 58:25,
    59:2, 67:15, 67:18,
    78:14, 86:22 .
experience 29:8, 85:5 .
experienced 73:24 .
expert 76:2 .
expertise 59:25 .
explain 45:21, 72:18,
    73:18, 92:20 .
explained 25:20 .
explains 23:18 .
extent 40:18, 42:25 .
extraordinary 69:24 .
.
.
< F > .
face 39:20 .
fact 9:23, 69:11, 71:16,
    88:6 .
fair 29:2, 63:21, 66:11,
    74:13, 74:15, 74:17,
    76:10, 80:19, 80:23,
    86:8, 88:10, 89:22,
    91:19, 94:21 .
Faith 77:25 .
familiar 6:1 .
family 65:12, 108:23 .
far 28:24, 36:13, 41:5,
    43:11, 69:23, 99:10 .
faulting 73:3, 82:1,
    92:24 .
feature 19:20, 20:10 .
fed 40:18 .
Federal 5:22, 40:8, 60:18,
    60:24, 63:18, 64:14,
    64:21, 64:23, 65:4,
    111:17 .
fee 20:18, 28:3, 95:11,

95:22, 96:2 .
feed 43:13 .
feel 34:21, 79:21 .
feet 66:23 .
felon 27:13, 28:17 .
FEMA 63:16, 63:17 .
few 10:9, 25:20, 32:17,
    103:1, 107:20 .
figure 30:22, 31:8, 32:12,
    48:2, 55:18, 73:3, 82:6,
    89:8, 89:12, 90:20 .
figured 68:21 .
figures 76:6, 81:24, 82:9,
    90:21, 92:22,
    105:23 .
file 8:20, 18:17, 20:2,
    20:21, 39:6, 60:17 .
filed 6:15, 6:17, 9:11, 9:23,
    11:24, 17:12, 17:13,
    18:4, 18:6, 18:7, 18:8,
    20:10, 29:6, 49:1, 70:20,
    72:12 .
files 6:18 .
Filing 8:8, 21:10 .
fill 31:8, 31:25 .
Finally 15:24, 93:7 .
financial 63:20, 64:2 .
find 9:23, 10:1, 62:7,
    72:1 .
finding 9:8 .
fine 44:21, 60:10, 60:11,
    62:8, 76:19 .
finished 10:16, 12:4, 19:3,
    70:4, 70:5 .
first 4:7, 4:8, 4:15, 4:17,
    18:22, 33:21, 35:6, 35:8,
    38:7, 40:21, 42:23,
    68:22, 90:23, 98:6, 98:9,
    102:9, 104:3, 109:6,
    109:24 .
fix 43:21 .
fixed 30:7 .
floor 38:15 .
folder 103:13 .
folks 74:2 .
follow 14:9, 21:23,
    21:24 .
following 6:9, 16:16 .
foregoing 111:5 .
forgot 38:15 .

format 111:8 .
Forms 6:21, 8:23, 9:24,
    10:1, 13:3, 76:9 .
forth 43:10, 57:12, 78:21,
    79:13 .
forward 35:1, 98:1,
    108:8 .
frame 65:6 .
free 13:10, 34:21,
    42:17 .
Freedom 36:1 .
frequently 78:7 .
Friday 40:17, 41:2 .
front 10:9, 65:22 .
front-end 18:14 .
full 9:13 .
.
.
< G > .
G. 111:2, 111:16 .
gain 30:5 .
Gary 1:27 .
Gas 43:10, 49:18, 59:4,
    80:12, 80:14, 80:20,
    91:23, 92:9, 94:17 .
gathering 5:19 .
gave 38:17, 38:25, 42:2,
    70:5, 70:12, 78:15, 80:9,
    81:23, 82:4, 84:13,
    84:24, 87:20, 91:20,
    92:19, 93:5, 95:14,
    95:19, 96:3 .
General 35:24 .
Generally 6:4, 6:6, 10:21,
    12:9, 15:15, 16:2,
    21:5 .
generate 20:19 .
gentlemen 4:4, 34:17,
    61:6, 107:18 .
Gerald 1:40, 1:41,
    3:15 .
Gerry 62:21 .
gets 76:2, 76:24,
    110:16 .
getting 26:15, 29:22, 40:6,
    103:8, 103:9,
    103:20 .
gifts 97:7, 97:11 .
give 23:23, 27:9, 28:14,
    40:11, 42:7, 43:8, 43:21,

68:11, 69:3, 69:5, 70:8,
76:7, 80:11, 81:4, 86:18,
90:7, 103:16,
108:25 .
**Given** 27:1, 61:7, 71:2,
86:7, 94:19 .
**Gives** 95:24, 96:1,
107:19 .
**giving** 84:9, 84:10 .
**glitch** 29:17, 30:7 .
**gotten** 109:23 .
**Government** 2:4, 4:6, 4:8,
4:9, 16:15, 40:8, 63:1,
63:4, 64:12, 65:5,
97:24 .
**GOVERNMENT'S** 4:13,
35:4, 98:4 .
**graduated** 36:14 .
**grandchildren** 40:14,
41:21, 42:25, 43:17,
50:5, 51:5, 51:18, 51:23,
52:2, 55:15, 55:21,
57:13, 59:3, 67:15,
95:19 .
**grandkids** 42:11, 43:3,
69:25 .
**grant** 28:5 .
**graphic** 18:18 .
**graphical** 18:19 .
**great** 56:10 .
**Greenbelt** 1:16, 1:30 .
**grew** 78:5 .
**Groceries** 49:18, 57:11,
59:4, 80:12, 80:14,
80:20, 90:19, 90:21,
91:23, 94:4, 94:9,
94:12 .
**grocery** 68:20 .
**Gross** 46:22, 46:25, 58:2,
88:15, 91:12 .
**group** 30:9 .
**guess** 13:24, 22:8, 42:6,
52:4, 61:19, 65:22,
68:20, 73:16, 84:7, 85:9,
102:13 .

.

< H > .
**H-a-l-l** 35:10 .
**half** 100:15 .

**hand** 4:12, 35:3, 98:3,
102:11 .
**handed** 103:13 .
**handful** 6:4 .
**handwriting** 79:20,
79:22 .
**happen** 103:6 .
**happened** 43:19, 60:2,
60:22, 73:4, 102:9 .
**happens** 7:14 .
**happy** 108:12 .
**hard** 30:9 .
**headache** 30:1 .
**health** 47:22 .
**health.** 47:14 .
**heat** 90:22 .
**heavy** 62:6 .
**held** 13:13, 111:7 .
**help** 6:21, 14:7, 31:24,
32:11, 42:12, 65:12,
95:16 .
**helped** 85:23 .
**helpful** 110:15 .
**here.** 22:11 .
**hereby** 111:4 .
**High** 36:14 .
**higher** 90:23 .
**historical** 7:6, 15:22 .
**Hold** 93:14 .
**Home** 31:18, 31:25, 47:7,
49:3, 58:6, 64:23, 69:3,
71:22, 77:15,
101:21 .
**homeowner** 47:24,
58:7 .
**Honorable** 1:22,
110:20 .
**Hopefully** 78:17, 110:3,
110:16 .
**Hospital** 98:21, 98:22 .
**hour** 100:15 .
**hours** 41:24 .
**house** 38:8, 38:23, 40:17,
40:18, 41:11, 41:15,
41:17, 41:19, 101:16,
101:22, 101:23 .
**household** 43:12 .
**Housing** 35:23 .
**HUD** 64:7, 64:8, 64:13 .
**husband** 36:7, 39:6, 39:8,

45:6, 47:22, 63:14, 72:3,
72:5, 72:7, 72:9, 72:23,
72:24, 73:9, 80:18,
82:17, 83:1, 100:16,
104:6, 107:12 .

.

.

< I > .
**idea** 88:20 .
**identical** 28:7, 86:7 .
**Identification** 7:21, 7:25,
8:4, 8:8, 17:2, 17:4,
27:21, 27:22, 74:19,
75:6, 76:21, 77:1, 79:16,
79:17, 83:8, 83:15,
84:16, 84:17, 85:17,
85:19, 87:7, 89:14,
89:15, 90:3, 93:7 .
**identified** 37:12 .
**identifier** 19:5 .
**identify** 3:8, 37:9, 61:25,
75:4, 76:25, 77:2, 79:18,
84:18, 85:20, 87:8,
89:15, 90:4, 90:6,
93:8 .
**identifying** 19:14, 19:15,
20:7, 21:8, 21:9 .
**identity** 19:19 .
**IDRS** 8:18, 9:1, 11:25, 12:1,
15:23 .
**II** 1:12, 47:4, 47:6, 54:12,
58:5 .
**important** 85:12 .
**inappropriate** 63:10 .
**include** 11:8, 34:6 .
**included** 19:3, 21:20 .
**including** 46:12, 54:1 .
**Income** 6:7, 6:10, 7:4,
10:22, 22:6, 22:12,
22:19, 45:9, 45:13,
45:15, 46:20, 52:13,
52:19, 56:3, 56:11,
56:12, 57:25, 58:2, 58:3,
104:9, 105:2, 105:20,
106:2, 106:4,
106:16 .
**incur** 56:15, 67:16 .
**incurred** 43:16, 50:5,
78:14 .
**INDEX** 2:1 .

**indicate** 29:5 .
**indicated** 26:6, 73:24 .
**Individual** 6:7, 6:15, 7:13,
8:20, 10:24, 11:3, 17:9,
18:1, 20:16, 37:5, 45:1,
52:13, 56:3, 99:25,
103:25 .
**indulgence** 16:13 .
**inform** 8:23 .
**initial** 104:3 .
**initially** 62:4 .
**ink** 87:24 .
**inside** 66:9, 70:12 .
**Inspector** 35:24 .
**instances** 29:13 .
**instead** 19:18 .
**instructions** 6:25, 12:24,
13:2, 13:5, 23:24,
32:6 .
**Insurance** 47:14, 47:15,
47:18, 47:21, 47:22,
47:23, 47:25, 58:7, 58:8,
58:10, 58:12, 58:16,
82:14, 82:21, 89:5,
92:11, 92:15, 92:17,
92:18, 93:2 .
**Integrated** 8:16, 8:17,
15:16 .
**intend** 61:23 .
**interest** 38:24, 69:2 .
**Internal** 5:1, 5:3, 5:4,
5:18 .
**internet** 8:12, 13:8, 17:14,
18:10, 18:12, 18:16,
20:20, 26:17, 32:23 .
**Investigation** 5:2,
28:11 .
**involve** 11:11 .
**Irs.gov** 13:8 .
**issue** 8:22, 26:22, 33:10,
86:12 .
**issued** 7:24, 8:15, 20:17,
28:20 .
**issues** 19:1, 109:2 .
**Itemized** 23:17, 24:10,
24:11, 24:12, 24:19,
24:21, 24:22, 25:4,
25:6 .
**items** 77:18, 87:23, 88:2,
93:24 .

**itself** 21:21, 39:17,
   70:15 .
**Ivy** 1:29 .
.
.
**< J >** .
**Jeep** 83:3, 92:12 .
**John** 99:4, 104:5, 105:8,
   107:6 .
**Johnson** 109:12 .
**joined** 3:10, 3:12 .
**joint** 72:12 .
**jointly** 39:6 .
**Jones** 109:10, 109:14 .
**jotting** 67:1, 67:3 .
**Judge** 62:5, 62:10, 95:5,
   97:19 .
**Judicial** 97:1, 111:8 .
**Jurors** 3:20, 72:18, 87:19,
   88:23 .
**Jury** 3:7, 4:2, 17:18, 21:3,
   54:15, 61:14, 61:15,
   61:19, 61:22, 61:24,
   62:3, 62:12, 78:17,
   88:21, 97:3, 101:20,
   102:7, 108:5, 108:6,
   110:16 .
**JURY TRIAL** 1:21 .
**Justice** 1:33, 3:12 .
.
.
**< K >** .
**Karen** 2:23, 97:25, 98:4,
   98:7, 98:11, 104:5,
   105:8 .
**keep** 6:18, 9:4, 61:8, 62:3,
   70:23, 71:1, 110:5 .
**kept** 25:24 .
**kids** 50:9, 95:21 .
**kind** 20:13, 21:22, 27:3,
   38:22, 47:21, 63:24,
   66:7, 67:5, 70:8, 74:2,
   77:20, 82:25, 87:3,
   101:8 .
**kinds** 55:9, 67:11,
   86:21 .
**knowledge** 27:17, 29:1,
   32:20, 70:15, 73:18,
   76:16, 82:2 .
**known** 5:7, 76:9, 88:9 .

**knows** 19:16, 108:14,
   110:6 .
.
.
**< L >** .
**L.** 1:32 .
**Lack** 9:21, 13:20, 14:1,
   14:5, 14:11, 26:24,
   84:6 .
**lacks** 9:16 .
**Ladies** 4:4, 34:17, 61:6,
   107:18 .
**Landover** 38:9,
   100:23 .
**Lane** 1:29 .
**large** 66:16 .
**larger** 11:11 .
**Largo** 100:23 .
**Last** 4:15, 4:17, 21:25,
   35:6, 35:8, 39:4, 60:15,
   60:16, 63:4, 63:5, 63:11,
   98:6, 98:7, 98:10, 98:11,
   100:13 .
**later** 18:17, 61:9 .
**LAW** 1:41, 110:20 .
**laws** 5:6, 27:17 .
**lawyers** 108:12 .
**learn** 100:4 .
**lease** 48:8, 48:16, 54:13,
   54:17 .
**leased** 48:19, 54:21,
   54:25 .
**leasing** 55:3 .
**least** 79:1, 92:24 .
**leave** 54:4, 108:11, 108:14,
   108:22 .
**left** 17:20, 17:21, 23:18,
   23:23, 23:24, 24:3,
   47:11, 61:15, 108:6 .
**less** 30:1 .
**Lexus** 51:11, 52:7, 81:17,
   81:21, 82:3, 82:7,
   92:12 .
**likely** 109:17 .
**lines** 21:11, 22:9,
   89:24 .
**list** 9:22, 9:24, 24:14 .
**listed** 24:6, 45:3, 46:16,
   46:25, 49:17, 50:2, 50:4,
   50:24, 51:13, 54:1,

   54:12, 56:6, 57:2, 58:3,
   68:16, 97:14, 104:12,
   105:17, 107:7,
   107:10 .
**lists** 21:7, 21:9, 22:23,
   48:11 .
**lit** 83:12 .
**little** 13:24, 20:13, 21:1,
   34:20, 51:8, 90:23 .
**live** 38:12 .
**Loan** 64:23 .
**location** 26:19 .
**locator** 18:25 .
**long** 5:9, 5:13, 30:19, 31:4,
   31:16, 31:21, 32:9,
   37:23, 39:4, 40:19,
   41:10, 64:7, 80:16,
   100:13, 101:23 .
**longer** 109:6 .
**look** 14:24, 15:7, 15:14,
   15:24, 21:13, 25:23,
   30:12, 33:13, 33:18,
   49:13, 53:22, 54:11,
   57:13, 59:9, 59:24, 60:9,
   71:22, 71:24, 81:24,
   84:12, 95:18, 96:6,
   102:8, 108:8 .
**looked** 9:25, 10:12, 31:13,
   94:7, 102:13 .
**Looking** 18:1, 18:3, 18:19,
   18:22, 19:23, 20:13,
   21:3, 21:4, 22:8, 23:2,
   25:1, 55:21, 58:6, 88:13,
   89:4, 91:9 .
**looks** 21:14, 26:21,
   38:14 .
**lose** 74:8 .
**Loss** 22:19, 22:23, 23:5,
   23:6, 45:13, 45:15, 46:2,
   52:20, 53:19, 56:11,
   56:13, 56:15, 56:24,
   57:16, 69:23, 73:24,
   74:3, 105:2, 106:17,
   107:2 .
**Losses** 45:21, 53:5, 53:7,
   106:7 .
**lot** 70:19, 72:24, 95:20 .
**loud** 62:8 .
**lunch** 107:21 .
.

**.
< M >** .
**Mahoney** 1:47, 3:13, 17:17,
   19:8, 20:25, 22:16,
   22:25, 23:14, 23:21,
   24:24, 33:6, 33:20, 47:4,
   80:1, 81:8, 88:12, 88:14,
   89:13, 97:5 .
**mailed** 17:13 .
**mainframe** 8:18 .
**maintenance** 55:8, 55:10,
   55:14, 55:20 .
**makeup** 26:19 .
**man** 63:21 .
**manage** 102:3 .
**Management** 63:18, 63:23,
   64:17 .
**managers** 102:4,
   107:13 .
**managers.** 107:9 .
**margin** 23:19 .
**marked** 10:10, 10:15, 11:2,
   12:3, 13:15, 14:13,
   15:14, 15:24, 17:2, 17:3,
   77:1, 79:17, 83:14,
   84:17, 85:19, 87:7,
   89:15, 90:3, 93:8 .
**married** 36:5, 99:1 .
**Martinsburg** 18:15 .
**Maryland** 1:2, 1:16, 38:10,
   38:12, 60:17, 100:24,
   111:4 .
**masks** 19:16 .
**master** 8:19, 8:20 .
**Materials** 49:18, 70:19,
   80:13 .
**math** 97:3 .
**Matt** 3:11 .
**matter** 3:4, 71:16,
   111:7 .
**Matthew** 1:32 .
**Maurice** 109:17 .
**MD** 1:30, 1:43 .
**mean** 18:24, 28:19, 30:1,
   67:22, 68:14, 69:4, 81:4,
   86:10 .
**meant** 75:25, 92:17 .
**measurement** 66:22 .
**measurements** 66:18,
   66:19 .

**Medical** 72:24, 77:23,
79:14, 96:16 .
**medicals** 77:4, 86:13,
90:15 .
**medium-size** 66:21 .
**meet** 38:6, 100:16, 100:22,
100:25, 102:10 .
**meeting** 43:19, 60:2,
100:13, 102:8,
102:25 .
**meetings** 39:4, 39:8,
39:10, 72:3 .
**member** 65:12 .
**mentioned** 8:6, 20:12,
24:2, 34:17, 72:16,
79:4 .
**mentioning** 49:21 .
**Merit** 111:2 .
**met** 38:8, 62:22, 62:24,
63:1, 63:4, 65:21, 65:23,
102:8 .
**Michael** 1:27, 3:9 .
**microphone** 4:15, 35:6,
98:6, 98:8 .
**mid-afternoon** 34:18 .
**mid-morning** 34:18, 59:15,
61:7 .
**middle** 20:14 .
**mileage** 79:2, 79:10 .
**miles** 78:6, 78:20 .
**million** 6:17 .
**minimal** 27:3 .
**minus** 104:23, 106:23 .
**minute** 91:3, 92:14 .
**minutes** 32:18, 39:5,
41:12, 59:17 .
**missing** 77:21 .
**Mitchell** 111:2, 111:16 .
**Mm-hmm** 41:16, 41:18,
69:9, 70:2, 76:23, 77:22,
86:2 .
**moment** 10:14, 16:14,
16:19, 17:5, 25:9, 33:3,
92:6, 95:3 .
**moments** 25:21 .
**Monday** 40:16, 41:2 .
**money** 6:13, 21:19, 22:4,
40:6, 40:9, 40:11, 42:3,
42:13, 69:6, 69:12,
73:15, 74:9, 74:16,

84:13, 90:17 .
**month** 42:7, 42:8, 82:18,
91:2, 92:8, 94:25, 95:11,
95:14, 95:25, 96:1 .
**morning** 3:9, 3:14, 3:16,
3:17, 3:19, 4:23, 4:24,
25:18, 25:19, 32:21,
35:16, 35:17, 62:19,
62:20, 63:25, 98:16,
98:17, 107:24, 108:3,
108:9, 108:17,
110:18 .
**mortgage** 38:24, 47:23,
47:25, 92:9 .
**mostly** 64:18 .
**move** 34:20, 61:25, 75:7,
77:6, 83:25, 84:20, 86:3,
87:12, 89:18, 90:10,
93:12 .
**moved** 101:21 .
**moves** 16:15 .
**Moving** 47:4 .
**MR. MORGAN** 50:17,
103:23 .
**Ms.** 35:1, 35:16, 62:15,
62:19, 66:25, 68:14,
72:8, 74:22, 75:11, 76:8,
77:10, 78:2, 80:4, 82:1,
84:5, 85:11, 86:7, 87:18,
88:15, 89:4, 89:16,
89:22, 97:20, 98:1, 98:9,
108:8, 109:5, 110:1 .
.
.
**< N >.**
**named** 32:17, 37:5,
99:25 .
**names** 45:3, 45:4, 50:24,
105:7 .
**natural** 92:9 .
**NE** 1:35 .
**need** 21:17, 85:7,
108:2 .
**needed** 42:12, 51:25, 52:3,
85:9 .
**Negative** 22:23, 45:16,
45:17, 52:25, 56:14 .
**new** 7:11, 29:14, 29:19 .
**Next** 13:15, 14:12, 24:16,
24:22, 30:8, 45:12,

47:13, 48:7, 49:14, 51:1,
58:23, 77:23, 91:22,
92:5, 97:23, 97:24,
107:20 .
**No.** 1:9, 3:5, 39:9, 42:2,
42:24, 46:25, 47:10,
48:6, 51:6, 53:11, 54:23,
55:1, 55:5, 57:10, 57:17,
58:17, 72:2, 72:5, 76:18,
79:20, 89:9, 89:12, 97:3,
99:17, 101:1, 101:16,
102:4, 105:12,
106:6 .
**nobody** 19:16 .
**nod** 88:23 .
**None** 57:10 .
**noon** 61:10 .
**normal** 69:3, 69:25 .
**normally** 95:14 .
**Northern** 1:34 .
**notation** 89:5 .
**notations** 69:11 .
**noted** 87:23 .
**notes** 1:49, 39:11, 39:14,
102:15 .
**Nothing** 34:11, 34:13,
40:11, 42:3, 63:10,
66:20, 69:23 .
**notice** 17:22, 97:1 .
.
.
**< O >.**
**objection** 16:20, 37:15,
75:8, 77:7, 84:2, 84:21,
86:4, 87:13, 89:19,
90:11, 93:13 .
**obtaining** 27:14 .
**obviously** 109:4 .
**offer** 77:5, 109:24 .
**offering** 17:1, 77:4,
79:14 .
**offerings** 78:22, 90:14 .
**Office** 1:28, 1:41, 13:10,
35:23, 38:8, 38:14,
38:19, 38:23, 39:1,
39:17, 39:18, 64:17,
65:18, 66:7, 66:9, 68:9,
100:19, 100:23, 101:2,
101:4, 102:9,
102:10 .

**officer** 36:1 .
**offices** 101:4 .
**Official** 20:2, 111:1,
111:17 .
**often** 40:10 .
**oldest** 40:20 .
**Once** 7:24, 38:5, 42:2,
86:12, 88:13, 89:24,
93:24, 94:2, 100:12 .
**ones** 13:13, 17:1 .
**online** 28:1 .
**operate** 42:15 .
**operating** 27:7 .
**opportunity** 34:19 .
**order** 30:22, 52:2,
63:1 .
**organized** 5:5 .
**orient** 21:2 .
**originally** 69:13 .
**originator** 8:10, 26:23 .
**otherwise** 79:9 .
**output** 86:21, 91:25 .
**outside** 38:2, 61:12,
108:1 .
**overpaid** 6:12 .
**owe** 6:13, 21:12, 22:2,
22:6 .
**owe.** 21:15 .
**owed** 21:19 .
**own** 26:9, 36:22, 41:17,
41:19, 49:3, 49:5, 51:20,
81:16, 99:18,
101:13 .
**owned** 8:9, 101:23 .
**owner** 26:23 .
**owners** 8:14 .
**owns** 23:9, 27:12 .
.
.
**< P >.**
**p.m.** 110:22 .
**package** 81:24, 92:19 .
**packet** 70:9 .
**Page** 2:4, 18:22, 19:9,
20:24, 21:13, 22:17,
23:1, 23:14, 24:25,
29:24, 33:16, 33:17,
33:21, 45:23, 49:13,
49:14, 50:18, 53:15,
56:21, 56:23, 58:23,

78:9, 78:13, 97:6,
106:24, 111:7 .
**pages** 11:9, 11:11, 29:15,
30:6, 30:18, 30:24, 31:4,
31:8, 31:16, 31:21,
31:24, 32:9, 32:12,
33:11, 34:4 .
**paid** 19:23, 42:1, 44:12,
44:14, 73:12, 73:16,
73:17, 73:19, 73:21,
76:3, 81:19, 82:14,
82:18, 84:13, 85:10,
91:1, 91:2, 95:16,
103:14 .
**paper** 17:12, 18:13, 44:11,
67:1, 67:4, 69:18, 79:17,
86:25, 87:24 .
**papers** 43:21, 44:6, 69:18,
70:6, 102:11, 103:8,
103:10 .
**Paperwork** 38:20, 38:24,
43:20, 70:12, 101:6,
101:8, 101:9,
103:12 .
**Paralegal** 1:47, 3:13 .
**parens** 91:25 .
**Part** 9:5, 9:8, 25:23, 46:20,
47:4, 47:6, 49:15, 51:6,
54:12, 57:23, 57:25,
58:5, 58:24, 67:8, 74:22,
75:15, 80:2, 80:4, 87:18,
94:3 .
**particular** 7:7, 7:9, 7:14,
7:18, 11:7, 12:24, 19:2,
20:17, 24:12, 24:15,
29:24, 30:9, 36:3, 78:9,
91:5, 91:17, 101:11 .
**particularly** 27:18 .
**parties** 110:13 .
**partnership-type** 23:8 .
**partnerships** 104:16,
105:3 .
**parts** 64:4 .
**party** 8:21 .
**passed** 28:20 .
**Patricia** 111:2, 111:16 .
**pause** 23:20 .
**pay** 6:13, 60:24, 61:1 .
**payers** 8:21 .
**payment** 8:23, 86:14,

90:24 .
**payments** 8:24 .
**PC** 1:41 .
**pen** 78:2 .
**penalties** 75:13, 75:18 .
**pending** 3:4 .
**Pennsylvania** 5:2 .
**people** 31:24, 64:3,
65:13 .
**Pepco** 92:8 .
**Per** 28:24, 38:4, 100:9,
100:11, 100:12 .
**percent** 28:19, 52:5,
90:20 .
**percentage** 50:8, 52:1,
92:1 .
**percentages** 59:5,
87:5 .
**Perfect** 24:1 .
**Perhaps** 27:12, 28:17,
29:10, 30:7, 68:15,
88:13 .
**period** 7:10 .
**perjury** 60:8, 75:13,
75:18 .
**permission** 74:18 .
**permit** 29:15 .
**person** 23:7, 23:9, 27:2,
27:10, 27:12, 28:4,
28:17, 28:25, 30:3,
65:21 .
**personal** 19:14, 19:15,
21:8, 21:9, 23:8 .
**personally** 26:5,
29:13 .
**persons** 8:24 .
**Philadelphia** 1:42 .
**phone** 49:19, 59:4, 68:15,
80:12, 80:14, 80:15,
94:23, 94:25 .
**phones** 92:9 .
**phrase** 26:24 .
**physical** 105:13 .
**physically** 73:17 .
**pick** 40:25, 41:13, 41:20,
42:9, 51:17, 52:2,
61:5 .
**picked** 40:16 .
**picking** 51:22, 57:11 .
**picture** 11:24 .

**picture-looking** 18:18 .
**piece** 67:1, 67:3,
69:18 .
**PIN** 19:15, 19:17 .
**place** 7:7, 7:15 .
**placed** 18:16, 69:18, 74:22,
80:21, 81:22 .
**places** 19:1, 41:6 .
**Plaintiff** 1:7, 1:25 .
**plan** 80:18, 110:10 .
**plus** 97:1 .
**point** 17:2, 17:4 .
**pointing** 78:2 .
**portal** 15:6, 26:18 .
**portion** 44:20, 45:24,
46:23, 50:18, 97:7,
106:25 .
**possess** 9:10 .
**possible** 34:3 .
**practically** 40:20 .
**practice** 9:4 .
**preceded** 18:23 .
**preceding** 21:18 .
**preclude** 27:7 .
**preparation** 36:17, 36:20,
38:2, 71:11, 93:10,
99:13, 99:16, 100:7 .
**prepare** 7:1, 14:7, 20:18,
28:2, 29:18, 63:2, 65:11,
68:18, 85:23, 90:7 .
**prepared** 36:22, 65:7, 68:8,
68:25, 69:11, 69:15,
72:4, 72:15, 72:20, 76:1,
76:18, 77:3, 77:11,
77:16, 79:25, 83:5,
86:16, 86:25, 87:10,
99:18 .
**preparing** 29:1, 79:7 .
**presence** 73:7 .
**Present** 1:46 .
**pretty** 40:21, 61:8,
71:14 .
**prevent** 27:13 .
**previous** 33:24 .
**previously** 14:9,
98:20 .
**primarily** 5:17 .
**Principal** 46:11, 53:25,
57:4, 57:19, 107:8,
107:12 .

**print** 11:10, 29:20, 34:7,
60:10, 60:11, 75:19,
76:19 .
**printed** 29:24 .
**printout** 18:18 .
**printouts** 12:1, 12:23,
15:16 .
**Prior** 35:22, 64:13, 78:10,
78:18, 78:25, 79:7, 79:9,
88:8, 99:7 .
**priority** 27:4 .
**Probably** 31:5, 50:12,
70:20, 80:17, 80:25,
81:4, 101:12 .
**Proceedings** 1:20, 110:22,
111:6 .
**process** 14:9, 18:8, 44:4,
102:7, 107:22 .
**processing** 19:3 .
**product** 46:12, 54:1 .
**profession** 46:12, 48:20,
53:25, 57:4, 57:19,
107:8, 107:13 .
**professional** 65:11,
65:13 .
**Profit** 23:5, 46:2, 53:18,
56:24, 57:16, 107:2 .
**program** 64:3 .
**progressed** 67:15 .
**promptly** 61:19 .
**proof** 4:7 .
**proper** 92:3 .
**properly** 27:7, 28:23 .
**property** 48:11, 48:20,
51:10, 54:14, 54:24,
55:3, 55:4, 101:12,
101:18, 101:20, 102:3,
102:4, 102:5, 105:14,
107:9, 107:13 .
**property.** 51:9 .
**proprietor** 46:6, 46:8,
53:23, 57:2, 107:5 .
**proprietorship** 23:6 .
**prosecutor** 71:17 .
**prosecutors** 63:6 .
**protect** 19:19 .
**provide** 13:11, 26:18,
45:19, 48:2, 49:23,
50:13, 68:12, 68:22,
88:2 .

provided 50:9, 67:24, 68:4,
  69:24, 94:8 .
provider 92:8 .
provides 16:11 .
providing 67:9 .
PTIN 7:24, 8:5, 8:6, 14:16,
  20:6, 20:12, 20:15,
  20:16, 20:22, 27:19,
  27:25, 28:5, 28:20,
  28:25 .
PTIN. 20:14 .
public 36:3 .
publication 13:11, 30:13,
  30:14, 30:16, 30:18,
  30:21, 31:1, 31:7, 31:14,
  31:16, 32:4, 32:11 .
publications 6:25, 12:23,
  13:2, 16:3, 16:6,
  16:10 .
publicly 13:5, 13:13, 16:7,
  16:10 .
publish 17:17, 33:20 .
pull 17:16, 33:6,
  104:24 .
purpose 3:6, 54:19 .
purposes 51:20,
  85:17 .
pursuant 111:5 .
pushing 30:9 .
put 53:10, 55:23, 57:18,
  59:7, 62:2, 70:11, 78:13,
  78:20, 79:10, 79:13,
  79:14, 82:2, 82:6, 82:9,
  87:1, 87:3, 87:5, 90:19,
  95:20, 101:22, 103:5,
  103:13 .
putting 40:1, 48:23, 57:15,
  76:6, 81:25, 102:22 .

.

.

< Q > .
qualified 29:1 .
quarter 41:14 .
queried 11:10 .
queries 9:22 .
question 66:23, 67:5,
  75:15, 93:19 .
questions 25:11, 32:25,
  52:8, 59:17, 61:3, 67:9,
  67:11, 75:16, 84:5, 95:5,

97:17 .
quite 29:20, 60:23 .

.

< R > .
raise 4:12, 35:2, 98:3 .
Ralph 77:25, 78:4,
  78:21 .
Rana 109:12 .
range 33:16 .
Rather 29:24, 37:1, 73:15,
  99:22 .
read 22:9, 22:18, 23:16,
  24:2, 24:17, 31:8, 31:23,
  33:16, 33:22, 39:23,
  45:12, 60:11, 75:15,
  75:20, 76:19, 89:23,
  89:24, 96:23,
  106:22 .
reading 24:16, 24:22,
  32:12 .
ready 3:22, 61:9, 62:15,
  107:24, 108:19, 110:11,
  110:12 .
Real 19:18, 74:13, 84:9,
  84:11, 85:12, 104:16,
  105:2, 107:9,
  107:13 .
realize 75:25, 78:25 .
really 11:24, 28:25, 44:5,
  44:6, 44:15, 60:23,
  88:14, 95:13, 95:18,
  102:13 .
Realtime 111:3 .
reason 29:10, 69:14,
  69:15 .
reasons 74:3 .
recall 30:16, 31:5, 32:17,
  44:12, 52:6, 55:2, 55:17,
  58:15, 66:9, 66:10,
  66:15, 66:16, 67:11,
  80:5, 80:15, 82:25, 84:9,
  89:11, 89:12 .
receipts 46:22, 47:1,
  88:15, 91:12 .
receive 26:2, 27:24, 36:16,
  43:20, 44:17, 99:12 .
received 6:11, 17:12,
  18:14, 19:2, 26:3, 29:9,
  42:5, 69:12, 82:2, 86:14,

90:24, 105:23 .
received. 105:21 .
receives 18:10, 18:11 .
receiving 69:6 .
Receptionist 38:16, 38:17,
  65:22, 65:23, 65:25 .
Recess 61:17 .
recognize 10:19, 12:7,
  12:22, 16:9, 77:18,
  83:23 .
recollection 39:11, 71:6,
  79:6, 80:8, 82:10,
  82:13 .
reconcile 6:8 .
Record 3:8, 4:18, 6:18,
  9:21, 14:5, 14:17, 15:2,
  15:9, 15:18, 35:9, 37:11,
  98:10 .
recorded 29:12 .
Records 6:2, 6:5, 9:3, 9:5,
  9:8, 9:10, 9:17, 10:2,
  10:3, 10:7, 11:17, 12:11,
  13:21, 14:1, 14:11,
  25:24, 26:9 .
redact 36:4 .
REDIRECT 2:13, 2:21,
  33:2, 33:8, 95:7,
  95:9 .
reduce 7:3 .
referred 37:20, 37:21,
  37:22 .
referring 90:24 .
refers 22:24 .
reflect 37:12 .
Refund 6:12, 22:3, 22:4,
  22:7, 22:14, 44:9, 44:17,
  76:7, 103:20,
  103:21 .
refund. 22:3 .
refunded 22:11 .
regarding 59:3 .
regardless 28:20 .
Registered 111:2 .
regular 9:4, 66:20 .
regulations 111:8 .
related 16:4, 43:3, 43:15,
  47:18, 55:10, 55:14,
  57:9, 58:12, 58:16 .
relates 70:23, 94:8 .
relates. 51:2 .

relationship 38:1 .
relatively 110:4 .
reliable 28:19 .
Remain 35:2, 98:2 .
Remember 30:20, 37:23,
  48:4, 66:13, 67:16,
  73:25, 80:13, 91:3,
  92:14, 92:16, 96:8,
  101:11, 103:2,
  103:17 .
Remics 105:4 .
remind 20:14 .
remove 54:6 .
rent 48:8, 48:16, 54:13,
  54:17, 101:16,
  102:1 .
Rental 101:18, 101:20,
  101:22, 104:16,
  105:2 .
rental. 107:11 .
rented 48:19, 54:21,
  54:24 .
renting 55:3 .
rents 105:21, 105:23 .
Repairs 55:8, 55:9, 55:14,
  55:20 .
repeat 70:15, 84:5 .
report 7:17, 7:18, 7:19,
  14:16, 15:8, 65:24 .
reported 65:23 .
Reporter 111:1, 111:2,
  111:3, 111:17 .
reports 8:5, 8:25 .
represent 5:17, 11:23,
  19:13, 62:21 .
representation 18:20 .
request 13:8, 68:12 .
requesting 22:13 .
required 8:22 .
requirements 27:24 .
requires 110:14 .
research 61:12, 108:1 .
resolved 30:10 .
result 78:9, 78:18 .
retire 35:20, 36:11, 63:15,
  98:24 .
retired 35:19, 36:10, 40:8,
  63:14, 98:19, 99:6 .
retirement 35:22, 99:7 .
Retrieval 8:16, 8:17,

15:17 .
**retrieved** 14:20, 18:17 .
**retrieving** 5:20 .
**returns** 5:20, 6:15, 8:4,
    8:11, 10:22, 10:23, 11:4,
    11:11, 11:24, 12:24,
    17:11, 18:8, 19:21,
    20:10, 29:2, 29:6, 29:9,
    29:11, 29:21, 32:13,
    33:11, 70:20, 71:5, 72:8,
    72:15, 79:8, 109:23 .
**Revenue** 5:1, 5:3, 5:4, 5:6,
    5:18, 9:5 .
**review** 10:3, 10:14, 11:14,
    12:3, 12:16, 13:12,
    13:15, 14:12, 44:7, 49:1,
    76:13 .
**reviewed** 11:20, 11:22,
    12:1, 36:4, 76:11 .
**Reviewing** 10:17, 12:5,
    12:20, 13:17 .
**right-hand** 48:9 .
**rise** 61:14, 108:5,
    110:20 .
**RMR** 111:16 .
**Road** 1:42 .
**Robert** 45:5, 50:25, 52:17,
    56:7, 72:3 .
**role** 5:11, 11:14, 36:2 .
**Ronald** 1:10, 3:6, 3:15,
    37:5, 99:25 .
**royalties** 104:16,
    105:3 .
**running** 7:6 .
.

.

**< S >** .
**salaries** 104:9, 104:13 .
**sales** 47:1 .
**sales.** 46:22 .
**sanctioned** 20:1 .
**sat** 38:17, 42:23, 66:12,
    66:17 .
**saw** 59:5, 67:3, 69:21 .
**saying** 28:16, 28:23, 41:24,
    44:5, 68:24, 78:24,
    89:2 .
**schedules** 7:1, 12:24,
    75:23 .
**scheduling** 108:15 .

**School** 36:13, 36:14,
    36:15, 40:16, 40:21,
    40:25, 41:3, 41:11,
    42:10, 43:11, 77:25,
    99:10 .
**Scranton** 5:2 .
**screen** 17:16, 17:19, 17:21,
    39:24, 62:3, 62:9,
    88:21 .
**scroll** 46:18, 51:7, 52:18,
    56:8, 56:22, 57:22, 58:5,
    58:23, 105:19 .
**scrolling** 104:15 .
**search** 9:13, 10:6 .
**searched** 9:25 .
**searching** 14:11 .
**season** 90:7 .
**seated** 3:3, 4:3, 4:14, 35:5,
    62:13, 98:5, 108:7 .
**second** 23:20, 30:5, 54:7,
    56:10, 93:14 .
**Secretary** 64:18, 98:23,
    99:8 .
**Section** 1:34, 21:25, 45:9,
    46:19, 52:19, 54:12,
    91:22, 96:14, 97:9,
    103:24, 104:9, 104:25,
    106:15 .
**Security** 7:8, 28:4,
    28:10 .
**seeing** 20:8, 61:24, 81:23,
    108:8 .
**seeking** 27:2 .
**seen** 72:8, 79:23 .
**segment** 77:24 .
**segments** 29:25 .
**send** 8:11 .
**sends** 8:4 .
**sense** 108:25 .
**sent** 17:14, 20:6 .
**sentence** 60:23 .
**separate** 11:11 .
**serial** 19:1 .
**Service** 5:1, 5:3, 5:4, 5:18,
    44:12, 46:12, 51:4,
    54:1 .
**services** 48:21, 54:2, 57:5,
    57:9, 57:20, 70:16,
    91:16, 98:23 .
**services.** 46:14, 51:3 .

**session** 107:21 .
**Seven** 5:14, 64:25,
    65:2 .
**several** 37:25, 41:6, 54:11,
    65:16 .
**sheet** 68:11 .
**shoot** 110:12 .
**short** 4:5, 61:7,
    107:18 .
**show** 21:22, 44:19, 74:19,
    76:21, 79:16, 84:17,
    85:19, 103:23 .
**showed** 38:24, 60:3, 65:24,
    80:6, 87:19, 92:14 .
**showing** 17:20, 17:23,
    61:23, 90:3 .
**shown** 32:16, 32:21, 73:23,
    80:4 .
**shows** 7:19, 7:20, 87:19,
    94:23 .
**side** 48:9, 63:23,
    64:18 .
**sign** 19:11, 43:22, 43:23,
    44:6, 60:2, 60:5, 76:12,
    76:19, 89:23, 94:5,
    103:8, 103:10 .
**sign-here** 19:13 .
**signature** 19:18, 20:8,
    60:7, 72:9, 72:19, 73:9,
    75:4, 75:5, 75:11,
    84:7 .
**signature.** 19:12, 20:4 .
**signatures** 83:21 .
**signed** 44:1, 60:9, 72:22,
    73:4, 73:9, 75:17, 75:21,
    76:2 .
**signify** 19:12 .
**signing** 75:18 .
**similar** 25:5, 28:1, 28:9,
    28:13, 109:25 .
**single** 14:12, 29:23, 95:14,
    101:4 .
**sit** 31:7 .
**Sitting** 10:9, 37:10 .
**six** 60:25 .
**six-digit** 8:9, 26:22 .
**six-story** 101:3 .
**sleeves** 70:11 .
**slightly** 109:6 .
**slips** 101:12 .

**small** 39:18, 66:7, 75:19,
    76:24 .
**smaller** 23:9, 75:12 .
**smoothly** 110:4 .
**soccer** 28:12, 28:15 .
**Social** 7:8, 28:4 .
**software** 20:2, 64:5 .
**solar** 92:7 .
**sole** 23:6 .
**somebody** 29:2,
    67:23 .
**someone** 6:18, 9:10,
    20:22 .
**sometimes** 9:9, 34:19,
    39:12, 41:17, 43:13,
    95:24 .
**Somewhere** 42:7, 95:20,
    95:21 .
**son-in-law** 100:5 .
**Sorry** 12:18, 13:22, 17:20,
    17:23, 18:11, 21:9,
    23:23, 56:22, 66:2, 83:4,
    105:13 .
**sort** 48:9, 53:9, 67:16,
    68:21, 84:13,
    107:21 .
**SOUTHERN** 1:3 .
**speaking** 55:2, 55:17, 70:4,
    71:18, 78:25, 88:8 .
**Special** 1:46, 3:12 .
**specific** 16:9, 19:20, 36:16,
    67:17, 81:1 .
**Specifically** 40:15, 43:7,
    54:13, 80:2, 80:13, 81:6,
    85:2, 89:1, 94:24,
    99:12 .
**Spell** 4:17, 35:8, 98:9 .
**spend** 74:13, 74:16 .
**spent** 90:19 .
**split** 33:12 .
**spoke** 60:15 .
**spoken** 62:22, 62:24, 88:4,
    103:2 .
**spouse** 99:3 .
**stand** 34:19, 63:17,
    98:2 .
**standard** 23:17, 23:18,
    23:22, 24:3, 24:7, 24:10,
    24:20 .
**standing** 35:2, 98:3 .

stands 8:18 .
Stanley 109:10 .
start 21:16, 21:21, 107:24 .
started 4:6, 40:21 .
starting 75:12 .
starts 33:23 .
state 4:15, 35:6, 60:24, 98:6, 105:9 .
statement 23:5, 29:2, 76:10, 86:8, 94:21 .
statements 75:23 .
States 1:1, 1:5, 1:28, 3:5, 3:10, 5:5, 34:24, 111:3, 111:9 .
status 21:10 .
stenographically-reported 111:6 .
stenotype 1:49 .
step 34:16, 44:7, 97:21, 108:8, 108:12 .
stop 46:19, 56:9, 110:15 .
stored 8:21 .
Street 1:35 .
stretch 34:20 .
stuff 44:14, 69:25, 76:14, 78:22 .
submit 17:10, 24:14, 28:2, 59:8 .
submitted 17:11, 32:22 .
subschedules 34:6 .
subsections 34:6 .
subsequent 31:2, 69:19, 107:20 .
substantial 40:12, 42:4 .
suit 37:10 .
suitability 26:20, 26:25, 27:5, 27:15, 28:4, 28:7, 28:8, 28:10, 28:16 .
suitable 27:11 .
Suite 1:29, 1:42 .
suited 28:18 .
summary 15:1 .
Supplemental 105:1 .
supplies 49:18, 80:13 .
supposed 85:3, 90:20 .
surprised 60:23 .

swearing 76:17 .
switching 17:23 .
SWORN 4:13, 35:4, 98:4 .
System 8:1, 8:16, 8:17, 8:18, 9:6, 11:8, 11:25, 12:1, 14:21, 15:13, 15:17, 15:23, 18:14, 19:4, 29:14, 29:17, 29:18, 29:19, 29:23, 34:5 .
systems 6:2, 6:5, 28:19 .
.
.
< T > .
T-h-o-m-a-s 4:19 .
table 3:11, 49:17 .
talked 16:6, 27:19, 39:19, 79:6, 79:9 .
tasked 5:19 .
tasks 52:4 .
taste 107:19 .
tax-related 5:20 .
taxable 7:4 .
taxpayer 7:1, 7:2, 7:7, 7:15, 7:16, 7:19, 9:24, 17:10, 19:14, 19:15, 19:16, 19:19, 19:25, 21:8, 22:4, 22:7, 24:13, 26:9, 27:16, 29:6, 32:17, 76:12, 85:4, 109:6, 109:13, 109:15 .
taxpayers 6:8, 6:10, 8:24, 9:25, 17:12, 109:19, 109:21 .
TDC-21-0449 3:5 .
technical 29:22 .
tells 34:5 .
temporary 29:17 .
tenure 64:12 .
terms 27:16 .
test 28:21 .
testified 5:23, 29:4, 29:14, 66:25, 74:5 .
testify 34:16 .
testimony 63:2, 65:7, 70:3, 97:21 .
text 39:23, 45:12, 47:13 .

Thanks 4:1 .
themself 23:9 .
themselves 26:10, 97:4 .
THEODORE 1:22 .
they'll 13:11, 21:3 .
they've 8:23 .
third 8:21 .
Thomas 2:7, 4:13, 4:16 .
though 15:22, 78:17, 78:18 .
Three 41:24, 64:11, 71:3, 72:16, 82:18, 100:10 .
throwing 29:10 .
tight 61:8 .
till 61:9 .
tips 104:10, 104:13 .
tithes 77:3, 78:22, 79:14 .
title 64:2 .
titled 46:20 .
today 3:6, 4:5, 37:7, 63:2, 67:11, 71:7, 107:18, 110:4 .
together 82:20, 100:17 .
toll 13:9 .
Tom 4:9 .
tomorrow 107:24, 108:3, 108:9, 108:17, 109:1, 109:5, 110:18 .
took 40:17, 41:19, 92:25 .
top 18:23, 23:15, 23:24, 33:13, 44:20, 44:25, 45:24, 46:1, 46:3, 47:8, 50:18, 50:19, 52:12, 53:16, 53:20, 56:1, 56:2, 90:14, 103:24, 104:25, 106:25, 107:1 .
total 50:2, 50:6, 96:10, 96:19, 96:21, 97:14 .
towards 35:2, 98:2, 102:21 .
track 110:5 .
trained 64:3, 64:5 .
training 36:16, 99:12 .
transaction 7:7, 7:14 .

TRANSCRIPT 1:20, 7:5, 7:6, 25:20, 25:23, 111:6, 111:7 .
transcription 1:49 .
transcripts 7:11, 12:10, 25:25 .
transmitted 18:15 .
trash 29:11 .
Treasury 5:5 .
trial 3:7, 10:4, 11:14, 21:4 .
trials 5:22, 5:23 .
tried 43:6, 68:12 .
truck 83:3, 83:4 .
true 11:17, 12:2, 12:11, 14:17, 15:2, 15:9, 15:18, 19:17, 28:15, 41:8, 72:15, 76:16, 78:19, 94:25, 111:5 .
trusted 60:1, 60:13, 76:3 .
trusts 105:4 .
try 61:8 .
trying 73:3 .
Tuesday 63:5, 63:11 .
turn 17:15, 19:8, 20:24, 22:25, 24:24, 39:13, 39:16, 39:19, 47:10, 52:10, 55:25, 56:21 .
Turning 106:24 .
Twelfth 99:11 .
two 11:3, 11:11, 17:11, 39:21, 41:24, 59:16, 67:14, 74:3, 74:8, 89:24, 93:1 .
two. 42:25 .
type 75:12, 79:2 .
types 6:21, 13:5, 43:8, 109:22 .
typewriter 77:15 .
typically 41:1, 41:23, 43:18 .
.
.
< U > .
U.S. 1:33, 6:7, 10:22, 35:23, 44:25, 52:12, 56:3, 103:25 .
Underneath 46:5, 46:11, 50:24, 52:16, 55:6, 56:6,

86:20, 90:17, 92:11, 96:17, 105:2, 105:7, 105:20, 107:7 .
**understand** 28:23, 30:11, 30:13, 31:13, 31:18, 31:24, 62:1, 65:21, 66:7, 70:3, 75:17, 75:21, 77:10, 78:16, 78:24, 82:1, 88:8, 91:3, 91:9, 91:17, 92:18, 92:24, 93:3 .
**understanding** 28:23 .
**Understood** 30:11, 64:7, 70:1, 78:16, 81:7, 93:4, 93:6, 96:5 .
**Unfortunately** 3:20 .
**unique** 19:5, 19:7 .
**United** 1:1, 1:5, 1:28, 3:5, 3:10, 5:5, 34:24, 111:3, 111:9 .
**Unless** 101:16 .
**until** 61:17 .
**unusual** 66:20 .
**updated** 7:23, 7:24, 8:2, 8:5, 11:8 .
**updates** 7:13, 29:18 .
**updating** 7:13 .
**Urban** 35:23 .
**user** 15:5 .
**using** 20:6, 21:2, 102:17 .

.

**< V >** .
**V.** 49:15, 80:2 .
**various** 6:1, 70:6, 86:21 .
**vehicle** 51:17, 51:22 .
**verified** 12:14, 14:22, 15:5, 15:12, 15:21 .
**verify** 6:11, 12:1, 15:22, 27:5 .
**versus** 3:6 .
**Veterans** 98:21, 98:22, 99:8 .
**view** 13:9, 18:18 .
**viewed** 76:9 .
**Virginia** 18:15 .
**visit** 101:5 .
**VOLUME** 1:12 .

**voluminous** 29:20 .
**voluntary** 98:23 .
**volunteer** 87:20 .
**vs** 1:8 .

.

.

**< W >** .
**W-2** 8:22 .
**W.** 45:5, 50:25, 52:17, 56:7 .
**Wages** 104:9, 104:12 .
**wait** 38:18 .
**walk** 35:2, 39:18, 98:2 .
**wall** 66:14 .
**wanted** 28:15, 68:21, 69:14, 87:5 .
**warmed** 107:22 .
**warning** 84:6 .
**Washington** 1:36, 98:21, 105:18 .
**watch** 41:23, 42:10 .
**water** 90:22, 92:8 .
**ways** 17:9, 17:11 .
**week** 40:25, 78:7 .
**Weishaar** 1:46, 3:12 .
**Welcome** 4:4, 62:14 .
**well-established** 38:16 .
**West** 18:15 .
**Whatever** 29:9, 39:13, 43:16, 43:22, 51:24, 57:11, 59:24, 66:14, 67:24, 68:13, 69:24, 72:25, 76:7, 82:7, 90:19, 90:20, 92:20, 108:2 .
**whenever** 38:5 .
**Whether** 9:9, 25:24, 26:3, 28:17, 28:18, 28:25, 44:13, 71:19, 76:25, 79:18, 80:10, 85:7, 85:20, 87:5, 87:8, 90:4, 109:1 .
**whole** 23:22, 40:21, 64:11 .
**whom** 37:21 .
**will** 6:5, 21:22, 37:16, 61:19, 62:1, 62:3, 89:24, 109:20, 110:16 .
**willing** 108:11 .
**Without** 20:22, 29:22,

61:24, 68:25, 69:10 .
**WITNESS** 2:4, 4:8, 4:13, 4:16, 4:19, 5:12, 5:15, 5:17, 5:24, 34:23, 35:4, 35:7, 35:10, 37:12, 61:24, 62:5, 62:6, 74:19, 74:20, 93:21, 97:22, 97:23, 98:2, 98:4, 98:7, 98:11, 109:7, 109:11, 109:24 .
**witnesses** 34:19, 110:7 .
**word** 81:21, 82:3, 84:6, 93:2 .
**words** 23:7, 67:22 .
**work** 4:25, 5:1, 21:6, 35:22, 36:7, 39:1, 64:7, 64:17, 64:24, 69:4, 87:20, 93:25, 98:20, 99:5, 100:19 .
**worked** 5:9, 63:13, 63:16, 64:8, 64:11, 64:13, 64:17, 64:21, 65:4, 70:18, 70:21 .
**working** 36:9, 70:5 .
**works** 21:16 .
**worth** 48:20, 50:12, 55:9, 58:15, 59:17 .
**write** 36:3, 39:12, 44:15, 78:4, 103:16 .
**writing** 39:14 .
**written** 53:22, 54:4, 92:15, 105:7 .
**wrote** 91:25, 94:25 .

.

.

**< Y >** .
**years** 5:10, 5:14, 9:25, 12:25, 37:25, 40:20, 41:6, 64:8, 64:19, 64:20, 64:24, 65:3, 65:4, 65:8, 65:10, 65:14, 65:16, 65:18, 68:22, 69:19, 70:18, 70:20, 70:24, 71:3, 71:11, 72:16, 79:12, 101:21, 101:25 .
**you-all** 88:22 .
**yourself** 37:2, 54:8, 66:4, 68:8, 99:23, 102:3 .

**yourselves** 3:8, 61:11, 107:25 .

.

.

**< Z >** .
**zoom** 22:1, 22:17, 23:14, 23:21 .