```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                        SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4            Plaintiff,              )
         vs.                          )
 5                                    ) CRIMINAL NO.:
     RONALD EUGENE WATSON,            ) 8:21-cr-00449-TDC-1
 6                                    )
              Defendant.              )   VOLUME V
 7   _____)

 8
                                   Greenbelt, Maryland
 9                                 March 6, 2023
                                   8:52 a.m.
10
                      TRANSCRIPT OF PROCEEDINGS
11                    JURY TRIAL - EXCERPT
               BEFORE THE HONORABLE THEODORE D. CHUANG
12

13   For the Plaintiff:

14       Gary Michael Morgan, Esquire
         Office of the United States Attorney
15       6406 Ivy Lane, Suite 800
         Greenbelt, MD 20770
16
         Matthew L. Cofer, Esquire
17       U.S. Department of Justice
         Tax Division, Northern Criminal Enforcement Section
18       150 M Street NE
         Washington, DC 20002
19
     For the Defendant:
20
         Gerald C. Ruter, Esquire
21       Law Office of Gerald C. Ruter PC
         9411 Philadelphia Road, Suite O
22       Baltimore, MD 21237

23
     Also Present: Special Agent Charles Weishaar, IRS
24                 Paralegal Eric Mahoney, DOJ

25       (Computer-aided transcription of stenotype notes)
```

1                                INDEX

2

3    <u>WITNESS FOR THE GOVERNMENT</u>                           <u>Page</u>

4    **Claudette Clair**

5        Direct Examination By Mr. Morgan.......................... 10

6        Cross-examination By Mr. Ruter ........................... 42

7        Redirect Examination By Mr. Morgan ....................... 58

8    **Nathan Wanamaker**

9        Direct Examination By Mr. Morgan.......................... 61

10       Cross-examination By Mr. Ruter ........................... 105

11       Redirect Examination By Mr. Morgan ....................... 119

12       Recross-examination By Mr. Ruter.......................... 121

13   **Radiah Carson**

14       Direct Examination By Mr. Cofer .......................... 123

15       Cross-examination By Mr. Ruter ........................... 183

16

17   GOVERNMENT RESTS ....................................... 198

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2        (8:52 a.m.)
 3             THE COURT:  Thank you, everyone.  Please be seated.
 4             THE CLERK:  The matter now pending before this Court
 5   is Criminal Action No. TDC-21-0449, United States of America
 6   versus Ronald Eugene Watson.  We are here today for the purpose
 7   of a jury trial.
 8             Counsel, please identify yourselves for the record.
 9             MR. MORGAN:  Good morning, Your Honor.  Michael
10   Morgan and Matt Cofer on behalf of the United States.
11             THE COURT:  Good morning.
12             MR. RUTER:  Gerald Ruter on behalf of Mr. Ronald
13   Watson; he's seated to my right.  Good morning, Your Honor.
14             THE COURT:  Good morning.  Good morning, Mr. Watson.
15             I understand there's something to discuss about
16   exhibits?
17             MR. COFER:  Yes, Your Honor.  There's a handful of
18   remaining exhibits that are IRS records that the very first
19   witness in this case, Tom Bolus from the IRS Service Center,
20   laid the foundation for and authenticated and have since become
21   relevant through the rest of the case.  We discussed that with
22   Mr. Ruter, and there's several we've agreed on that we could
23   just move to admit at this point if that's all right.
24             Then there is also a couple mostly tied to the motion
25   in limine regarding some of Mr. Watson's own tax returns that
```

```
 1    we would like to have some, I think, additional argument about,

 2    discussion with the Court.

 3            THE COURT:  First of all, can you pull the microphone

 4    up.  It's pointed the wrong way.

 5            What kind of records are we talking about?

 6            MR. COFER:  So I think the ones that both sides

 7    there's not really a dispute about coming in are IRS

 8    instructions from 2015 through 2017 for the various forms and

 9    schedules that are at issue in this case.

10            THE COURT:  Okay.

11            MR. COFER:  As well as, very similarly, publications.

12    That's, I think, no dispute over.  Then the other kind

13    of category is there's three exhibits that are Mr. Watson, his

14    PTIN application, preparer tax identification number, his

15    e-filing identification number, and information associated with

16    that, IRS records.  And the rest --

17            THE COURT:  Taking that first part, no objection to

18    that, Mr. Ruter?

19            MR. RUTER:  No, sir.

20            THE COURT:  Okay.

21            MR. COFER:  Then I think this is where there's a

22    little bit of disagreement.  The main thing, which goes back to

23    the pretrial conference and motion in limine, is the Government

24    would like to admit into evidence Mr. Watson's 2013, 2017 and

25    2018 individual tax returns on the premise that they're false
```

1    and under 404(b) demonstrate evidence of his intent and absence

2    of mistake as we discussed in the motion at the pretrial

3    conference.  Then there's a few other IRS records that mostly

4    go as evidence that's establishing some of the falsities on

5    those returns.

6            So that's kind of the second category of documents

7    which I think there's -- as was previewed at the pretrial

8    conference --

9            THE COURT:  When you say evidence establishing

10   falsities, I thought you said a large part of the falsity was

11   the fact that people didn't see a lot of people in his office.

12   What are the other -- so there's his tax returns themselves.

13           MR. COFER:  Right.

14           THE COURT:  Mr. Ruter, other than the prior objection

15   to admitting anything on this topic at all, do you have

16   anything specific about these documents that you have a problem

17   with?

18           MR. RUTER:  Your Honor, 2013 is the most peculiar tax

19   return I've ever seen and the issue has to do with -- if I can

20   articulate it, Judge, because it's not clear to me what it is.

21   But it was Mr. Watson's attempt to file -- he did file a tax

22   return which had to do with some kind of a forgiveness of debt,

23   a large amount which was because of a foreclosure on a property

24   of his which turned out to be, according to the IRS, wrong.  It

25   took them years to figure that out and they didn't permit it.

1          The reason I objected to it, Judge, is because we're

2     kind of here for a very different reason.  We're here because

3     of overstating very specific numbers on very specific

4     attachments to the 1040 --

5          THE COURT:  I agree with that --

6          MR. RUTER:  That return has nothing to do with

7     that.

8          THE COURT:  Maybe that's part of the question because

9     if I recall correctly, I granted to some degree the

10    Government's motion, but the distinction I drew was the mere

11    fact that he didn't file returns even if he was supposed to, if

12    that was false or improper; I wasn't going to allow that

13    because that's not the issue here.  It's not as if he was

14    advising people to not file a return at all.  If anything, it

15    was the opposite.  He was trying to get them to file returns.

16         But if his own personal returns for some of these

17    years, particularly '15 through '17, dealt with the same type

18    of issues, "Hey, I have a business.  Hey, I am overreporting

19    business expenses.  I am putting things down as unreimbursed

20    employee expenses."  I didn't fully grasp what those issues

21    are, but I think it's pretty clear what the issues are in this

22    case with these taxpayers.

23         So I would want to know -- if there's a dispute on

24    the content other than the broad concept, I've accepted the

25    broad concept, but implicit in that was the understanding that

1    these tax returns, based on the proffer by the Government, do

2    have those types of issues.  Whether we can agree or disagree

3    on that or whether I need to look at them myself, I agree that

4    the broad notion should be that I'm assuming these tax returns

5    are coming in because they have those types of improper

6    deductions, improper reporting on the same types of line items

7    that are in our case.

8            Now I'm not sure -- maybe there's other stuff going

9    on, but are you saying you don't believe 2013 has any of the

10   issues in our case, even if it might have other issues as well?

11           MR. RUTER:  No, Judge, I'm not saying that.  The

12   Court should take a look.  There are entries, Schedule C and

13   some of the other schedules are, in fact, part of that 2013

14   file.  The reason I became very alarmed is because there was

15   another exhibit the Government wanted to introduce concerning,

16   I think for lack of a better word, the IRS's treating of this

17   item which I can't grab hold of.  It actually ended up in

18   federal court.  He filed a lawsuit pro se over what he thought

19   to be a proper tax return, which I think that case got

20   dismissed.

21           THE COURT:  Okay, we have two minutes and I

22   understand the jury is here, so we're probably not going to

23   sort this out before 9:00.

24           But let me get clarification from Mr. Cofer.  These

25   tax returns, do they have the same kinds of problems with

1    Schedule Cs, Schedule A, 2106, et cetera, and is that true for

2    each year, only certain years?

3         MR. COFER:  Each of the three years has a Schedule C

4    for Mr. Watson's tax preparation business which, in our view,

5    claimed the exact same sort of exaggerated and mischaracterized

6    expenses on the Schedule C, I think all three years.  The

7    expenses on the Schedule C result in a loss or total income of

8    $1,000 on gross receipts of like 175,000.  So they're all the

9    same in that respect as discussed at the pretrial conference.

10        On the 2013 return, what I think Mr. Ruter is

11   referring to, in addition to that -- I understand the

12   explanation for why Mr. Watson put this on the return may be

13   complicated, I don't know.  But what is showing up on the

14   return, that is, this kind of separate thing, is in the refund

15   box where he lists -- or just above that where you list

16   payments to the IRS, such as a withholding from a W-2 and

17   that's what drives a refund, there is a line entry that

18   Mr. Watson reported as a payment to the IRS of $128,140 which

19   caused him to request a refund of $88,000.

20        So the only other piece of evidence we want to

21   introduce is there is what is the IDRS history which is the IRS

22   database which shows forms issued to Mr. Watson.  There is a

23   Form 1099 from Ocwen Loan Servicing for an amount of debt

24   canceled in the amount of $128,140 --

25        THE COURT:  So it's 9:00 now.  The jury is ready;

```
 1    we're going to bring them in.  If you-all want to talk about

 2    these things, like I said, I'm available at 8:30, and I said

 3    over the weekend if you had an issue, you should let me know.

 4    I was available at 8:45 which was the time we said we would

 5    presumptively be here.  I was told there were no issues until

 6    like 10 minutes ago.

 7             So we're not taking the jury's time.  The time was

 8    8:30.  We'll bring the jury in.

 9             MR. MORGAN:  Would Your Honor like us to bring in the

10    witness?

11             THE COURT:  Yes.

12             Good morning, ma'am.

13        (Jury entered the courtroom at 9:02 a.m.)

14             THE COURT:  Thank you, everyone.  Please be seated.

15    Welcome back, ladies and gentlemen.  I hope you had a good

16    weekend.  We're continuing with the case.  I mentioned to you

17    that the Government anticipated that they're getting closer to

18    the end of their case, but they still have several other

19    witnesses.

20             Why don't we ask the Government to call the next

21    witness.

22             MR. MORGAN:  The United States calls Claudette

23    Clair.

24             THE CLERK:  Ma'am, would you please stand, and please

25    raise your right hand.
```

1      **CLAUDETTE CLAIR, GOVERNMENT'S WITNESS, SWORN**

2              THE CLERK:  You may be seated, please.  Speak clearly

3      into the microphone.  Please state your first and last name.

4              THE WITNESS:  My name is Claudette Clair.

5              THE CLERK:  Spell your first and last name for the

6      record, please.

7              THE WITNESS:  Claudette, C-l-a-u-d-e-t-t-e, Clair,

8      C-l-a-i-r.

9              THE CLERK:  Thank you, ma'am.

10             THE COURT:  Go ahead.

11                        **DIRECT EXAMINATION**

12     **BY MR. MORGAN:**

13     **Q**    Good morning.

14     **A**    Good morning.

15     **Q**    Where do you work?

16     **A**    U.S.D.A., Department of Agriculture.

17     **Q**    Are you employed anywhere else?

18     **A**    Right now I'm working part time with MedStar.

19     **Q**    How long were you with the Department of Agriculture?

20     **A**    Since 2012.

21     **Q**    With MedStar?

22     **A**    Since April of last year.

23     **Q**    What do you do for the Department of Agriculture?

24     **A**    Right now I've been promoted, so I'm a loan and grant

25     specialist.

1   **Q**    In 2015, '16 and '17, what were you doing for

2   employment?

3   **A**    A loan specialist.

4   **Q**    For the same agency?

5   **A**    Yes.

6   **Q**    Can you please describe your educational background for

7   the jury.

8   **A**    Yes.  I'm an international management master's degree.  I

9   have an honorary doctorate in humanities and divinity.

10  **Q**    Have you ever received training in taxes or tax

11  preparation?

12  **A**    No, sir.

13  **Q**    Have you ever taken any classes in taxes or tax

14  preparation?

15  **A**    No, sir.

16  **Q**    Have you ever prepared your own taxes?

17  **A**    No, sir.

18  **Q**    So do you use a tax preparer?

19  **A**    Yes.

20  **Q**    Why do you use a tax preparer rather than doing it

21  yourself?

22  **A**    Because, one, I'm not familiar with the laws of the IRS.

23  I don't know what you can get, what you can write off.  I'm not

24  just familiar with it, and I just choose not to do it.

25  **Q**    Do you know an individual named Ronald Watson?

Direct - Clair

1    **A**    Yes.

2    **Q**    How do you know him?

3    **A**    He prepared my taxes in '15 and '16.

4    **Q**    Did you ever work with anyone other than Mr. Watson during

5    those years?

6    **A**    No.

7    **Q**    Do you know Mr. Watson in any way other than as your tax

8    preparer?

9    **A**    No, sir.

10   **Q**    Where did you meet with Mr. Watson to do your taxes?

11   **A**    At his office.

12   **Q**    How many times did you meet with Mr. Watson to do your

13   taxes each year?

14   **A**    Maybe twice.

15   **Q**    Can you describe the first meetings.

16   **A**    I went into his office.  We talked, we introduced

17   ourselves, gave him my paperwork, and that was the gist of

18   it.

19   **Q**    What kind of paperwork would you give him?

20   **A**    W-2s from my job, maybe things that I could probably write

21   off.  If I have a property in Alabama, property taxes to that.

22   Anything that I may have -- no major purchases because there

23   wasn't any.  It was mainly W-2s and things like that.  Nothing

24   major.

25   **Q**    How did you arrange that appointment?

Direct - Clair

```
 1   A     I called.

 2   Q     Who did you speak with when you called?

 3   A     That was a secretary that answered the phone.

 4   Q     You went to the office, you gave him some paperwork?

 5   A     Yes.

 6   Q     Where did you meet with him to give him the paperwork?

 7   A     In his office.

 8   Q     Can you describe the office a little bit.

 9   A     Sure.  When you walk into the office, there's a door that

10   sits here.  His desk was back against the wall.  That was a

11   credenza in the back.  I remember a child's painting.  There

12   was a printer or copier right to his left, and his desk was

13   there, and there were two chairs that sit right in front of the

14   desk.

15   Q     Did he speak with you during those meetings?

16   A     Yeah, he communicated with me.

17   Q     What would you speak about?

18   A     What do you do for a living?  What do you do -- things

19   like that, you know.  I talked about my son because I claimed

20   my son.  But it wasn't -- he was just asking general tax

21   questions that were pertaining to the taxes.

22   Q     Did you go to these meetings alone?

23   A     The first time I went with the person that introduced me

24   to Mr. Watson.

25   Q     Were you filing your taxes with that person?
```

1    **A**    No, we filed separately.

2    **Q**    Approximately how long did those first meetings take?

3    **A**    It was about 30, 35 minutes.

4    **Q**    Was this procedure the same for both '15 and '16 tax

5    years?

6    **A**    Uh-huh, yeah.

7    **Q**    So did he have a computer that he was working on?

8    **A**    If I'm not mistaken, it was a laptop that he worked on,

9    yes.

10   **Q**    Did you see him entering any data into the laptop?

11   **A**    No, as I said, his computer was to back -- the desk --

12   chairs were outside in front of his desk.  With his computer

13   being toward him, you can't see what the person is entering.

14   **Q**    Did you notice whether he was taking any notes?

15   **A**    He would write down a few things.  Maybe like my son's

16   Social Security number, stuff like that.  It wasn't anything

17   major.

18   **Q**    Did you ever read the notes he wrote?

19   **A**    No, I didn't read the notes.

20   **Q**    So you said you had two meetings with him each year.  What

21   was the second meeting for?

22   **A**    Well, one time I went in -- I don't want to speculate, but

23   I know the second time I went, it was just to pick up a check

24   because -- I don't want to get the years mixed up -- because

25   the check didn't go to the mail, it came back to his office and

Direct - Clair

1    I had to pick it up.  I'm not certain what the years were, what

2    year it was, whether it was '15 or '16.  One time I dropped it

3    off and had to come back.

4    **Q**    Dropped what off?

5    **A**    Dropped my documents off and had to come back and meet

6    with him.

7    **Q**    Was he preparing the taxes while you were there meeting

8    with him?

9    **A**    Yes, I think the first time we did that, that's how it was

10   done.

11   **Q**    Other than giving him some documents that you sort of

12   described, did you ever email him any documents ahead of

13   time?

14   **A**    I can't recall emailing him any documents.  I think I

15   always hand-carried what I had.

16   **Q**    Do you know whether -- did you see him make any copies of

17   any of those documents, if you remember?

18   **A**    No, I can't remember whether he made copies or not.

19   **Q**    Do you have a business?

20   **A**    I have an EIN number that I use that, that I would use --

21   like a startup.  I was starting as a startup business, and I

22   actually labeled it for the name of the business.  I was trying

23   to maintain the name.  I just did it through the State of

24   Maryland.

25   **Q**    What was the name of it?

Direct - Clair

1    **A**    It's Just Temporary.

2    **Q**    The name of it was It's Just Temporary?

3    **A**    Name of it is It's Just Temporary, yes.

4    **Q**    What was that?

5    **A**    What it is, it started out I wanted it to be for people

6    that would be homeless.  It started out to be just for women

7    and to let them know that their situation they would be in

8    would be just that, It's Just Temporary.  So I wanted to help

9    them come off the street when they needed help, and then I

10   wanted it to grow into more because I know that it's just more

11   than women that are homeless and need to come off the street,

12   that there are younger teens and such.  But, again, it was a

13   startup.  I would go to certain places to help.

14        This was not making money.  This was trying to build

15   something for me and a name.  It was only with small churches

16   maybe.  They wouldn't pay me.  I wasn't governed under their

17   umbrella.  But it was just something to help them and to more

18   so market me and teach me how to help people because it's what

19   I wanted to do.

20   **Q**    What were you doing for the churches?

21   **A**    Nothing pretty much.  If they would ask me, I would go in

22   and help set up the women's ministry or something to that

23   effect.  Like I said, it wasn't something that I was getting

24   paid for at the time.  I just wanted to market myself, learn

25   how to do what I really wanted to do.

Direct - Clair

1   **Q**    So did you ever receive any repayment or gifts or any kind

2   of money --

3   **A**    Only if I spoke at the women's retreat or something like

4   that.  Again, these were small churches.  If they gave me $100

5   or if they said, "Well, we'll give you something towards your

6   hotel," but it was nothing major.  It wouldn't even cover the

7   hotel.  Again, I wasn't in it for the profit, if you will.  It

8   was more of trying to launch out and to find out what I can do

9   and how to do.

10  **Q**    So if you had to estimate, or if you remember, how much

11  money did you make or have come in for these activities?

12  **A**    It may have been about under $1,500 for the whole year.

13  **Q**    Did you have a separate bank account for it?

14  **A**    No, I didn't.

15  **Q**    Did Mr. Watson ever ask you about your vehicles?

16  **A**    My?

17  **Q**    Your vehicles, your cars?

18  **A**    I don't know if he asked me but I know I told him for the

19  purposes of driving there, I wanted to do mileage maybe.

20  **Q**    So you did speak about mileage for that --

21  **A**    Yeah, mileage, tolls.

22  **Q**    Did the two of you speak about your cell phone bill?

23  **A**    Yes, we talked about the cell phone bill.

24  **Q**    What did you talk about?

25  **A**    Just did I use it for the purposes of the business.

Direct - Clair

1   **Q**   Did you have a cell phone bill at the time?

2   **A**   I did.

3   **Q**   Did that bill have just the cell phone on it, or were

4   there other things on your bill as well?

5   **A**   It was just my cell phone bill but I used it like 55, 59

6   percent of the time for calling for -- or people calling me and

7   dealing and talking about It's Just Temporary.

8   **Q**   Did you speak with Mr. Watson about any percentages of the

9   use of that cell phone?

10  **A**   We didn't talk about percentages.  I don't recall talking

11  about percentages.

12  **Q**   Would he give you a copy of the return right then and

13  there?

14  **A**   The times -- the time that we did it right there and he

15  finished it, I would get it, a copy.  And then he would say,

16  "Sign where the Xs are.  This is how much you will get back.

17  Sign where the Xs are," and that's what I did.

18  **Q**   Did he go over the return with you?

19  **A**   Not page by page, no.

20  **Q**   What part did he go over with you?

21  **A**   Just the pages where he said sign where the Xs are.

22  **Q**   Just the signature pages?

23  **A**   Yes.

24  **Q**   Did he go over how much your refund might be?

25  **A**   He verbally told me what it would be, and then, "Sign

Direct - Clair

1  where the Xs are."

2  **Q**    I think you mentioned that perhaps it was different on

3  another occasion?

4  **A**    Yes, and I can't remember what year and I don't want to

5  try to do that where -- I don't know what prompted it -- that

6  the check came back to his office.  I don't know what happened.

7  I think we mentioned something about the bank -- and I'm not

8  sure if it was my bank or what, that it didn't go in direct

9  deposit.  But the check was actually brought back to his

10 office, and I had to pick it up.

11 **Q**    Did you get your return then at that time during the

12 second meeting on that occasion or --

13 **A**    Yes, that would have been the time I went back to pick up

14 the check.

15 **Q**    What about not the refund, the check, but the return, the

16 paperwork itself?

17 **A**    The paperwork itself I got then and then left and waited

18 for the check to come.

19 **Q**    Okay.  So on both occasions, you got your return paperwork

20 where you signed on the first meeting with him?  Am I

21 understanding that correctly?

22 **A**    Yes.  I want to say that we did it while I was there.

23 **Q**    Did you ever read the returns at all?

24 **A**    No.  I mean, I trusted.  You know, I trusted he's a CPA,

25 he know what he's doing, and I give him the information.  Like

1   so, I trust my doctor.  I go to her, she says this is what's

2   happening, you go take this prescription, get it filled, and

3   you take it.  I just trusted him.

4   **Q**   I'd like to turn your attention, please, to Exhibit 18A.

5          MR. MORGAN:  If we could enlarge the top portion,

6   please.

7   **Q**   Ma'am, do you see this Form 1040, individual Income Tax

8   Return for 2015?

9   **A**   Yes.

10  **Q**   Is there a name underneath there?

11  **A**   Yes.

12  **Q**   What's the name?

13  **A**   Claudette Clair.

14  **Q**   Is that your name?

15  **A**   It is.

16         MR. MORGAN:  I'd like to scroll down to line 12.

17  **Q**   Do you see here on line 12 where it says, "Business income

18  or loss, attach Schedule C or C-EZ"?

19  **A**   Yes.

20  **Q**   And box 12 to the right of that?

21  **A**   Yes.

22  **Q**   Is there an amount in box 12?

23  **A**   Yes, it is, sir.

24  **Q**   Could you please read it.

25  **A**   It's a negative 31,277.

1              MR. MORGAN:  Could we please turn to page 34 of

2     Exhibit 18A.  Enlarge the top portion, please.

3     **Q**     Do you see, ma'am, this is the Schedule C for Profit or

4     Loss From Business for the year 2015?

5     **A**     Yes.

6     **Q**     Is there a name of proprietor?

7     **A**     Yes.

8     **Q**     What's the name there?

9     **A**     It says, "Claudette Clair."

10    **Q**     In box A, "Principal business or profession, including

11    product or service," what's listed there?

12    **A**     "Religious grant making."

13    **Q**     Line C, business name?

14    **A**     "It's Just Temporary."

15    **Q**     Is that the business that you mentioned before?

16    **A**     Yes.

17             MR. MORGAN:  If we could please scroll down to line 7

18    in the Income section.

19    **Q**     Do you see where it says, "Gross income"?

20    **A**     Yes.

21    **Q**     How much is the amount listed in box 7 for gross income?

22    **A**     1,150.

23    **Q**     Scrolling down, please, to the Expenses section --

24    actually for that 1,150, does that sound about right for what

25    you had coming in --

1    **A**    Right, yeah.  It was less than, like I said earlier,

2    1,500.

3    **Q**    I'd like to direct your attention to line 20B.  Do you see

4    that where it says, "Rent or lease other business property"?

5    **A**    Yes.

6    **Q**    And box 20B?

7    **A**    Yes.

8    **Q**    What's listed in the amount there?

9    **A**    The amount is 8,850.

10   **Q**    For It's Just Temporary, did you rent or lease business

11   property for $8,850?

12   **A**    No, sir.

13   **Q**    Do you remember discussing this with Mr. Watson?

14   **A**    No, we never talked about renting property.

15   **Q**    I'd like to direct your attention to line 21 for "Repairs

16   and maintenance."  Do you see box 21?

17   **A**    Yes.

18   **Q**    Is there an amount listed there?

19   **A**    Yes, it is.

20   **Q**    What is it?

21   **A**    $589.

22   **Q**    Did you have any discussions with Mr. Watson about any

23   repairs or maintenance related to your activities for It's Just

24   Temporary?

25   **A**    Other than my vehicle.

Direct - Clair

```
 1   Q     What about your vehicle?

 2   A     Being repaired.  There was a tire that I hit a pothole

 3   once, and I had it repaired.  But anything pertaining to the

 4   business would have only been the Jeep that I drive.

 5   Q     Line 27a where it says, "Other expenses from line 48," do

 6   you see the box next to it, 27a?  Do you see that there?

 7   A     Yes.

 8   Q     What's the amount listed?

 9   A     5,160.

10           MR. MORGAN:  Let's scroll down, please, to the next

11   page of this exhibit, 18A.  The bottom portion, Part V, Other

12   Expenses, this is page 35 of 46, Exhibit 18A.

13   Q     Did you have some expenses for It's Just Temporary?

14   A     Yes.

15   Q     Did you discuss that with Mr. Watson?

16   A     Yes.  Computers, printers, business cards.  Things of that

17   nature.  Paper.

18   Q     I'd like to direct your attention to the third line in

19   where it says, "Cell phone and internet."  Do you see that?

20   A     Yes.

21   Q     What's the amount listed there?

22   A     3,228.

23   Q     How much was your cell phone and internet bill for that

24   year, if you remember?

25   A     The cable and the internet was together so it was like
```

Direct - Clair

1    roughly $250.  Cell phone may have been maybe 100.  But the

2    cable and internet was together.

3    **Q**    Okay.  Did you have any discussions with Mr. Watson about

4    what percentages of the internet you use or what percentages

5    your cell phone you used for the business?

6    **A**    No, we didn't talk about percentages of the internet or

7    the cell phone.

8    **Q**    To your knowledge, did you have $3,228 worth of expenses

9    for cell phone and internet related to It's Just Temporary?

10   **A**    Well, I know if you add that bill for the month or the

11   year, it would be close but maybe not right at 3,000.

12   **Q**    For just It's Just Temporary or for the entire bill?

13   **A**    This is for the entire bill.  The cable and internet was

14   together.  I remember the phone bill was just one bill but it

15   was together, I used it.

16          MR. MORGAN:  Please go to page 34, line 28 of Exhibit

17   18A.

18   **Q**    You see line 28 where it says, "Total expenses before

19   business expenses for the use of the home"?  Do you see that?

20   **A**    Yes.

21   **Q**    And box 28?

22   **A**    Yes, sir.

23   **Q**    What's the amount listed in box 28?

24   **A**    The amount listed in box 28 is 32,427.

25   **Q**    Setting aside anything you may have used for the home,

1    your business use of the home, did you have $32,427 in expenses

2    related to It's Just Temporary?

3    **A**    No.

4    **Q**    Do you recall speaking with Mr. Watson about these

5    expenses or that figure for these expenses?

6    **A**    No, I didn't speak to him about these expenses.

7    **Q**    Where did you run It's Just Temporary out of?

8    **A**    At that time it was out of my apartment in a separate

9    room.

10   **Q**    So you didn't rent or lease a separate office or space for

11   that?

12   **A**    No, sir.

13   **Q**    Can you describe what that looked like in your home.

14   **A**    Yeah.  It was separate from the bedroom and dining room.

15   It was just a little box.  Again, it was an apartment I lived

16   in.  I set up in there a table, a chair, the particulars, lamp,

17   room for my printer and copier, and that was it.

18   **Q**    Was that a separate, walled-off room?

19   **A**    Yes, it was.

20   **Q**    Did you use that room for any other purpose other than

21   just It's Just Temporary work?

22   **A**    Not really.  I mean, there were times when I teleworked

23   from home and sometimes I would use it, but I had a laptop so I

24   could be anywhere, you know, in the house.

25   **Q**    Did you speak with Mr. Watson about this business use of

Direct - Clair

1    the home?

2    **A**    I may have.  I just can't remember.

3    **Q**    I'd like to direct your attention to line 30 where it

4    says, "Expenses for business use of your home.  Do not report

5    these expenses elsewhere."  Do you see that line?

6    **A**    Yes.

7    **Q**    And in box 30, is there an amount listed there?

8    **A**    No.

9              MR. MORGAN:  If we could go back up to page 3 of this

10   same Exhibit 18A and enlarge the Tax and Credits section,

11   please.

12   **Q**    Ma'am, do you see line 40 where it says, "Itemized

13   deductions from Schedule A or your standard deduction"?  Do you

14   see that line?

15   **A**    Yes.

16   **Q**    And box 40?

17   **A**    I see box 40.

18   **Q**    What's the amount listed there?

19   **A**    67,875.

20             MR. MORGAN:  Let's look at Schedule A, please, on

21   page 32 of the same exhibit, 18A.  Please enlarge the top

22   portion.

23   **Q**    Do you see that here Schedule A, Itemized Deductions, for

24   the year 2015?

25   **A**    Yes.

1    **Q**    Is there a name on this form?

2    **A**    Yes, Claudette Clair.

3            MR. MORGAN:  If we could scroll down, please, to line

4    21.

5    **Q**    Do you see line 21 where it says, "Unreimbursed employee

6    expenses, job travel, union dues, job education, et cetera.

7    Attach Form 2106 or 2106-EZ if required"?

8    **A**    Yes.

9    **Q**    Do you see box 21?

10   **A**    Yes.

11   **Q**    How much is listed in box 21?

12   **A**    51,413.

13            MR. MORGAN:  Can we please go to page 12 of Exhibit

14   18A.  Please enlarge the top portion.

15   **Q**    Do you see this Form 2106 for Employee Business Expenses

16   for 2015?  Do you see that?

17   **A**    Yes.

18   **Q**    Do you see a name listed under your name?

19   **A**    A name listed under my name?

20   **Q**    Where it says "your name", the box --

21   **A**    Yes, Claudette Clair.

22   **Q**    In the box next to it where it says, "Occupation in which

23   you incurred expenses"?

24   **A**    "Loan and grant tech."

25   **Q**    Were you a loan and grant tech this year for the

1    Department of Agriculture?

2    **A**    Yes.

3    **Q**    You mentioned before that you did occasionally work from

4    home in 2015; is that correct?

5    **A**    Yes.

6    **Q**    Can you please describe that for the jury.

7    **A**    I worked -- on Wednesdays, I teleworked from home on

8    Wednesdays.  You want me to go into detail about what I did or?

9    **Q**    Sure.

10   **A**    I was a loan and grant tech.  I worked at home, I log in

11   at 6:30, I log out at 5:00.  I just did the work that was

12   allotted to me.

13   **Q**    Did you have any unreimbursed expenses from that work at

14   home --

15   **A**    No.

16   **Q**    Did you have any unreimbursed expenses at all from your

17   job at the Department of Agriculture?

18   **A**    No.

19          MR. MORGAN:  I'd like to scroll down, please, to

20   line 4.

21   **Q**    Do you see where it says, "Business expenses not included

22   on lines 1 through 3"?

23   **A**    Uh-huh.

24   **Q**    "Do not include meals and entertainment."

25   **A**    Yes.

Direct - Clair                                    Vol. V-29

1    **Q**    And then box 4, do you see that?

2    **A**    Yes, sir.

3    **Q**    What's the amount listed there in box 4?

4    **A**    43,494.

5    **Q**    Did you have $43,494 in business expenses related to your

6    work at the Department of Agriculture that were not

7    reimbursed?

8    **A**    No, sir, no.

9    **Q**    Do you remember discussing with Mr. Watson this figure?

10   **A**    No.

11   **Q**    Likewise, please, on line 5, do you see where it says,

12   "Meals and entertainment expenses"?

13   **A**    Yes.

14   **Q**    In box 5, column B, do you see an amount listed there?

15   **A**    Yes, sir.

16   **Q**    What's the amount?

17   **A**    $4,800.

18   **Q**    Likewise in the Department of Agriculture, in your job

19   there, did you have unreimbursed expenses for meals and

20   entertainment?

21   **A**    No, sir.

22   **Q**    Do you remember discussing anything like that with

23   Mr. Watson?

24   **A**    No, sir.

25   **Q**    Did you know this was on the form that was submitted to

Direct - Clair

1    the IRS?

2    **A**    No, sir.

3           MR. MORGAN:  Can you please scroll down a little bit.

4    Thank you.

5           If we could now scroll down to 19A -- I apologize.

6    Can we please go back to 18A and page 4.

7    **Q**    Do you see this here?

8    **A**    Yes, sir.

9    **Q**    When you were signing the documents, were you signing with

10   an ink pen, or did you sign electronically, or do you

11   remember?

12   **A**    I would sign with an ink pen.

13   **Q**    Did you read this portion before you signed it?

14   **A**    I did not.

15   **Q**    Were you aware of the text above the box where it says

16   "your signature," where it says, "Under penalties of perjury, I

17   declare that I have examined this return and accompanying

18   schedules and statements, and to the best of my knowledge and

19   belief, they are true, correct and complete"?

20   **A**    I did not read it, sir.  I just signed it.

21   **Q**    Why did you sign it without reading it?

22   **A**    Well, I trusted him.  I trusted because he's a

23   professional.  I really just trusted him.

24   **Q**    Whose name is listed underneath there as the paid

25   preparer?

Direct - Clair                    Vol. V-31

1    **A**    Ronald E. Watson.

2          MR. MORGAN:  If we could go up one page to page 3,

3    please, and enlarge the Refund section at the bottom.

4    **Q**    Do you see the Refund section, line 76a, where it says,

5    "Amount of line 75 you want refunded to you"?

6    **A**    Yes, sir.

7    **Q**    Is there an amount in 76a?

8    **A**    Yes, it is, sir.

9    **Q**    How much is that?

10   **A**    3,961.

11   **Q**    Thank you.

12         MR. MORGAN:  Now could we please go to Exhibit 19A,

13   and please enlarge the top.  Thank you.

14   **Q**    Do you see here the Form 1040 for U.S. Individual Tax

15   Return for the year 2016?

16   **A**    Yes.

17   **Q**    Whose name is listed there for this return?

18   **A**    Mine, Claudette Clair.

19         MR. MORGAN:  Could we please scroll down to line

20   12 -- if we could go up a little bit, a little bit more.

21   **Q**    In the section here, "exemptions," do you see 6c where it

22   says "dependents"?

23   **A**    Yes.

24   **Q**    Do you see names listed there?

25   **A**    Yes.

Direct - Clair                          Vol. V-32

1    **Q**    Who are those individuals?

2    **A**    Eugene Clair is my son and Mary Hockett is my aunt.

3    **Q**    Those were two individuals you were claiming as dependents

4    that year?

5    **A**    Yes.

6            MR. MORGAN:  If you could scroll down, please, to

7    Income.

8    **Q**    Line 12 where it says, "Business income or loss, attach

9    Schedule C or C-EZ," do you see that line?

10   **A**    Yes, sir.

11   **Q**    Box 12, do you see that?

12   **A**    Yes, sir.

13   **Q**    What's the number there listed in box 12?

14   **A**    It's negative $37,071.

15           MR. MORGAN:  Could we please pull up 35 of Exhibit

16   19A, and enlarge the top portion, please.

17   **Q**    Do you see here the Schedule C for Profit or Loss From

18   Business for the year 2016?

19   **A**    Yes, sir.

20   **Q**    And the name of proprietor?

21   **A**    Claudette Clair.

22   **Q**    And the principal business or profession, including

23   product or service?

24   **A**    "Religious grant making."

25   **Q**    And the business name?

Direct - Clair

1   **A**    "It's Just Temporary."

2   **Q**    So the work you were doing for It's Just Temporary, did

3   that involve any grant making for religious organizations?

4   **A**    No.

5            MR. MORGAN:  If we could scroll down, please, to

6   line 7 where it says, "Gross income."

7   **Q**    Do you see that?

8   **A**    Yes, sir.

9   **Q**    How much is the amount listed as the gross income in

10  box 7?

11  **A**    1,605.

12           MR. MORGAN:  If we could please scroll down to line

13  21, "Repairs and maintenance."

14  **Q**    Do you remember having a discussion with Mr. Watson about

15  any repairs or maintenance related to It's Just Temporary?

16  **A**    No, sir.

17  **Q**    Did you have discussions about repairs and maintenance for

18  your car?

19  **A**    I was always having repairs for the car because it was

20  always needing repairs, what we would call a lemon, if you

21  would.  It really did stay in the shop a lot.

22  **Q**    How many cars did you have?

23  **A**    Just the one.

24  **Q**    Did you use that for personal --

25  **A**    Everything.  Travel, everything.

1   **Q**    To commute to and from work?

2   **A**    Yes.

3   **Q**    And just your normal daily activities?

4   **A**    Yes.

5   **Q**    And also did you use it some for the It's Just

6   Temporary --

7   **A**    Yes.

8   **Q**    -- activities?  Out of all your usage of your vehicle that

9   year, what percentage do you think you may have used for It's

10  Just Temporary?

11  **A**    Maybe 59 percent I would say.

12  **Q**    What's the amount listed in box 21?

13  **A**    3,429.

14  **Q**    And box 27a, do you see where it says, "Other expenses"?

15  **A**    Yes, sir.

16  **Q**    What's the amount in box 27a?

17  **A**    5,992.

18        MR. MORGAN:  Could we please go down one page to page

19  34 and the bottom portion.

20  **Q**    Do you see this itemized list here?

21  **A**    Yes.

22  **Q**    Did you have discussions with Mr. Watson about any

23  expenses you may have had for It's Just Temporary?

24  **A**    It would have been the same:  Gas, tolls, parking and

25  things of that nature.

Direct - Clair

1   **Q**    Likewise here again, on this year we have cell phone and

2   internet.  Do you see that line?

3   **A**    Yes, sir.

4   **Q**    And what's the amount for that?

5   **A**    2,350.

6   **Q**    Do you recall having any discussions with Mr. Watson about

7   how much of your cell phone and internet bill you may have used

8   for It's Just Temporary versus any other purpose?

9   **A**    No.  We didn't split it.  I just -- we didn't talk about

10  percentages.

11           MR. MORGAN:  If we could please go up to page 3 of

12  19a.  Enlarge the Tax and Credit section.

13  **Q**    Line 40 where it says, "Itemized deductions from Schedule

14  A or your standard deduction," do you see that?

15  **A**    Line 40?  Yes.

16  **Q**    And box 40, do you see that?

17  **A**    Yes.

18  **Q**    What's the amount listed in box 40?

19  **A**    36,936.

20           MR. MORGAN:  Please go to page 31 of this

21  Exhibit 19A.

22  **Q**    Do you see this form or Schedule A for Itemized Deductions

23  for the tax year 2016?

24  **A**    Yes.

25           MR. MORGAN:  Let's scroll down, please, to line 21.

1   Q    Do you see that where it says line 21, "Unreimbursed

2   employee expenses, job travel, union dues, job education, et

3   cetera.  Attach Form 2106"?  Do you see that?

4   A    Yes, yes.

5   Q    What's the amount listed in box 21?

6   A    23,809.

7   Q    Did you have $23,809 in unreimbursed employee expenses

8   that year?

9   A    No.

10  Q    Were you still working with the Department of

11  Agriculture?

12  A    Yes, sir.

13  Q    Were you still a loan and grant tech that year?

14  A    I'm sorry?

15  Q    What was your job that year in 2016?

16  A    Just loan and grant tech.

17       MR. MORGAN:  Could we please go to page 10 of 19A.

18  Enlarge the top portion.  Thank you.

19  Q    Do you see this Form 2106, Employee Business Expenses, for

20  the year 2016?

21  A    Yes.

22  Q    Whose name is listed there?

23  A    Claudette Clair.

24  Q    And occupation in which you incurred expenses, what's

25  listed there?

1    **A**    Loan and grant tech.

2    **Q**    Please look down at line 4 where it says, "Business

3    expenses not included on lines 1 through 3, do not include

4    meals and entertainment."  Do you see that line?

5    **A**    Yes, sir.

6    **Q**    Box 4, column A, do you see that box?

7    **A**    Yes.

8    **Q**    How much is listed there?

9    **A**    20,545.

10   **Q**    Do you remember having any discussions with Mr. Watson

11   about $20,545 worth of business expenses, not related to meals

12   and entertainment, that were unreimbursed by the Department of

13   Agriculture?

14   **A**    No.

15   **Q**    Turning to line 5, "Meals and entertainment expenses," do

16   you see that?

17   **A**    Yes.

18   **Q**    Column B, box 5, do you see a number there?

19   **A**    Yes.

20   **Q**    How much is listed there?

21   **A**    3,600.

22   **Q**    Did you have $3,600 in unreimbursed expenses for meals and

23   entertainment from the Department of Agriculture?

24   **A**    No, sir.

25   **Q**    Did you discuss anything like this with Mr. Watson?

Direct - Clair

1   **A**    No, we didn't discuss this.

2   **Q**    Did you know that these numbers were on this form here?

3   **A**    No, sir.

4          MR. MORGAN:  I'd like to go back up, please, to page

5   29.  I'm sorry, page 31.  If we could enlarge, please, the

6   section again where it says, "Job expenses and certain

7   miscellaneous deductions."

8   **Q**    This time now I would like to direct your attention,

9   please, to line 23 where it says, "Other expenses, investment,

10  safe deposit box, et cetera.  List type and amount."  Do you

11  see that?

12  **A**    Yes.

13  **Q**    Is there a box 23?

14  **A**    Box 23?  Yes.

15  **Q**    What's the amount listed there?

16  **A**    1,320.

17         MR. MORGAN:  Could we please now go to page 29.

18  **Q**    Do you see this statement which is tax year 2016, Other

19  Expenses Statement?

20  **A**    Yes.

21  **Q**    Whose name is listed there?

22  **A**    Claudette Clair.

23  **Q**    Do you see a table listed here, do you see a table?

24  **A**    Yes.

25  **Q**    Under "type of expense," what's listed?

1   **A**      "Horseback riding."

2   **Q**      And the amount for the other expense amount listed?

3   **A**      $1,320.

4   **Q**      Did you have $1,320 in horseback riding expenses for the

5   year 2016?

6   **A**      No.  I had about $175.

7   **Q**      How did you have $175 --

8   **A**      I went riding once for 55.  The next time I went, I took

9   my nephews, my nieces and grands too.  Just pony riding was

10  about $70 for them.

11  **Q**      So you took them pony riding and you, yourself, went

12  riding one time, and why did you do that?

13  **A**      Because I just wanted to.  I mean, I just wanted to take

14  them riding.  I wanted to experience it.  I had ridden before

15  but I hadn't been in a long time.  I just wanted to ride, and I

16  thought it would be something good to take the kids so the next

17  time I went, I took them.

18  **Q**      So in total you said how much do you think you spent --

19  **A**      I spent 55 for me and like $70 for the kids which was

20  probably was under 200, $175 maybe.

21  **Q**      Do you remember having any discussions with Mr. Watson

22  about horseback riding?

23  **A**      He asked me about other things that I would do.  I told

24  him that's what I did.  But I didn't know it would be an

25  expense.  It was just what we were talking about.

1   **Q**    He asked you about anything else you did?

2   **A**    Yeah, any other activities.

3   **Q**    Was this just an activity you told him about that you

4   did?

5   **A**    Yes.

6   **Q**    Did Mr. Watson tell you that he was claiming $1,320 for

7   horseback riding as an expense on your tax return?

8   **A**    No, sir.

9   **Q**    Did you know this was on this tax return that was filed

10  with the IRS?

11  **A**    No.  When I found out about this expense is when you guys

12  came to me.

13          MR. MORGAN:  If you could please go back to page 3 of

14  this exhibit.  If you could please enlarge the Refund section.

15  **Q**    Do you see line 76a where it says, "Amount of line 75 you

16  want refunded to you"?  Do you see that?

17  **A**    Yes, sir.

18  **Q**    What is the amount listed in box 76a?

19  **A**    It says 6,219.

20          MR. MORGAN:  If we could go to the next page, please,

21  page 4 of 19A.

22  **Q**    Does this look like the spot where you signed with the wet

23  ink pen?

24  **A**    I'm sorry?

25  **Q**    Did you sign a page that looked like this with a wet ink

Direct - Clair                                                Vol. V-41

1   pen that year?

2   **A**     Yes.  This looks like the signature page.

3   **Q**     For this year, did you read the text above the signature

4   line on this year either?

5   **A**     I did not.

6   **Q**     Why not?

7   **A**     I trusted him.

8            MR. MORGAN:  Thank you.  You can take it down.

9   **Q**     Did you have any idea that the tax returns were

10  inaccurate?

11  **A**     No.  I believed that he was a good tax preparer.  Again, I

12  trusted him.  I had heard good things about him, and I thought

13  he was a good tax preparer.

14  **Q**     When was the last time you spoke with Mr. Watson?

15  **A**     It was right after I got a visit from the investigator,

16  and I called Mr. Watson and I said to him, "I'm being

17  investigated."  And Mr. Watson said to me, "No, you're not

18  being investigated.  I'm being investigated, and they're

19  looking into some people that I prepared their taxes for."

20  **Q**     Did he tell you whether your return was accurate or not?

21  **A**     We didn't talk about the return, sir.  At that point we

22  hadn't spoke since.  I just went ahead and got a new tax

23  preparer.

24            MR. MORGAN:  No further questions.  Thank you.

25            THE COURT:  Okay.  Mr. Ruter for cross-examination.

1              MR. RUTER:  Thank you.

2                    **CROSS-EXAMINATION**

3    **BY MR. RUTER:**

4    **Q**   Good morning, ma'am.

5    **A**   Good morning, sir.

6    **Q**   If I could show you for identification only, marked for

7    identification only, Exhibit 226.  I'll ask you, Ms. Clair, if

8    you can identify this document?

9    **A**   It looks like a signature page.

10   **Q**   An exhibit you already saw; is that right?

11   **A**   Yes.

12   **Q**   Is that your signature on that document?

13   **A**   That is.

14              MR. RUTER:  I move for its admission, Your Honor.

15              MR. MORGAN:  No objection.

16              THE COURT:  Exhibit 226 is in evidence.  Again,

17   please try to use the microphone if you can.

18              MR. RUTER:  Yes, sir.  Thank you.

19   BY MR. RUTER:

20   **Q**   Ms. Clair, I do want to just direct your attention a

21   little bit further.  Counsel for the Government already has.

22   But we see this is your signature, right?

23   **A**   Yes.

24   **Q**   And just above that signature, we see some language in

25   small print, do we not?

Cross - Clair                                        Vol. V-43

1    **A**    We see it.

2    **Q**    And I'd like just to ask you a few questions about that.

3    **A**    Okay.

4    **Q**    The first thing it says is, "Under the penalties of

5    perjury," correct?

6    **A**    Yes, it does.

7    **Q**    You know what that means?

8    **A**    Yes.

9    **Q**    Then it says, "I declare that I have examined this

10   return."  When you signed that, was that accurate?

11   **A**    I signed it.

12   **Q**    Was it accurate that you had examined the return?

13   **A**    No.

14   **Q**    And it also says that, "I declare that I have examined

15   accompanying schedules and documents."  Was that true when you

16   signed this?

17   **A**    No, I didn't examine it.

18   **Q**    You didn't examine it?

19   **A**    I did not examine them.  I just signed it, as I said

20   earlier.

21   **Q**    Yes, ma'am.  Then finally it says "To the best of my

22   knowledge and belief, they are true, correct and

23   complete."  Was that accurate at the time that you signed the

24   document?

25   **A**    No, because I didn't know all those things were there.

```
 1    Q    So we understand that before you met Mr. Watson, you
 2    called his office; is that right?
 3    A    Yes, to make an appointment.
 4    Q    And his secretary answered the phone?
 5    A    Made the appointment, yes.
 6    Q    And she made the appointment?
 7    A    Yes.
 8    Q    When you appeared, was the secretary there, present?
 9    A    I think she was because she walked us back to his room, to
10    his office.
11    Q    You had never met Mr. Watson prior?  This was your first
12    meeting with him, correct?
13    A    Yes.
14    Q    And before you met with him, you had never had any
15    conversations with him; is that right?
16    A    Right.
17    Q    So when you brought some documents, did you have any idea
18    really what documents you needed to bring?
19    A    When I spoke to the secretary, I was bringing in -- I told
20    her I was going to bring in my W-2s.  Again, he was referred
21    and he came under good word that he was a great person -- I
22    mean a good tax preparer.
23    Q    Yes, ma'am.
24    A    So I brought in my W-2s and the things that I would need
25    to give to Mr. Watson to prepare my documents.
```

1    **Q**    Okay.  Did you bring in any proof of your charitable
2    contributions?
3    **A**    What, you talking like tithe and offerings and things of
4    that nature?
5    **Q**    Yes, ma'am.  If I understand it, you could have cash
6    contributions to a qualified organization, or you could have
7    noncash contributions to a charitable organization.  Is that
8    your understanding?
9    **A**    Yes.  Tithes and offerings, things like that that I
10   brought in, my son who I was claiming.  And that was pretty
11   much what I would start with with Mr. Watson, and those are the
12   things that he used.
13   **Q**    Okay.  So you-all discussed charitable contributions?
14   **A**    I told him I paid tithe and offerings.
15   **Q**    Yes.  And did you have any documentation to back that
16   up?
17   **A**    Yes.
18   **Q**    Did you-all speak about chairs and desks?
19   **A**    Chairs and desks?  I don't remember.
20   **Q**    Did you-all discuss hair, presumably your hair?  Did you
21   discuss that with him?
22   **A**    My hair?
23   **Q**    Yes, ma'am.
24   **A**    No, sir.
25   **Q**    You did discuss tolls?

1    **A**    Yes.

2    **Q**    And gasoline?

3    **A**    Yeah, parking.

4    **Q**    And mileage?

5    **A**    Yes.

6    **Q**    When you first met him, did he take any notes that you

7    saw?

8    **A**    Like I said to the attorney earlier, he may have written

9    down a few things, but I don't recall what he wrote and I

10   didn't see what he wrote.

11   **Q**    Yes, ma'am.  Can you recall though, Ms. Clair, whether or

12   not when he wrote down anything, did he write it down at the

13   time that he was asking you questions?

14   **A**    I'm not sure, sir.  I'm not sure.

15   **Q**    He ultimately began to do some work on the computer; is

16   that right?

17   **A**    Yes, he did work on the computer, sir.

18   **Q**    Is it correct to say that the computer was located behind

19   him?

20   **A**    No, his computer was in front of him.

21   **Q**    In front of him?  So was the computer between where you

22   were seated and where he was seated?

23   **A**    His computer was on his desk that I can remember.

24   **Q**    Could you see the screen of the computer --

25   **A**    No, I don't recall being able to see his screen.  I know

Cross - Clair

1   that behind him was a credenza that was a printer.  Like I

2   said, a picture a kid had drawn.  But he worked with his desk

3   to the back of the credenza so he would work -- I don't recall

4   seeing his screen, I really don't.

5   **Q**   Okay.

6   **A**   Even with that, you're not that close to -- he has a desk

7   and there are two chairs, you know.  And the desk is not up on,

8   your chair is not on the desk.

9   **Q**   Understood.  When he finished preparing the return, do I

10  understand that he then gave you a total printed-out tax

11  return?

12  **A**   What he gave was the signature pages where he would X them

13  and say sign where the Xs are.

14  **Q**   And one of those documents you just identified a minute

15  ago?

16  **A**   Yes.

17  **Q**   After he was totally done, did he give you a completed

18  copy of your tax return?

19  **A**   He would.  He would put it in a folder, and you were done.

20  You would take it home and file it away and wait on your

21  refund.

22  **Q**   Yes, ma'am.  Whatever documents you brought in, did he

23  return those to you, and then you placed them or he placed them

24  inside of the folder with your tax return?

25  **A**   They were inside the folder with the tax return.

1  **Q**    So do we understand that you opened up the organization

2  called It's Just Temporary in 2015?

3  **A**    No, I had the EIN number way before I met Mr. Watson.

4  **Q**    Do you recall what year it was --

5  **A**    No, I do not.

6  **Q**    How did the topic come up about this organization called

7  It's Just Temporary?

8  **A**    I told him about it.

9  **Q**    And --

10  **A**    That -- go ahead.

11  **Q**    You told him about that because you thought it may be

12  something that it could have tax implications; is that a fair

13  statement?

14  **A**    For the mileage, for the tolls, any hotel expenses I may

15  have got.  I asked him if I could use it toward that.

16  **Q**    Yes.  In regard, ma'am, say to the items you just

17  mentioned, you mentioned just now three items, did you have any

18  receipts as it related to a hotel or gas or tolls or parking?

19  **A**    Most of the hotels if you would pay, you would pay at the

20  hotel so I had the hotel receipt.  That's why I said it was

21  never really much.

22  **Q**    Understood.  But you brought with you, as an example, a

23  hotel receipt or receipts?

24  **A**    A hotel receipt, yes.

25  **Q**    You had one?

Cross - Clair

1    **A**    I think it was one.  Like I said, sir, this is 2015

2    and '16 we're talking about.

3    **Q**    Yes, ma'am.

4    **A**    It's hard to remember.

5    **Q**    Understood.  What I'm trying to understand is whether or

6    not some things you gave him were not supported by a piece of

7    paper, but it was simply your best estimate as to what that

8    expense might be?  That's what I'm trying to understand.

9    **A**    So in giving that to the expert, he would know whether it

10   could be used or not.

11   **Q**    Understood.  But take the idea -- not the idea.  Take the

12   line item of gas.

13   **A**    Okay.

14   **Q**    You didn't have receipts, did you, with all the gas that

15   you had spent?

16   **A**    No, I had receipts.

17   **Q**    For gasoline?

18   **A**    For gasoline.  I got receipts for gasoline.  When you go

19   to the gas pump -- especially when I'm going out of town.

20   **Q**    Yes, ma'am.  So you gave then to Mr. Watson gasoline

21   receipts?

22   **A**    Okay, yes --

23   **Q**    No, no, I'm asking a question.  Did you?

24   **A**    Yes.

25   **Q**    Do we understand sometimes you would receive payment for

Cross - Clair                                      Vol. V-50

 1   your services?

 2   **A**    For It's Just Temporary.

 3   **Q**    Yes, ma'am.

 4   **A**    It may be $50 or -- like I said earlier.

 5   **Q**    Yes.  But you were shown by Government counsel the line

 6   item for the gross amount of money you received in 2015,

 7   right?

 8   **A**    Uh-huh.  Like I said, it was always under maybe like

 9   $1,500 or so.

10   **Q**    Yes, ma'am.  You agreed that the line item appeared to be

11   correct?  I think $1,150 if my mind serves me right.

12   **A**    One was 1,006 something, one was 1,005.  Something like

13   that, yes.

14   **Q**    Did you have any documentation to support the amount of

15   income that you had received from the various churches, as an

16   example, that you visited?

17   **A**    Like I said, I got a check once for $100, and then they

18   gave me $100 in cash like to go toward the hotel.  Again, these

19   were small entities.  These are not major corporations.

20   **Q**    Okay.

21          But Ms. Clair, in terms of that number that was on your

22   return, did you have specific documents to support the $1,500

23   or the $1,150 placed on the returns?

24   **A**    I had it written down and I gave it to Mr. Watson.

25   **Q**    Okay.  So you then would have given him, or at least told

Cross - Clair

1   him, of what was on the paper that you brought?

2   **A**    Uh-huh.

3   **Q**    Is that right?

4   **A**    That could be right, yes.

5   **Q**    In terms of your mileage, did you provide him with the

6   amount of mileage that you had driven relative to this

7   business?

8   **A**    Right.

9   **Q**    Just so we know, how did you actually do that?

10  **A**    And the way I did that was for my mileage sheet, that I

11  would start using my odometer from start to finish.  Because I

12  was told by the tax preparer before him if I was ever going to

13  use mileage, I need to have that.

14  **Q**    And so you provided your -- was it actually like just a

15  log sheet that had various entries on it concerning mileage; is

16  that right?

17  **A**    Yes, yes.  I actually -- I want to say I left it with him

18  or gave him a copy of it, but I did -- I know before I handed

19  it to him, I actually read it off.

20  **Q**    Okay.  When you read it off, do you recall him taking any

21  notes?

22  **A**    I think he may have wrote that down.

23  **Q**    Ms. Clair, you were shown several line items on different

24  schedules that showed the amount of certain expenses or the

25  amount of certain losses.  Do you recall that?

1    **A**    Yes.

2    **Q**    When counsel asked you whether or not you had lost

3    $31,277, what is your understanding of the word "loss"?

4    **A**    Well, I know it's different from on the government tax

5    side.  If I lose something, 1- or $200 here, that's a loss.

6    But this is business loss I'm thinking that you guys are

7    talking about, and this is why I go to tax preparers because I

8    don't know the laws to that and what extent it could be.  So

9    I'm not very familiar with that.

10   **Q**    Okay.  So would it be fair to say that as to the IRS's

11   definition of loss, you don't know what that definition is?

12   **A**    To the extent, no.  This is why I go to the

13   professionals.

14   **Q**    That's understood as well.

15   **A**    Mm-hmm.

16   **Q**    You indicated that you did have repairs on your vehicle?

17   **A**    I did.

18   **Q**    What vehicle did you drive in 2015; do you remember,

19   ma'am?

20   **A**    Yes, sir, I do.

21   **Q**    What was that?

22   **A**    It was a 2009 Jeep Grand Cherokee.

23   **Q**    You had a computer at home?

24   **A**    Yes.

25   **Q**    A printer?

Cross - Clair

1   **A**    Yes.

2   **Q**    You bought paper?

3   **A**    I did.

4   **Q**    Some business cards?

5   **A**    Yes.

6   **Q**    And all of those were things that Mr. Watson placed on

7   your tax return; is that right?

8   **A**    Yes.

9   **Q**    Just taking one at a time.  For the computer, did you have

10  the paperwork which showed how much you paid for the

11  computer?

12  **A**    I'm not sure, I'm not.

13  **Q**    If you didn't, then did you provide Mr. Watson with a

14  number that you thought represented how much you paid for the

15  computer?

16  **A**    I provided Mr. Watson with the amount from the receipt

17  that I paid for the computer.

18  **Q**    Yes, ma'am.  But my last question was:  Did you have a

19  receipt for the computer?

20  **A**    Yes, I had the receipt from the computer.  Now did I give

21  it to Mr. Watson?  I can't remember.

22  **Q**    Right.  Well, if you didn't give it to him, did you give

23  him what the receipt said?  Did you advise him of what it says

24  on the receipt --

25  **A**    Yeah.  Yes, sir, that's what I said.

1   **Q**    When you did that, did you see him write something down?

2   **A**    He might have wrote it down, sir.  I can't remember.

3   **Q**    Okay.  I'll ask the same question about the printer.  Do

4   you recall whether or not you had a receipt for the printer?

5   **A**    Yes.  Like I said, it would have been the same for

6   everything, sir.

7   **Q**    Okay.  The paper and the business cards, all of that?

8   **A**    Yes.

9   **Q**    Yes, ma'am.  So do we understand, ma'am, that in 2015 that

10  you actually then worked from home for your job at the

11  Department of Agriculture?

12  **A**    Only one day a week, sir.

13  **Q**    Yes.  Was that throughout the whole 2015 year; do you

14  recall?

15  **A**    Yeah, I teleworked one day a week.

16  **Q**    Okay.  So when you teleworked, do we also understand you

17  didn't necessarily use that dedicated one room you talked about

18  where you had your business -- the business that you owned?

19  You sometimes would work out in different areas of your

20  apartment when you were working at home for your main job?

21  **A**    Right.  I mean, but there were times I was in it more

22  often maybe than not because it was a quiet place to work.  But

23  the job provides you with a laptop so you can move anywhere in

24  the house.

25  **Q**    Yes.

1    **A**    Yeah.

2    **Q**    And that laptop is different than the computer we're

3    talking about that you may have had in your business --

4    **A**    Oh, yes, sir.  Yeah.

5    **Q**    When you were teleworking, what exactly were you doing, if

6    you could describe to us?

7    **A**    When I telework, at the time I had cases that I worked on.

8    They were on the S drive so I would work from my S drive.  I

9    was working for rule development, I still do, and telecom.  So

10   I was just providing loans and grants and fulfilling the

11   request of the borrowers throughout the states that I was

12   assigned.

13   **Q**    Okay.  So you were working on your computer?

14   **A**    My government computer.

15   **Q**    Yes, ma'am.

16   **A**    Uh-huh.

17   **Q**    Some of that also you were working on your phone?  You

18   were working on the phone, a phone as well?

19   **A**    Not my cell phone.

20   **Q**    Or were you making no calls?

21   **A**    Not my cell phone, why -- I don't mean why.  But the

22   government work was just a laptop.

23   **Q**    Okay.

24   **A**    The work that I did when I teleworked, I worked for the

25   government on my laptop.  If I needed to call somebody, I could

1    call them from home or from the laptop.

2    **Q**    So Ms. Clair, you returned to have Mr. Watson do your 2016

3    tax return as well; is that right?

4    **A**    Uh-huh.

5    **Q**    Once again, did you call in advance?

6    **A**    Yes, had to call and make an appointment.

7    **Q**    Do you recall who you spoke with when the appointment was

8    made?

9    **A**    I'm thinking it was the secretary.

10   **Q**    Do you recall on that occasion whether or not Mr. Watson

11   was making notes while you and he were discussing your tax

12   return?

13   **A**    Sir, I don't want to lie on Mr. Watson.  I don't know if

14   he was making notes or not, I really don't.

15   **Q**    Do you recall whether or not you had any discussions about

16   a computer?

17   **A**    Yes, because I think I actually bought a new computer

18   because that one got water damaged.  I don't know if I told him

19   it was water damaged, but I know I got another one.

20   **Q**    Did you discuss the internet?

21   **A**    Yes, I think we discussed the internet and phone and

22   things of that nature.

23   **Q**    And cell phone and travel?

24   **A**    Yes.  It was pretty much the same.  I think he just took

25   the one from '15 and created '16 from it, assuming like most

Cross - Clair

1   tax preparers do, if you consecutively go back to them.

2   **Q**    Yes, ma'am.  Do we understand that he asked you about what

3   outside activities you engaged in, if any?

4   **A**    He asked was there any other activities you may have.

5   **Q**    Yes.

6   **A**    I said, the only thing I have outside of going to church

7   and work is I went horseback riding.  I remember that because

8   it just sticks out.  There are other activities I like, skating

9   as well, but we didn't talk about that.  I just remembered.  If

10  I did, I don't recall if I even said it to him.  But we did

11  mention that.

12  **Q**    Yes.  Ms. Clair, you said skating?

13  **A**    Yeah, but I don't know if I even mentioned that to him or

14  not.  Other activities that I do.

15  **Q**    If you could though, regarding skating, what is it that

16  you do in that activity?  Do you go to an ice rink and skate?

17  **A**    I don't ice skate, sir.  I roller skate.

18  **Q**    I'm sorry.  You go to a roller rink and skate?

19  **A**    Uh-huh.  But I don't recall doing it in the last four

20  years.

21  **Q**    But you may have in 2015 since we're outside four years?

22  **A**    Unh-unh, I don't think I did it in '15.  We were just

23  talking in general about what we do and what we like, that's it

24  or what I have.  He asked for other activities.  I just recall

25  that one.

1          MR. RUTER:  If I could just have one moment, Your

2     Honor, please.

3          THE COURT:  Yes.

4       (Pause.)

5          MR. RUTER:  No further questions.  Thank you, Your

6     Honor.

7          THE COURT:  Thank you.  Any redirect?

8          MR. MORGAN:  Briefly, thank you.

9                      **REDIRECT EXAMINATION**

10    **BY MR. MORGAN:**

11    **Q**    In 2015 and '16 when you were working from home, was that

12    something that was mandated by your job to work from home, or

13    was that just an option?

14    **A**    We had a choice if we wanted to do it, and I just chose

15    it.  They only gave us one day back then.  Now we're

16    full-time -- I mean, until they call us back in the office.

17    **Q**    I'd like to show you an exhibit that was just shown to

18    you, Exhibit 226.  Do you see this exhibit again?

19    **A**    Yes, sir.

20    **Q**    I'd like to direct your attention, please.  Do you see

21    where your signature is?

22    **A**    Yes, sir.

23    **Q**    Do you see that black, sort of triangle figure there right

24    next to your signature?

25    **A**    Yes, sir.

1    **Q**    There's a marking to the left of that.  Do you see that

2    marking there?

3    **A**    Yes, sir.

4    **Q**    Do you recognize that?

5    **A**    The X?

6    **Q**    Yes.

7    **A**    Yes, sir.

8    **Q**    How do you recognize that?

9    **A**    Because those were the Xs that Mr. Watson made that said,

10   "Just sign where the Xs are."

11   **Q**    Thank you.

12          MR. MORGAN:  Your Honor, at this time I'd move to

13   admit Exhibit 233.

14          THE COURT:  Is there any objection?

15          MR. RUTER:  No, Your Honor.

16          THE COURT:  Exhibit 233 is in evidence.

17   BY MR. MORGAN:

18   **Q**    Likewise on Exhibit 233, do you see a similar marking on

19   this one?

20   **A**    Yes, sir.

21   **Q**    And what is it?

22   **A**    It's an X.

23   **Q**    And what do you know about that being there, if

24   anything?

25   **A**    The same as the other.  This is the X that Mr. Watson

Redirect - Clair

```
 1    would make and say sign.
 2             MR. MORGAN:  Thank you.  No further questions.
 3             THE COURT:  Anything on that?
 4             MR. RUTER:  No, thank you.
 5             THE COURT:  Thank you, Ms. Clair.  We appreciate you
 6    coming to testify.  You can step out now.
 7             Who's the next witness?
 8             MR. MORGAN:  The United States calls Nathan
 9    Wanamaker.
10             THE CLERK:  Mr. Wanamaker, please walk towards me,
11    sir, and please take the stand.  Remain standing and please
12    raise your right hand.
13             **NATHAN WANAMAKER, GOVERNMENT'S WITNESS, SWORN**
14             THE CLERK:  You may be seated, sir.  Speak clearly
15    into the microphone.  Please state your first and last name.
16             THE WITNESS:  Nathan Wanamaker.
17             THE CLERK:  Spell your first and last name for the
18    record, sir.
19             THE WITNESS:  N-a-t-h-a-n W-a-n-a-m-a-k-e-r.
20             THE CLERK:  Thank you, sir.
21             MR. MORGAN:  Good morning.
22             Your Honor, at this time the United States moves to
23    admit Exhibits 90A through V, 91E through K, 91N through Z, 92A
24    through H and 93B, please.
25             THE COURT:  Any objection, Mr. Ruter?
```

1              MR. RUTER:  No, sir.

2              THE COURT:  Okay.  Those exhibits are in evidence:

3    90A through V, 91E through K, 91N through Z, 92A through H, and

4    93B.

5              MR. MORGAN:  Thank you.

6                        **DIRECT EXAMINATION**

7    **BY MR. MORGAN:**

8    **Q**    Good morning, sir.

9    **A**    Good morning.

10   **Q**    Where do you work?

11   **A**    TaxSlayer.

12   **Q**    How long have you worked at TaxSlayer?

13   **A**    Almost 23 years.

14   **Q**    What is your position there?

15   **A**    I am the product owner for our professional tax

16   products.

17   **Q**    What does that job entail?

18   **A**    Essentially it comes down to me approving, deciding what

19   is added, taken away, changed to our software for TaxSlayer

20   Pro.

21   **Q**    Have you had any other positions at TaxSlayer over the

22   years?

23   **A**    I have.  Over 23 years I've done just about everything

24   there.  I've been in sales, support, pretty much everything.

25   **Q**    So are you familiar with how the program works?

**A**    Yes.

**Q**    So what is TaxSlayer?

**A**    Big picture, TaxSlayer is a company that provides tax preparation software to either taxpayers directly or to tax professionals to prepare taxes as part of their business.

**Q**    Is there a specific name for the software that you provide for tax preparers?

**A**    Yes, it's TaxSlayer Pro.

**Q**    What is TaxSlayer Pro?

**A**    TaxSlayer Pro is the software that's designed to be used by tax preparers to prepare taxes for other taxpayers as part of a business.

**Q**    Are there various editions or versions of TaxSlayer Pro?

**A**    There is.  There's a standard classic version.  There's a premium version which adds additional features.  There's also web-based software as well.

**Q**    Generally speaking, how does TaxSlayer Pro work?

**A**    The easiest way to describe it would be it uses a series of menus to capture the data that the tax preparer is putting in and then translates that to the forms as appropriate.

**Q**    What kinds of things can you do with TaxSlayer Pro?

**A**    You can file just about any federal and state tax return that's necessary for that year.  It's an annual product so it's released every year.

**Q**    So can you actually file the return to the IRS through

1  this software?

2  **A**    You can.  Once you've completed a return, you can choose

3  to print it out and mail it.  You can electronically file it to

4  the federal government and the state if they want.

5  **Q**    Does it assist in preparing any reports or invoices or

6  financial documents associated with tax returns?

7  **A**    It does have business management functions to it as well.

8  So the ability to create invoices, run reports, create invoices

9  for clients, those kind of things, yeah.

10 **Q**    Does TaxSlayer Pro have any help for tax preparers to

11 assist them in using your product?

12 **A**    There's a couple options inside the software.  There's a

13 help menu which will link you through -- there's a couple

14 different places you could do it.  The help menu.  There's also

15 some support icons and software that will link you to the

16 federal publications for more information, federal instructions

17 for the forms for more information.

18       Then depending on the year, there's also been partnerships

19 with other private companies that do tax research as well.

20 **Q**    Are they able to contact TaxSlayer to obtain assistance or

21 answers to questions about using the software?

22 **A**    Yes.  We have a toll-free sales number that they can call

23 into and also a regular support number as well.

24 **Q**    What hours are they operating?

25 **A**    That changes depending on the time of the year and how

1    busy it is.  At a minimum, it's usually 9:00 to 5:00.  Then

2    it's open on weekends during the busier time.  Usually 9:00 to

3    9:00 during busier times too.

4    **Q**     Over your time in your work at TaxSlayer, has the program

5    itself fundamentally changed at any point in time that you're

6    aware of?

7    **A**     Fundamentally, not really.  It's been updated visually and

8    from a user experience standpoint, as far as how you interact

9    with it, probably two or three times in my 23 years.  But from

10   the way it actually works with those menus where you're putting

11   in the data versus it printing it out in the form, it's been

12   pretty much the same.

13   **Q**     I'd like to direct your attention to Exhibit 90A.  Do you

14   see this?

15   **A**     Yes.

16   **Q**     What is this?

17   **A**     That is the main landing screen when you open our software

18   for 2015.

19   **Q**     For which tax year is this specific slide?

20   **A**     2015.

21   **Q**     For the tax years 2016 and '17, did it look the same as

22   this?

23   **A**     Very similar.

24   **Q**     Can you please explain to the jury what it is that we're

25   seeing here in the center of this exhibit.

**A**      So at the center you have a couple options.  They're kind

of repetitive.  So you have the Tax Returns, E-file Returns,

Help Center and Print Results are those four main icons.  You

can take action on those by clicking on them, or you can use

the menu on the right-hand side, Tax Returns all the way down

through Updates.  You can also use the number listed next to

those on the keyboard to access those.

**Q**      So if a tax preparer wanted to start a new tax return,

what would the tax preparer do?

**A**      You can either enter 1 on your keyboard and hit Enter, you

can click on the Tax Returns next to the number 1, or that icon

on the left that say Tax Returns.

          MR. MORGAN:  Could we please bring up Exhibit 90B.

**Q**      First I'd like to actually direct your attention to the

top left portion of the screen.  Can you describe -- there's

icons and text there; can you describe what that is.

**A**      Sure.  Like most desktop software, it's got little

drop-down menus so the View, Tools, Help, Where's My Refund.

Those are all little menus if you click on them, they should

drop down and show you additional options.  The other icons are

actually shortcut icons is what we refer to them as, so they

all go to one specific thing so the Help would launch the help

page.  The calculator symbol would launch a calculator, for

example.

**Q**      So you had just indicated that to start a new return, you

1    would press 1 or Tax Returns.  Is this the next screen that

2    shows up?

3    **A**    Yes, this would be the next screen.

4    **Q**    Can you please explain what it is we're seeing here in the

5    center of the screen.

6    **A**    Sure.  This is what we call the client list, so it's going

7    to show you any returns that have already been started or

8    created in the software.  In this example then, for example,

9    "test return" would be a return that's already been started.

10   You can access any return that's in that list by

11   double-clicking on them.  If you want to start a new tax

12   return, you'd enter the Social Security number in that

13   highlighted center box.

14   **Q**    In this line where it says "11111, test return" and some

15   other data, is that just some sample information that's been

16   inputted here?

17   **A**    Exactly.

18            MR. MORGAN:  I'd like to please pull up Exhibit 90C.

19            THE COURT:  Mr. Morgan, do you have copies of these

20   exhibits for me?

21            MR. MORGAN:  Your Honor, we don't have the printed

22   versions because of a paper problem, but we have digital

23   versions.

24            THE COURT:  Okay.

25   BY MR. MORGAN:

1   **Q**    Exhibit 90C, what is it we're seeing here?

2   **A**    So if you start a new tax return, that's the first menu

3   that would pop up essentially just asking you what's the filing

4   status for the tax preparer; whether they're single, married

5   filing joint, married filing separate, head of household, or

6   qualifying widower.

7   **Q**    So if the tax preparer wanted to file a tax return for a

8   single individual, what would they do?

9   **A**    They'd just click on number 1, single.

10          MR. MORGAN:  If we could turn please to Exhibit 90D.

11  **Q**    And this slide?

12  **A**    This would be the next step that pops up after you

13  selected your filing status.  In this case looks like it was

14  probably single since there's no spouse information listed.  So

15  we're going to put in the basic information for that taxpayer.

16  So their name, Social Security number, date of birth,

17  occupation, address, phone numbers, contact information.

18  **Q**    Then after that, what would you do?

19  **A**    Click Okay.

20          MR. MORGAN:  Let's please look at Exhibit 90F -- I'm

21  sorry, 90E.

22  **Q**    What are we seeing here?

23  **A**    So it's pretty common in the way our software works that

24  after you put data into a menu like that, it gives you a

25  summary screen right after that.  That's what this is

1    representing.  It's a summary screen of all the taxpayer's's

2    personal information you just entered in.

3    **Q**    Why does it do that?  Why do you have summary screens

4    after --

5    **A**    Just to confirm it and if you need to navigate back to

6    make a change at any point, that's the easiest way to do it.

7    **Q**    After viewing this screen, what would the tax preparer

8    do?

9    **A**    If ready to move on, they'd just hit Enter on their

10   keyboard or click Exit.

11          MR. MORGAN:  Let's bring up 90F.

12   **Q**    What is this now?

13   **A**    This is what's called the preparer code.  This is where

14   when you're first installing the software, you can set up

15   multiple preparers if you want to.  So if you and I were in a

16   tax office together, I'd put my personal information in, my

17   PTIN that identifies who I am when I file returns and assign

18   myself a number, say I'm number 1.  We can set you up the exact

19   same way with your PTIN number, say your number is 2.

20          What this is doing in the software is allowing you to

21   enter that one, it would pull all my information into the tax

22   return instead of me having to type it in every single time.

23          MR. MORGAN:  Exhibit 90G, please.

24   **Q**    What are we seeing here?

25   **A**    Again, just another summary menu.  Now we've done the

1  personal information on that return, we've entered our preparer

2  code, and it gives you the options to do more of the top of a

3  1040 tax return at this point.  Like dependents, for example.

4  **Q**   After you enter in whatever data here you want, what

5  happens then?

6  **A**   You would again either click Exit or hit Enter on the

7  keyboard.

8          MR. MORGAN:  Could we please go to 90H.

9  **Q**   What are we seeing here?

10 **A**   That's the next step on creating a new return.  During the

11 initial creation of the return, the software always asks you if

12 you want to enter W-2 now just because it's usually on 95

13 percent of the returns, so it makes it quicker to enter it and

14 skip the menu you'd have to go to otherwise.

15 **Q**   If you didn't have a W-2 and you hit no, what would

16 happen?

17 **A**   If you did not, you'd say no, and it would go to the next

18 menu.

19         MR. MORGAN:  If we could go, please, to Exhibit 90I.

20 **Q**   What are we seeing here?

21 **A**   That's the next menu, what we call the income menu.

22 That's where you could access any of the different types of

23 income that you might be required to report on the tax

24 return.

25 **Q**   If a tax preparer wanted to fill out income for a

1   Schedule C business, what would they do here?

2   **A**    They would click on number 6, business income and loss.

3       MR. MORGAN:  Can we please bring up 90J.

4   **Q**    What is it we're looking at here?

5   **A**    So this is the summary of any Schedule Cs that have been

6   entered into the software at the point you're looking at.  This

7   representation has no Schedule Cs entered yet.

8   **Q**    So in order to create the Schedule C, what would the tax

9   preparer do?

10  **A**    You would click on New or press the Insert key on your

11  keyboard.

12      MR. MORGAN:  Could we please go to Exhibit 90K.

13  **Q**    What is it we're looking at here?

14  **A**    Once you start a Schedule C, it starts to step you through

15  filling out the top of the Schedule C.  One of the first things

16  it needs to know is what kind of business was it.  This is

17  where you would determine what type of business is going to be

18  selected for that Schedule C.

19  **Q**    There's an icon on the left portion of this screen in the

20  middle portion here.  What is that?

21  **A**    The one on the left-hand side is a PDF.  If you click on

22  it, it will bring up a PDF from the IRS publication listing the

23  different six-digit codes and descriptions of types of

24  businesses.

25      MR. MORGAN:  Can we bring up Exhibit 90L.

1    **Q**    What is this?

2    **A**    It looks like the snippet from a portion of that PDF.

3    **Q**    So when you click on that button, this is a portion of the

4    PDF that comes up?

5    **A**    Yes.

6    **Q**    And, again, what is this PDF?

7    **A**    So it's a listing -- the IRS identifies all types of

8    Schedule C businesses by a six-digit code.  That number matches

9    to whatever you're doing in that business.  If you were running

10   an amusement park, you'd be 713100, for example.

11           MR. MORGAN:  Could we please go to Exhibit 90M.

12   **Q**    On this screen, what does it depict?

13   **A**    So there's another -- there's a few other ways to actually

14   pick out your option that you're putting in for description of

15   the business.  If you look in the middle of that screen where

16   it says, "Select the principal business category," that is a

17   drop-down menu that shows different titles or subjects that

18   kind of separate that big list of different business types into

19   groups.  So in this case, it's been selected as information as

20   the subcategory, and it lists the actual business codes and

21   business types that fall into that category.

22   **Q**    If you wanted to enter in the name of a principal business

23   that is not coded or prepopulated in TaxSlayer, could you do

24   that?

25   **A**    Yes.

1    **Q**    How do you do that?

2    **A**    So those top two boxes where it says, under the principal

3    business code, that you can directly type in the six-digit code

4    if you know what it is.  There's also all nines which is

5    miscellaneous where you're not really picking one the IRS

6    accepts.

7          Then you'll see it says, "Or enter description."  That's

8    free typing.  You could type in whatever you wanted to type in

9    there, and you could do it without a six-digit number which is

10   why it says "or" at the beginning there.

11   **Q**    Are you limited to just the codes that are in the

12   drop-down or the PDF?

13   **A**    No, you can type in whatever you wanted up to the

14   character length of the field.

15          MR. MORGAN:  Exhibit 90N, please.

16   **Q**    And here what is this?

17   **A**    So when I was mentioning earlier, that's a drop-down menu

18   in the middle there where it says, "Select the principal

19   business category."  That's where you're seeing the

20   subcategories.  On the other screen, we had already clicked on

21   information as our subcategory, and it showed the options below

22   that fell into that category.  This is a listing from that

23   drop-down menu.

24          MR. MORGAN:  And Exhibit 90-O, please.

25   **Q**    And this menu?

1    **A**    This is the summary screen that followed doing that basic

2    information.  At this point it knows the principal business,

3    the business name, the EIN and the contact information for the

4    business.

5    **Q**    If a tax preparer saw here that the principal business or

6    profession was incorrect, are they able to change it?

7    **A**    Yes, you could highlight that test area or the area where

8    it says test and type in whatever you wanted.

9             MR. MORGAN:  90P, please.

10   **Q**    What are we looking at here?

11   **A**    Again, summary of all the data that was just entered.

12   **Q**    All right.  After you review this summary, what does the

13   tax preparer do then?

14   **A**    Just to continue, you click on Exit.

15   **Q**    If there was something inaccurate at this point that the

16   tax preparer sees --

17   **A**    You could click on any one of those options.

18   **Q**    And then do what?

19   **A**    Edit the information displayed there.

20   **Q**    Assuming everything is correct here on the summary page,

21   what would the tax preparer do then?

22   **A**    Click on Exit.

23   **Q**    Okay.

24             MR. MORGAN:  Could we please go to 90Q.

25   **Q**    What are we looking at here?

Direct - Wanamaker                                      Vol. V-74

1    **A**    This is the next menu that would come up when you're

2    starting a Schedule C.  Essentially, when you're filling out an

3    IRS form Schedule C, there's a list of about eight or nine

4    questions about the type of business, so that's what this is

5    representing.  What was your accounting type, cash, accrual,

6    all those kinds of things.

7    **Q**    After you finish with this screen, what would you do as

8    the taxpayer?

9    **A**    Click Exit.

10   **Q**    Then what happens?

11   **A**    Take you to the main Schedule C menu.

12   **Q**    Exhibit 90R, what are we seeing here?

13   **A**    Now you're at the main Schedule C menu where you can

14   access all that basic information that we just talked about,

15   the Schedule C questions which was the menu we just looked at.

16   And then you can enter your income and expenses for that

17   Schedule C.

18   **Q**    If you wanted to edit or change some of the basic

19   information that you just saw, how would you go back to do

20   that?

21   **A**    You'd go back into number 1, change basic information.

22   **Q**    So is it here where the tax preparer could enter income or

23   expenses?

24   **A**    Correct.

25   **Q**    What is number 5?

Direct - Wanamaker

**A**    Five is business use of home, so it's another separate

form that you can use in coordination with the Schedule C if

you're using part of your home for business.

**Q**    So if the tax preparer wanted to just enter income,

regular income for the Schedule C, what would that person

select?

**A**    Number 3.

        MR. MORGAN:  Can we please look at Exhibit 90S.

**Q**    And here, what is this?

**A**    So this is the representation for the Income section of

the Schedule C and the different lines that show up on the

Schedule C.

**Q**    If the tax preparer wanted to enter in gross receipts or

sales into a Schedule C, what would they do?

**A**    Select number 1.

        MR. MORGAN:  If we could look please at 90T.

**Q**    What is this?

**A**    That's what you would see when you selected number 1, so

that's where -- you'd do two things here.  You can enter the

total of gross receipts or sales for that business, or if you

want to itemize them out, you'd press F10 on your keyboard and

put an amount with the description, et cetera.

**Q**    What does that ultimately generate, if anything?

**A**    If you list them out separately, it will carry back the

grand total to this line, and then it will generate a printed

1    statement that shows the description and amounts all the way

2    down until it totals up.

3    **Q**    In a table?

4    **A**    Yeah.

5              MR. MORGAN:  Going to 90U, please.

6    **Q**    What is this?

7    **A**    So this is back at the income menu, having entered $25,000

8    into the gross receipts.

9    **Q**    So if the tax preparer, after doing income, wanted to

10   enter expenses, what would the person do?

11   **A**    You'd exit out of here back to the main Schedule C menu.

12             MR. MORGAN:  If we could please go to 90R.

13   **Q**    And then --

14   **A**    Then select expenses.

15   **Q**    Which one is expenses?

16   **A**    Number 4.

17             MR. MORGAN:  Could we please go to 90V.

18   **Q**    What is it we're looking at here?

19   **A**    This is the expenses menu which matches the expenses

20   section of the Schedule C.

21   **Q**    If the tax preparer wanted to input an amount for renting

22   or leasing business property, how old would he do that?

23   **A**    You'd enter -- select number 15, rental property.

24             MR. MORGAN:  Can we please go to Exhibit 91E.

25   **Q**    And what is this?

1    **A**    That's what you get once you click on that.  This is where

2    you enter the amount you paid for that rental so storefront

3    property, for example.  If you're paying 15,000 for the year or

4    whatever.

5    **Q**    After the amount is entered in here, what would the tax

6    preparer do?

7    **A**    Press Enter and it would bring you back to your expenses

8    menu.

9            MR. MORGAN:  Could we take a look at 91F, please.

10   **Q**    What is that depicting?  Is there an amount listed in the

11   box in this one?

12   **A**    Yes, I'm sorry.

13   **Q**    What is it?

14   **A**    10,000.

15   **Q**    If we go to 91G, where are we now?

16   **A**    Back at the main expenses menu where it shows that

17   $10,000.

18   **Q**    And what line does it show it?

19   **A**    On 15.

20   **Q**    So if someone wanted to put in unreimbursed employee

21   expenses, what would they do?  Not in this Schedule C, I'm

22   sorry.

23   **A**    You'd have to exit the Schedule C.

24           MR. MORGAN:  Could we go, please, to Exhibit 91N.

25   **Q**    What are we looking at here?

Direct - Wanamaker

1   **A**    This is what we call the 1040 screen.  It's kind of the

2   center hub of doing a tax return in our software.

3   **Q**    What is it showing here in the middle?

4   **A**    It's a representation of the actual Form 1040.

5   **Q**    Does that -- will that show the data that's been

6   inputted?

7   **A**    Yes.

8   **Q**    What's the diagnostics warning at the bottom?

9   **A**    Diagnostic warnings is an area where we can pop

10  information that we're trying to communicate to the tax

11  preparer.  They don't stop you from doing a tax return.  Just

12  kind of heads-up kind of things.

13  **Q**    If a tax preparer wanted to input some unreimbursed

14  employee expenses on Schedule A, how would they do it from

15  here?

16  **A**    The easiest way on the left side, it's numbered again.

17  This one is 1 through 13, so number 4 is itemized deductions.

18  You can either type in 4 or click on number 4.

19  **Q**    Could you circle where that is on the screen with your

20  finger.  Thank you.

21  **A**    Sorry, not real good on drawing.

22       MR. MORGAN:  If we could please go to 91H.

23  **Q**    So what is this?

24  **A**    That's the main Schedule A menu you would get when you

25  clicked on that.

Direct - Wanamaker                          Vol. V-79

1   **Q**    From here, what would the tax preparer do to put in

2   unreimbursed employee expenses?

3   **A**    You go to number 6.

4   **Q**    What does it say?

5   **A**    Two percent deductions and job expenses, Form 2106.

6   **Q**    So if they click 6, what happens then?

7   **A**    It should bring up another menu.

8   **Q**    If we could go to 91-I, please.  What are we seeing

9   here?

10  **A**    This is the menu that would open when you click on that

11  option.

12  **Q**    If the tax preparer wanted to put in employee business

13  expenses or fill out a 2106, how would they do it?

14  **A**    Click on number 15, employee business expenses, 2106.

15          MR. MORGAN:  Can we please pull up 91J.

16  **Q**    What is this?

17  **A**    So it's going to ask a couple things about the tax

18  preparer and their job first.  This is asking what was their

19  occupation.

20  **Q**    After the tax preparer types in an occupation, what

21  happens then?

22  **A**    It's going to start taking you into the 2106.

23          MR. MORGAN:  Can we look at Exhibit 91K, please.

24  **Q**    What is it we're seeing here?

25  **A**    That's the main 2106 menu.

1    **Q**    All right.  Is there a number 9 -- where it says

2    "occupation," is there something listed there?

3    **A**    Yes, it says "worker."

4    **Q**    Was that entered by you as a sample?

5    **A**    Yes.

6    **Q**    So if someone wanted to input meals and entertainment

7    expenses that were unreimbursed, how would the tax preparer

8    enter that in?

9    **A**    So you would select number 5, meals and entertainment

10   expenses.

11          MR. MORGAN:  Can we please go to Exhibit 92F.

12   **Q**    What is it we're seeing here?

13   **A**    This is the first box that will pull up when you click on

14   that option and it's asking you to enter in any meals and

15   entertainment expenses that are subject to what the IRS deems

16   as 50 percent deductible.

17          MR. MORGAN:  Back to 92K, please -- I'm sorry, 91K.

18   **Q**    If the tax preparer wanted to input other business

19   expenses, not meals and entertainment, how would he go about

20   doing that?

21   **A**    Click on number 4.

22          MR. MORGAN:  Can you please pull up 92G.

23   **Q**    What is it we're looking at here?

24   **A**    That's the submenu you get when you clicked on that

25   number 4.

Direct - Wanamaker

1    **Q**    In order to put other business expenses, what would the

2    tax preparer click?

3    **A**    You would also again click number 4 in this menu which is

4    other business expense.

5             THE COURT:  Can you use the microphone, please.

6    **A**    You would click number 4, other business expense.

7             MR. MORGAN:  Can we please go to Exhibit 92E.

8    **Q**    What is it we're seeing here?

9    **A**    This is back at the main 2106 menu after some of those

10   figures have been entered in.

11            MR. MORGAN:  Then back to 92H.

12   **A**    Now back to the Schedule A menu that those pull back to.

13   **Q**    So does this list out the expenses that the tax preparer

14   would have entered in here for those items?

15   **A**    Yes, so the total carries back down to that line 15.

16   **Q**    So are you able to see where these figures that you're

17   putting in, where they show up on the actual form?

18   **A**    You can.  You would have to exit back to the main 1040

19   screen that we looked at already.

20   **Q**    All right.

21            MR. MORGAN:  Can we please go to Exhibit 91N.

22   **A**    Once you get to the 1040 screen here, you've got an option

23   on the left-hand side called View Results, number 11, you could

24   click on that.

25   **Q**    Before we do that, on this page here right in front of us

1   with the 1040, are you able to see the itemized deductions on

2   the 1040?

3   **A**    You can see the total.  So if you notice on the right-hand

4   side of the screen, it's got a little scroll bar.  That's

5   because you could scroll down on the 1040.  Once you got down

6   further onto page 2, you can see the amount of itemized

7   deductions that carried back.

8        MR. MORGAN:  Can we please go to Exhibit 91-O.

9   **Q**    What is this depicting?

10  **A**    That's exactly what I was just saying.  If you scroll down

11  that screen, you can get down to line 40, and it will show you

12  the total itemized deductions.

13  **Q**    So you were saying that in order to see those deductions

14  on the form, the Schedule A, for example, what would you do?

15  **A**    The easiest way would be to select number 11, View Results

16  on the left-hand side.

17  **Q**    Can you please circle where that is on this exhibit.

18  Thank you.

19        MR. MORGAN:  Can we please go to 91R.

20  **Q**    What is this?

21  **A**    So once you select View Results, it's going to give you a

22  listing like this which is a list of all the forms that have

23  been generated for that tax return.

24  **Q**    So if you wanted to, for example, see the Schedule A, all

25  the data you just put in and those menus, you wanted to

1    actually see the form --

2    **A**    You can just select number 6, Schedule A.

3    **Q**    All right.

4         MR. MORGAN:  Can we please pull out Exhibit 91P.

5    **Q**    What are we seeing here?

6    **A**    That's what would generate when you made that selection, a

7    PDF of the actual form with the data.

8    **Q**    Is the data in here pulled from the data that you just put

9    in in those boxes?

10   **A**    Correct.

11   **Q**    If you wanted to see the Schedule C, how would you do

12   that?

13   **A**    The exact same way.  So from the view results menu, you

14   would select Schedule C.

15        MR. MORGAN:  Could we go to 91R, please.

16   **Q**    Where is that on this?

17   **A**    So for this return, that's number 7.

18        MR. MORGAN:  Can we please go to 91Q.

19   **Q**    What is this?

20   **A**    That's the generated PDF of the Schedule C with the values

21   on it.

22   **Q**    Okay.  Let's say the tax preparer is reviewing this and

23   has a question -- a tax question, what could they do, if

24   anything, from this software?

25   **A**    They had a question about what now?

1   **Q**    How to properly fill in -- do the tax return.

2   **A**    More of a tax question type thing?

3   **Q**    Yes.

4   **A**    They could exit out of the PDF we're looking at here, and

5   they could go to -- like I mentioned earlier, there's a couple

6   different things.  They could go to the help menu --

7          MR. MORGAN:  Let's go to 91R so we can see it a

8   little bit better.  I'm sorry, 91S.

9   **A**    So that's a representation of at the top of the screen --

10  can I circle something?

11  **Q**    Yes, please.

12  **A**    That icon right there is a shortcut that would lead you to

13  this screen which allows you to pull up the IRS publications

14  and form instructions and the forms.

15  **Q**    If you wanted to review a publication, what would you

16  do?

17  **A**    Simply click on the word "Publications" there.

18         MR. MORGAN:  Can we please see Exhibit 91T.

19  **Q**    What is this?

20  **A**    That's what you'd get when you clicked on Publications.

21  It's going to bring you to a list of the different IRS pubs and

22  the publication title or links that will open up that

23  publication.

24  **Q**    If we scroll --

25         MR. MORGAN:  Go to the next exhibit which is 91U.

1    **Q**    If the tax preparer wanted to, for example, get help about

2    business expenses and what a business expense is on a

3    Schedule C, how would they pull up the publication for that?

4    **A**    On this menu here, you'll see 535 is the publication

5    number, and business expenses is a highlighted link.  So when

6    you click on it, it will open up that actual PDF.

7    **Q**    Could you please circle where you're referring to.

8    **A**    (Witness complied.)

9    **Q**    After they click on that, it does what?

10   **A**    It will open a new screen.

11          MR. MORGAN:  Can you please bring up Exhibit 91V.

12   **Q**    What is this?

13   **A**    That's what would open when you select that business

14   expenses link.  It's the actual IRS publication.

15          MR. MORGAN:  If we could please go to Exhibit 91S.

16   **Q**    If the tax preparer wanted to review the instructions, how

17   would they do that?

18   **A**    They would just select Instructions there.

19          MR. MORGAN:  Can we please go to Exhibit 91W.

20   **Q**    If someone wanted to see the instructions for a

21   Schedule C, what would they do here?

22   **A**    They would select Profit or Loss from Business, Schedule C

23   in the middle there.

24   **Q**    Do you mind circling it, please.

25   **A**    (Witness complied.)

1    **Q**    Thank you.  After you click on that, what happens?

2    **A**    It will open up the actual IRS link for the Schedule C

3    instructions.

4              MR. MORGAN:  Can you please display Exhibit 91X.

5    **Q**    What is it we're seeing here?

6    **A**    Once you clicked on that link, it opens up that set of

7    instructions.

8    **Q**    Here it says "2022 instructions."  Why does it say 2022?

9    **A**    So if you see up here, it's actually taking you to the IRS

10   website to generate these.  I don't remember exactly what year

11   it was, but at one point the IRS used to have all these

12   publications and instructions done by year.  They moved to

13   having one URL where they would update every year with the

14   current instructions so they always had access to the current

15   ones.

16   **Q**    So for whatever tax year the TaxSlayer Pro software is

17   for, would it have that year's instructions in it?

18   **A**    During that time frame, yes.  If you were doing this back

19   in 2015, it would say 2015.

20   **Q**    Okay.  So if the tax preparer is finished entering all the

21   data and is ready to review it, what would the tax preparer

22   do?

23   **A**    There's a couple of different ways you could view the

24   data.  As we had just gone to view results, from there you

25   could review any of the forms that have been created.  You can

1    also print the entire form from there --

2              MR. MORGAN:  I'm sorry, to 91R, please.

3    **A**    That's the view results.  From there, you can access any

4    of those forms that have been generated to view them.  You

5    could print the entire return, using number 2, for example.

6    **Q**    Can you print it before you file it with the IRS?

7    **A**    Uh-huh.

8    **Q**    At this point, if the tax preparer is reviewing the forms

9    and notices something that the tax preparer would like to edit,

10   an error or something like that, how would the tax preparer

11   then do that?

12   **A**    From here you would exit from the view results screen

13   which would bring you back to the 1040 screen, and then from

14   there, you would select whichever menu you needed to get to.

15   If you spelled the name wrong, you'd go into personal

16   information and change the name.  If you had something else in

17   a different place, you'd click on that matching section.

18             MR. MORGAN:  So that would be back at Exhibit 91N,

19   please.

20   **A**    Yeah, back there from the 1040 screen, you could access

21   whatever section you need to get to.  Number 1, personal

22   information; 2, income, for example.

23             MR. MORGAN:  Back to 91R for a second.

24   **Q**    When you select "print return," what does that actually

25   do?

**A**     So when you select number 2 from this menu, the next thing you would see is what do you want to print, meaning -- it has different print options.  By default, when we ship the software out to the user, it has one copy federal, two copy federal, one copy federal, one copy state, so it's determined what you would actually print.

     So if you clicked on number 2, print return, what do you want to print is essentially what it's asking you.  And you could select "one copy federal," it would print out everything that's just for the federal return.

**Q**     That would print out whatever it is that would be filed with the IRS --

**A**     Correct, generate the actual forms, the PDF.

**Q**     What is number 18?

**A**     It's what we call the client listing summary.  It's almost like a table of contents for the preparer.  It's one of the first things that prints out.  It lists the forms that were generated for that tax return, the client's basic information.  W-2s are listed on there in a table format.  Really it's a shortcut.  You'd put that at the top of your folder that you stuck in your office for each client so you can pull it out to easily see what their name, phone number was, that kind of stuff.

**Q**     Does it also show the amount of the refund or their tax due?

1    **A**    Yes.

2    **Q**    If the tax preparer, after reviewing everything, is ready

3    to file, how does the tax preparer file the tax returns?

4    **A**    So if they're at this screen, they would exit here, bring

5    you back to the 1040 screen.  When you exit the 1040 screen,

6    it's going to bring you to what we call the receipt screen.

7              MR. MORGAN:  If we could go to 91N, please.

8    **Q**    Is this the first screen you'd go to?

9    **A**    Yep, you'd hit the 1040 screen.  If you're ready to exit

10   the tax return, you'd exit here and it would take you to the

11   receipt screen.

12             MR. MORGAN:  I'd like to go to Exhibit 91Y first.

13   **Q**    What is this?

14   **A**    That is the receipt screen.  When you exit that 1040

15   screen, you would come here.

16   **Q**    What do you do with this screen?

17   **A**    The biggest thing you're doing here is determining what

18   you're charging for the return.  When you exit this screen,

19   you'll also determine that the return is complete, and that is

20   the next logical step if you're going to be filing it

21   electronically.

22   **Q**    So this is where the tax preparer would put their fee?

23   **A**    Correct.  There's a couple different ways that fees can be

24   generated for a return.  When you install the software, there

25   is what is known as a form list where you can put a charge by

1    form.  So in this example, the way I configured the software

2    was to charge a flat $100 for a 1040.  Because there's a 1040

3    on this return, it generated the fee of $100.  I could leave it

4    at that; I could change it if I wanted to at this point.

5            MR. MORGAN:  91Z, please.

6    **Q**    What is this?

7    **A**    This is what an invoice looks like, so you can print this

8    out from the software as well which will list the forms that

9    were used on the return, as well as the basic information for

10   the taxpayer and the company and the fees.

11           MR. MORGAN:  And 92C, please.

12   **Q**    What is this?

13   **A**    So this is the menu inside the software where you would be

14   navigating to actually transmit the return electronically.

15   **Q**    So if the preparer then -- let me take you back.

16           MR. MORGAN:  Let's go to 92D for a second.

17   **Q**    Down at the bottom, is that -- do you see where it says

18   "sign here"?

19   **A**    Yes.

20   **Q**    What is this depicting here?

21   **A**    So that's showing you the bottom of page 2 of the 1040

22   which has a couple different sections, as you can see.  It

23   lists here refund or amount you owed as a tax preparer.

24       Third party designee is allowing somebody to talk to the

25   IRS on your behalf regarding the tax return.

1          The signature area for the tax preparer and/or spouse to

2     sign their return and then the paid preparer's information at

3     the bottom.  So if it was prepared by someone for compensation,

4     you're required to identify who you are.

5          MR. MORGAN:  If we go to 92B, please.

6     **Q**    What's this?

7     **A**    So this is inside of the tax return.  When the taxpayer

8     has indicated they want to file their return electronically and

9     the preparer marks their return for electronic filing, this is

10    what's known as the practitioner PIN method.  The easiest way

11    to think of it is a modern way of signing it electronically, so

12    the taxpayer and spouse both have a five digit PIN, as well as

13    the tax preparer.

14    **Q**    Let's say at this point the tax preparer realizes that

15    they want to create an additional Schedule A, for example.

16    Could they do that at this point still?

17    **A**    Sure.  This is still inside the tax return.  You haven't

18    sent it off, so you could exit back out of here and go back in

19    and make your changes.

20          MR. MORGAN:  To 91N, please.

21          THE COURT:  Mr. Morgan, why don't we take the break

22    now.  We've been going quite a bit, so we'll continue after the

23    break.

24          Ladies and gentlemen, thank you for your attention

25    this morning.  It was a pretty long session.  The second half

 1   of the morning will be shorter.  I think we're going to need to

 2   break for lunch around 12:30 so a little bit shorter on the

 3   second half.  Don't discuss the case among yourselves.  Don't

 4   do research.  Just enjoy the break.

 5              There is a matter I need to discuss with counsel, so

 6   why don't we make it 11:20, give you extra time.  We'll see you

 7   in 20 minutes.  Thank you.

 8        (Jury left the courtroom at 11:00 a.m.)

 9              THE COURT:  Thank you.  Please be seated.

10   Mr. Wanamaker, you can step out and take the break now.  We'll

11   see you back here in 20 minutes.

12              I did want to ask quickly on this, going back to the

13   issue we had before.  This is for Agent Carson, correct, the

14   other tax returns?  Is there a way I can get copies of these

15   exhibits?

16              MR. COFER:  Of Mr. Watson's tax returns?  Yes.

17              THE COURT:  Generally speaking, as you probably

18   noted, I was surprised these 98 exhibits were not in the

19   binder.  Are they even on the exhibit list?  I'm not even sure

20   they are, are they?

21              MR. COFER:  Your Honor, they are on the updated

22   exhibit list.

23              THE COURT:  No, the one that was submitted on the

24   first day of trial.

25              MR. COFER:  I don't know if they were on there as a

1    place holder.

2         THE COURT:  Do I even have an updated exhibit list,

3    or are you just keeping it yourselves?

4         MR. COFER:  I'm not sure if we've sent you one, Your

5    Honor, but we'll do that.

6         THE COURT:  Generally speaking, as you've probably

7    heard from your colleagues, I want copies of all the exhibits

8    before they're being offered.  And I also want the exhibit list

9    and I, frankly, don't want changes after the first day of

10   trial.  If anyone wants to make a change, they usually need to

11   explain why it's late.  So why is it late?

12        MR. COFER:  Your Honor, I think just speaking to the

13   screenshots, I think it was as the trial strategy developed and

14   we identified Mr. Wanamaker as a witness for --

15        THE COURT:  It developed at the middle of trial?

16        MR. COFER:  Mr. Wanamaker, I think, was included on

17   the witness list that was submitted on the day of trial but --

18        THE COURT:  So you knew he was coming, and you didn't

19   have any exhibits for him.

20        MR. COFER:  Yes, Your Honor.  As soon as we

21   identified him, there was back and forth with TaxSlayer to see

22   who would be able to come and we, as expeditiously as we could,

23   set a time to work with him to take the screenshots.  As soon

24   as we --

25        THE COURT:  During the trial?

Direct - Wanamaker

1              MR. COFER:  I think it was either the weekend before

2       or the beginning of trial.  As soon as we got them, we sent

3       them to defense counsel and we worked to process them --

4              THE COURT:  When were you planning to give them to

5       me?

6              MR. COFER:  As far as printing them, I think that was

7       a technical difficulty --

8              THE COURT:  A technical difficulty or an oversight?

9              MR. COFER:  The printing itself --

10             THE COURT:  The jury is going to need to get printed

11      copies.  When are they going to get their printed copies?

12             MR. COFER:  We're working on that today.  So, Your

13      Honor, the -- it's both.  Processing these exhibits and getting

14      them exactly in the format took some time and, yes, that was

15      delayed.  As far as printing them, the problem there is they

16      don't fit onto a normal size sheet of paper, so Mr. Mahoney was

17      in the office this weekend doing heroic work because of us, Mr.

18      Morgan and I, to get these returns processed and got them in

19      great shape electronically.  But because of my failure to get

20      them in the right format and exactly getting them printed was

21      an extra hurdle --

22             THE COURT:  You know they don't get electronic

23      exhibits, so if you want them to see these, they're not going

24      to get --

25             MR. COFER:  Yes, Your Honor.  We will have printed

1   copies of them for the jury.

2        THE COURT:  And for me at some point?

3        MR. COFER:  Yes, Your Honor --

4        THE COURT:  This afternoon?

5        MR. COFER:  Yes.  As soon as we have access to a

6   printer.  We're going to work throughout the day when

7   Mr. Mahoney is able to step out, basically as soon as we can

8   leave the courtroom --

9        THE COURT:  Okay.  Mr. Watson's tax returns, I ruled

10  on that motion at least provisionally saying you could use

11  them.  So are they in the binders?

12       MR. COFER:  Yes, Your Honor.  Those are in the

13  binders.

14       THE COURT:  What are the numbers so I can look at

15  them?  I need to understand whether -- as you can tell, I like

16  to look at the exhibits before they're offered.

17       MR. COFER:  I understand, Your Honor.  So the

18  exhibits for Mr. Watson's tax returns are Exhibit 47, 48 and

19  49, and that's in order, 2013, 2017 and 2018.  Your Honor, I

20  can speak briefly to them in response to the defense.  I would

21  just add that as far as the Government is concerned, we really

22  don't have much of anything to add at all.  This was all

23  discussed in our motion in limine.

24       THE COURT:  Let me ask you this.  This point he had

25  about this 1099, how is that inconsistent with my ruling?  I

1    said I was willing to allow you to put on evidence that he used

2    the same type of methodology of business expenses, itemized

3    deductions, the kinds of things I would and now have seen.  I

4    haven't seen anything about sort of asking for a refund.  How

5    is that even close to being within my ruling?

6              MR. COFER:  Yes, Your Honor.  As explained in our

7    motion in limine, the 2013 return, just as with the 2017 and

8    2018, has the falsified Schedule C that's exactly overlapping

9    with what's going on in his client returns.  On the 2013

10   return, not separated from that, again demonstrating how that

11   flows to a refund --

12             THE COURT:  No, I've heard the description, I'll look

13   at the document.  I want to understand how that is at all

14   similar to the conduct here which is what I said you're going

15   to be allowed to do, not just random false statements.

16             MR. COFER:  Right, Your Honor.  I think what we're

17   going to show with all the client returns and what we're going

18   to show with Mr. Watson's returns is the Schedule Cs, these

19   false expenses reduced the taxable income which leads to

20   refunds that are not warranted.  Just as we've done with all

21   the client witnesses --

22             THE COURT:  Which client did what he did or had a

23   return like his where he claimed that he had made a payment

24   that he didn't actually make?  Did any of the tax preparers

25   that have taken the witness stand or we have exhibits for, did

1    any of them do that?

2             MR. COFER:  I'll be specific here, Your Honor, if

3    you'll bear with me just one second.  All of the clients are

4    going to have a payment in the box right above the refund, and

5    that's going to determine what their refund amount is.  For all

6    the clients, those payments are not alleged to be false.

7    They're typically withholdings from the W-2.  So, yes,

8    Mr. Watson's 2013 return is I guess unique in the sense that it

9    too has a payment listed there, but it is clearly false.  So in

10   order --

11            THE COURT:  Why isn't that propensity evidence then?

12   Or character evidence?

13            MR. COFER:  Again --

14            THE COURT:  None of these other people did the same

15   thing.

16            MR. COFER:  So I think the similarity here is that

17   the bottom line of what Mr. Watson is doing is to create false

18   refunds --

19            THE COURT:  How is that different than what I said

20   about you can't just put on the fact that he didn't file a

21   return when he was supposed to?

22            MR. COFER:  I guess, Your Honor, that's different

23   because that's just filing a return.  I think in order to

24   discuss, just as we are with all these clients, how these

25   Schedule C expenses are creating refunds, we can't just not

 1    discuss the fact that there's a $124,000 payment.

 2              THE COURT:  Why do we even need to talk about 2013?

 3    I told you I wasn't totally sure about that.  Now you're making

 4    it harder because you're injecting all this other stuff that's

 5    probably not even admissible.  So why should we even use that

 6    when you have -- is it 2015 and 2016?  What are the other ones?

 7              MR. COFER:  2017 and 2018.  The 2013 return, Your

 8    Honor, it was filed by Mr. Watson late in March 2017 which is

 9    in the square middle of the charged conduct.  That's on, that

10    is demonstrated on what's also on the original exhibit list as

11    the account transcript which is just when, as Mr. Bolus

12    testified, when someone files a return, there's an

13    automatically updated transcript.

14              THE COURT:  So he filed it late or he amended it?

15              MR. COFER:  He filed it late, I believe.

16              THE COURT:  Was that before or after the

17    investigation began or he was aware of the investigation?

18    What's your theory on why he filed it four years later?

19              MR. COFER:  It was before -- I believe the first time

20    he was visited by Special Agent Weishaar and became aware of

21    any sort of criminal investigation was in 2018.  I can't

22    remember the month.  October 1, 2018.

23              THE COURT:  When was this filed?

24              MR. COFER:  March 2017.  Your Honor, as far as why

25    they're late, he's failed to file numerous years.  He's filed

 1   late his 2013 return.  I can't recall exactly if his 2017, 2018

 2   return were filed late.  We're not actually getting into his

 3   late filing, but as far as why he's doing it, I think again,

 4   Your Honor, similar theory to the failure to file returns; he's

 5   just not that adamant about fulfilling his tax requirements.

 6   But --

 7            THE COURT:  Again, why isn't that character

 8   propensity?  What does it have to do with 404(b)?  You said

 9   your theory is he doesn't like to file tax returns or doesn't

10   feel like he needs to.  Why is that probative in this case?

11            MR. COFER:  To be clear, I was just explaining in

12   response to the Court's question -- I'm not going to get into

13   that.  The 2013 return, the only point there is it's the same

14   Schedule C so that's what we're showing which again, I think,

15   through the evidence --

16            THE COURT:  But you want to put on separate evidence

17   about some 1099.  You're not even just saying I want to put

18   that in and not talk about it or redact it.  You actually want

19   to affirmatively prove he lied about some payment.

20            MR. COFER:  Yes, Your Honor.  The reason why is I

21   think it's part and parcel of showing the refund because if --

22   in order to demonstrate the Schedule C and see the refund, the

23   jury is going to have to look at that section.  And they're

24   going to see a payment for $124,000, and they're going to

25   wonder whether that's --

1          THE COURT:  We have limited time because everyone

2     needs a break, particularly the staff.  47, 48, 49 are the

3     returns.  What are the other exhibits you want to offer in this

4     whole realm of Mr. Watson's tax returns?

5          MR. COFER:  The account transcripts.

6          THE COURT:  Numbers.

7          MR. COFER:  Exhibit 52A, 52E, 52F and then Exhibit

8     82B and 82C.  Those are absence of records forms that Mr. Bolus

9     described and what those --

10         THE COURT:  Absence of what?

11         MR. COFER:  82B is the absence of 1099s issued by

12    Mr. Watson, and similarly 82C is absence of W-2s issued by

13    Mr. Watson.  That goes to whether or not the contract labor

14    amount on the Schedule C is false.

15         THE COURT:  Got it, okay.

16         MR. COFER:  Then the only other exhibit is Exhibit 84

17    which goes to the Ocwen Loan debt which is the false payment.

18    That's tethered to the question Your Honor was asking about

19    previously.

20         THE COURT:  Okay.  Why don't we take the break then.

21    See you at 11:20.

22         MR. COFER:  Thank you.

23         THE CLERK:  All rise.  This Honorable Court now

24    stands in recess.

25      (Recess taken at 11:12 a.m., until 11:23 a.m.)

1          THE COURT:  Thank you, everyone.  Please be seated.

2     So you want to dismiss counts, Mr. Morgan?

3          MR. MORGAN:  Yes, Your Honor.  At this time the

4     United States moves to dismiss Counts 1, 2 and 3.  Ms. Cannon's

5     medical issues have not improved, and we are unable to bring

6     her in today.

7          THE COURT:  Just to clarify, that's 1, 2 and 3, and

8     previously it was 17 and 18?

9          MR. MORGAN:  Yes, Your Honor.

10          THE COURT:  You moved to dismiss those or not?

11          MR. MORGAN:  I did move to dismiss the two other

12     counts related to Ms. Denton or Ms. Williamson, I believe, is

13     her name now.

14          THE COURT:  It's a little unclear, but client 9.

15     Okay.

16          MR. MORGAN:  Thank you.

17          THE COURT:  No objection I assume, Mr. Ruter?

18          MR. RUTER:  No, sir.

19          THE COURT:  So Counts 1, 2 and 3 are dismissed.

20     We're ready for the jury.

21        (Jury entered the courtroom at 11:26 a.m.)

22          THE COURT:  Thank you, everyone.  Please be seated.

23     I believe we are ready to continue with the testimony of

24     Mr. Wanamaker.  Go ahead, Mr. Morgan.

25          MR. MORGAN:  Thank you, Your Honor.

1              If we could please display Exhibit 91N.  And 91R,

2    please.

3    BY MR. MORGAN:

4    **Q**    Mr. Wanamaker, before you were explaining you could print

5    forms and summaries from here, correct?

6    **A**    Correct.

7    **Q**    And line 18 was the client form listing summary; is that

8    what you said before?

9    **A**    Correct.

10   **Q**    I'd like to show you Exhibit 88.  Just formatting wise,

11   not the specific data in here, but do you recognize what this

12   is?

13   **A**    Yeah, that's the client listing summary.

14   **Q**    This is what would print out if you selected number 18

15   or --

16   **A**    Yes.

17   **Q**    Yes, 18.  If you printed that, if a tax preparer printed

18   that summary form, the client form listing summary --

19   **A**    Client listing summary is what I've always called it.

20   **Q**    If the tax preparer prints one of those out, then realizes

21   that they would like to make changes to the return for whatever

22   reason, the tax preparer makes the changes and submits the

23   return to the IRS, would the IRS be aware of the changes, the

24   fact that there had been changes?

25   **A**    Do you mind if I restate it so I make sure I understand

1    it?

2    **Q**    Yes, certainly.

3    **A**    So if a return was prepared, the client listing summary

4    was printed, then changes were made, and it was then sent to

5    the IRS for the first time?

6    **Q**    Correct.

7    **A**    The IRS would not know about the previous information,

8    correct.

9    **Q**    Even though the document had -- even though some documents

10   had been printed?

11   **A**    Correct, if we're talking about the e-filing of that

12   return.  They don't know anything about the print.

13   **Q**    Okay.  Just because a return has been printed in paper

14   copy does not necessarily mean that the IRS at that point in

15   time has received the return at all --

16   **A**    No, not at all.

17   **Q**    May have, may not have.

18   **A**    No.

19   **Q**    Could you please -- were you able to look up in your

20   systems at TaxSlayer whether an individual named Ronald Watson

21   had purchased your software?

22   **A**    Yes.

23          MR. MORGAN:  I'd like to please bring up Exhibit 93B.

24   **Q**    Do you recognize this?

25   **A**    I do.

1          MR. MORGAN:  If we could enlarge the top portion,

2    please.

3    **Q**    What is this?

4    **A**    So this is -- it's our internal software that we use for

5    sales and support that tracks all of the people that purchased

6    our software.

7          MR. MORGAN:  If we could zoom out of this.  If you

8    can read it -- maybe if we can enlarge the order history

9    section.  Thank you.

10   **Q**    Are you able to tell the first year that the software was

11   purchased?

12   **A**    Looks like it was 2004.

13   **Q**    There's a column there that says "paid."  For 2004 it says

14   "no."  What does that mean, if you know?

15   **A**    So often when you purchase our software, we give you the

16   prior year at no charge, so the date -- the first paid version

17   was probably the 2005, and 2004 was not paid for.  It was

18   included at no charge, what it looks like.

19   **Q**    So does this depict the records that TaxSlayer has

20   regarding an account for Mr. Watson for the purchases of the

21   software from 2004 essentially or 2005 through 2021?

22   **A**    Yes.

23   **Q**    And some of them are listed as premium versus classic, do

24   you see those?

25   **A**    I do.

1    **Q**    As the product type.  Visually speaking, is there a

2    difference -- would you see a difference between what we just

3    saw in those slides before this between the premium and classic

4    versions?

5    **A**    Not in the stuff that we just looked at, no.

6    **Q**    So essentially whether he was using the premium or classic

7    version, it would look the same?

8    **A**    Correct.

9            MR. MORGAN:  No further questions.  Thank you.

10           THE COURT:  Okay.  Mr. Ruter.

11           MR. RUTER:  Thank you, sir.

12                      **CROSS-EXAMINATION**

13   **BY MR. RUTER:**

14   **Q**    Do we understand that the TaxSlayer program has not made

15   fundamental changes for a long time?

16   **A**    Correct.

17   **Q**    So would the TaxSlayer software program for 27 work the

18   same way as that for 26 -- 2017 to 2016, would they operate the

19   same way?

20   **A**    Fundamentally the interfaces would be the same.

21   **Q**    How about from 2016 to 2015?

22   **A**    Yes.

23   **Q**    So could you explain what the difference would be, if any,

24   from the 2015 version of TaxSlayer to 2016.

25   **A**    I guess the best way to summarize changes from year to

1    year, as I mentioned earlier, it's an annual software purchase

2    because each year the laws change.  Sometimes there's nothing

3    significant.  It's just cost of living increases, the standard

4    deduction increases, for example.  Then other times there may

5    actually be tax law code change.

6         Our software, as you've seen, is designed to give you a

7    visual menu that represents what's on the form so that it's

8    easy to put stuff in the place that it belongs and find what

9    you need if you're familiar with what the form looks like.  If

10   there's a change in the form, it would kind of mirror that, but

11   fundamentally the way it works has been the same.

12   **Q**    Okay.  So one reason there would be a change is if there

13   was a change in the tax code, somehow Title 26 changed, that

14   would somehow affect the TaxSlayer software program, you would

15   incorporate that in the TaxSlayer program?

16   **A**    Correct.

17   **Q**    So that starts out as a legal function from somebody in

18   TaxSlayer; is that a fair statement?

19   **A**    As far as how we do the updates?

20   **Q**    As far as there being a change in the law and it

21   ultimately finding its way in the TaxSlayer program.

22   **A**    It would start with IRS draft forms.  They release the new

23   forms to software developers early before they release them to

24   the public obviously for filing purposes.

25   **Q**    Yes.

Cross - Wanamaker                    Vol. V-107

1    **A**    Then we get draft instructions.

2    **Q**    Then someone at TaxSlayer examines those data they got

3    from the IRS; is that right?  They examine it?

4    **A**    Uh-huh.

5    **Q**    And then someone from TaxSlayer decides whether or not

6    because of the documents they read from the IRS, there needs to

7    be some kind of a change in the program itself?

8    **A**    Essentially, yes.

9    **Q**    Okay.  That is done in order to assist the taxpayer who

10   was performing -- doing their own taxes; is that right?  It's

11   to help them?  Let me try it again.

12       The changes are incorporated in the program in order to

13   assist the preparation of the tax return?

14   **A**    Correct.

15   **Q**    Right?  Whether it's the taxpayer himself or whether it's

16   a tax preparer --

17   **A**    Correct.

18   **Q**    Is that a fair statement?

19       Would it be a fair estimate, sir, to say that if changes

20   had been made to the law in some way which TaxSlayer believed

21   there needed to be an alteration of the program itself, that's

22   done for the specific purpose of making it easier for the

23   taxpayer or the tax preparer?

24   **A**    I would say the changes would be made to make -- to

25   provide the ability to file the return accurately.  The ease of

Cross - Wanamaker                                    Vol. V-108

1   use gets more into user interface, what does the button look

2   like, all that kind of stuff.

3   Q    Okay.  There is a place in that program where fees can be

4   actually placed onto the -- somewhere along the return so one

5   can figure out how much they're being charged by a tax preparer

6   to prepare their return; is that right?

7   A    Uh-huh.

8   Q    And you told us there were two different ways that the

9   program allows you to do that; is that right?

10  A    Yeah.

11  Q    What are those two ways?

12  A    So what is probably the most common is in the

13  configuration for the software, there's the form listing which

14  lists all the different federal and state forms, and you can

15  assign charges per those forms.

16       So in the example that I was showing earlier or being

17  asked about earlier, I had put a $100 fee on the Form 1040.  So

18  the program then, if you've set it up that way, the program

19  knows when you get to the end of the tax return and you get to

20  the receipt screen that we showed, the fee that shows up at the

21  top is what we call the calculated fee, and that's what you

22  have on the return based on what you set up earlier.  So that

23  1040 charge showed up.

24       If I wanted to, I can change that by going in there and

25  saying, "This was much easier than my average 1040, and I am

1    only going to charge them $50."  And you could change it to 50,

2    for example.

3    **Q**    Did we hear you say earlier that one has the ability to

4    charge for each form that has been worked on?

5    **A**    Most forms, yes.

6    **Q**    When you say "most forms," do you know how many forms

7    there are?

8    **A**    Give or take, federal is about 1,200 I think.  But that's

9    also business forms, like 1120, 1120S, stuff like that.

10   **Q**    About 1,200 federal forms, is that what you said?

11   **A**    I think so, yes.

12   **Q**    Do we understand that if a tax preparer used 100 of those,

13   he or she has the right, the ability to charge a fee for each

14   one of those forms that they happened to work on for the

15   taxpayer; is that accurate?

16   **A**    They would have the ability in the software to set a fee

17   for each form that might be used, if that's what you're getting

18   at.

19   **Q**    And if they -- whatever fee they charge, does that show

20   itself on that work summary that you talked about near the end

21   of your direct examination?

22   **A**    The client listing summary?

23   **Q**    Yes, sir.

24   **A**    That lists all the forms that were generated for that

25   return at that time, yes.

1   **Q**    Okay.  It also shows the amount of money associated --

2   that is a bottom line of each form that's mentioned in that

3   summary; isn't that right?

4   **A**    I'd have to look at it again.  I think it shows current

5   form charges, and it might also tell you what the prior year

6   fee was if it's a return client.  I'd have to see it to make

7   sure.

8   **Q**    Okay.  But you're saying this afternoon as you sit here,

9   that you're not sure what that form actually shows?

10  **A**    I'm saying I don't remember off the top of my head if it

11  lists out the dollar charge per form.

12  **Q**    Okay.

13  **A**    You're talking about the listing summary, not the invoice

14  that we looked at as well, right?

15  **Q**    Right.

16  **A**    Because the invoice would show per form the charge or the

17  total.

18  **Q**    Right.  That would show the actual fee being paid as well;

19  isn't that right?

20  **A**    That all depends on how the client, how the tax preparer

21  was receiving their payment.

22  **Q**    Okay.  Whether or not it was being directly deposited, as

23  an example, into a bank or whether or not they received a

24  check?

25  **A**    No.  What I was referring to was the software has

1    partnerships with banks that allow a taxpayer to get their

2    refund processed and have the fees that they're paying to get

3    the refund done taken out of the refund.  We would know that

4    through the electronic transmission of information and know

5    that it was paid or not paid.  But if it's not one of those

6    products, if the tax preparer received cash or credit card or a

7    check to pay their fee, they would have to indicate that it was

8    paid or not.  We don't know that.

9    Q    Okay.  A different topic.  If a taxpayer comes into a tax

10   preparer's office for the first time using your program, when

11   that program is turned on and begins to pop up with that first

12   exhibit you were shown, would it be true that there would be no

13   names, no numbers, no nothing on the program as one goes

14   through it?

15   A    When you first install our software, it would have no

16   names on it, yes, if you were not a new user to us or if we

17   didn't do a data conversion or anything like that.

18   Q    So under that circumstance, the tax preparer would

19   literally be starting with a blank slate; is that right?

20   A    Yes.

21   Q    So is there any difference in what happens when the same

22   client comes back to that tax preparer the next year?

23   A    Yes.

24   Q    And he turns on his machine, would there be a difference

25   between what he would see this time versus what he saw, which

1   was nothing, the year before?

2   **A**    The answer to that question is no, it would look the same.

3   Some other things happen when you're preparing a return for

4   someone that you've done in the past.

5   **Q**    Understood.  Another way of asking it is everything that

6   was contained on the prior year's return would appear on the

7   next return that that tax preparer is about to prepare; is that

8   right?

9   **A**    It doesn't appear.  You get asked if you want to pull

10  information from the prior year.

11  **Q**    So if you don't, does that mean that when you first start

12  out, you would not have the person's basic information already

13  there in front of you?

14  **A**    Correct.

15  **Q**    If a person, however, chose to pull up all the information

16  from the prior year, would it then automatically appear?

17  **A**    No, it doesn't work that way.

18  **Q**    How does it work?

19  **A**    It prompts at different parts of the return.  I'll try and

20  explain it.  Cut me off if I'm going too far into this.  When I

21  install my software for the year, there's nobody in my client

22  list.  I haven't done anything yet so it's blank, which I think

23  is what you were trying to get at at one point.  If I put in a

24  Social Security number for a client and I've done that client's

25  return in the prior year, it will alert you and say that the

1    return has been found for a prior year; would you like to use

2    that information?  If you say no, it's like the person never

3    came to you.  You'd have to put in everything from scratch just

4    like the first time.

5         If you said yes, then the flow that you saw earlier going

6    through the personal information, that all remains the same,

7    but it will prompt and prefill the name and address for you and

8    then take you to that summary page where you can verify it,

9    change it if they moved.  If their name and social is the same,

10   pull it forward but change their address if they moved, for

11   example.  At different points, it's going to ask you to pull

12   forward information if it sees it available.

13        If you had dependents on the previous year, it's going to

14   ask if you want to pull the dependents forward.  If you had W2s

15   entered the year before, it's going to ask if you want to pull

16   those forward.  It's not like it all just shows up.

17   **Q**    Yes.  That would mean that if a tax preparer wanted to see

18   what had happened the year prior, he would hit a prompt that

19   would say bring forward what was actually filed the year

20   prior?

21   **A**    If you wanted to look at the prior year?  If you wanted to

22   look at the prior year, I would think you'd look at the prior

23   year software.  You wouldn't look at the current year -- again,

24   let's say it was a W-2.  If I got to that point of the return

25   and it said, "I found prior year W-2s, do you want to pull them

Cross - Wanamaker                               Vol. V-114

1   forward?" if you say yes, what it's actually going to pull

2   forward for you is going to be the EIN of the employer, the

3   name of the employer and address, and that's it.  There's not

4   going to be data on it.

5       So if you wanted to see what's in the prior year, you

6   should be going into the prior year and looking at it.

7   **Q**   So you're saying then while a new tax year is now being

8   filled out that that software program you're currently on is

9   different from the software program of the previous year?

10  **A**   Yes.  Each of our years is an annual software

11  installation.  So if you wanted to use TaxSlayer 2022, you'd

12  open up 2022.  If you wanted to open up 2021, you'd open up

13  2021, and they'd run as separate software.

14  **Q**   Okay.  Bottom line being that if a tax preparer wants to

15  see what had happened the year prior, then they have the

16  ability to do that?

17  **A**   Absolutely.

18  **Q**   If a business does not have a formal name, do I understand

19  that TaxSlayer will prompt the taxpayer or tax preparer to

20  another place where they can designate what kind of a business

21  it is?

22  **A**   I wouldn't say that.  The Schedule C main menu that we

23  looked at earlier, if you recall, it had at the top a place to

24  enter the business code which is that six-digit number the IRS

25  uses or a business activity, what type of business it is.

1    That's something you can type in -- lawn care, for example.

2    And the IRS requires one or the other of those.  You can fill

3    in one, just the number, just the name, or you can have them

4    both filled in.

5        We don't prefill any of that for you.  You could type in

6    the number, you could type in the name.  We give you those

7    links to look up codes.  If you know that they're lawn care but

8    you're a stickler and want to know what the six-digit number

9    is, you could use those, for example.

10   **Q**   If the tax preparer places some kind of a description

11   under the description or business line of the Schedule C, will

12   there be any reason why the TaxSlayer program would not permit

13   it, would kick it out somehow or make a warning that you can't

14   use that designation, whatever that designation may have

15   been?

16   **A**   The only thing I could think of that you could cause a

17   problem if you tried to use special characters.  Apostrophes,

18   pound signs, things like that often aren't allowed because they

19   can't be sent electronically.  And of course it's got a maximum

20   length.  We have to say it's 35 characters.  You couldn't try

21   and type in 36, it wouldn't take it.

22   **Q**   Other than that, if I just wanted to string together a

23   bunch of letters, TaxSlayer program would permit that?  It

24   wouldn't reject it because of that?

25   **A**   Right.

1   **Q**    Does TaxSlayer correct mathematical errors?

2   **A**    TaxSlayer is a software that provides calculations for

3   you.  I don't know where you would put something in that would

4   be a mathematical error that it would be correcting, if that

5   makes sense.

6   **Q**    It does.  What the answer really means is that the

7   TaxSlayer program makes the calculation, doesn't it?

8   **A**    Yes.

9   **Q**    So therefore --

10  **A**    If it's a calculated field --

11  **Q**    -- it's never going to be a mathematical error because

12  TaxSlayer is the one that decides what the calculation is?

13  **A**    Correct.  Fields are the calculator -- calculated by the

14  software.

15  **Q**    Does TaxSlayer have the ability to tell the tax preparer

16  where a number is supposed to go?

17  **A**    Can you be more specific?

18  **Q**    Well, I think that's specific.  What I want --

19          THE COURT:  Mr. Ruter, can you move the microphone

20  over to where you are.

21          MR. RUTER:  I'm sorry, Judge, I have a habit.

22          THE COURT:  Thank you.

23          MR. RUTER:  Thank you.

24  BY MR. RUTER:

25  **Q**    We've established that TaxSlayer does calculations.  The

1   tax preparer doesn't have to add -- when a number is placed on

2   a return, maybe multiple numbers, the tax preparer doesn't have

3   to then add up numbers and write it down himself, does he?

4   **A**    If there are direct lines on the form, that's correct.

5   **Q**    TaxSlayer does that?

6   **A**    Correct.

7   **Q**    Does TaxSlayer advise or assist the tax preparer in

8   determining where a certain number should go on a return?

9   **A**    If you remember the way I described our software, its

10  entry menus is designed after the form so that it looks like

11  the form.  If you're familiar with the form, then you know

12  where to go.  That's the user experience, the interface that

13  kind of helps you do it.  But there's not something that pops

14  up and says, "Hey, do you need to know what to do with this?"

15  or anything like that.

16  **Q**    Right.  If a tax preparer uses the wrong form upon which

17  to place a number, TaxSlayer has no ability to correct the

18  that?

19  **A**    No.  We don't -- we can't change what's put in.

20  **Q**    Right.  Or you can't change where it should go if it

21  should go in a different place, right?  TaxSlayer can't do that

22  either?

23  **A**    No.

24  **Q**    You did indicate, sir, there is a diagnostic warning, did

25  you not?

**A**    There's a diagnostics section down at the bottom, yeah.

**Q**    What does that mean exactly?

**A**    As I tried to explain, it's essentially things where the program is just saying, hey, you might consider these.  One of the ones that seems to make the most sense to me -- I hope it does for anybody in here that might be old enough to get Social Security.  If you're 65 or over or 62 and a half or older, you generally should have Social Security coming in.  So if you're doing a tax return for somebody who's 70 years old, you would get a diagnostic warning -- had you not already put in Social Security income -- saying hey, the person is old enough to receive Social Security, you might want to double-check that you haven't overlooked it.  Those kind of things.

**Q**    Okay.  How many Schedule As will TaxSlayer permit a tax preparer to actually send to the IRS for one taxpayer, do you know?

**A**    Schedule A, you can only do one.

         MR. RUTER:  Just one moment, Your Honor, please.

     (Pause.)

         MR. RUTER:  Thank you, Judge.

**Q**    Sir, do you know how the -- how depreciation is supposed to be treated on the TaxSlayer program?

**A**    At a general level, I would say yes.

**Q**    And what is that?

**A**    The most popular way by using what's called the

1    depreciation module.

2    **Q**     Do you know what the special depreciation means?

3    **A**     I believe you're referring to what's also called bonus

4    depreciation from the IRS.

5    **Q**     Yes, I am.  Do you know what that means?

6               THE COURT:  Do you want to take the screen down,

7    please.  Thank you.

8    **A**     Yes.

9    **Q**     What does it mean?

10   **A**     Depending on the year involved, the tax code allows for,

11   for lack of a better word, bonus depreciation where you're able

12   to get a larger deduction in specific years when you're

13   depreciating business property.

14   **Q**     Gotcha.  Sir, thank you very much.

15              MR. RUTER:  No further questions, Your Honor.

16              THE COURT:  Okay.  Any redirect?

17              MR. MORGAN:  Thank you, Your Honor.

18                        **REDIRECT EXAMINATION**

19   **BY MR. MORGAN:**

20   **Q**     When there's a new version of TaxSlayer each year based

21   upon the updates to the tax codes or whatever might have

22   changed, does TaxSlayer as a company go through any

23   verification process to make sure that the software is working

24   correctly?

25   **A**     So we're required each year to go through what's called

1  assurance testing with the IRS.  So during the winter, November

2  time frame, we have to test with the IRS, yes.

3  **Q**    And you discussed briefly pulling information from one

4  year to another year.  Does that pull the specific numbers out

5  of the tax return for the previous year and put them on the new

6  return or just the information, like the biographical kind of

7  information or both?

8  **A**    It's not an easy answer because most of it is just the

9  biographical.  One example -- certain calculations require

10 year-to-year calculation.  One, for example, would be the one

11 just brought up, depreciation.  Depreciation, to keep it

12 simple, if the IRS says that you can deduct an amount for

13 buying a computer and they say it's three years, to keep it

14 simple, they give you an amount each year you can deduct.  So

15 there's a calculation involved there that would pull forward if

16 you chose to pull forward that asset.

17     The software would ask you:  Do you want to pull forward

18 the asset that you entered last year?  If you say yes, it's

19 going to use some of the numbers from the prior year to

20 determine what the current year calculation should be.

21 **Q**    So the tax preparer would have to specifically say yes for

22 those numbers to come over into the form?

23 **A**    Yes.

24             MR. MORGAN:  Can we please pull up Exhibit 92D.  If

25 we can enlarge the bottom half.

1   **Q**    So you mentioned some calculations that TaxSlayer -- you

2   said that TaxSlayer does do some occasional calculations; is

3   that correct?

4   **A**    Yes.

5   **Q**    Directing your attention to line 74, for example, where it

6   says, "Add line 64, 65, 66a and 67 through 73," would that be

7   an example of a calculation that TaxSlayer might do?

8   **A**    Yes.

9            MR. MORGAN:  Thank you.  No further questions.

10           THE COURT:  Anything else just on that?

11           MR. RUTER:  Can I have one, Your Honor, please?

12           THE COURT:  If it's within the scope.

13           MR. RUTER:  Thank you.

14                       **RECROSS-EXAMINATION**

15   **BY MR. RUTER:**

16   **Q**    We were talking about, I think, Form 4562, the

17   depreciation schedule; am I right?

18   **A**    Those figures carry back to a 4562, yes.

19   **Q**    If that means of depreciation was chosen, the next year

20   would that tax return actually populate itself to what the next

21   year's figure should be?

22   **A**    If you answered the question about pulling that

23   information forward, yes.

24   **Q**    And all the tax preparer would have to do is hit the yes

25   button and that's it?

1    **A**    A couple times.  So depreciation is tied to a 4562 which

2    is tied to a form that it's carrying back to.  Whether it be

3    Schedule E, Schedule F, Schedule C, a 2106, it's going to keep

4    carrying back.  The way the software pull forward works is if

5    you said, "Yes, I want to pull information from the prior year"

6    like we talked about, when it got to whatever the parent form

7    was -- so let's say it was a Schedule C.  It would say:  We

8    found a Schedule C in last year's return.  Do you want to use

9    it and pull it forward?  You'd have to say yes to that.

10        Then you'd have to go in and access the depreciation and

11   say, yes, I want it to pull forward anything it found for

12   depreciation.

13   **Q**    Then the form would know how much money it would be?

14   TaxSlayer would know --

15   **A**    It would know the current year's deduction for anything

16   that was on last years that should still be there.  It doesn't

17   know anything about anything you haven't put in or anything

18   like that.

19   **Q**    Yes, sir.

20             MR. RUTER:  Thank you, Judge.

21             THE COURT:  Thank you, Mr. Wanamaker.  We appreciate

22   your testimony.  You can step out now.

23             Why don't we start the next witness.  Who's the next

24   witness?

25             MR. COFER:  Your Honor, the United States calls

```
 1   Radiah Carson.

 2           THE CLERK:  Please walk towards me.  Please take the

 3   stand and remain standing.  Please raise your right hand.

 4           RADIAH CARSON, GOVERNMENT'S WITNESS, SWORN

 5           THE CLERK:  You may be seated, please.  Speak

 6   clearly into the microphone.  Please state your first and last

 7   name.

 8           THE WITNESS:  Radiah Carson.

 9           THE CLERK:  Spell your first and last name for the

10   record.

11           THE WITNESS:  R-a-d-i-a-h C-a-r-s-o-n.

12           THE CLERK:  Thank you, ma'am.

13                        DIRECT EXAMINATION

14   BY MR. COFER:

15   Q     Good afternoon, Ms. Carson.

16   A     Good afternoon.

17   Q     Where do you work?

18   A     The Internal Revenue Service.

19   Q     How long have you been with the IRS?

20   A     Since April 2009.

21   Q     What's your current role?

22   A     Internal revenue agent.

23   Q     How long have you been a revenue agent?

24   A     Since I started in April of 2009.

25   Q     Before becoming a revenue agent, did you study
```

1  accounting?

2  **A**    I did.

3  **Q**    Could you tell us some more about your educational

4  background.

5  **A**    I graduated from Bowie State University with a degree in

6  accounting.  I have some post-grad work studies at University

7  of Maryland, College Park, but I did not complete my graduate

8  studies.

9  **Q**    What were those studies in?

10 **A**    Tax, taxation.

11 **Q**    What are your general duties as an IRS revenue agent?

12 **A**    The examination of individual and business income tax

13 returns for tax compliance.

14 **Q**    As part of your work as a revenue agent with the IRS, have

15 you received any training?

16 **A**    Yes, I have.

17 **Q**    Generally could you just tell us what kind of training you

18 received.

19 **A**    When you come on board at the IRS, at that time they sent

20 us away for training.  It was phase one training consisted of

21 six weeks of individual income tax training where you learned

22 the process and procedures for referencing tax codes, tax law,

23 how to recognize large and unusual questionable items.  We

24 would come back, be assigned a few cases.  We would work those

25 cases.

Direct - Carson                              Vol. V-125

1        Then we go for phase two which would include corporate tax

2   returns.  We would come back, get assigned cases -- corporate

3   tax returns.  Then we would go back for flow through which

4   would consist of partnerships and S corps and the same process,

5   come back and assigned tax returns and work those.

6   **Q**    As part of your work as a revenue agent, do you examine or

7   have you examined individual tax returns before?

8   **A**    I'm sorry, I didn't hear your question.

9   **Q**    Sure.  As part of your work as a revenue agent, have you

10  examined individual tax returns before?

11  **A**    Yes, I have.

12  **Q**    Is an examination also known as an audit?

13  **A**    Yes, it is.

14  **Q**    Generally speaking, what is an audit?

15  **A**    An audit is just a review of a tax return to confirm tax

16  compliance and that the correct tax is reported on a return.

17  **Q**    Does the IRS audit every tax return that is filed?

18  **A**    No, not to my knowledge, no.

19  **Q**    About how many do they audit?

20  **A**    In my field, we're field agents and during the course of

21  training, the indication is one to three percent of tax returns

22  are audited by a revenue agent.

23  **Q**    As a general matter, when someone files an individual tax

24  return with the IRS, does a human being confirm the accuracy of

25  that return before it's accepted by the IRS?

1    **A**      No.

2    **Q**      So not necessarily how many have you audited, but how many

3    individual tax returns have you looked at in the course of your

4    career at the IRS, just ballpark?

5    **A**      Thousands I would say maybe -- yeah, because we have to

6    review prior and subsequent years in related returns when we

7    are assigned a case.

8    **Q**      Are you familiar with the basic forms and schedules that

9    comprise an individual tax return?

10   **A**      Yes.

11   **Q**      What I'd like to do now is show you some individual tax

12   returns that are exhibits in this case.  I'd like to ask you

13   some questions about how the numbers on those returns flow

14   together across different parts of the return and how that

15   affects certain calculations on those returns.

16   **A**      Okay.

17          MR. COFER:  First, Mr. Mahoney, could we please pull

18   up Exhibit 34, page 1.  Zoom in on the top real quick,

19   please.

20   **Q**      Ms. Carson, we should be looking at a 2016 Form 1040 for

21   Stanley and Debra Jones.

22          MR. COFER:  Can we zoom back out.

23   **Q**      Ms. Carson, as part of your job, do you educate taxpayers

24   on how to use a Form 1040 generally?

25   **A**      Yes, I do.  I enjoy it.

1    Q     Could you explain that to the jury on a general level.

2    A     On a general level, when I have a taxpayer in front of me,

3    I explain -- these tax years in particular, I would explain the

4    tax return is literally only the first two pages of that 1040.

5    All of those other papers that you-all receive are schedules

6    and calculations that are summarized on the first two pages of

7    the 1040.

8    Q     So how do you start to work through it?  Do you start at

9    the top and work down?  What's the process by which you fill

10   out a Form 1040?

11   A     You would start at the top with an individual's name,

12   their Social Security number and address, and then you work

13   down the tax return with the different sections that are

14   highlighted.  For instance, they have the filing status after

15   your individual name and Social Security number.  The filing

16   statuses are usually either you're single or married.  If

17   you're single, you may qualify for head of household, depending

18   on factors of whether or not you have dependants.  You're

19   either single or married.  If you're married, you're either

20   married filing joint or married filing separate.

21         Then you go down each section, the section for exemptions.

22   That would list the exemptions for yourself and/or a spouse and

23   any dependents you are eligible to claim.

24         Then you come down to your income, the adjusted gross

25   income, and continue with each section.

1          MR. MORGAN:  To keep walking through it quickly,

2    Mr. Mahoney, can we turn to the next page which would be page 2

3    of Exhibit 34 and one more to page 3.

4    Q    You just described Gross Income.  And Tax and Credits, is

5    that the next section?

6    A    Uh-huh.  If you look at the top of this exhibit on line

7    38, the adjusted gross income number is at the top, and then

8    from that you would consider any tax or credits.  The important

9    line for us is the -- you would get to your tax and credits,

10   and then you'd look at the itemized deductions or standard

11   deductions, and that's part of your tax and credits.  Then the

12   exemptions.  Then you have the taxable income and your tax.

13   Then from that there are additional credits and taxes that may

14   or may not be assessed.

15         MR. MORGAN:  Can we zoom back out.  We'll come back

16   to these but just to get us through to the bottom.

17   Q    Then it looks like we have the Other Taxes section.  What

18   generally goes in there?

19   A    So other taxes that are applicable to a taxpayer.  For

20   instance, if you -- the first line is self-employment tax.  So

21   if you had a business and it produced an income, the

22   self-employment tax would go there.  There are some other taxes

23   that are listed on there.  You only fill that out if it's

24   applicable.

25         Then you get to payments and credits -- it says

1    "Payments."  So those would be like your withholdings on your

2    W-2 that you receive.  Most people are familiar with that.

3    Then some people may pay estimated tax payments so that would

4    list it here.  Then you have other credits that may be

5    applicable to an individual.

6         The final section is the Refund and a determination is

7    made.  If you've paid more than what is due, you would get a

8    refund.  The section below that is the amount due.  If you pay

9    taxes but after you complete your 1040, you realize that you

10   owe more taxes, then it would list the amount due there.  And

11   you have your third party designee.

12   Q    Let me pause real quick on the "refund" and "amount you

13   owe" boxes.  We'll go up to talk in more detail how we get

14   here, but let's just look at this particular return.

15        So in line 76a, there's a number, $5,081 and this says,

16   "The amount of line 75 you want refunded to you."  What's that

17   mean here?

18   A    On this particular return for this particular taxpayer

19   that's the refund of money they would receive.  So basically --

20   based on your taxable income, you're assessed a tax amount.

21   They have paid more than the tax amount that was due in taking

22   into consideration any other taxes or credits.  So they're due

23   a refund.

24   Q    Then the "amount you owe" box below here, in line 78 and

25   box 78 to the right, that's blank.  Why is that blank?

1   **A**   Because they do not owe any additional tax.

2   **Q**   Can you both get a refund and have an amount you owe?

3   **A**   Not that I'm aware of, no.

4   **Q**   So these two boxes at the bottom, is this what you're

5   trying to calculate, either the refund or the amount you owe?

6   **A**   That's the final number which we do want to determine is

7   the tax due on any given return.  Then you take into

8   consideration any payments that have been made or any credits

9   and any -- additional tax that may be due.

10  **Q**   Is that tax due, is that the line 63 for "total tax"?

11  **A**   Yes, yeah.

12  **Q**   So just to be clear, so you start at the top, and you just

13  work your way down ultimately to line 78?  Is that how that

14  flows?

15  **A**   Again, this is the summary pages so there are other

16  schedules that you work your way through that filter up to

17  these first two pages.

18  **Q**   Got it.  We'll come to some of those.  In a little more

19  detail and using this form as an example, looking at some of

20  the figures here, I'm going to walk through some of these

21  sections.

22          MR. MORGAN:  Mr. Mahoney, could we please go back to

23  page 1 of Exhibit 34.

24  **Q**   So the income box, what does -- see the bottom of that

25  box, line 22, that says, "This is your total income."

1          THE COURT:  Can you enlarge these portions?  I think

2     people are having a hard time seeing these.

3          MR. COFER:  Yes, Your Honor.  Thank you for that

4     reminder.  Looks like we're now zoomed in on the income box.

5     **Q**    Could you read the amount in line 22.

6     **A**    68,593.

7     **Q**    So, again, what's that total income line represent in this

8     section?

9     **A**    That represents the total income that's reported in this

10    income section.  If you look to your left, it says "income."

11    That section there are different amounts.  Most people are

12    familiar with your wages because you'll receive your W-2, so

13    that's on line 7.  This particular taxpayer had a tax refund --

14    credit of 2,109 so that would be added.  Then they have a loss

15    from business loss which is on line 12 of 31,232, and then

16    there's another amount under pensions and annuity for 18,231

17    which would be added.  Those amounts total to 68,593.

18    **Q**    Okay.  So you're filling in the specific types of income

19    and then basically adding or subtracting those up, and that

20    gets you that line 22?

21    **A**    Yes.

22         MR. COFER:  Mr. Mahoney, if we could zoom back out

23    and zoom in on the adjusted gross income box.  I think some of

24    it is on the next page.

25    **Q**    I'll just start with this, Ms. Carson.  We have line 22,

1    and then we go to the adjusted gross income section.  What is

2    adjusted gross income?

3    **A**    So from the total income at the top, there may or may not

4    be adjustments that are made to that income to arrive at

5    adjusted gross income.  On this particular tax return, there

6    are no amounts listed so their adjusted gross income should

7    equal the total income.

8          MR. COFER:  Mr. Mahoney, can we please turn to the

9    next page, page 2 of Exhibit 34, and highlight the top.

10   **Q**    Line 37, that says, "This is your adjusted gross income."

11   What's the number in that box?

12   **A**    68,593.

13   **Q**    So that's just the total income from line 22?

14   **A**    Yes.

15         MR. COFER:  Can we please turn to page 3 of Exhibit

16   34, and could we highlight the whole Tax and Credits box.

17   **Q**    Again, what is this section just generally?

18   **A**    On any given tax preparer -- I'm sorry, taxpayer, you

19   would report here the tax and credits that are applicable to

20   that particular taxpayer.

21   **Q**    All right.  So the first line of this section says,

22   "Amount from line 37, adjusted gross income."  So we start with

23   what we just looked at before on line 37?

24   **A**    Yes, sir.

25   **Q**    I think we can skip the box 39a, it's not filled in here.

1    The next line is line 40.  It says, "Itemized deductions from

2    Schedule A or your standard deduction."  I want to ask you what

3    both of those things are, but before that, just generally, what

4    is a deduction?

5    **A**    A deduction is generally something that reduces your

6    income as far as it applies to the tax return.

7    **Q**    So the number listed in line 40, that's going to be

8    reducing your adjusted gross income or your income?

9    **A**    Yeah, it reduces the adjusted gross income.

10   **Q**    First it seems like two options.  What's the standard

11   deduction?

12   **A**    The standard deduction is an amount that's decided on any

13   given year by the powers that be, Congress, what have you, that

14   this amount is what a person can deduct depending on their

15   filing status, whether they file single, married filing

16   separate, married filing joint.  Those deductions will be

17   listed to the left, and sometimes there's limitations and

18   things of that nature, but it just depends on the individual.

19   **Q**    Could you circle where they are listed here.  I think you

20   can just touch the screen, if you can do that.

21   **A**    Me?  Oh, you're talking to me?  I'm sorry.

22   **Q**    My mistake, yeah.

23   **A**    Okay.  (Complied.)

24   **Q**    Generally speaking, if you're filing as a single person or

25   married filing separately, it says $6,300.  If that's the case

Direct - Carson                           Vol. V-134

1   and you're going to take the standard deduction, you just put

2   that in line 40; is that what you do?

3   **A**    Yes.

4   **Q**    In that case, what are itemized deductions?

5   **A**    Itemized deductions are those personal expenses on any

6   particular year that are allowed to be deducted on

7   Schedule A.

8   **Q**    So you can either take the standard deduction, or you can

9   itemize specific deductions?

10  **A**    Yes, sir.

11  **Q**    Why would you itemize?

12  **A**    You may itemize because your itemized deductions would be

13  more than your standard deduction.

14  **Q**    By "more than," does that mean you can deduct more?

15  **A**    Yes.

16  **Q**    Looking at this return here, in line 40, could you read

17  the amount in that box.

18  **A**    $49,790.

19  **Q**    So from looking at that, can you tell if on this return,

20  this taxpayer is taking the itemized deduction versus standard

21  deduction?

22  **A**    Yes.  You can tell just in general by looking because that

23  number is higher than any of the standard deductions.  But I

24  believe -- was this a married filing joint return, or was this

25  single?

1   **Q**    I believe married filing jointly.

2   **A**    If it was married filing joint, as you can see --

3   **Q**    Feel free to touch the screen whenever you want.

4   **A**    Married filing joint or widower, for a standard deduction,

5   the amount would have been 12,600.  They've chosen the itemized

6   deductions of 49,790.

7   **Q**    Okay.  We'll come back to the Schedule A but just moving

8   through this section --

9          THE COURT:  Mr. Mahoney, why don't we take the lunch

10   break now.  I think there's a couple of other things we need to

11   discuss, so I think it's a good stopping point.

12          Ladies and gentlemen, I know that wasn't a very long

13   session there, sorry for that.  People don't mind when we go to

14   lunch usually.  So we'll have the lunch break now.  There's a

15   few things I need to discuss with counsel, so we'll give you an

16   extra ten minutes for us to do that and for everyone here to

17   still have lunch.  We'll give you until 1:30, and then we'll

18   come back and complete Agent Carson's testimony.

19          Again, don't discuss the case, keep an open mind.

20   We'll see you back here at 1:30.  Thank you.

21     (Jury left the courtroom at 12:22 p.m.)

22          THE COURT:  Thank you, everyone.  Please be seated.

23   Agent Carson, you can step out and take the break now if you'd

24   like.

25          I just want to get back to you all on this issue of

1    the Watson tax returns.  Is that part of this testimony or this

2    witness; is that correct?

3         MR. COFER:  Yes, Your Honor.  I think we don't plan

4    to get too much into it.  I don't know if you want me to wait

5    for Ms. Carson to exit -- if I could have one quick second,

6    Your Honor.

7         (Pause.)

8         MR. COFER:  Your Honor, my current plan, assuming

9    everything would come in, is not to do a deep dive on

10   Mr. Watson's return.  The only actual exhibit I think I would

11   need Revenue Agent Carson to explain, if it were deemed

12   admissible by the Court, is that Exhibit 84 which is the IRS

13   history that shows the 1099 for that debt canceled which is the

14   same amount that's on that payment line --

15        THE COURT:  Okay, I'm not that interested in what

16   we're using with the witness.  I want to make sure I know when

17   we need to make these decisions.  However, in terms of 47, 48

18   and 49, I guess what I'm not sure about, 49 -- this is the 2018

19   return.  I don't see how -- it doesn't look like we have the

20   full 1040.  Am I missing something here?

21        MR. COFER:  I believe we should have it.

22        THE COURT:  Pages 1 and 2, it only goes up to line 23

23   as opposed to line 78, whatever you were just going through

24   with Agent Carson.  Is it a different kind of form here?

25        MR. COFER:  It should not be.  If I can have a second

1    to look at our copy, to make sure it's the same you're looking

2    at.  That's Exhibit 49, Your Honor?

3              THE COURT:  Yes.  I take it you did not include all

4    the schedules or did you?

5              MR. COFER:  They should be attached.

6              THE COURT:  I think Schedule As are not in a lot of

7    this.  I think you have all the Schedule Cs -- and that's for

8    all the exhibits.  Particularly for Exhibit 49, I don't even

9    see the full 1040.  It looks like sort of a different type,

10   maybe a 1040-EZ, although I don't see the EZ here.

11             MR. COFER:  I think it should be printed

12   double-sided.

13             THE COURT:  It is but I have page numbers here, so I

14   don't think you just missed -- you didn't give me the right

15   pages.  You gave me a 16-page exhibit that's already paginated,

16   right?

17             MR. COFER:  Your Honor, this may be -- I can't ask

18   Ms. Carson but perhaps Special Agent Weishaar knows.  I think

19   this is the year when the Form 1040 changed, the graphical

20   representation.  I think Congress passed a law in 2017 that

21   started in 2018 that tried to shrink the Form 1040 to one

22   page.

23             THE COURT:  That could be.

24             MR. COFER:  So I think the Schedule C which is on

25   page 14 should look the same as other Schedule Cs.

1          THE COURT:  Where does that roll up into the 1040?  I

2     guess I'm not even sure where that number would be in the

3     1040.

4          MR. COFER:  That's going to be now on what's page 3.

5     So I think what -- if I can do my best to explain.

6          THE COURT:  Schedule 1, I see, okay.

7          MR. COFER:  Yeah, so the Schedule C rules still work,

8     but I think what Congress tried to do is put the front page of

9     the Form 1040 just to fit on one page.  And instead of listing

10    it out across the three pages we've been going through, they

11    have these new things called Schedule 1 where that's where you

12    put your line 12.

13         THE COURT:  But I take it in all three of these, I

14    don't see a Schedule A.  You're not planning to get into any

15    alleged problems with Schedule A, correct?

16         MR. COFER:  No, Your Honor.  I think the only thing

17    on his returns that we'd be interested is the Schedule C and

18    the loss or the expenses that creates, and does that lead to a

19    refund.

20         THE COURT:  What about 4562?  Those are here but I

21    don't think we went into any of these forms in detail with the

22    other witnesses.

23         MR. COFER:  Yeah, again, Your Honor, I think we're

24    just looking at the Schedule C really.  To the extent we

25    discuss it all, I don't think we're getting into that with

1    Agent Carson.  It would just be for closing or other

2    purposes.

3              THE COURT:  So for purposes of the Schedule C issue,

4    what, if anything, do you get out of the 2013 return that you

5    don't get out of the 2017, '18 in terms of probative value?

6              MR. COFER:  If I could flip to the 2013, Your Honor,

7    to look at that schedule in particular.  Generally --

8              THE COURT:  Here the business income, I guess it's

9    negative but it's not a massive number.

10             MR. COFER:  Your Honor, I think having the three

11   together -- so, one, this is filed squarely in the middle of

12   the returns.  I realize perhaps the concern is with the

13   payment --

14             THE COURT:  Well, it's that and it's also for a tax

15   year that's really not relevant to any other tax years that we

16   have in this case.  There was some testimony about people in

17   terms of their 2010 and 2011 elicited by the defense, but this

18   case is about '15 through '17 anyway.

19             MR. COFER:  Correct, Your Honor.  I think it's less

20   about the tax year of this form and more that the timing part

21   is that he filed it March 2017 which is just, I think, squarely

22   in the middle of the charged conduct here.  And I think the

23   rules for the Schedule C are going to be the same.  It's really

24   just pointing out that insofar as the various arguments that

25   defense may make, I don't know, but showing that there's just

1    very similar -- what appear to be false, inflated Schedule C

2    numbers which the Government is alleging with respect to the

3    clients, that's happening on his own returns in the middle of

4    this which is probative in several different respects.

5           And then in conjunction with the 2017 and 2018, this

6    kind of successive period where this is happening again shows

7    absence of mistake and --

8           THE COURT:  Okay.  So with the exhibits that we've

9    seen, I'm not totally sure what the summaries 52A, E and F do,

10   but they don't seem problematic in any particular way.  I'm

11   going to allow 48 and 49.  I'm not going to allow 47 which is

12   2013, partly because it's a different time period and it's in

13   some ways cumulative, but also because of this issue with the

14   1099.  It seems as if the main purpose of that return is to

15   focus on not -- or a huge part of it is this issue of whether

16   or not he falsely reported that there was a payment made when

17   there wasn't which, again, it's not at all similar in any way

18   to the alleged false statements in this case.

19          So although there is potentially an argument that

20   relates to intent and knowledge and willfulness, I think the

21   probative value of that is substantially outweighed by the

22   danger of unfair prejudice because it really is -- it's

23   different enough that we're really talking about something that

24   is going to seem more like this person makes false statements

25   in general or on tax returns because it doesn't resemble any of

1     the type of false statements that are at issue in our case.

2             So I'm going to exclude that discussion which means

3     Exhibits 47 and 84 and I guess 52A also relates to 2013.  Then

4     I think 2017 and 2018 stay in which is 48, 49, 52E and 52F.

5             Then Exhibits 82B and C, although those are not --

6     they're relevant, obviously.  They cover other years, so I

7     guess the issue is whether that matters.  Is that a concern to

8     you at all, Mr. Ruter, or no?

9             MR. RUTER:  If I can look at it one more time, Judge.

10    82C, was it, Your Honor?

11            THE COURT:  82B and C.

12            MR. RUTER:  No, it does not.

13            THE COURT:  Okay.  So 82B and C are fine.  So whether

14    you want to use these with Agent Carson or, I don't know,

15    another way, you have to offer them at some point; that's up to

16    you.

17            Anything else on that issue?

18            MR. RUTER:  For the record, I wanted to object to the

19    Court's ruling as it relates to 2017 and 2018.  The reason

20    being, Your Honor, the way I see it, I think there's

21    insufficient evidence for anybody to opine that either one of

22    those returns are false.  The way in which falsity has been

23    proven in the case in chief, of course, has come from the

24    taxpayers who said, "I didn't give him that number."  That

25    taken alone, of course, in my opinion, would be enough to hold

1    the case in, as an example, at the end of the Government's

2    case.

3         But we don't have that here at all.  We have the

4    Government saying there's a couple of forms that he maybe could

5    have filed.  You know, Judge, how many people hire people --

6    it's got to be by the millions -- and they don't file 1099s.

7    It just doesn't happen.  But they want to use that as one of

8    the grounds by which it somehow provides substantive evidence

9    that those forms are fraudulent.  If there was a bunch more

10   besides that, they may have a point --

11        THE COURT:  Now you're arguing that I should let the

12   2013 in, aren't you, to some degree?

13        MR. RUTER:  2013 has nothing to do with what's going

14   on with --

15        THE COURT:  I agree with that.  Their point is it was

16   filed in the same time frame.  That makes it better than if it

17   was actually filed four years before.

18        MR. RUTER:  That I have to submit.  All I'm saying,

19   Your Honor, is I just object to the Court's ruling based upon

20   what I just --

21        THE COURT:  I understand.  It's obviously the same

22   objection you made earlier, more detailed.  I'm going to

23   overrule that.

24        I don't disagree with you that there's a fair

25   argument that you can make and probably will make that the

1    1099s are not dispositive on that question, that there's a lot

2    of reasons why it wouldn't have been filed.  I think it has

3    relevance and I think it's, frankly, given the argument that

4    you can make, I don't think the probative value is

5    substantially outweighed by the danger of unfair prejudice.

6    And, again, this issue of contract labor or wages or whatever,

7    payments for -- that line item is at issue with the other

8    taxpayer.  So to the extent they have some basis to prove or at

9    least to make the argument that that was false in his own

10   return, then I think that is probative.

11            Based on the discussion at the prior hearing on the

12   motion, I do think in this type of case, there's the potential

13   that one argument would be that I was just relying entirely on

14   the taxpayer.  So here where obviously he has personal

15   knowledge of what's spent, I think there is some probative

16   value there.  So I'm going to overrule the objection.

17            I would just note, just to foreclose any -- let's

18   talk schedule first.  How much longer with Agent Carson?

19            MR. COFER:  Not super long but we are going to go

20   pretty meticulous through the rest of the 1040 and do the same

21   thing with the Schedule C and Schedule A.  That will basically

22   be it.

23            The one other thing that I would seek to introduce

24   through Ms. Carson is that TaxSlayer summary chart which shows

25   the number of returns, the average fee.

1          THE COURT:  This is an IRS document?

2          MR. COFER:  I think we discussed this briefly at the

3  pretrial conference, and Mr. Mahoney is going to grab paper

4  copies of slightly updated forms.  The defense and the

5  Government have discussed this, and I think we're in agreement

6  about it.  The only decision we wanted to put before the Court

7  is, if you recall, basically what it is is it shows, 2015

8  through 2018, the number of returns that Mr. Watson prepared

9  each year, the average preparation fee charged based on the

10  TaxSlayer data, and then the estimated fee.

11          THE COURT:  I think we talked about this, right?

12          MR. COFER:  That's correct.  The only, I think,

13  question that we'd like to resolve is we made two different

14  versions.  The defense objects to including 2018 --

15          THE COURT:  So there is an exhibit here, jeez.  Let

16  me know in advance; you're burying the lead.  I just asked how

17  long your direct examination is going to be.  Now you're

18  uncovering a whole other dispute.

19          MR. COFER:  Yes, Your Honor.  That is the only other,

20  I think, issue that the defense and the Government had

21  discussed to resolve with respect to Ms. Carson's testimony.

22  It's just whether or not 2018 could be included on the chart.

23  We have two different versions.

24          THE COURT:  2018 for the tax returns -- what's the

25  reason to include that since there's no 2018 returns?  You're

1    talking about tax year 2018, right?

2         MR. COFER:  Right.  So the chart shows basically an

3    estimate of how much money Mr. Watson is making each year based

4    on his fee charge and the number of returns he's filing.  So

5    for 2015 to 2017, that's getting to his motive about his

6    business model and why he's doing this.

7         2018 is a little bit different because it's after the

8    charged conduct.  Our argument for relevance for including that

9    year is because it shows the falsity of the gross receipts

10   Mr. Watson is reporting on his own 2018 returns, so it's just

11   one other item that gets to the falsity of his own returns.

12        I think the defense thinks it's irrelevant; I'll let

13   him speak to that, but we basically have two different --

14        THE COURT:  Gross receipts for the business?

15        MR. COFER:  Gross receipts for his tax preparation

16   business on his 2018 return.

17        THE COURT:  I'm sorry, so there's allegedly false --

18   there's information showing how much he was making in 2018, but

19   why is that going to show up -- you mean on the 2018 return?

20        MR. COFER:  Right.  The chart shows he's making

21   possibly significantly more money --

22        THE COURT:  I'll have to look at the charts, but I

23   think that's probably going to be okay because Mr. Ruter is

24   just pointing out how he thinks the evidence is pretty thin on

25   proving false statements on the Schedule C and this is another

```
 1    piece.  I think I would be inclined to allow it unless you've

 2    got a great argument, Mr. Ruter.

 3             MR. RUTER:  Your Honor --

 4             THE COURT:  I have yet to see it, of course, just

 5    working under that assumption.

 6             MR. RUTER:  Yes.  Making sure I understand, Your

 7    Honor.  I thought as to 2018, it was the amount of money he

 8    earned in 2018 for the preparation of the 2017, presumably,

 9    return?

10             MR. COFER:  To clarify, Your Honor, I can bring up

11    the exhibits.

12             THE COURT:  Why don't you do that.  Hand them to the

13    clerk, please.  Hand them to the clerk, please.

14         (Document tendered to the Court.)

15             THE COURT:  So I understand the probative value of

16    the 2018 number in terms of the income issue, but I don't know

17    if I agree that you should be -- is this that 1006 exhibit or

18    you're going to offer as evidence?

19             MR. COFER:  Yes, Your Honor, this is 1006 --

20             THE COURT:  If you want to offer in some other way

21    this 2018 figure to make the argument about the false

22    statement, you can do that.  But this -- I mean, you're doing a

23    sum total of almost $800,000 he made when one whole year has

24    nothing to do with this case.  So I don't think that's

25    appropriate.  Maybe if you did it without the total numbers or
```

1     whether you, again, just have some other way to offer the 2018

2     figure, I'll allow it for the purpose of the tax return, false

3     statement issue, the Watson tax return false statement issue.

4     But I don't think you should be adding it all up and saying

5     here's the big loss when that's not what we're talking about.

6             Is there a way to do both of those things?  To cover

7     15 through 18 on these total numbers for purposes of showing

8     how much he's made and perhaps what the motive is and then

9     having the 2018 number in some other way?

10            MR. COFER:  I think we can sort something out there,

11    Your Honor.  I think the main thing would be that alternative

12    chart which is just 2015 through 2017.

13            THE COURT:  And figuring out the '18 thing some other

14    way.

15            MR. COFER:  Yes, Your Honor.  The main purpose of the

16    chart is last to show the 2018 gross receipts is false; that is

17    part of it.  The main purpose for the chart is for those three

18    years to show his motivation --

19            THE COURT:  Right, let's try to do it that way.

20            Just from a schedule standpoint, we're going to

21    finish Agent Carson today?

22            MR. COFER:  Yes.

23            THE COURT:  Do you have extensive cross on her?

24            MR. RUTER:  Your Honor, if she's going to do more of

25    this, the answer is going to be very little.  I really don't --

1    I do not know how deep she's going to be trying to dive into

2    the specifics of this matter.

3              THE COURT:  Okay.  So then, I mean, probably going to

4    be mid afternoon.  Do you have witnesses other than the

5    defendant?

6              MR. RUTER:  No.

7              THE COURT:  Is the defendant still going to testify?

8              MR. RUTER:  Yes.

9              THE COURT:  Should we start him today, or should we

10   start him tomorrow morning?

11             MR. RUTER:  I would absolutely urge the Court from

12   our standpoint to start tomorrow.  There are some documents we

13   still want to put together, Your Honor, for him.

14             THE COURT:  Okay.  I think we had said that depending

15   on when we finish, if we finish around 3:00 or so, we still

16   need to talk about this jury instruction issue that the

17   Government has raised.  I'd rather do that sooner so we can

18   plan.  So I'd probably be willing to send them home early if we

19   have a sense.  How long is the direct going to be, would you

20   say, for Mr. Watson?

21             MR. RUTER:  Your Honor, I intend on being horribly

22   boring and tedious.  I think it's my responsibility --

23             THE COURT:  I understand.  Although they've taken

24   three to four counts out.

25             MR. RUTER:  They sure did, and that is very helpful.

1  Just to give the Court a heads up, I had intended on moving

2  through each count.

3          THE COURT:  Sure, I understand.

4          MR. RUTER:  I think I'll probably do it by count and,

5  quite frankly, Your Honor, I was going to ask the Court's

6  permission to try to -- just let the jury know we're about to

7  talk about Counts 3, 4 and 5, so they can try to get it in

8  their minds as to what it is that's going on here.  Sometimes

9  it can get a little bit lost.  If you don't want me to, I won't

10  do that, but I want to try to draw their attention:  This is

11  what we're talking about and this is the person's name that's

12  attached to that account.

13          THE COURT:  The names are not hard, this chart you

14  gave me -- obviously might need to update it -- are you

15  planning to offer that as part of your case through Agent

16  Carson or some other way?

17          MR. COFER:  Yes, Your Honor.  We need to update it to

18  remove the counts.  I think defense and Government agree it's

19  helpful so we can move it in jointly --

20          THE COURT:  If that's in evidence already, Mr. Ruter,

21  you can obviously refer to that exhibit.  I guess it's really

22  up to the Government whether they have an objection to you

23  identifying counts.  If they had tried to do it, I would have

24  waited to see what you said.  If you objected, I would think

25  about it.  If you hadn't, I would have let them do that, so it

1    just depends.

2              MR. RUTER:  I appreciate that.

3              THE COURT:  So work it out with them.  They didn't

4    look too upset about that.

5              MR. MORGAN:  No objection.

6              THE COURT:  There you go.

7              MR. RUTER:  Thank you.  Another issue, I had intended

8    on showing Mr. Watson the TaxSlayer program of 2017 for

9    Trixy --

10             THE COURT:  Here's the thing, Mr. Ruter.  I'm trying

11   to be conscious of all of you, as well as the staff.  If this

12   relates to Agent Carson's testimony, we can talk about it.  If

13   it involves Mr. Watson's testimony, let's do it after the jury

14   leaves and everyone has had lunch.

15             MR. RUTER:  Happy to.

16             THE COURT:  Does that make sense?

17             MR. RUTER:  It does.

18             THE COURT:  I was just trying to get the schedule

19   laid out.  So we'll finish the witness.  Assuming it's not a

20   very quick witness, we'll move into the jury instructions and

21   these other issues you want to move into.

22             The only thing I wanted to flag or clarify is on

23   these exhibits, the tax returns, the Government wanted to get

24   in and they're going to get in some but not all of them, are

25   you planning to cross-examine on those, including any of the

```
 1    ones I've excluded in your case in chief?  I just want to

 2    understand what we're dealing with or are we dealing with

 3    anything in particular.

 4              MR. MORGAN:  Your Honor, for cross-examining the

 5    defendant?

 6              THE COURT:  Yes, it's a different issue.

 7              MR. MORGAN:  Sure.  Yes, Your Honor.  We would

 8    probably -- of course depending on what he says, but yes, I

 9    think we most likely would.

10              THE COURT:  What I would ask you-all to do then is,

11    again at some appropriate time soon, meet and confer.  You know

12    what the ruling is on what you get to use already.  You're

13    getting to use the 17 and 18 returns, so obviously you're going

14    to cross-examine on those.  To the extent you have a basis to

15    ask questions about 2013 or anything else, any of these other

16    things that are either excluded or we haven't talked about,

17    again, the legal analysis is different when you're talking

18    about a testifying defendant who's a witness, not just a

19    defendant.

20              So I think without -- it's not -- there's no major

21    secrets here.  I think if you-all understand what -- how the

22    Government is going to try to use those things, if at all, and

23    if Mr. Ruter sees a path to object to it, then we can talk

24    about it.  If he doesn't see a path, then it will be smooth

25    sailing at least for purposes of the rulings and the jury's
```

Vol. V-152

```
 1    process.  That's what I want to make sure we get that sorted

 2    out.  If there is a dispute about how and if you can use these

 3    things, then we can talk about it perhaps this afternoon or

 4    before the defendant's case begins.

 5             MR. RUTER:  Yes.  Thank you.

 6             THE COURT:  Thank you.

 7             THE CLERK:  All rise.  This Honorable Court now

 8    stands in recess.

 9        (Recess taken at 12:46 p.m., until 1:36 p.m.)

10             THE COURT:  Thank you, everyone.  Please be seated.

11    Call the jury in.

12        (Jury entered the courtroom at 1:36 p.m.)

13             THE COURT:  Thank you, everyone.  Please be seated.

14    Welcome back from the lunch break.  A little bit longer than we

15    predicted, but hopefully that's okay.  We'll continue with the

16    testimony.

17             MR. COFER:  Your Honor, at this time the United

18    States would move to admit the following exhibits.

19             THE COURT:  Hold on one second.  Let's just wait for

20    the clerk to get back.

21             MR. COFER:  Sure.

22             THE COURT:  Okay.  What exhibits do you want to

23    offer?

24             MR. COFER:  Exhibits 48 and 49, 52E and 52F, 82B and

25    82C.  As well we also have 53 through 70, 83A through 83C, 85A
```

1    through 85C and 72.

2              THE COURT:  I know about the first group but,

3    Mr. Ruter, any objections to any of those other than the first

4    group there?

5              MR. RUTER:  No, Your Honor.  Not at all.

6              THE COURT:  Exhibits 48 and 49, 52E and F, 82B and C,

7    53 through 70, 83A through C, 85A through C, and 72 are in

8    evidence.

9    BY MR. COFER:

10   **Q**    Ms. Carson, I think when we left off, we were looking at

11   Exhibit 34.

12             MR. COFER:  So if we can pull up Exhibit 34, page 3.

13   If we could highlight the Tax and Credits box again.

14   **Q**    If I recall correctly, I think you had just finished

15   discussing line 40, itemized deductions and standard

16   deductions.  Could you read the amount in line 40 here.

17   **A**    49,790.

18   **Q**    Then line 40 says subtract -- excuse me.  Line 41 says,

19   "Subtract line 40 from line 38."  So what are we doing on line

20   41?

21   **A**    You're subtracting those itemized deductions from the

22   adjusted gross income.

23   **Q**    Then we get to line 42 which are exemptions.  Can you talk

24   a little about what exemptions are.

25   **A**    Exemptions are allowances for you, your spouse and/or any

1    qualified dependents, and that amount varies year to year.

2    **Q**    Then we get to line 43 which says, "Taxable income."  What

3    does this line represent?

4    **A**    The taxable income represents the income that you're going

5    to be taxed on.

6    **Q**    Then on line 44, it says "tax."  What happens there?

7    **A**    That's the tax associated with your taxable income.

8    **Q**    So line 44 is the tax.  Are we done?  What happens next?

9    **A**    No, you're not done.  Depending on your situation and

10   circumstances, you may or may not have additional tax and/or

11   credits, slash, payments that would apply to the tax.

12   **Q**    I don't think we need to dwell too much on the credits

13   here but what generally, what's a credit?

14   **A**    A credit is -- in general, it just reduces your tax.

15             MR. COFER:  Mr. Mahoney, could we scroll down a

16   little bit so we can get line 56.

17   **Q**    All right.  Ms. Carson, what's line 56 represent?

18   **A**    Line 56 represents your tax minus -- on this particular

19   return, it represents the tax minus the education credit, and

20   then you have that total of $427.

21   **Q**    So line 56 is just taking the tax on line 44 and taking

22   out any credits you list?

23   **A**    Yes.

24   **Q**    Reducing it by the credits.

25             MR. COFER:  Mr. Mahoney, if we could zoom back out

1    and then zoom in on the other taxes box.

2    **Q**    Ms. Carson, again this section, "Other taxes," what's that

3    mean?  What are we putting here?

4    **A**    Depending on the taxpayer, those would be other taxes

5    associated or that would be assessed to that particular

6    taxpayer.  So in this particular case, it's additional tax on

7    IRAs, line 59.

8    **Q**    That just gets added to line 56?  Is that how we get to

9    line 63?

10   **A**    Yes.

11   **Q**    Line 63, it says, "Total tax."  What's this line mean?

12   **A**    That's the total tax after the tax on your income and the

13   credits and additional tax applicable to that particular

14   taxpayer have been addressed.

15   **Q**    Is this an important line?

16   **A**    Yes, it is.

17   **Q**    When people -- I'll move on, sorry, bad question.

18          MR. COFER:  If we could zoom back out and highlight

19   the payment section, please.  Sorry, could we actually capture

20   a bit more so we can get the total tax.  Just that total tax

21   line 63 through the total payment section.  I'm sorry.

22   Starting with -- get all the way to the payment section too,

23   please.  Just scroll down slightly, a bit more.  Great, right

24   there.

25   **Q**    Okay, Ms. Carson, so we have total tax on line 63, and

1    then below that we're looking at a section called Payments.

2    You talked a little bit about what this section is before, but

3    can you just talk about the numbers here.  What do we see on

4    this particular return?

5    A    You see line 64 that indicates the federal income tax

6    withheld from Forms W-2 in the amount of $7,331.

7    Q    Does that just get added to line 74?

8    A    You would add -- yes.  There aren't any other amounts to

9    add, so that is the total payments on line 74.

10   Q    So then in looking here at the Refund section just below

11   that -- and we can keep the screen here -- line 75, what's that

12   line doing?  How did we get to the number in that box on this

13   return?

14   A    You're looking at your total tax line and applying all of

15   the payments made to your total tax.  In this particular case,

16   they overpaid so they're due a refund.

17        MR. COFER:  Mr. Mahoney, could we scroll down to

18   capture that whole refund section.

19   Q    Line 76a, what's the amount in that box, Ms. Carson?

20   A    $5,081.

21   Q    Is that the refund being claimed on this return?

22   A    Yes, it is.

23   Q    Then in the amount you owe section, it's blank.  Why is

24   that again?

25   A    They paid the amount of tax that they owed, the total tax

1    that was due, and the payments they made exceeded that amount

2    and/or they paid the amount in full, so they don't owe

3    additional tax.

4    **Q**    So now I want to drill down on a couple of lines on the

5    Form 1040 that we just discussed.  First I'd like to look at

6    line 12.

7              MR. COFER:  Can we please go back to page 1 of

8    Exhibit 34.

9    **Q**    Ms. Carson, we talked about this Income section.  Could

10   you please read line 12.

11   **A**    Line 12, "Business income or loss, attach Schedule C or

12   C-EZ."  The amount is a negative or a loss of $31,232.

13   **Q**    So what's this line for?

14   **A**    This line is for any business income or losses, you

15   account for it on the front of this Form 1040 here.

16   **Q**    What's the Schedule C?

17   **A**    The Schedule C is -- it captures business activity,

18   income -- business activity.

19   **Q**    So is the amount in line 12 supposed to be supported by

20   the Schedule C?

21   **A**    Yes, it should.

22   **Q**    So you read the number here in this line 12, negative

23   31,232.  Tell me generally how is that number affecting this

24   return on the Form 1040.

25   **A**    This number reduces the total income which reduces the

1    adjusted gross income which reduces -- the overall effect is it

2    reduces your taxable income and, in turn, reduces your tax.

3    **Q**    How does that affect the refund or amount owed?

4    **A**    A reduction in your total taxable income will reduce your

5    tax.  So if your withholdings or the amount you paid is greater

6    than the tax due, you would get a refund.

7    **Q**    So if the loss reported on this line 12 was smaller, a

8    smaller loss, how would that affect the calculation of taxes

9    owed on this form?

10   **A**    It would increase the taxes owed or total tax due.

11   **Q**    So let's look at the Schedule C for this return.

12          MR. COFER:  Can we please turn to page 33 of Exhibit

13   34.

14   **Q**    We see the top, Schedule C, Profit or Loss from Business,

15   2016.

16          MR. COFER:  Actually could we zoom back out and see

17   the whole thing.

18   **Q**    Ms. Carson, what is this Schedule C?  What is this doing

19   generally?

20   **A**    The Schedule C captures the activity, the income and

21   loss -- the income and expenses of a business activity.

22   **Q**    All right.  Let me pause here.  What if, for example, you

23   make some money on the side, but you're not sure if it's a

24   business or whether you can put it on the Schedule C.  How can

25   you find out what counts as a business?

1    **A**    The IRS has database or resources.  In particular, you can

2    click on links associated with different schedules.

3           MR. COFER:  Can we please zoom in on the top of this

4    form.

5    **Q**    Ms. Carson, looking at the top here below where it says

6    Profit or Loss from Business, could you read where it says,

7    "Information about Schedule C."

8    **A**    "Information about Schedule C and its separate

9    instructions is at www.irs.gov/schedulec."

10   **Q**    So what's an instruction?  Is that something that's

11   referenced on every form like this one?

12   **A**    Pretty much.

13   **Q**    What's an instruction?

14   **A**    It will give you -- what's the instruction?

15   **Q**    What's an instruction for a Schedule C or for a Form 1040,

16   what is it?

17   **A**    Guidance on how to use this form correctly.

18   **Q**    Who creates the instruction?

19   **A**    The IRS employees.

20          MR. COFER:  I'd like to turn to Exhibit 60.  We can

21   leave it zoomed out for now.

22   **Q**    What are we looking at?  What is this?

23   **A**    These are the 2016 instructions for Schedule C.

24   **Q**    Is that what is being referred to on the previous

25   Schedule C we were just talking about?

1   **A**    Yes.

2           MR. COFER:  Mr. Mahoney, can we please zoom in on the

3   top box.

4   **Q**    Ms. Carson, could you please read the first three

5   sentences of this instruction.

6   **A**    "Profit or Loss from a Business.  Use Schedule C Form 1040

7   to report income or loss from a business you operated or a

8   profession you practiced as a sole proprietor.  An activity

9   qualifies as a business if your primary purpose for engaging in

10  the activity is for income or profit, and you are involved in

11  the activity with continuity and regularity."

12  **Q**    One more sentence, please.

13  **A**    "For example, a sporadic activity or a hobby does not

14  qualify as a business."

15          MR. COFER:  Mr. Mahoney, can we please return to page

16  33 of Exhibit 34.

17  **Q**    So I think we're back here on the Schedule C we were just

18  looking at.  Can we highlight the Income section, please.

19          Ms. Carson, generally what are we listing in Part I for

20  income?

21  **A**    In Part I, you would list the gross receipt or sales from

22  your business that you received in that particular year.  You

23  would also account for any cost of goods sold and returns and

24  allowances if you were selling particular items versus

25  providing a service.  It calculates the gross income.

1           MR. COFER:  Mr. Mahoney, if we could zoom back out

2    and zoom in on Part II of Expenses, that entire box down

3    through line 29.

4    Q    To the right of where it says Part II, Expenses,

5    Ms. Carson, could you please read that.

6    A    "Enter expenses for business use of your home only on line

7    30."

8    Q    What's that mean?

9    A    Sometimes taxpayers operate their business out of their

10   home.  If there are any expenses that are shared between the

11   business and your personal, then you account for that on line

12   30, not here on this Part II.

13   Q    So to be clear, Part II, does that include lines 8 through

14   27a?

15   A    Yes.

16           MR. COFER:  Mr. Mahoney, could we scroll down a bit

17   so we can see line 30.

18   Q    Ms. Carson, could you read line 30, just those first three

19   sentences.

20   A    "Expenses for business use of your home.  Do not report

21   these expenses elsewhere.  Attach Form 8829 unless using the

22   simplified method.  See instructions."

23   Q    What is a Form 8829?

24   A    Form 8829 accounts for the business use of your home in an

25   income-producing activity.

1    **Q**    I want to discuss that more, but first I want to keep

2    looking at this Schedule C.

3           MR. COFER:  Mr. Mahoney, if we could zoom back out.

4    If we could -- actually take the whole bottom half, starting

5    with Part II to the bottom.  Thank you.

6    **Q**    Ms. Carson, explain how Part II, Expenses, works from

7    line 8 to line 27d.

8    **A**    Basically a taxpayer who is operating an activity that is

9    determined to be a business, they're deducting the expenses in

10   line 8 through line -- you said 27b?

11   **Q**    Sure, yes.

12   **A**    So if you have any advertising or car and truck or

13   commissions, these different line items are categorized for you

14   to put the amount for that particular tax year in those amounts

15   and account for them there.

16   **Q**    And line 28 says Total Expenses.  What's going on on that

17   line?

18   **A**    If you add up line 8 through line 27a, that total will be

19   on line 28.

20   **Q**    What's line 29?

21   **A**    Line 29 is if you subtract the amount in line 28 from the

22   line 7 which is the income portion.

23   **Q**    That gets you the amount in that box?

24   **A**    I can't see that.

25           MR. COFER:  Mr. Mahoney, can we zoom out -- right

1    there.

2    **Q**    Line 7, gross income?

3    **A**    Yes, sir.  Gross income.

4    **Q**    So what --

5    **A**    Line --

6    **Q**    -- are the two lines that go to line 29?

7    **A**    I'm sorry.

8    **Q**    Sorry.  Could you restate the lines that are being

9    subtracted to get line 29.

10   **A**    You're taking your gross income minus the expenses, the

11   gross income on line 7 minus expenses on line 28.  That gives

12   you the amount in line 29.

13   **Q**    So line 29 says negative 31,232.  Is that a profit or a

14   loss represented there?

15   **A**    That's a loss.

16   **Q**    Then on this form, there's nothing on line 30, and then we

17   get to line 31.  What's line 31?

18   **A**    Negative or a loss of $31,232.

19   **Q**    So where do we put the number that is on line 31?  Where

20   does that go in the Form 1040?

21   **A**    That goes on that front page of the Form 1040, line 12.

22          MR. COFER:  Mr. Mahoney, could we please go back to

23   page 1 of Exhibit 34.  Highlight line 12.

24   **Q**    Ms. Carson, line 12 and line 31 on the Schedule C we just

25   looked at, are those numbers supposed to match?

1    **A**     Yes.

2            MR. COFER:  If we could please go back to page 33 of

3    Exhibit 34.  Highlight the bottom half again, please, starting

4    with Part II.

5    **Q**     Just to connect the dots, Ms. Carson, let's say, for

6    example, the number entered in line 25 for utilities is wrong.

7    Let's just say it should be zero.  How would that affect line

8    12 of the Form 1040?

9    **A**     It would reduce the loss.

10   **Q**     Can you just walk us through the numbers at the bottom.

11   What's changing?

12   **A**     So if line 25 was reduced to zero, that would reduce line

13   28, the total expenses, and that would reduce the loss.  That

14   loss carries over to line 12.

15   **Q**     From line 31?

16   **A**     From line 31, yes, sir.

17   **Q**     On this form, we skipped over line 30.  Now I'd like to

18   ask you about the Form 8829 for business use of the home that

19   you mentioned.  To do that, I'd like to turn your attention to

20   a different tax return.

21           MR. COFER:  Mr. Mahoney, can we please pull up

22   Exhibit 33.  Highlight the top, please.

23   **Q**     Looks like we're looking at another 1040 for 2015.  Names

24   in the box, Stanley and Debra Jones.

25           MR. COFER:  Can we please now turn to page 22 of

1    Exhibit 33.

2    **Q**    Ms. Carson, are we looking at another Schedule C?

3    **A**    Yes.

4    **Q**    And for the previous year?

5    **A**    2015.

6          MR. COFER:  Mr. Mahoney, could we scroll down the

7    bottom half again, and highlight the whole bottom half with

8    Part II to the bottom.

9    **Q**    Ms. Carson, looking at line 30, could you please read the

10   number that's in that box.

11   **A**    1,245.

12         MR. COFER:  Mr. Mahoney, can we please now turn to

13   page 12 of Exhibit 33.  Could we highlight line 35 at the

14   bottom.

15   **Q**    Ms. Carson, could you explain what line 35 is

16   calculating?

17   **A**    The allowable expenses for business use of your home,

18   1,245.

19   **Q**    Is that what goes on line 30 of the Schedule C?

20   **A**    Yes.

21   **Q**    I don't want to talk about this entire form, but I want to

22   ask just a couple questions about it.

23         MR. COFER:  If we could highlight the top half of it.

24   Part I in particular.

25   **Q**    Ms. Carson, in Part I which says "part of your home used

1    for business," could you please read line 1.

2    **A**    "Area used regularly and exclusively for business,

3    regularly for day care or for storage of inventory or product

4    samples.  See instructions."

5    **Q**    On these first three lines, what is being calculated

6    here?

7    **A**    A percentage of the use of your personal residence or home

8    for business purposes.

9    **Q**    Why does a taxpayer need to calculate that percentage?

10   **A**    Because they're allowed to take a portion of their home

11   that's used regularly and exclusively for business, and they

12   need to determine that amount based on -- some people do it on

13   square footage or what have you, and that would determine the

14   allowance of the personal expenses that would be allowed for

15   business use of home.

16            MR. COFER:  Could we zoom back out and highlight

17   Part II.

18   **Q**    Ms. Carson, looking at line 20, it says "utilities."

19   Could you please read the amount in the box to the right there

20   on line 20.

21   **A**    6,000.

22   **Q**    $6,000 worth of utilities.  Do you get to deduct all

23   $6,000 of utilities listed here?

24   **A**    What happens here is you put the total amount here -- the

25   answer is no.  To answer your question is no.

1   **Q**    How do we determine how much of that utilities we get to

2   deduct?

3   **A**    Based on the calculation that was performed at the top,

4   the percentage of the portion of the home that's used regularly

5   and exclusively, you would apply that percentage to the total

6   amount of utilities of your home, and then that's what you're

7   able to deduct if there aren't any other limitations.

8   **Q**    So on this form, it just looks like there's a couple lines

9   here, but do you do that with all the expenses listed here on

10  lines 8 through 34?

11  **A**    I'm sorry, can you ask your question again.

12  **Q**    You discussed you're taking the total utilities listed

13  here and applying it to the percentage that we discussed in

14  Part I.  Is that generally how this section works with things

15  like rent and repair and maintenance and insurance?

16  **A**    Yes.  Rent, repairs and insurance, yes.

17  **Q**    And then line 35 which we discussed before, is that the

18  total that you can deduct on your Schedule C?

19  **A**    Yes.

20         MR. COFER:  Can we please turn back to page 22 of

21  Exhibit 33.  Can we highlight the bottom half again, Part II

22  down to the bottom.

23  **Q**    Ms. Carson, we just looked at $6,000 worth of utility

24  expenses listed on the Form 8829.  If we look at line 25 up in

25  Part II, could you read the amount in that box.

1   **A**    6,000.

2   **Q**    So that says utilities as well.  So what's the difference

3   between listing utilities on line 25 versus on the 8829?

4   **A**    The difference is on this Schedule C, some people may have

5   an addition to their home that would be where it's not a shared

6   space where your family activity occurs.  It's exclusively an

7   office with a separate entrance, people come into that

8   particular area.  And you may have a separate meter so it

9   calculated your utilities for that particular area that's

10  exclusively used is 6,000.

11       Or you rent an entirely separate business space or

12  location somewhere where you're also responsible for utilities,

13  and you would report it there and it's not your home.

14  **Q**    What's the difference between the $6,000 utility expense

15  on line 25 versus the same amount on the 8829 as far as how

16  much you get to deduct?  How much of this 6,000 on line 25 do

17  you get to deduct?

18  **A**    The entire amount.

19  **Q**    So if you have the same amount on both spots, which one

20  leads to a bigger deduction?

21  **A**    On the Schedule C.

22  **Q**    So now I'd like to talk just a little bit about

23  depreciation.  So looking at this Schedule C on line 13, could

24  you please read line 13.

25  **A**    The amount?

1    **Q**    Read the line and then the amount as well.

2    **A**    "Depreciation and Section 179 expense deduction.  Not

3    included in part 3, see instructions.  $17,740."

4    **Q**    Is there another form that's typically associated with

5    depreciation expenses like on line 13?

6    **A**    Yes, there are a lot of schedules that help.

7              MR. COFER:  Can we please turn to page 8 of

8    Exhibit 33 and zoom in on the top.

9    **Q**    So this is a Form 4562.  It says Depreciation and

10   Amortization.  Is that one such form?

11   **A**    Yes.

12   **Q**    That would connect to the line 13?

13   **A**    Yes.

14   **Q**    Very generally -- not really looking at this form -- what

15   is depreciation?

16   **A**    Depreciation is an amount of useful life of an asset that

17   you -- it's when you take the life of an asset, and you say,

18   okay, it loses its value over this course of time.

19   **Q**    So, for example, what does it mean for a car to depreciate

20   in value?

21   **A**    When you buy a car, generally most people know it loses

22   its value or they'll say -- besides during this current time --

23   but normally a car will lose its value as soon as you drive it

24   off the lot or may be useful for five to seven years.  So you

25   would take your cost and divide it over that seven-year time

Direct - Carson                              Vol. V-170

1   frame, and each year would account for your depreciation.

2   **Q**    So the general idea is as the car gets older and it's

3   used, it's worth less than it used to be?

4   **A**    Correct.

5   **Q**    What kind of assets can be depreciated?

6   **A**    Assets that are used in your business to help produce

7   income.

8          MR. COFER:  Mr. Mahoney, can we please zoom back out

9   and highlight all of Part I.

10  **Q**    Ms. Carson, what can you list here?  Specifically looking

11  at line 6, what can you list in this part of the form?

12  **A**    You can list property that is used in your business more

13  than 50 percent to help produce income.

14         MR. COFER:  If we could zoom back out, please.

15  Highlight the bottom, please, line 22.

16  **Q**    Would you read the amount in line 22, please, Ms. Carson.

17  **A**    $17,740.

18         MR. COFER:  Can we please now go back to page 22 of

19  Exhibit 33.  Highlight Part II.

20  **Q**    Ms. Carson, could you please read the amount again on

21  line 13.

22  **A**    $17,740.

23  **Q**    So how does claiming a depreciation deduction like in

24  line 13 affect the total tax on the tax return?

25  **A**    It reduces your total taxable income which, in turn,

1    reduces the tax due.

2    **Q**    I'd like to talk about a couple more Schedule Cs.

3            MR. COFER:  Mr. Mahoney, can we please pull up

4    Exhibit 48.  Highlight the top part.

5    **Q**    It looks like we're looking at a 1040 for 2017.

6    Ms. Carson, could you please read the name in the box that

7    says, "Your first name and initial."

8    **A**    "Ronald E. Watson."

9            MR. COFER:  Mr. Mahoney, could we zoom back out.

10   Could we highlight line 12.

11   **Q**    Ms. Carson, could you read the amount in line 12.

12   **A**    Negative or a loss of $7,748.

13           MR. COFER:  Can we now please turn to page 10 of

14   Exhibit 48.  Can we highlight the top part.

15   **Q**    Looks like a Schedule C for 2017.  Ms. Carson, could you

16   please read the box and name in the proprietor box.

17   **A**    Ronald E. Watson.

18   **Q**    Could you please read the description in box A below that.

19   **A**    Tax preparation service.

20   **Q**    And the business name?

21   **A**    Ronald Watson.

22           MR. COFER:  Could we zoom back out.  Could we

23   highlight Part I for Income.

24   **Q**    Ms. Carson, what's the gross income being listed on line 7

25   here?

Direct - Carson                          Vol. V-172

1    **A**     127,992.

2           MR. COFER:  Zoom back out.  Can we highlight Part II

3    for Expenses.

4    **Q**     What's line 28, what's the total expenses?

5    **A**     135,740.

6    **Q**     Comparing the gross income --

7           MR. COFER:  Excuse me, Mr. Mahoney, can we scroll up

8    slightly so we can see the gross income line.

9    **Q**     Ms. Carson, can you explain how we get the tentative

10   profit or loss on line 29 --

11   **A**     Take the gross income on line 7 and subtract the total

12   expenses on line 28.

13   **Q**     So what's the number on line 29?

14   **A**     A loss of $7,748.

15          MR. COFER:  Could we scroll down to line 31.

16   **Q**     Line 31, that's the amount that connects back to

17   line 12 --

18   **A**     Yes.

19   **Q**     -- that's Form 1040?

20          MR. COFER:  Could we now look at Exhibit 49.  Could

21   we highlight the top half.

22   **Q**     Looks like we're looking at a 2018 1040.  Could you,

23   Ms. Carson, read the name in the first -- "your first name and

24   initial" box.

25   **A**     Ronald E. Watson.

1            MR. COFER:  Can we zoom back out, please.

2    **Q**    Ms. Carson, this Form 1040, just the format looks a little

3    different than the previous years we were looking at.

4    **A**    It is.

5    **Q**    Why is that?

6    **A**    Each administration may come in and change the tax law or

7    what's allowed or disallowed on the tax return, and therefore

8    the tax return will change in presentation.

9    **Q**    Is this -- this happened in 2018?

10   **A**    I'm sorry?

11   **Q**    The change in how the form looks, was 2018 the first year

12   that happened?

13   **A**    It could change -- it depends on the year.

14   **Q**    This particular form --

15   **A**    This form, as far as this one-page form, I believe it was

16   2018.

17           MR. COFER:  Can we please turn to page 14 of Exhibit

18   49.  Just leave it on the whole thing.

19   **Q**    Looks like we're looking at a Schedule C for 2018.  Is

20   this schedule changed much as far as you can tell, Ms. Carson,

21   or as far as you know?

22   **A**    Not much -- no, not just from looking at this one tax

23   year, 2018.  Doesn't look like it changed much.

24           MR. COFER:  Could we highlight the top half of this

25   form again.

Direct - Carson                          Vol. V-174

1    **Q**    Could you read the name of the proprietor.

2    **A**    Ronald E. Watson.

3    **Q**    Principal business?

4    **A**    Tax preparation service.

5    **Q**    And the business name?

6    **A**    Ronald Watson.

7    **Q**    Can we look at the gross income if we scroll down.

8    **A**    Gross income, 125,986.

9           MR. COFER:  Could we zoom out and highlight the

10   Part II, Expenses, box.

11   **Q**    Could you read the amount on line 28.

12   **A**    $121,947.

13   **Q**    Then we have line 29.  How are we getting that number

14   again?

15   **A**    You're taking the gross income in line 7 and subtracting

16   the total expenses on line 28.

17   **Q**    What's the amount on line 29?

18   **A**    $4,039.

19          MR. COFER:  Can we scroll down to line 31.

20   **Q**    Again, this number connects to Form 1040, line 12?

21   **A**    Yes.

22          MR. COFER:  Can we please pull up Exhibit 5.

23   **Q**    So I want to ask you one more general question about the

24   Schedule C and the difference between a Schedule E and a

25   Schedule C.

1        MR. COFER:  Mr. Mahoney, can we please highlight the

2   Income box.

3   **Q**    Ms. Carson, could you please read line 17.

4   **A**    "Rental real estate, royalties, partnerships, S

5   Corporations, trusts, et cetera.  Attach Schedule E."

6   **Q**    What's the amount in line 17?

7   **A**    Negative 19,268.

8        MR. COFER:  Can we please now turn to page 30 of

9   Exhibit 5.

10  **Q**    Is this a Schedule E, Ms. Carson?

11  **A**    Yes, it is.

12  **Q**    If you receive income from owning a rental property, would

13  you list that on a Schedule E such as the one we're looking at

14  here?

15  **A**    Yes.

16  **Q**    It looks like below there's a section for income and a

17  section for expenses.  Is that where you put your income and

18  expenses for your rental property?

19  **A**    Yes.

20  **Q**    So what if instead of listing your expenses from your

21  rental property here on a Schedule E, you instead list them on

22  a Schedule C, would that affect the calculation of taxes for

23  that return?

24  **A**    It could.  On Schedule E there may or may not be

25  limitations that apply.  And on Schedule C there is no

1    limitation.

2    **Q**    So could those limitations result in being able to deduct

3    less on a Schedule E?

4    **A**    Yes.

5    **Q**    So we just spent a lot of time looking at line 12 on the

6    Form 1040 and how that connects to a Schedule C.  I'd now like

7    to ask you about a Schedule A.

8             MR. COFER:  Mr. Mahoney, can we please return to

9    Exhibit 34.

10            This is the Form 1040 in 2016 for Stanley and Debra

11   Jones that we were looking at earlier.  Can we please turn to

12   page 3 and highlight line 40.

13   **Q**    Ms. Carson, could you again read the amount in the box on

14   line 40.

15   **A**    $49,790.

16   **Q**    Again, what does that number represent?

17   **A**    That represents the itemized deductions.

18   **Q**    When you take itemized deductions, what do you fill out to

19   attach to your Form 1040?

20   **A**    Form Schedule A.

21            MR. COFER:  Can we please turn to page 31 of

22   Exhibit 34.

23   **Q**    Are we looking at a Schedule A here?

24   **A**    Yes.

25   **Q**    Very generally, and we can keep it zoomed out, how do you

1    use the Schedule A?

2    **A**    You use Schedule A for deductions that are allowed in that

3    particular year that you -- that any taxpayer, if they

4    experienced or have paid any of these particular deductions and

5    they add up to more than the standard deduction, then they

6    would put those deductions here on Schedule A.

7                MR. COFER:  Could we zoom in on the bottom, line 29

8    and 30.

9    **Q**    Ms. Carson, could you please read the amount in line 29.

10   **A**    49,790.

11   **Q**    How does this connect to line 40 of the Form 1040?

12   **A**    It carries over.

13               MR. COFER:  Could we zoom back out, please.

14   **Q**    I'd like to ask you about just the couple of types of

15   deductions listed on a Schedule A.

16               MR. COFER:  Can we please highlight line 21.

17   **Q**    Could you please read line 21.

18   **A**    "Unreimbursed employee expenses, job travel, union dues,

19   job education, et cetera.  Attach Form 2106 or 2106-EZ if

20   required.  See instructions."

21   **Q**    On this return, what's the amount in line 21?

22   **A**    29,602.

23   **Q**    So, again, what's the form associated with this particular

24   line?

25   **A**    2106 or 2106-EZ.

1          MR. COFER:  Can we please turn to page 8 of

2    Exhibit 34.

3    **Q**    Ms. Carson, seems like we're looking at a Form 2106 for

4    2016.  It says Employee Business Expenses at the top.  How does

5    this form generally work?

6    **A**    In general, this form for this particular taxpayer,

7    Mr. Stanley Jones, his name is listed.  His employer, he's a

8    government employee.  He would list any expenses that he

9    incurred to perform his duties that were not reimbursed.

10         MR. COFER:  Can we zoom in on line 10.

11   **Q**    What's the amount in line 10, Ms. Carson?

12   **A**    29,602.

13   **Q**    Where does that number go on the Form 1040 -- excuse me on

14   the --

15   **A**    Schedule A.

16   **Q**    Yeah, how does this work up to the Form 1040?

17   **A**    This amount here would go to the Schedule A, line 21, as

18   instructed on number 10.  And then from there, it is part of

19   the total calculation of those personal itemized expenses that

20   are allowed for that particular year.  Those expenses would go

21   onto that second page of the 1040 and reduce your income which

22   reduces your taxable income which reduces the tax owed and

23   due.

24         MR. COFER:  Could we zoom back out, please.  Before

25   we leave this form, could we go to the next page, page 9 of

1    Exhibit 34.  Could you highlight the top part, top third.

2    **Q**    So Ms. Carson, the top here, it says Part II, Vehicle

3    Expenses.  Could you read the line below that starting with

4    "Section A, general information."

5    **A**    "You must complete this section if you are claiming

6    vehicle expenses."

7    **Q**    Again, very generally, what's the point of this section?

8    **A**    If you worked for an employer who required you to go from

9    a location to location without reimbursement or, in general, if

10   they didn't reimburse you, that's where you would report the

11   miles associated with that particular business travel, that

12   travel associated with that employer.

13           MR. COFER:  If we could please return to page 31 of

14   Exhibit 34.  Could we highlight line 31 -- I'm sorry, line

15   23.

16   **Q**    Ms. Carson, what's line 23?

17   **A**    "Other expenses, investment, safe deposit box, et cetera.

18   List type and amount."

19   **Q**    What are the sorts of other expenses we can put here?

20   **A**    Those are expenses that you may incur for the production

21   of taxable income.  Normally, what I'll see there is like

22   investment, interest expense or investments in other -- advice.

23   Again, it has your safe deposit box.

24           MR. COFER:  Can we please return to page 1 of

25   Exhibit 34.  Just leave it zoomed out for now.

Direct - Carson                    Vol. V-180

1    **Q**    Ms. Carson, we've spent a lot of time talking about line

2    12 and line 40 in particular.  Could we look again at this

3    particular return and could you read the amount in line 12.

4              MR. COFER:  If we could zoom in on that, please.

5    **A**    Negative or loss of 31,232.

6              MR. COFER:  If we could please turn to page 3 of

7    Exhibit 34 and highlight line 40.

8    **Q**    Could you, Ms. Carson, please read the amount on line 40,

9    again.

10   **A**    49,790.

11   **Q**    So here's my question.  Those two numbers you just read,

12   what is the general effect that those two amounts listed on

13   this particular return, what general effect is that having on

14   this return?

15   **A**    They're reducing the taxable income.

16   **Q**    By the combined amounts in those two boxes?

17   **A**    Yes.

18   **Q**    Just to clarify, the line 12, it's a negative so that's a

19   loss?

20   **A**    Yes.

21   **Q**    Why then is line 40 positive?

22   **A**    I don't understand your question.

23   **Q**    Bad question.  I just want to make clear that in line 38,

24   we have adjusted gross income, right?

25   **A**    Yes.

1   Q    And then in line 40, we have itemized deductions?

2   A    Yes.

3   Q    The number you just read in line 40, that's a positive

4   number.  Is that reducing adjusted gross income or increasing

5   it?

6   A    It's reducing.

7   Q    Finally, Ms. Carson, I would like to show you what has

8   been marked for identification only --

9           MR. COFER:  So if we can bring down the screen.  Pull

10  up just for the witness what's been marked as Exhibit 79W.

11  Q    Ms. Carson, do you recognize this document that's

12  appearing on your screen?

13  A    Yes, I do.

14  Q    What is it generally?

15  A    It's the summary of tax returns prepared by Mr. Watson.

16  Q    Do you know where the information summarized on this chart

17  is coming from?

18  A    Yes.

19  Q    Did you verify the accuracy of this chart compared to the

20  underlying sources?

21  A    Yes, I did.

22  Q    Is it accurate?

23  A    Yes.  To my knowledge, yes, it is.

24          MR. COFER:  Your Honor, at this time the Government

25  moves that Exhibit 79W be admitted into evidence.

1            THE COURT:  Any issues?

2            MR. RUTER:  Already discussed, Your Honor.  Thank

3   you.

4            THE COURT:  Right.  Exhibit 79W is in evidence.

5            MR. COFER:  One moment please, Your Honor.

6   BY MR. COFER:

7   **Q**    Just looking at this last exhibit, Ms. Carson, the first

8   column, we have the tax year.  What's in that second column,

9   "Number of returns filed with the IRS"?

10  **A**    319.

11  **Q**    What's that showing with respect to?

12  **A**    That number is the number of returns that were on the

13  documentation from the Internal Revenue Service of returns

14  prepared by Mr. Watson.

15  **Q**    Then the next column, it says, "Average preparation fee

16  per TaxSlayer," what's that column showing?

17  **A**    $388.62.

18  **Q**    Just in general, what's that, the average preparation

19  fee?

20  **A**    That was the average preparation fee as determined when

21  looking at the TaxSlayer data.

22  **Q**    That third column -- or the last column, the fourth

23  column, is that just the previous two columns multiplied?

24  **A**    Yes, the 319 multiplied by the average fee.

25            MR. COFER:  No further questions, Your Honor.

1        THE COURT:  Okay.  Mr. Ruter.

2                     **CROSS-EXAMINATION**

3    **BY MR. RUTER:**

4    **Q**    Good afternoon, ma'am.

5    **A**    Good afternoon, sir.

6    **Q**    So, ma'am, what exactly is an audit?

7    **A**    It's an examination of a tax return or the taxpayer as a

8    whole, in general, to confirm tax compliance.

9    **Q**    As a revenue agent, do you have a procedure that you

10   follow if you want to formally look or examine a particular tax

11   return that's in front of you?

12   **A**    Well, there are procedures to follow.

13   **Q**    What are they?

14   **A**    It depends on the tax return that's in front of me.

15   **Q**    Okay.  Can you then use as an example the Debra Jones

16   return which you just got done looking at for a few minutes.

17   Can you tell us about in that instance, what kind of a

18   procedure did you follow?

19   **A**    In general -- so I'm assigned a tax return for whatever

20   reason.  It could be a project.  It could be because it was

21   determined some large, unusual, questionable items.  It could

22   be a related return.  So there are a number of reasons why a

23   return might come in front of me.

24        Once it's in front of me, we contact the taxpayer using

25   our standard mailing letters to let them know they're under

1    examination.  We wait for a call back.  We get in touch with

2    the taxpayer.

3         While we're doing that, we do some preliminary research.

4    Once we've talked to the taxpayer, we'll hold an interview.

5    During that interview, we'll gain some knowledge about their

6    financial situation, their business if there is a business, any

7    Schedule E activity.  Whatever is on the return, we'll ask them

8    about that.

9         Then if there are any questionable items, we'll ask for

10   substantiating documentation or the information and calculation

11   and documents that were used to prepare the return.

12   **Q**    So the first process I think you mentioned was a letter

13   going to the taxpayer?

14   **A**    Uh-huh.

15   **Q**    After you get the file; is that right?

16   **A**    Yes.

17   **Q**    Could you explain how does a file get to you?  What's the

18   process as to how the file gets on your desk?

19   **A**    Okay.  So, in general, when a taxpayer files a tax return,

20   it goes to our campus location.  That location, they may get a

21   correspondence letter which is also considered an audit that

22   says:  Hey, something on your return doesn't match what we have

23   in our system, so you need to correct this or explain to us why

24   your position is correct.

25        In other instances, it will come to a revenue agent.  We

1    have revenue agents who are office agents and then myself, I'm

2    a field agent.  So I audit self-employed -- small business,

3    self-employed individuals.  I am assigned that return from my

4    manager, and I don't know the chain of commands once it gets to

5    our group.  It just depends.  We have different divisions.  We

6    have the large and mid-size.  I'm the small business,

7    self-employed.  So I get that section of returns.  Then it's

8    assigned to an individual agent.

9    **Q**    With Debra Jones, was that case assigned to you?

10   **A**    No.

11   **Q**    The second --

12   **A**    I didn't know she was audited.  I don't have any

13   information about that.

14   **Q**    None at all?  You have no information about her at all?

15   **A**    I would have to look it up and see.

16   **Q**    Today you don't have any recollection?

17   **A**    Not to my recollection, no.

18   **Q**    All right.  So the last process you mentioned was asking

19   the taxpayer for documentation?

20   **A**    Yes, sir.

21   **Q**    And the documentation you would request, of course, would

22   depend upon the nature of the difficulty that the IRS has with

23   that return; is that right?

24   **A**    I'm sorry, can you repeat your question?

25   **Q**    Sure.  The kind of documents you might be seeking would be

1   dependent upon the difficulties that you have with that

2   particular return?

3   **A**    No, it really just -- it depends on the particular expense

4   itself.  Not the difficulty of the return, no, I wouldn't say

5   that's the case.

6   **Q**    Do you simply ask for any documents that a taxpayer has in

7   their possession?  Is that what you're saying you do when you

8   ask the taxpayer, while you're doing an audit, for documents?

9   **A**    No, like I said, we'd ask for the documents that are used

10  to prepare the return.  The amount -- my particular language

11  would state:  Please provide the information, documents, and

12  calculation to report the amounts listed on this return.  It

13  would have specific line items.  It wouldn't be for everything

14  on the return.

15  **Q**    Yes.  You mentioned that there could be a letter before

16  that letter?

17  **A**    Yes.

18  **Q**    Would that letter be more general than the letter you just

19  got done referencing?

20  **A**    Yes.

21  **Q**    So the first letter might be very broad?

22  **A**    Correct.

23  **Q**    And then you hope there's going to be a communication with

24  the taxpayer of some type?

25  **A**    Yes.

1    **Q**    And if I understand it, some communication would be by

2    telephone call?

3    **A**    Yes, yes.

4    **Q**    And if I understand it further, another contact might be

5    for the production of documents?

6    **A**    Yes, sir.

7    **Q**    Did I understand that there could be also a sit-down

8    between your office, you as a revenue agent, and the

9    taxpayer?

10   **A**    Yes.

11   **Q**    Is there ever any times when none of those procedures are

12   followed?

13   **A**    Like I said, sometimes when a return is filed, it's

14   received and processed by our systems, but then our systems

15   will also look at -- a good example to give is a W-2.  Everyone

16   is familiar with a W-2.

17       So if you're paid $50,000 but you put 40,000 on your

18   return and your W-2 says 50,000, our system will send out a

19   letter.  So you might not sit with an agent in that case.  The

20   letter is automatically generated and it will say:  Hey, we

21   have 10,000 more in income.  Please explain why that's not on

22   this return.  If not, this is what will happen.  These

23   additional taxes will be due.

24   **Q**    So does it get a bit more complex on the expense side

25   versus on the income side, or is that not really accurate?

**A**    It depends, it depends.

**Q**    All right.

**A**    And for that --

**Q**    I'm sorry, ma'am, there wasn't a question.  I'm sorry.

**A**    Oh.

**Q**    Excuse me, I didn't mean to interrupt you.

After the document stage, assume for the moment that there are no documents that you, as a revenue officer, were looking for in order to resolve the question that's before you, okay?

**A**    Uh-huh.

**Q**    Do you understand that so far?

**A**    Sure.

**Q**    It's an assumption I'm asking you to make.

**A**    Okay.  I'm sorry, can you repeat?

**Q**    If that taxpayer doesn't have those documents that you had requested vis-a-vis a letter you sent --

MR. COFER:  Your Honor, objection.  Scope and relevance.

THE COURT:  Overruled.

BY MR. RUTER:

**Q**    -- then what happens next?

**A**    So if it comes to me -- if it gets to the point where it comes to me, a revenue agent, that's different than the letter that's sent out because there's a mismatch in income.  Those letters are sent out, are computer generated.  They don't look

1    at expenses either.  They are only referencing other

2    third-party documents that come in.

3         The point that it gets to a revenue agent, of course,

4    we'll establish a relationship with the taxpayer and have that

5    interaction where we're trying to seek clarification of their

6    return and make sure it's correct.  So we'll ask for the

7    calculations and documents that were used.

8         If they don't -- normally during the initial interview, a

9    lot of information is brought about as far as the business

10   activities, their personal activities, things of that nature.

11   So if, in fact, they don't have the documents, we try to either

12   get them from the third-party sources, or there are times when

13   you could recreate expenses.  But that, you know, that would

14   depend upon the interview that has happened and the overall

15   integrity of the return.

16   **Q**    So --

17   **A**    It's a case-by-case basis.

18   **Q**    There are a lot of variables then as to each tax return

19   that you look at; is that a fair statement?

20   **A**    Yes, yes.

21   **Q**    When everything is said and done where you believe on the

22   expense side that a taxpayer has failed to demonstrate to you

23   that the expenses they've placed on their return are not

24   verified, then what is your next step?

25   **A**    For me, a revenue agent, if they have failed to verify, it

1    just isn't explained, it isn't an industry practice, there's

2    just additional questions that make it appear as if -- again,

3    we look at the overall turn.  So if things are questionable, we

4    just disallow it at that point.

5    **Q**    And a disallowance results in some kind of a paper being

6    sent to the taxpayer saying you owe this much money; is that

7    accurate?

8    **A**    That's the end result, yes.  There are a lot of steps

9    before it gets to that point.

10   **Q**    I'm not going to ask what those steps are, but did I hear

11   you say that even after the taxpayer fails to satisfy you

12   because the documents do not exist for whatever reason, that

13   there's more steps before the IRS disallows it and then tells

14   the taxpayer, "You're going to have to pay some more money"?

15   Did I hear you properly when you said that?

16   **A**    Yes, we give them additional time to turn stuff in.

17   **Q**    Agent Carson, you have read endless, thousands of tax

18   returns over your life; isn't that right?

19   **A**    Yes.

20   **Q**    And you know about the declaration portion of the 1040,

21   right?

22   **A**    Yes.

23   **Q**    A person has to say under oath that this is accurate, et

24   cetera, et cetera?  Am I right?

25   **A**    Yes, sir.

1   **Q**    Is there also a declaration for a tax preparer?

2   **A**    On the 1040 itself?

3   **Q**    Yes.

4   **A**    I'm not sure if there's an actual declaration.  I'd have

5   to see that portion.

6              MR. RUTER:  Could we see Exhibit 34.  It may be page

7   3 or 4.  Thank you.  If you could highlight just a little bit

8   larger so it can be seen.

9   **Q**    This is the declaration to which I'm referencing.  You've

10  seen that a lot of times, right?  Is that right, ma'am?

11  **A**    Yes, yes.

12  **Q**    So the question is on the second line, starting at the

13  very top.  Second line, starting with the word "declaration."

14  It says, "Declaration of preparer, other than tax preparer, is

15  based on all information upon which a preparer has any

16  knowledge."  You've seen that before?

17  **A**    Yes.

18  **Q**    What's your understanding about what that means?

19  **A**    That the preparer is declaring, based on his knowledge,

20  that the tax return is prepared correctly.

21              MR. RUTER:  You can take that down.  Thank you very

22  much.

23  **Q**    It would be a fair statement, wouldn't it, Agent, that the

24  chances are a tax preparer will have less information about the

25  numbers placed on a tax return than the taxpayer themselves?

1   **A**     Can you repeat that?

2               MR. COFER:  Objection, Your Honor.

3               THE COURT:  What's the objection?

4               MR. COFER:  Calls for speculation.

5               THE COURT:  Overruled.  She can answer yes or no.

6   BY MR. RUTER:

7   **Q**     Did you understand that convoluted question?

8   **A**     No, I just wanted to hear you again, I'm sorry.

9   **Q**     Wouldn't it be true that ordinarily a taxpayer would have

10  more information about the items placed on a tax return than

11  the tax preparer?

12  **A**     Well, I would have to -- that's not a yes-or-no question

13  for me, so I hope I can give some explanation.

14  **Q**     You may.

15  **A**     Okay.  In general, most taxpayers get their taxes prepared

16  once a year.  They don't deal with taxes, and they don't

17  understand what's on the tax return.  So when I do send out

18  letters for documents and information, oftentimes they contact

19  their preparer for assistance because they're not sure of

20  what's even needed that was reported on a return.  I don't know

21  if that answers your question or not.  I hope it helps.

22  **Q**     That's your answer.  I appreciate it, ma'am.

23  **A**     Okay.

24  **Q**     Do we understand that the Schedule C has language to the

25  fact that the business must be, quote, what is continually and

1   regularly in operation?  Is that a fair statement?  The

2   business has to be continually and regularly doing whatever it

3   does in order for it to qualify as a business.  Am I right in

4   saying that?

5   **A**    Yeah, that sounds fair.

6   **Q**    What is the definition of "continually"?

7   **A**    Again, that's just -- it's based on the circumstance and

8   the situation of a taxpayer and the activity that they're

9   involved in.

10       For example, you may have someone who operates an activity

11  that's seasonal, so continuously it's done each and every

12  spring season or the winter season, such as a ski lodge or

13  something like that.  Then you have someone who may operate a

14  day care, that's needed Monday through Friday.  Do you do it

15  regularly?  Have you been doing it year after year, or are

16  you -- well, to answer your question of continually, that's two

17  examples I would give.

18  **Q**    How do you differentiate that definition with

19  "regularly"?

20  **A**    I'm sorry?

21  **Q**    If I understand it, that's the second part of the

22  definition.  The IRS says it's got to be continuous and it's

23  got to be regular.

24  **A**    Right.

25  **Q**    I'm simply asking now, you've helped us with the idea of

1    continuous.  What does the IRS mean when they talk about a

2    regular kind of a business?

3    **A**    I would need to go back and look and see exactly that

4    business activity and then apply -- we have standards we'll

5    apply and questions that we'll ask.  So if -- just in general,

6    if I were examining somebody and I wanted to know if they were

7    regularly doing something, is it something that you do

8    repetitively?  Do you continuously do this, do you do it on a

9    regular basis?  Is it something that you can say:  I attend to

10   daily, every other day, weekly?  So that's the best explanation

11   that I can give in general.

12   **Q**    Yes, ma'am.  Do you recall today, Agent, in 2015 how much

13   a person had to earn before they were required to file a tax

14   return?

15   **A**    No, I don't recall that offhand.  That's something I would

16   need to look up.

17   **Q**    How about 2016?

18   **A**    No, sir.

19   **Q**    2017?

20   **A**    No, sir.  It changes year to year.

21   **Q**    For tax purposes, what's the difference between a direct

22   expense and an indirect expense?

23   **A**    As far as, what, the business activity?

24   **Q**    Yeah.

25   **A**    Can you -- I don't understand your question.  Do you have

1    reference?

2    **Q**    Well, I think it's contained actually in Part II.  I think

3    it's maybe Form 8829.

4              MR. RUTER:  Schedule C, line 25 let's try.  Try that

5    first.

6              You can take that down.  I'm going to change my mind.

7    Thank you very much.

8    **Q**    Special Agent or Revenue Agent Carson, how is the term of

9    years for depreciation determined?

10   **A**    It depends on the asset.  Some of it is the choice of the

11   taxpayer depending on the tax year.  So the depreciation, it

12   could change with each administration, as I stated before.

13   Sometimes you're allowed different bonus depreciations or

14   special depreciations, and then the asset life -- so it depends

15   on the asset that you're talking about.

16   **Q**    So let's take cars as an example.  Are cars, in your

17   experience, a common asset that might be depreciated by a

18   business person?

19   **A**    It could -- yes, it's a common asset, yes, it is.

20   **Q**    Are there any limitations on how long you can depreciate a

21   car as an example?

22   **A**    Yes.

23   **Q**    What's that limit?

24   **A**    It depends.  It depends on the depreciation at that point,

25   how much they've previously depreciated, what tax year I'm

1    examining.  So there are other factors that I would need to

2    consider to answer your question appropriately.

3    **Q**    Okay.  Well, tell me this.  Who determines that, how long

4    that asset can be depreciated?

5    **A**    Tax laws determine that.  The taxpayer or their preparer

6    or whoever they are utilizing to help with their asset

7    categorization would determine that.  Then if they choose to

8    use any special depreciation, it's determined by a number of

9    factors.

10   **Q**    Can a taxpayer depreciate a car, all of a car in one

11   year?

12   **A**    Depending on the tax year.

13   **Q**    Okay.  It changes that much, does it?

14   **A**    Yeah, yeah, it does.

15   **Q**    If I bought a car that was $50,000 and I happened to be in

16   the right tax year, whatever that tax year is, I could take

17   $50,000 off my income?  I could expense that out for 50

18   grand?

19   **A**    Again, there are several factors to take into place.  Like

20   was it placed in service that year?  Was it new?  The

21   percentage of business use?  Was it 100 percent use for

22   business, or was it used for both personal and business?  What

23   type of car or vehicle?  So there are other factors, I

24   apologize.

25   **Q**    But nonetheless though, the IRS in the final analysis,

1    it's the IRS that determines what kind of depreciation you can

2    take on any asset; isn't that right?

3    **A**    Not necessarily.

4    **Q**    Does that mean that as a taxpayer, I might decide how much

5    I want to depreciate my home that I work in?  Because I say to

6    myself, I think I'll depreciate my home.  Maybe it costs 400

7    grand; I'll depreciate $150,000 this year.  I can't do that,

8    can I?

9    **A**    No, you just can't wake up and do that.

10   **Q**    What can I do?

11   **A**    Again, it depends.  That depreciation, the use of your

12   home goes on a different schedule than the form that you

13   showed, so there are other factors to take into place.  The use

14   of your home versus the depreciation of an asset is something

15   different.  I'm not following you.

16   **Q**    And the IRS has the final say, do they not, in determining

17   how many years you can stretch your depreciation over or how

18   narrow you can depreciate an asset?  It's in the law somewhere,

19   isn't it?

20   **A**    There are procedures -- guidelines, yes, that we follow,

21   but we take into account what is presented and any depreciation

22   schedules that are presented.  So it starts with the owner of

23   the asset.  We just confirm that they've correctly accounted

24   for their asset.

25          MR. RUTER:  If I could have one second, Your Honor.

1          (Pause.)

2              MR. RUTER:  Nothing further.  Thank you, Your

3      Honor.

4              THE COURT:  Okay.  Any redirect?

5              MR. COFER:  No, Your Honor.

6              THE COURT:  Okay.  Thank you, Agent Carson.  We

7      appreciate you coming to testify today.  You can step out.

8              THE WITNESS:  Thank you.

9              THE COURT:  Does the Government have any further

10     evidence?

11             MR. MORGAN:  No, Your Honor.

12             THE COURT:  Does that mean the Government is resting?

13             MR. MORGAN:  Yes, the Government rests.

14             THE COURT:  Okay, thank you.

15             So, ladies and gentlemen, obviously, like I said, the

16     timing is never completely precise what's going to happen, but

17     we've gotten through the Government's case.  As you've heard,

18     the defense has no burden, but they have the opportunity, if

19     they would like to, to present a case.  This is an opportune

20     time though, when going from the Government case to the defense

21     case, to take a pause, and there's a number of things I need to

22     discuss with the attorneys.  And rather than have you wait for

23     that and also from a timing perspective -- we're a little bit

24     ahead of where we thought we'd be; we thought we might take the

25     full day on this -- we're going to let you go home and have you

1    come back tomorrow morning for the defense case.  I think

2    that's more efficient for all of us.

3           I hope you don't mind being released early.  That's

4    up to you whether you want to tell work, family, friends that

5    you're still here or not.  That's up to you.  Appreciate you

6    sitting through today.  Again, the rest of the day and

7    overnight, don't discuss the case with anyone.  Keep an open

8    mind.  You've only heard one side of the story, obviously.

9           We'll see you back here, ready to start tomorrow at

10   9:00 with the defense case.  Thank you very much.  Have a good

11   rest of the day.

12       (Jury left the courtroom at 2:56 p.m.)

13           THE COURT:  It's probably about time to take a break

14   anyway since we have a number of things to talk about.  Why

15   don't we take a 15-minute break and then come back to discuss

16   all the various matters.  So we'll see you back in 15 minutes.

17           LAW CLERK:  This Honorable Court now stands in

18   recess.

19       (Recess taken at 2:57 p.m.)

20       (End of excerpt.)

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia G. Mitchell, Registered Merit Reporter, Certified Realtime Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 18th day of April 2023.


*Patricia G. Mitchell*
_____
Patricia G. Mitchell, RMR, CRR
Federal Official Reporter

**< Dates >**
**April** 10:22, 123:24 .
**April 2009** 123:20 .
**April 2023.** 200:10 .
**March 2017** 98:8, 139:21 .
**March 2017.** 98:24 .
**March 6, 2023** 1:17 .
**May** 103:17 .
**November** 120:1 .
**October 1, 2018** 98:22 .
**$1** 8:8, 17:12, 39:3, 39:4, 40:6, 50:9, 50:11, 50:22, 50:23 .
**$10** 77:17 .
**$100** 17:4, 50:17, 50:18, 90:2, 90:3, 108:17 .
**$121** 174:12 .
**$124** 98:1, 99:24 .
**$128** 8:18, 8:24 .
**$150** 197:7 .
**$17** 169:3, 170:17, 170:22 .
**$175** 39:6, 39:7, 39:20 .
**$20** 37:11 .
**$200** 52:5 .
**$23** 36:7 .
**$25** 76:7 .
**$250** 24:1 .
**$3** 24:8, 37:22 .
**$31** 52:3, 157:12, 163:18 .
**$32** 25:1 .
**$37** 32:14 .
**$388.62** 182:17 .
**$4** 29:17, 174:18 .
**$427** 154:20 .
**$43** 29:5 .
**$49** 134:18, 176:15 .
**$5** 129:15, 156:20 .
**$50** 50:4, 187:17, 196:15, 196:17 .
**$50.** 109:1 .
**$589** 22:21 .
**$6** 133:25, 166:22, 166:23, 167:23, 168:14 .
**$7** 156:6, 171:12, 172:14 .
**$70** 39:10, 39:19 .

**$8** 22:11 .
**$800** 146:23 .
**$88** 8:19 .
.
.
**< 0 >.**
**00** 7:23, 8:25, 28:11, 64:1, 64:2, 64:3, 92:8, 148:15, 199:10 .
**000** 8:8, 8:19, 24:11, 76:7, 77:3, 77:14, 77:17, 98:1, 99:24, 146:23, 166:21, 166:22, 166:23, 167:23, 168:1, 168:10, 168:14, 168:16, 187:17, 187:18, 187:21, 196:15, 196:17, 197:7 .
**005** 50:12 .
**006** 50:12 .
**02** 9:13 .
**039** 174:18 .
**071** 32:14 .
**081** 129:15, 156:20 .
.
.
**< 1 >.**
**1-** 52:5 .
**1-cr-00449-tdc-1** 1:10 .
**10** 2:9, 9:6, 36:17, 77:14, 171:13, 178:10, 178:11, 178:18, 187:21 .
**100** 24:1, 109:12, 196:21 .
**1006** 146:17, 146:19 .
**1040-EZ** 137:10 .
**105** 2:19 .
**109** 131:14 .
**1099** 8:23, 95:25, 99:17, 136:13, 140:14 .
**1099s** 100:11, 142:6, 143:1 .
**11** 81:23, 82:15, 92:6, 92:8, 100:21, 100:25, 101:21 .
**11111** 66:14 .
**1120** 109:9 .
**1120S** 109:9 .
**119** 2:21 .
**121** 2:23 .
**123** 2:27 .

**125** 174:8 .
**127** 172:1 .
**13** 78:17, 168:23, 168:24, 169:5, 169:12, 170:21, 170:24 .
**135** 172:5 .
**14** 137:25, 173:17 .
**140** 8:18, 8:24 .
**15** 6:17, 12:3, 14:4, 15:2, 56:25, 57:22, 76:23, 77:3, 77:19, 79:14, 81:15, 139:18, 147:7, 199:16 .
**15-minute** 199:15 .
**150** 1:35, 21:22, 21:24, 50:11, 50:23 .
**16** 11:1, 12:3, 14:4, 15:2, 49:2, 56:25, 58:11 .
**16-page** 137:15 .
**160** 23:9 .
**17** 6:17, 11:1, 64:21, 101:8, 139:18, 151:13, 175:3, 175:6 .
**175** 8:8 .
**179** 169:2 .
**18** 88:14, 101:8, 102:7, 102:14, 102:17, 131:16, 139:5, 147:7, 147:13, 151:13 .
**183** 2:29 .
**18A** 20:4, 21:2, 23:11, 23:12, 24:17, 26:10, 26:21, 27:14, 30:6 .
**18th** 200:10 .
**19** 175:7 .
**198** 2:33 .
**19A** 30:5, 31:12, 32:16, 35:12, 35:21, 36:17, 40:21 .
.
.
**< 2 >.**
**2** 35:5, 68:19, 82:6, 87:5, 87:22, 88:1, 88:7, 90:21, 101:4, 101:7, 101:19, 128:2, 131:14, 132:9, 136:22, 199:12, 199:19 .
**20** 37:9, 92:6, 92:7, 92:11, 100:21, 166:18,

166:20 .
**200** 39:20, 109:8, 109:10 .
**20002** 1:36 .
**2004** 104:12, 104:13, 104:17, 104:21 .
**2005** 104:17, 104:21 .
**2009** 52:22, 123:24 .
**2010** 139:17 .
**2011** 139:17 .
**2012** 10:20 .
**2013** 4:24, 5:18, 7:9, 7:13, 8:10, 95:19, 96:7, 96:9, 97:8, 98:2, 98:7, 99:1, 99:13, 139:4, 139:6, 140:12, 141:3, 142:12, 142:13, 151:15 .
**2015** 4:8, 11:1, 20:8, 21:4, 26:24, 27:16, 28:4, 48:2, 49:1, 50:6, 52:18, 54:9, 54:13, 57:21, 58:11, 64:18, 64:20, 86:19, 98:6, 105:21, 105:24, 144:7, 145:5, 147:12, 164:23, 165:5, 194:12 .
**2016** 31:15, 32:18, 35:23, 36:15, 36:20, 38:18, 39:5, 56:2, 64:21, 98:6, 105:18, 105:21, 105:24, 126:20, 158:15, 159:23, 176:10, 178:4, 194:17 .
**2017** 4:8, 4:24, 95:19, 96:7, 98:7, 99:1, 105:18, 137:20, 139:5, 140:5, 141:4, 141:19, 145:5, 146:8, 147:12, 150:8, 171:5, 171:15, 194:19 .
**2021** 104:21, 114:12, 114:13 .
**2022** 86:8, 114:11, 114:12 .
**20770** 1:30 .
**20B** 22:3, 22:6 .
**21** 22:15, 22:16, 27:4, 27:5, 27:9, 27:11, 33:13, 34:12, 35:25, 36:1, 36:5, 177:16, 177:17, 177:21,

178:17.

**2106** 8:1, 27:7, 27:15, 36:19, 79:5, 79:13, 79:14, 79:22, 79:25, 81:9, 122:3, 177:19, 177:25, 178:3.

**2106"** 36:3.

**2106-EZ** 27:7, 177:19, 177:25.

**21237** 1:43.

**219** 40:19.

**22** 130:25, 131:5, 131:20, 131:25, 132:13, 135:21, 164:25, 167:20, 170:15, 170:16, 170:18.

**226** 42:7, 42:16, 58:18.

**228** 23:22, 24:8.

**23** 36:6, 38:9, 38:13, 38:14, 61:13, 61:23, 64:9, 100:25, 136:22, 179:15, 179:16.

**231** 131:16.

**232** 131:15, 157:12, 157:23, 163:13, 163:18, 180:5.

**233** 59:13, 59:16, 59:18.

**245** 165:11, 165:18.

**25** 164:6, 164:12, 167:24, 168:3, 168:15, 168:16, 195:4.

**26** 101:21, 105:18, 106:13.

**268** 175:7.

**27** 105:17.

**277** 20:25, 52:3.

**27a** 23:5, 23:6, 34:14, 34:16, 161:14, 162:18.

**27b** 162:10.

**27d** 162:7.

**28** 24:16, 24:18, 24:21, 24:23, 24:24, 162:16, 162:19, 162:21, 163:11, 164:13, 172:4, 172:12, 174:11, 174:16, 200:5.

**29** 38:5, 38:17, 161:3, 162:20, 162:21, 163:6, 163:9, 163:12, 163:13,

172:10, 172:13, 174:13, 174:17, 177:7, 177:9, 177:22, 178:12.

.

.

**< 3 >**.

**3** 23:22, 24:11, 26:9, 28:22, 31:2, 31:10, 34:13, 35:11, 37:3, 37:21, 40:13, 75:7, 101:4, 101:7, 101:19, 128:3, 132:15, 138:4, 148:15, 149:7, 153:12, 169:3, 176:12, 180:6, 191:7.

**30.** 161:7.

**300** 133:25.

**31** 20:25, 35:20, 38:5, 131:15, 157:23, 163:13, 163:17, 163:19, 163:24, 164:15, 164:16, 172:15, 172:16, 174:19, 176:21, 179:13, 179:14, 180:5.

**319** 182:10, 182:24.

**32** 24:24, 26:21.

**320** 38:16, 39:3, 39:4, 40:6.

**33** 158:12, 160:16, 164:2, 164:22, 165:1, 165:13, 167:21, 169:8, 170:19.

**331** 156:6.

**34** 21:1, 24:16, 34:19, 126:18, 128:3, 130:23, 132:9, 132:16, 153:11, 153:12, 157:8, 158:13, 160:16, 163:23, 164:3, 167:10, 176:9, 176:22, 178:2, 179:1, 179:14, 179:25, 180:7, 191:6.

**35** 14:3, 23:12, 32:15, 115:20, 165:13, 165:15,

167:17.

**350** 35:5.

**36** 35:19, 115:21, 152:9, 152:12.

**37** 132:10, 132:22, 132:23.

**38** 128:7, 180:23.

**38.** 153:19.

**39a** 132:25.

.

.

**< 4 >**.

**4** 28:20, 29:1, 29:3, 30:6, 37:2, 37:6, 40:21, 76:16, 78:17, 78:18, 80:21, 80:25, 81:3, 81:6, 149:7, 191:7.

**40** 26:12, 26:16, 26:17, 35:13, 35:15, 35:16, 35:18, 82:11, 133:1, 133:7, 134:2, 134:16, 153:15, 153:16, 153:18, 153:19, 176:12, 176:14, 177:11, 180:2, 180:7, 180:8, 180:21, 181:1, 181:3, 187:17.

**400** 197:6.

**404(b** 5:1, 99:8.

**41** 153:18, 153:20.

**413** 27:12.

**42** 2:11, 153:23.

**427** 24:24, 25:1.

**429** 34:13.

**43** 29:4, 154:2.

**44** 154:6, 154:8, 154:21.

**45** 9:4.

**4562** 121:16, 121:18, 122:1, 138:20, 169:9.

**46** 23:12, 152:9.

**47** 95:18, 100:2, 136:17, 140:11, 141:3.

**48** 23:5, 95:18, 100:2, 136:17, 140:11, 141:4, 152:24, 153:6, 171:4, 171:14.

**49** 95:19, 100:2, 135:6, 136:18, 137:2, 137:8, 140:11, 141:4, 152:24,

153:6, 153:17, 172:20, 173:18, 177:10, 180:10.

**494** 29:4, 29:5.

.

.

**< 5 >**.

**5** 23:9, 28:11, 29:11, 29:14, 34:17, 37:15, 37:18, 64:1, 74:25, 80:9, 149:7, 174:22, 175:9.

**50** 80:16, 109:1, 170:13, 187:18, 196:17.

**500** 17:12, 22:2, 50:9, 50:22.

**51** 27:12.

**52** 1:18, 3:2.

**52A** 100:7, 140:9, 141:3.

**52E** 100:7, 141:4, 152:24, 153:6.

**52F** 100:7, 141:4, 152:24.

**53** 152:25, 153:7.

**535** 85:4.

**545** 37:9, 37:11.

**55** 18:5, 39:8, 39:19.

**56** 154:16, 154:17, 154:18, 154:21, 155:8, 199:12.

**57** 199:19.

**58** 2:13.

**59** 18:5, 34:11, 155:7.

**593** 131:6, 131:17, 132:12.

.

.

**< 6 >**.

**6** 28:11, 40:19, 70:2, 79:3, 79:6, 83:2, 166:21, 168:1, 168:10, 168:16, 170:11.

**60** 159:20.

**600** 37:21, 37:22, 135:5.

**602** 177:22, 178:12.

**605** 33:11.

**61** 2:17.

**62** 118:7.

**63** 130:10, 155:9, 155:11,

155:21, 155:25 .
**64** 121:6, 156:5 .
**6406** 1:29 .
**65** 118:7, 121:6 .
**66a** 121:6 .
**67** 26:19, 121:6 .
**68** 131:6, 131:17, 132:12 .
**6c** 31:21 .

.

.

**< 7 >** .

**7** 21:17, 21:21, 33:6, 33:10, 83:17, 131:13, 162:22, 163:2, 163:11, 171:24, 172:11, 174:15 .
**70** 118:9, 152:25, 153:7 .
**713100** 71:10 .
**72** 153:1, 153:7 .
**73** 121:6 .
**74** 121:5, 156:7, 156:9 .
**740** 170:17, 170:22, 172:5 .
**740."** 169:3 .
**748** 171:12, 172:14 .
**75** 31:5, 40:15, 129:16, 156:11 .
**753** 200:5 .
**76a** 31:4, 31:7, 40:15, 40:18, 129:15, 156:19 .
**78** 129:24, 129:25, 130:13, 136:23 .
**790** 134:18, 135:6, 153:17, 176:15, 177:10, 180:10 .
**79W** 181:10, 181:25, 182:4 .

.

**< 8 >** .

**8** 1:18, 3:2, 9:2, 9:4, 9:8, 22:9, 161:13, 162:7, 162:10, 162:18, 167:10, 169:7, 178:1 .
**800** 1:29, 29:17 .
**809** 36:6, 36:7 .
**82B** 100:8, 100:11, 141:5, 141:11, 141:13, 152:24,

153:6 .
**82C** 100:8, 100:12, 141:10, 152:25 .
**83A** 152:25, 153:7 .
**83C** 152:25 .
**84** 100:16, 136:12, 141:3 .
**850** 22:9, 22:11 .
**85A** 152:25, 153:7 .
**85C** 153:1 .
**875** 26:19 .
**88** 102:10 .
**8829** 161:21, 161:23, 161:24, 164:18, 167:24, 168:3, 168:15, 195:3 .
**8:** 1:10 .

.

**< 9 >** .

**9** 7:23, 8:25, 9:13, 64:1, 64:2, 64:3, 80:1, 101:14, 178:25, 199:10 .
**90-O** 72:24 .
**90A** 60:23, 61:3, 64:13 .
**90B** 65:13 .
**90C** 66:18, 67:1 .
**90D** 67:10 .
**90E** 67:21 .
**90F** 67:20, 68:11 .
**90G** 68:23 .
**90H** 69:8 .
**90I** 69:19 .
**90J** 70:3 .
**90K** 70:12 .
**90L** 70:25 .
**90M** 71:11 .
**90N** 72:15 .
**90P** 73:9 .
**90Q** 73:24 .
**90R** 74:12, 76:12 .
**90S** 75:8 .
**90T** 75:16 .
**90U** 76:5 .
**90V** 76:17 .
**91-I** 79:8 .
**91-O** 82:8 .
**91E** 60:23, 61:3, 76:24 .
**91F** 77:9 .
**91G** 77:15 .

**91H** 78:22 .
**91J** 79:15 .
**91K** 79:23, 80:17 .
**91N** 60:23, 61:3, 77:24, 81:21, 87:18, 89:7, 91:20, 102:1 .
**91P** 83:4 .
**91Q** 83:18 .
**91R** 82:19, 83:15, 84:7, 87:2, 87:23, 102:1 .
**91S** 84:8, 85:15 .
**91T** 84:18 .
**91U** 84:25 .
**91V** 85:11 .
**91W** 85:19 .
**91X** 86:4 .
**91Y** 89:12 .
**91Z** 90:5 .
**92A** 60:23, 61:3 .
**92B** 91:5 .
**92C** 90:11 .
**92D** 90:16, 120:24 .
**92E** 81:7 .
**92F** 80:11 .
**92G** 80:22 .
**92H** 81:11 .
**92K** 80:17 .
**936** 35:19 .
**93B** 60:24, 61:4, 103:23 .
**9411** 1:42 .
**947** 174:12 .
**95** 69:12 .
**961** 31:10 .
**98** 92:18 .
**986** 174:8 .
**992** 34:17, 172:1 .

.

.

**< A >** .

**A.** 10:16, 83:2, 138:14, 143:21, 176:7, 177:15 .
**a.m.** 1:18, 3:2, 9:13, 92:8, 100:25, 101:21 .
**ability** 63:8, 107:25, 109:3, 109:13, 109:16, 114:16, 116:15, 117:17 .
**able** 46:25, 63:20, 73:6, 81:16, 82:1, 93:22, 95:7,

103:19, 104:10, 119:11, 167:7, 176:2 .
**above** 8:15, 30:15, 41:3, 42:24, 97:4 .
**above-entitled** 200:7 .
**Absence** 5:1, 100:8, 100:10, 100:11, 100:12, 140:7 .
**Absolutely** 114:17, 148:11 .
**accepted** 6:24, 125:25 .
**accepts** 72:6 .
**access** 65:7, 66:10, 69:22, 74:14, 86:14, 87:3, 87:20, 95:5, 122:10 .
**accompanying** 30:17, 43:15 .
**according** 5:24 .
**account** 17:13, 98:11, 100:5, 104:20, 149:12, 157:15, 160:23, 161:11, 162:15, 170:1, 197:21 .
**accounted** 197:23 .
**accounting** 74:5, 124:1, 124:6 .
**accounts** 161:24 .
**accrual** 74:5 .
**accuracy** 125:24, 181:19 .
**accurate** 41:20, 43:10, 43:12, 43:23, 109:15, 181:22, 187:25, 190:7, 190:23 .
**accurately** 107:25 .
**across** 126:14, 138:10 .
**Action** 3:5, 65:4 .
**activities** 17:11, 22:23, 34:3, 34:8, 40:2, 57:3, 57:4, 57:8, 57:14, 57:24, 189:10 .
**activity** 40:3, 57:16, 114:25, 157:17, 157:18, 158:20, 158:21, 160:8, 160:10, 160:11, 160:13, 161:25, 162:8, 168:6, 184:7, 193:8, 193:10, 194:4, 194:23 .
**actual** 71:20, 78:4, 81:17, 83:7, 85:6, 85:14, 86:2,

88:13, 110:18, 136:10,
191:4 .
**adamant** 99:5 .
**Add** 24:10, 95:21, 95:22,
117:1, 117:3, 121:6,
156:8, 156:9, 162:18,
177:5 .
**added** 61:19, 131:14,
131:17, 155:8,
156:7 .
**adding** 131:19, 147:4 .
**addition** 8:11, 168:5 .
**additional** 4:1, 62:15,
65:20, 91:15, 128:13,
130:1, 130:9, 154:10,
155:6, 155:13, 157:3,
187:23, 190:2,
190:16 .
**address** 67:17, 113:7,
113:10, 114:3,
127:12 .
**addressed** 155:14 .
**adds** 62:15 .
**adjusted** 127:24, 128:7,
131:23, 132:1, 132:2,
132:5, 132:6, 132:10,
132:22, 133:8, 133:9,
153:22, 158:1, 180:24,
181:4 .
**adjustments** 132:4 .
**administration** 173:6,
195:12 .
**admissible** 98:5,
136:12 .
**admission** 42:14 .
**admit** 3:23, 4:24, 59:13,
60:23, 152:18 .
**admitted** 181:25 .
**admitting** 5:15 .
**advance** 56:5, 144:16 .
**advertising** 162:12 .
**advice** 179:22 .
**advise** 53:23, 117:7 .
**advising** 6:14 .
**affect** 106:14, 158:3, 158:8,
164:7, 170:24,
175:22 .
**affecting** 157:23 .
**affects** 126:15 .
**affirmatively** 99:19 .

**afternoon** 95:4, 110:8,
123:15, 123:16, 148:4,
152:3, 183:4, 183:5 .
**agency** 11:4 .
**agents** 125:20, 185:1 .
**ago** 9:6, 47:15 .
**agree** 6:5, 7:2, 7:3, 142:15,
146:17, 149:18 .
**agreed** 3:22, 50:10 .
**agreement** 144:5 .
**Agriculture** 10:16, 10:19,
10:23, 28:1, 28:17, 29:6,
29:18, 36:11, 37:13,
37:23, 54:11 .
**ahead** 10:10, 15:12, 41:22,
48:10, 101:24,
198:24 .
**Alabama** 12:21 .
**alarmed** 7:14 .
**alert** 112:25 .
**alleged** 97:6, 138:15,
140:18 .
**allegedly** 145:17 .
**alleging** 140:2 .
**allotted** 28:12 .
**allow** 6:12, 96:1, 111:1,
140:11, 146:1,
147:2 .
**allowable** 165:17 .
**allowance** 166:14 .
**allowances** 153:25,
160:24 .
**allowed** 96:15, 115:18,
134:6, 166:10, 166:14,
173:7, 177:2, 178:20,
195:13 .
**allowing** 68:20, 90:24 .
**allows** 84:13, 108:9,
119:10 .
**Almost** 61:13, 88:15,
146:23 .
**alone** 13:22, 141:25 .
**Already** 42:10, 42:21, 66:7,
66:9, 72:20, 81:19,
112:12, 118:10, 137:15,
149:20, 151:12,
182:2 .
**alteration** 107:21 .
**alternative** 147:11 .
**Although** 137:10, 140:19,

141:5, 148:23 .
**amended** 98:14 .
**America** 1:5, 3:5 .
**among** 92:3 .
**Amortization** 169:10 .
**amount.** 38:10,
179:18 .
**amounts** 76:1, 131:11,
131:17, 132:6, 156:8,
162:14, 180:12, 180:16,
186:12 .
**amusement** 71:10 .
**analysis** 151:17,
196:25 .
**and/or** 91:1, 127:22,
153:25, 154:10,
157:2 .
**annual** 62:23, 106:1,
114:10 .
**annuity** 131:16 .
**answer** 112:2, 116:6,
120:8, 147:25, 166:25,
192:5, 192:22, 193:16,
196:2 .
**answered** 13:3, 44:4,
121:22 .
**answers** 63:21,
192:21 .
**anticipated** 9:17 .
**anybody** 118:6,
141:21 .
**anyway** 139:18,
199:14 .
**apartment** 25:8, 25:15,
54:20 .
**apologize** 30:5,
196:24 .
**Apostrophes** 115:17 .
**appear** 112:6, 112:9,
112:16, 140:1,
190:2 .
**appeared** 44:8, 50:10 .
**appearing** 181:12 .
**applicable** 128:19, 128:24,
129:5, 132:19,
155:13 .
**application** 4:14 .
**applies** 133:6 .
**apply** 154:11, 167:5,
175:25, 194:4,

194:5 .
**applying** 156:14,
167:13 .
**appointment** 12:25, 44:3,
44:5, 44:6, 56:6,
56:7 .
**Appreciate** 60:5, 122:21,
150:2, 192:22, 198:7,
199:5 .
**appropriate** 62:20, 146:25,
151:11 .
**appropriately** 196:2 .
**approving** 61:18 .
**Approximately** 14:2 .
**are.** 19:1, 59:10 .
**Area** 73:7, 78:9, 91:1,
166:2, 168:8, 168:9 .
**areas** 54:19 .
**arguing** 142:11 .
**argument** 4:1, 140:19,
142:25, 143:3, 143:9,
143:13, 145:8, 146:2,
146:21 .
**arguments** 139:24 .
**around** 92:2, 148:15 .
**arrange** 12:25 .
**arrive** 132:4 .
**articulate** 5:20 .
**aside** 24:25 .
**asks** 69:11 .
**assessed** 128:14, 129:20,
155:5 .
**asset** 120:16, 120:18,
169:16, 169:17, 195:10,
195:14, 195:15, 195:17,
195:19, 196:4, 196:6,
197:2, 197:14, 197:18,
197:23, 197:24 .
**Assets** 170:5, 170:6 .
**assign** 68:17, 108:15 .
**assigned** 55:12, 124:24,
125:2, 125:5, 126:7,
183:19, 185:3, 185:8,
185:9 .
**assist** 63:5, 63:11, 107:9,
107:13, 117:7 .
**assistance** 63:20,
192:19 .
**associated** 4:15, 63:6,
110:1, 154:7, 155:5,

159:2, 169:4, 177:23,
179:11, 179:12 .
**assume** 101:17, 188:7 .
**Assuming** 7:4, 56:25,
73:20, 136:8,
150:19 .
**assumption** 146:5,
188:13 .
**assurance** 120:1 .
**Attach** 20:18, 27:7, 32:8,
36:3, 157:11, 161:21,
175:5, 176:19,
177:19 .
**attached** 137:5,
149:12 .
**attachments** 6:4 .
**attempt** 5:21 .
**attend** 194:9 .
**attention** 20:4, 22:3, 22:15,
23:18, 26:3, 38:8, 42:20,
58:20, 64:13, 65:14,
91:24, 121:5, 149:10,
164:19 .
**Attorney** 1:28, 46:8 .
**attorneys** 198:22 .
**audit** 125:12, 125:14,
125:15, 125:17, 125:19,
183:6, 184:21, 185:2,
186:8 .
**audited** 125:22, 126:2,
185:12 .
**aunt** 32:2 .
**authenticated** 3:20 .
**automatically** 98:13,
112:16, 187:20 .
**available** 9:2, 9:4,
113:12 .
**Average** 108:25, 143:25,
144:9, 182:15, 182:18,
182:20, 182:24 .
**aware** 30:15, 64:6, 98:17,
98:20, 102:23,
130:3 .
**away** 47:20, 61:19,
124:20 .
.

**< B >** .
**background** 11:6,
124:4 .

**Bad** 155:17, 180:23 .
**ballpark** 126:4 .
**Baltimore** 1:43 .
**bank** 17:13, 19:7, 19:8,
110:23 .
**banks** 111:1 .
**bar** 82:4 .
**Based** 7:1, 108:22, 119:20,
129:20, 142:19, 143:11,
144:9, 145:3, 166:12,
167:3, 191:15, 191:19,
193:7 .
**basic** 67:15, 73:1, 74:14,
74:18, 74:21, 88:18,
90:9, 112:12, 126:8 .
**Basically** 95:7, 129:19,
131:19, 143:21, 144:7,
145:2, 145:13,
162:8 .
**basis** 143:8, 151:14,
189:17, 194:9 .
**bear** 97:3 .
**became** 7:14, 98:20 .
**become** 3:20 .
**becoming** 123:25 .
**bedroom** 25:14 .
**began** 46:15, 98:17 .
**beginning** 72:10, 94:2 .
**begins** 111:11, 152:4 .
**behalf** 3:10, 3:12,
90:25 .
**behind** 46:18, 47:1 .
**belief** 30:19, 43:22 .
**believe** 7:9, 98:15, 98:19,
101:12, 101:23, 119:3,
134:24, 135:1, 136:21,
173:15, 189:21 .
**believed** 41:11,
107:20 .
**belongs** 106:8 .
**below** 72:21, 129:8,
129:24, 156:1, 156:10,
159:5, 171:18, 175:16,
179:3 .
**besides** 142:10,
169:22 .
**best** 30:18, 43:21, 49:7,
105:25, 138:5,
194:10 .
**better** 7:16, 84:8, 119:11,

142:16 .
**Big** 62:3, 71:18, 147:5 .
**bigger** 168:20 .
**biggest** 89:17 .
**bill** 17:22, 17:23, 18:1,
18:3, 18:4, 18:5, 23:23,
24:10, 24:12, 24:13,
24:14, 35:7 .
**binder** 92:19 .
**binders** 95:11, 95:13 .
**biographical** 120:6,
120:9 .
**birth** 67:16 .
**bit** 4:22, 13:8, 30:3, 31:20,
42:21, 84:8, 91:22, 92:2,
145:7, 149:9, 152:14,
154:16, 155:20, 155:23,
156:2, 161:16, 168:22,
187:24, 191:7,
198:23 .
**black** 58:23 .
**blank** 111:19, 112:22,
129:25, 156:23 .
**board** 124:19 .
**Bolus** 3:19, 98:11,
100:8 .
**bonus** 119:3, 119:11,
195:13 .
**boring** 148:22 .
**borrowers** 55:11 .
**Bottom** 23:11, 31:3, 34:19,
78:8, 90:17, 90:21, 91:3,
97:17, 110:2, 114:14,
118:1, 120:25, 128:16,
130:4, 130:24, 162:4,
162:5, 164:3, 164:10,
165:7, 165:8, 165:14,
167:21, 167:22, 170:15,
177:7 .
**bought** 53:2, 56:17,
196:15 .
**Bowie** 124:5 .
**boxes** 72:2, 83:9, 129:13,
130:4, 180:16 .
**break** 91:21, 91:23, 92:2,
92:4, 92:10, 100:2,
100:20, 135:10, 135:14,
135:23, 152:14, 199:13,
199:15 .
**Briefly** 58:8, 95:20, 120:3,

144:2 .
**bring** 9:1, 9:8, 9:9, 44:18,
44:20, 45:1, 65:13,
68:11, 70:3, 70:22,
70:25, 77:7, 79:7, 84:21,
85:11, 87:13, 89:4, 89:6,
101:5, 103:23, 113:19,
146:10, 181:9 .
**bringing** 44:19 .
**broad** 6:24, 6:25, 7:4,
186:21 .
**brought** 19:9, 44:17,
44:24, 45:10, 47:22,
48:22, 51:1, 120:11,
189:9 .
**build** 16:14 .
**bunch** 115:23, 142:9 .
**burden** 198:18 .
**burying** 144:16 .
**busier** 64:2, 64:3 .
**business.** 160:14 .
**businesses** 70:24,
71:8 .
**busy** 64:1 .
**button** 71:3, 108:1,
121:25 .
**buy** 169:21 .
**buying** 120:13 .
.

**< C >** .
**C-a-r-s-o-n** 123:11 .
**C-EZ** 20:18, 32:9 .
**C-EZ.** 157:12 .
**C-l-a-i-r** 10:8 .
**C-l-a-u-d-e-t-t-e** 10:7 .
**C.** 1:40, 1:41, 70:15, 74:2,
122:7, 158:24, 159:7,
162:2, 174:25, 176:6,
200:5 .
**cable** 23:25, 24:2,
24:13 .
**calculate** 130:5, 166:9 .
**calculated** 108:21, 116:10,
116:13, 166:5,
168:9 .
**calculates** 160:25 .
**calculating** 165:16 .
**calculation** 116:7, 116:12,
120:10, 120:15, 120:20,

121:7, 158:8, 167:3, 175:22, 178:19, 184:10, 186:12 .
**calculations** 116:2, 116:25, 120:9, 121:1, 121:2, 126:15, 127:6, 189:7 .
**calculator** 65:23, 116:13 .
**Call** 9:20, 33:20, 55:25, 56:1, 56:5, 56:6, 58:16, 63:22, 66:6, 69:21, 78:1, 88:15, 89:6, 108:21, 152:11, 184:1, 187:2 .
**called** 13:1, 13:2, 41:16, 44:2, 48:2, 48:6, 68:13, 81:23, 102:19, 118:25, 119:3, 119:25, 138:11, 156:1 .
**calling** 18:6 .
**Calls** 9:22, 55:20, 60:8, 122:25, 192:4 .
**campus** 184:20 .
**canceled** 8:24, 136:13 .
**Cannon** 101:4 .
**capture** 62:19, 155:19, 156:18 .
**captures** 157:17, 158:20 .
**car** 33:18, 33:19, 162:12, 169:19, 169:21, 169:23, 170:2, 195:21, 196:10, 196:15, 196:23 .
**card** 111:6 .
**cards** 23:16, 53:4, 54:7 .
**care** 115:1, 115:7, 166:3, 193:14 .
**career** 126:4 .
**carried** 82:7 .
**carries** 81:15, 164:14, 177:12 .
**carry** 75:24, 121:18 .
**carrying** 122:2, 122:4 .
**cars** 17:17, 33:22, 195:16 .
**case-by-case** 189:17 .
**cases** 55:7, 124:24, 124:25, 125:2 .

**cash** 45:5, 50:18, 74:5, 111:6 .
**categorization** 196:7 .
**categorized** 162:13 .
**category** 4:13, 5:6, 71:16, 71:21, 72:22 .
**category.** 72:19 .
**cause** 115:16 .
**caused** 8:19 .
**Cell** 17:22, 17:23, 18:1, 18:3, 18:5, 18:9, 23:19, 23:23, 24:1, 24:5, 24:7, 24:9, 35:1, 35:7, 55:19, 55:21, 56:23 .
**Center** 3:19, 64:25, 65:1, 65:3, 66:5, 66:13, 78:2 .
**certain** 8:2, 15:1, 16:13, 38:6, 51:24, 51:25, 117:8, 120:9, 126:15 .
**certainly** 103:2 .
**CERTIFICATE** 200:1 .
**Certified** 200:3 .
**certify** 200:4 .
**cetera** 8:1, 27:6, 36:3, 38:10, 75:22, 175:5, 177:19, 179:17, 190:24 .
**chain** 185:4 .
**chair** 25:16, 47:8 .
**Chairs** 13:13, 14:12, 45:18, 45:19, 47:7 .
**chances** 191:24 .
**change** 68:6, 73:6, 74:18, 74:21, 87:16, 90:4, 93:10, 106:2, 106:5, 106:10, 106:12, 106:13, 106:20, 107:7, 108:24, 109:1, 113:9, 113:10, 117:19, 117:20, 173:6, 173:8, 173:11, 173:13, 195:6, 195:12 .
**changed** 61:19, 64:5, 106:13, 119:22, 137:19, 173:20, 173:23 .
**changes** 63:25, 91:19, 93:9, 102:21, 102:22, 102:23, 102:24, 103:4, 105:15, 105:25, 107:12,

107:19, 107:24, 194:20, 196:13 .
**changing** 164:11 .
**character** 72:14, 97:12, 99:7 .
**characters** 115:17, 115:20 .
**charge** 89:25, 90:2, 104:16, 104:18, 108:23, 109:1, 109:4, 109:13, 109:19, 110:11, 110:16, 145:4 .
**charged** 98:9, 108:5, 139:22, 144:9, 145:8 .
**charges** 108:15, 110:5 .
**charging** 89:18 .
**charitable** 45:1, 45:7, 45:13 .
**Charles** 1:46 .
**chart** 143:24, 144:22, 145:2, 145:20, 147:12, 147:16, 147:17, 149:13, 181:16, 181:19 .
**charts** 145:22 .
**check** 14:23, 14:25, 19:6, 19:9, 19:14, 19:15, 19:18, 50:17, 110:24, 111:7 .
**Cherokee** 52:22 .
**chief** 141:23, 151:1 .
**child** 13:11 .
**choice** 58:14, 195:10 .
**choose** 11:24, 63:2, 196:7 .
**chose** 58:14, 112:15, 120:16 .
**chosen** 121:19, 135:5 .
**CHUANG** 1:22 .
**church** 57:6 .
**churches** 16:15, 16:20, 17:4, 50:15 .
**circle** 78:19, 82:17, 84:10, 85:7, 133:19 .
**circling** 85:24 .
**circumstance** 111:18, 193:7 .
**circumstances** 154:10 .
**claim** 127:23 .

**claimed** 8:5, 13:19, 96:23, 156:21 .
**claiming** 32:3, 40:6, 45:10, 170:23, 179:5 .
**Clair** 2:7, 9:23, 10:1, 10:4, 10:7, 20:13, 27:2, 27:21, 31:18, 32:2, 32:21, 36:23, 38:22, 42:7, 42:20, 46:11, 50:21, 51:23, 56:2, 57:12, 60:5 .
**Clair.** 21:9 .
**clarification** 7:24, 189:5 .
**clarify** 101:7, 146:10, 150:22, 180:18 .
**classes** 11:13 .
**classic** 62:14, 104:23, 105:3, 105:6 .
**Claudette** 2:7, 9:22, 10:1, 10:4, 10:7, 20:13, 21:9, 27:2, 27:21, 31:18, 32:21, 36:23, 38:22 .
**clear** 5:20, 6:21, 99:11, 130:12, 161:13, 180:23 .
**clearly** 10:2, 60:14, 97:9, 123:6 .
**CLERK** 3:4, 9:24, 10:2, 10:5, 10:9, 60:10, 60:14, 60:17, 60:20, 100:23, 123:2, 123:5, 123:9, 123:12, 146:13, 152:7, 152:20, 199:17 .
**clicked** 72:20, 78:25, 80:24, 84:20, 86:6, 88:7 .
**clicking** 65:4 .
**Client** 66:6, 88:15, 88:18, 88:21, 96:9, 96:17, 96:21, 96:22, 101:14, 102:7, 102:13, 102:18, 102:19, 103:3, 109:22, 110:6, 110:20, 111:22, 112:21, 112:24 .
**clients** 63:9, 97:3, 97:6, 97:24, 140:3 .
**close** 24:11, 47:6, 96:5 .
**closer** 9:17 .
**closing** 139:1 .

**code** 68:13, 69:2, 71:8, 72:3, 106:5, 106:13, 114:24, 119:10 .
**coded** 71:23 .
**codes** 70:23, 71:20, 72:11, 115:7, 119:21, 124:22 .
**colleagues** 93:7 .
**College** 124:7 .
**Column** 29:14, 37:6, 37:18, 104:13, 182:8, 182:15, 182:16, 182:22, 182:23 .
**columns** 182:23 .
**combined** 180:16 .
**comes** 61:18, 71:4, 111:9, 111:22, 188:22, 188:23 .
**coming** 4:7, 7:5, 21:25, 60:6, 93:18, 118:8, 181:17, 198:7 .
**commands** 185:4 .
**commissions** 162:13 .
**common** 67:23, 108:12, 195:17, 195:19 .
**communicate** 78:10 .
**communicated** 13:16 .
**communication** 186:23, 187:1 .
**commute** 34:1 .
**companies** 63:19 .
**company** 62:3, 90:10, 119:22 .
**compared** 181:19 .
**Comparing** 172:6 .
**compensation** 91:3 .
**complete** 30:19, 89:19, 124:7, 129:9, 135:18, 179:5 .
**complete.** 43:23 .
**completed** 47:17, 63:2 .
**completely** 198:16 .
**complex** 187:24 .
**compliance** 124:13, 125:16, 183:8 .
**complicated** 8:13 .
**Complied.** 85:8, 85:25, 133:23 .
**comprise** 126:9 .

**computer** 14:7, 14:11, 14:12, 46:15, 46:17, 46:18, 46:20, 46:21, 46:23, 46:24, 52:23, 53:9, 53:11, 53:15, 53:17, 53:19, 53:20, 55:2, 55:13, 55:14, 56:16, 56:17, 120:13, 188:25 .
**Computer-aided** 1:49 .
**Computers** 23:16 .
**concept** 6:24, 6:25 .
**concern** 139:12, 141:7 .
**concerned** 95:21 .
**concerning** 7:15, 51:15 .
**conduct** 96:14, 98:9, 139:22, 145:8 .
**confer** 151:11 .
**Conference** 4:23, 5:3, 5:8, 8:9, 144:3, 200:9 .
**configuration** 108:13 .
**configured** 90:1 .
**confirm** 68:5, 125:15, 125:24, 183:8, 197:23 .
**conformance** 200:8 .
**Congress** 133:13, 137:20, 138:8 .
**conjunction** 140:5 .
**connect** 164:5, 169:12, 177:11 .
**connects** 172:16, 174:20, 176:6 .
**conscious** 150:11 .
**consecutively** 57:1 .
**consider** 118:4, 128:8, 196:2 .
**consideration** 129:22, 130:8 .
**considered** 184:21 .
**consist** 125:4 .
**consisted** 124:20 .
**contact** 63:20, 67:17, 73:3, 183:24, 187:4, 192:18 .
**contained** 112:6, 195:2 .
**content** 6:24 .

**contents** 88:16 .
**continually** 192:25, 193:2, 193:6, 193:16 .
**continue** 73:14, 91:22, 101:23, 127:25, 152:15 .
**continuing** 9:16 .
**continuity** 160:11 .
**continuous** 193:22, 194:1 .
**continuously** 193:11, 194:8 .
**contract** 100:13, 143:6 .
**contributions** 45:2, 45:6, 45:7, 45:13 .
**conversations** 44:15 .
**conversion** 111:17 .
**convoluted** 192:7 .
**coordination** 75:2 .
**copier** 13:12, 25:17 .
**copies** 15:16, 15:18, 66:19, 92:14, 93:7, 94:11, 95:1, 144:4 .
**copy** 18:12, 18:15, 47:18, 51:18, 88:4, 88:5, 88:9, 103:14, 137:1 .
**corporate** 125:1, 125:2 .
**Corporations** 50:19, 175:5 .
**corps** 125:4 .
**correcting** 116:4 .
**correctly** 6:9, 19:21, 119:24, 153:14, 159:17, 191:20, 197:23 .
**correspondence** 184:21 .
**cost** 106:3, 160:23, 169:25 .
**costs** 197:6 .
**Counsel** 3:8, 42:21, 50:5, 52:2, 92:5, 94:3, 135:15 .
**count** 149:2, 149:4 .
**Counts** 101:2, 101:4, 101:12, 101:19, 148:24, 149:7, 149:18, 149:23, 158:25 .
**couple** 3:24, 63:12, 63:13,

65:1, 79:17, 84:5, 86:23, 89:23, 90:22, 122:1, 135:10, 142:4, 157:4, 165:22, 167:8, 171:2, 177:14 .
**course** 115:19, 125:20, 126:3, 141:23, 141:25, 146:4, 151:8, 169:18, 185:21, 189:3 .
**Court.** 146:14 .
**courtroom** 9:13, 92:8, 95:8, 101:21, 135:21, 152:12, 199:12 .
**cover** 17:6, 141:6, 147:6 .
**CPA** 19:24 .
**create** 63:8, 70:8, 91:15, 97:17 .
**created** 56:25, 66:8, 86:25 .
**creates** 138:18, 159:18 .
**creating** 69:10, 97:25 .
**creation** 69:11 .
**credenza** 13:11, 47:1, 47:3 .
**Credit** 35:12, 111:6, 131:14, 154:13, 154:14, 154:19 .
**Credits** 26:10, 128:4, 128:8, 128:9, 128:11, 128:13, 128:25, 129:4, 129:22, 130:8, 132:16, 132:19, 153:13, 154:1, 154:12, 154:22, 154:24, 155:13 .
**Criminal** 1:9, 1:34, 3:5, 98:21 .
**cross** 147:23 .
**CROSS-EXAMINATION** 2:11, 2:19, 2:29, 41:25, 42:2, 105:12, 183:2 .
**cross-examine** 150:25, 151:14 .
**cross-examining** 151:4 .
**CRR** 200:16 .
**Cs** 8:1, 70:5, 70:7, 96:18, 137:7, 137:25, 171:2 .

cumulative 140:13 .
current 86:14, 110:4,
   113:23, 120:20, 122:15,
   123:21, 136:8,
   169:22 .
currently 114:8 .
Cut 112:20 .

.

< D > .
D. 1:22 .
daily 34:3, 194:10 .
damaged 56:18, 56:19 .
danger 140:22, 143:5 .
data 14:10, 62:19, 64:11,
   66:15, 67:24, 69:4,
   73:11, 78:5, 82:25, 83:7,
   83:8, 86:21, 86:24,
   102:11, 107:2, 111:17,
   114:4, 144:10,
   182:21 .
database 8:22, 159:1 .
date 67:16, 104:16 .
Dated 200:10 .
day 54:12, 54:15, 58:15,
   92:24, 93:9, 93:17, 95:6,
   166:3, 193:14, 194:10,
   198:25, 199:6, 199:11,
   200:10 .
DC 1:36 .
deal 192:16 .
dealing 18:7, 151:2 .
dealt 6:17 .
Debra 126:21, 164:24,
   176:10, 183:15,
   185:9 .
debt 5:22, 8:23, 100:17,
   136:13 .
decide 197:4 .
decided 133:12 .
decides 107:5, 116:12 .
deciding 61:18 .
decision 144:6 .
decisions 136:17 .
Declaration 190:20, 191:1,
   191:4, 191:9,
   191:14 .
declaration. 191:13 .
declare 30:17, 43:9,
   43:14 .

declaring 191:19 .
dedicated 54:17 .
deduct 120:12, 120:14,
   133:14, 134:14, 166:22,
   167:2, 167:7, 167:18,
   168:16, 168:17,
   176:2 .
deducted 134:6 .
deductible 80:16 .
deducting 162:9 .
deduction 26:13, 35:14,
   106:4, 119:12, 122:15,
   133:4, 133:5, 133:11,
   133:12, 134:1, 134:8,
   134:13, 134:20, 134:21,
   135:4, 168:20, 169:2,
   170:23, 177:5 .
deduction. 133:2 .
deductions. 38:7 .
deemed 136:11 .
deems 80:15 .
deep 136:9, 148:1 .
default 88:3 .
Defendant 1:12, 1:38,
   148:5, 148:7, 151:5,
   151:18, 151:19,
   152:4 .
defense 94:3, 95:20,
   139:17, 139:25, 144:4,
   144:14, 144:20, 145:12,
   149:18, 198:18, 198:20,
   199:1, 199:10 .
definition 52:11, 193:6,
   193:18, 193:22 .
degree 6:9, 11:8, 124:5,
   142:12 .
delayed 94:15 .
demonstrate 5:1, 99:22,
   189:22 .
demonstrated 98:10 .
demonstrating 96:10 .
Denton 101:12 .
Department 1:33, 10:16,
   10:19, 10:23, 28:1,
   28:17, 29:6, 29:18,
   36:10, 37:12, 37:23,
   54:11 .
depend 185:22,
   189:14 .
dependants 127:18 .

dependent 186:1 .
dependents 31:22, 32:3,
   69:3, 113:13, 113:14,
   127:23, 154:1 .
Depending 63:18, 63:25,
   119:10, 127:17, 133:14,
   148:14, 151:8, 154:9,
   155:4, 195:11,
   196:12 .
depends 110:20, 133:18,
   150:1, 173:13, 183:14,
   185:5, 186:3, 188:1,
   195:10, 195:14, 195:24,
   197:11 .
depict 71:12, 104:19 .
depicting 77:10, 82:9,
   90:20 .
deposit 19:9, 38:10,
   179:17, 179:23 .
deposited 110:22 .
depreciate 169:19, 195:20,
   196:10, 197:5, 197:6,
   197:7, 197:18 .
depreciated 170:5, 195:17,
   195:25, 196:4 .
depreciating 119:13 .
Depreciation 118:21,
   119:1, 119:2, 119:4,
   119:11, 120:11, 121:17,
   121:19, 122:1, 122:10,
   122:12, 168:23, 169:2,
   169:5, 169:9, 169:15,
   169:16, 170:1, 170:23,
   195:9, 195:11, 195:24,
   196:8, 197:1, 197:11,
   197:14, 197:17,
   197:21 .
depreciations 195:13,
   195:14 .
describe 11:6, 12:15, 13:8,
   25:13, 28:6, 55:6, 62:18,
   65:15, 65:16 .
described 15:12, 100:9,
   117:9, 128:4 .
description 71:14, 75:22,
   76:1, 96:12, 115:10,
   115:11, 171:18 .
description. 72:7 .
descriptions 70:23 .
designate 114:20 .

designation 115:14 .
designed 62:10, 106:6,
   117:10 .
designee 90:24,
   129:11 .
desk 13:10, 13:12, 13:14,
   14:11, 14:12, 46:23,
   47:2, 47:6, 47:7, 47:8,
   184:18 .
desks 45:18, 45:19 .
desktop 65:17 .
detail 28:8, 129:13, 130:19,
   138:21 .
detailed 142:22 .
determination 129:6 .
determine 70:17, 89:19,
   97:5, 120:20, 130:6,
   166:12, 166:13, 167:1,
   196:5, 196:7 .
determined 88:5, 162:9,
   182:20, 183:21, 195:9,
   196:8 .
determines 196:3,
   197:1 .
determining 89:17, 117:8,
   197:16 .
developed 93:13,
   93:15 .
developers 106:23 .
development 55:9 .
Diagnostic 78:9, 117:24,
   118:10 .
diagnostics 78:8,
   118:1 .
difference 105:2, 105:23,
   111:21, 111:24, 168:2,
   168:4, 168:14, 174:24,
   194:21 .
differentiate 193:18 .
difficulties 186:1 .
difficulty 94:7, 94:8,
   185:22, 186:4 .
digit 91:12 .
digital 66:22 .
dining 25:14 .
DIRECT 2:9, 2:17, 2:27,
   10:11, 19:8, 22:3, 22:15,
   23:18, 26:3, 38:8, 42:20,
   58:20, 61:6, 64:13,
   65:14, 109:21, 117:4,

123:13, 144:17, 148:19,
194:21 .
**Directing** 121:5 .
**directly** 62:4, 72:3,
110:22 .
**disagree** 7:2, 142:24 .
**disagreement** 4:22 .
**disallow** 190:4 .
**disallowance** 190:5 .
**disallowed** 173:7 .
**disallows** 190:13 .
**discuss** 3:15, 23:15, 37:25,
38:1, 45:20, 45:21,
45:25, 56:20, 92:3, 92:5,
97:24, 98:1, 135:11,
135:15, 135:19, 138:25,
162:1, 198:22, 199:7,
199:15 .
**discussed** 3:21, 5:2, 8:9,
45:13, 56:21, 95:23,
120:3, 144:2, 144:5,
144:21, 157:5, 167:12,
167:13, 167:17,
182:2 .
**discussing** 22:13, 29:9,
29:22, 56:11,
153:15 .
**discussion** 4:2, 33:14,
141:2, 143:11 .
**discussions** 22:22, 24:3,
33:17, 34:22, 35:6,
37:10, 39:21, 56:15 .
**dismiss** 101:2, 101:4,
101:10, 101:11 .
**dismissed** 7:20,
101:19 .
**display** 86:4, 102:1 .
**displayed** 73:19 .
**dispositive** 143:1 .
**dispute** 4:7, 4:12, 6:23,
144:18, 152:2 .
**distinction** 6:10 .
**District** 1:1, 1:2, 200:4 .
**dive** 136:9, 148:1 .
**divide** 169:25 .
**divinity** 11:9 .
**Division** 1:3, 1:34 .
**divisions** 185:5 .
**doctor** 20:1 .
**doctorate** 11:9 .

**Document** 42:8, 42:12,
43:24, 96:13, 103:9,
144:1, 146:14, 181:11,
188:7 .
**documentation** 45:15,
50:14, 182:13, 184:10,
185:19, 185:21 .
**documents.** 43:15 .
**DOJ** 1:47 .
**dollar** 110:11 .
**done** 15:10, 47:17, 47:19,
61:23, 68:25, 86:12,
96:20, 107:9, 107:22,
111:3, 112:4, 112:22,
112:24, 154:8, 154:9,
183:16, 186:19, 189:21,
193:11 .
**door** 13:9 .
**dots** 164:5 .
**double-check** 118:12 .
**double-clicking** 66:11 .
**double-sided** 137:12 .
**draft** 106:22, 107:1 .
**draw** 149:10 .
**drawing** 78:21 .
**drawn** 47:2 .
**drew** 6:10 .
**drill** 157:4 .
**drive** 23:4, 52:18, 55:8,
169:23 .
**driven** 51:6 .
**drives** 8:17 .
**driving** 17:19 .
**drop** 65:20 .
**drop-down** 65:18, 71:17,
72:12, 72:17, 72:23 .
**Dropped** 15:2, 15:4,
15:5 .
**due** 88:25, 129:7, 129:8,
129:10, 129:21, 129:22,
130:7, 130:9, 130:10,
156:16, 157:1, 158:6,
158:10, 171:1, 178:23,
187:23 .
**dues** 27:6, 36:2,
177:18 .
**During** 12:4, 13:15, 19:11,
64:2, 64:3, 69:10, 86:18,
93:25, 120:1, 125:20,
169:22, 184:5,

189:8 .
**duties** 124:11, 178:9 .
**dwell** 154:12 .

.

**< E >.**
**E-file** 65:2 .
**e-filing** 4:15, 103:11 .
**E.** 31:1, 171:8, 171:17,
172:25, 174:2,
175:5 .
**earlier** 22:1, 43:20, 46:8,
50:4, 72:17, 84:5, 106:1,
108:16, 108:17, 108:22,
109:3, 113:5, 114:23,
142:22, 176:11 .
**early** 106:23, 148:18,
199:3 .
**earn** 194:13 .
**earned** 146:8 .
**ease** 107:25 .
**easier** 107:22, 108:25 .
**easiest** 62:18, 68:6, 78:16,
82:15, 91:10 .
**easily** 88:22 .
**easy** 106:8, 120:8 .
**Edit** 73:19, 74:18, 87:9 .
**editions** 62:13 .
**educate** 126:23 .
**education** 27:6, 36:2,
154:19, 177:19 .
**educational** 11:6,
124:3 .
**effect** 16:23, 158:1, 180:12,
180:13 .
**efficient** 199:2 .
**eight** 74:3 .
**EIN** 15:20, 48:3, 73:3,
114:2 .
**either** 41:4, 62:4, 65:10,
69:6, 78:18, 94:1,
117:22, 127:16, 127:19,
130:5, 134:8, 141:21,
151:16, 189:1,
189:11 .
**electronic** 91:9, 94:22,
111:4 .
**electronically** 30:10, 63:3,
89:21, 90:14, 91:8,
91:11, 94:19,

115:19 .
**elicited** 139:17 .
**eligible** 127:23 .
**elsewhere** 161:21 .
**elsewhere.** 26:5 .
**email** 15:12 .
**emailing** 15:14 .
**employed** 10:17 .
**Employee** 6:20, 27:5,
27:15, 36:2, 36:7, 36:19,
77:20, 78:14, 79:2,
79:12, 79:14, 177:18,
178:4, 178:8 .
**employees** 159:19 .
**employer** 114:2, 114:3,
178:7, 179:8,
179:12 .
**employment** 11:2 .
**End** 9:18, 108:19, 109:20,
142:1, 190:8,
199:20 .
**ended** 7:17 .
**endless** 190:17 .
**Enforcement** 1:34 .
**engaged** 57:3 .
**engaging** 160:9 .
**enjoy** 92:4, 126:25 .
**Enlarge** 20:5, 21:2, 26:10,
26:21, 27:14, 31:3,
31:13, 32:16, 35:12,
36:18, 38:5, 40:14,
104:1, 104:8, 120:25,
131:1 .
**enough** 118:6, 118:11,
140:23, 141:25 .
**entail** 61:17 .
**Enter** 65:10, 66:12, 68:9,
68:21, 69:4, 69:6, 69:12,
69:13, 71:22, 72:7,
74:16, 74:22, 75:4,
75:13, 75:19, 76:10,
76:23, 77:2, 77:7, 80:8,
80:14, 114:24,
161:6 .
**entered** 9:13, 68:2, 69:1,
70:6, 70:7, 73:11, 76:7,
77:5, 80:4, 81:10, 81:14,
101:21, 113:15, 120:18,
152:12, 164:6 .
**entering** 14:10, 14:13,

86:20 .
**entertainment** 29:12,
29:20, 37:12, 37:15,
37:23, 80:6, 80:9, 80:15,
80:19 .
**entertainment.** 28:24,
37:4 .
**entire** 24:12, 24:13, 87:1,
87:5, 161:2, 165:21,
168:18 .
**entirely** 143:13,
168:11 .
**entities** 50:19 .
**entrance** 168:7 .
**entries** 7:12, 51:15 .
**entry** 8:17, 117:10 .
**equal** 132:7 .
**Eric** 1:47 .
**error** 87:10, 116:4,
116:11 .
**errors** 116:1 .
**especially** 49:19 .
**Esquire** 1:27, 1:32,
1:40 .
**Essentially** 61:18, 67:3,
74:2, 88:8, 104:21,
105:6, 107:8, 118:3 .
**establish** 189:4 .
**established** 116:25 .
**establishing** 5:4, 5:9 .
**estate** 175:4 .
**estimate** 17:10, 49:7,
107:19, 145:3 .
**estimated** 129:3,
144:10 .
**et** 8:1, 27:6, 36:2, 38:10,
75:22, 175:5, 177:19,
179:17, 190:23,
190:24 .
**Eugene** 1:10, 3:6,
32:2 .
**Everyone** 3:3, 9:14, 100:1,
101:1, 101:22, 135:16,
135:22, 150:14, 152:10,
152:13, 187:15 .
**Everything** 33:25, 54:6,
61:23, 61:24, 73:20,
88:9, 89:2, 112:5, 113:3,
136:9, 186:13,
189:21 .

**evidence** 4:24, 5:1, 5:4,
5:9, 8:20, 42:16, 59:16,
61:2, 96:1, 97:11, 97:12,
99:15, 99:16, 141:21,
142:8, 145:24, 146:18,
149:20, 153:8, 181:25,
182:4, 198:10 .
**exact** 8:5, 68:18,
83:13 .
**Exactly** 55:5, 66:17, 82:10,
86:10, 94:14, 94:20,
96:8, 99:1, 118:2, 183:6,
194:3 .
**exaggerated** 8:5 .
**EXAMINATION** 2:9, 2:13,
2:17, 2:21, 2:27, 10:11,
58:9, 61:6, 109:21,
119:18, 123:13, 124:12,
125:12, 144:17, 183:7,
184:1 .
**examine** 43:17, 43:18,
43:19, 107:3, 125:6,
183:10 .
**examined** 30:17, 43:9,
43:12, 43:14, 125:7,
125:10 .
**examines** 107:2 .
**examining** 194:6,
196:1 .
**examples** 193:17 .
**exceeded** 157:1 .
**EXCERPT** 1:21 .
**excerpt.** 199:20 .
**exclude** 141:2 .
**excluded** 151:1,
151:16 .
**exclusively** 166:2, 166:11,
167:5, 168:6,
168:10 .
**Excuse** 153:18, 172:7,
178:13, 188:6 .
**Exemptions** 31:21, 127:21,
127:22, 128:12, 153:23,
153:24, 153:25 .
**Exhibits** 3:16, 3:18, 4:13,
60:23, 61:2, 66:20,
92:15, 92:18, 93:7,
93:19, 94:13, 94:23,
95:16, 95:18, 96:25,
100:3, 126:12, 137:8,

140:8, 141:3, 141:5,
146:11, 150:23, 152:18,
152:22, 152:24,
153:6 .
**exist** 190:12 .
**Exit** 68:10, 69:6, 73:14,
73:22, 74:9, 76:11,
77:23, 81:18, 84:4,
87:12, 89:4, 89:5, 89:9,
89:10, 89:14, 89:18,
91:18, 136:5 .
**expeditiously** 93:22 .
**expense** 38:25, 39:2,
39:25, 40:7, 40:11, 49:8,
81:4, 81:6, 85:2, 168:14,
169:2, 179:22, 186:3,
187:24, 189:22, 194:22,
196:17 .
**expenses.** 6:20, 179:6 .
**experience** 39:14, 64:8,
117:12, 195:17 .
**experienced** 177:4 .
**expert** 49:9 .
**explain** 64:24, 66:4, 93:11,
105:23, 112:20, 118:3,
127:1, 127:3, 136:11,
138:5, 162:6, 165:15,
172:9, 184:17, 184:23,
187:21 .
**explained** 96:6, 190:1 .
**explaining** 99:11,
102:4 .
**explanation** 8:12, 192:13,
194:10 .
**extensive** 147:23 .
**extent** 52:8, 52:12, 138:24,
143:8, 151:14 .
**extra** 92:6, 94:21,
135:16 .
**EZ** 137:10 .
.
.
**< F >**
**F10** 75:21 .
**fact** 5:11, 6:11, 7:13, 97:20,
98:1, 102:24, 189:11,
192:25 .
**factors** 127:18, 196:1,
196:9, 196:19, 196:23,
197:13 .

**failed** 98:25, 189:22,
189:25 .
**fails** 190:11 .
**failure** 94:19, 99:4 .
**fair** 48:12, 52:10, 106:18,
107:18, 107:19, 142:24,
189:19, 191:23, 193:1,
193:5 .
**fall** 71:21 .
**false** 4:25, 6:12, 96:15,
96:19, 97:6, 97:9, 97:17,
100:14, 100:17, 140:1,
140:18, 140:24, 141:1,
141:22, 143:9, 145:17,
145:25, 146:21, 147:2,
147:3, 147:16 .
**falsely** 140:16 .
**falsified** 96:8 .
**falsities** 5:4, 5:10 .
**falsity** 5:10, 141:22, 145:9,
145:11 .
**familiar** 11:22, 11:24, 52:9,
61:25, 106:9, 117:11,
126:8, 129:2, 131:12,
187:16 .
**family** 168:6, 199:4 .
**far** 64:8, 94:6, 94:15, 95:21,
98:24, 99:3, 106:19,
106:20, 112:20, 133:6,
168:15, 173:15, 173:20,
173:21, 188:11, 189:9,
194:23 .
**features** 62:15 .
**Federal** 7:18, 62:22, 63:4,
63:16, 88:4, 88:5, 88:9,
88:10, 108:14, 109:8,
109:10, 156:5,
200:17 .
**fee** 89:22, 90:3, 108:17,
108:20, 108:21, 109:13,
109:16, 109:19, 110:6,
110:18, 111:7, 143:25,
144:9, 144:10, 145:4,
182:15, 182:19, 182:20,
182:24 .
**Feel** 99:10, 135:3 .
**fees** 89:23, 90:10, 108:3,
111:2 .
**fell** 72:22 .
**few** 5:3, 14:15, 43:2, 46:9,

71:13, 124:24, 135:15, 183:16 .
**field** 72:14, 116:10, 125:20, 185:2 .
**Fields** 116:13 .
**figure** 5:25, 25:5, 29:9, 58:23, 108:5, 121:21, 146:21, 147:2 .
**figures** 81:10, 81:16, 121:18, 130:20 .
**figuring** 147:13 .
**file** 5:21, 6:11, 6:14, 6:15, 7:14, 47:20, 62:22, 62:25, 63:3, 67:7, 68:17, 87:6, 89:3, 91:8, 97:20, 98:25, 99:4, 99:9, 107:25, 133:15, 142:6, 184:15, 184:17, 184:18, 194:13 .
**filed** 7:18, 14:1, 40:9, 88:11, 98:8, 98:14, 98:15, 98:18, 98:23, 98:25, 99:2, 113:19, 125:17, 139:11, 139:21, 142:5, 142:16, 142:17, 143:2, 182:9, 187:13 .
**files** 98:12, 125:23, 184:19 .
**filing** 13:25, 67:3, 67:5, 67:13, 89:20, 91:9, 97:23, 99:3, 106:24, 127:14, 127:15, 127:20, 133:15, 133:16, 133:24, 133:25, 134:24, 135:1, 135:2, 135:4, 145:4 .
**fill** 69:25, 79:13, 84:1, 115:2, 127:9, 128:23, 176:18 .
**filled** 20:2, 114:8, 115:4, 132:25 .
**filling** 70:15, 74:2, 131:18 .
**filter** 130:16 .
**final** 129:6, 130:6, 196:25, 197:16 .
**Finally** 43:21, 181:7 .
**financial** 63:6, 184:6 .
**find** 17:8, 106:8, 158:25 .

**finding** 106:21 .
**fine** 141:13 .
**finger** 78:20 .
**finish** 51:11, 74:7, 147:21, 148:15, 150:19 .
**finished** 18:15, 47:9, 86:20, 153:14 .
**fit** 94:16, 138:9 .
**Five** 75:1, 91:12, 169:24 .
**flag** 150:22 .
**flat** 90:2 .
**flip** 139:6 .
**flow** 113:5, 125:3, 126:13 .
**flows** 96:11, 130:14 .
**focus** 140:15 .
**folder** 47:19, 47:24, 47:25, 88:20 .
**follow** 183:10, 183:12, 183:18, 197:20 .
**followed** 73:1, 187:12 .
**following** 152:18, 197:15 .
**footage** 166:13 .
**for.** 41:19 .
**foreclose** 143:17 .
**foreclosure** 5:23 .
**foregoing** 200:5 .
**forgiveness** 5:22 .
**formal** 114:18 .
**formally** 183:10 .
**format** 88:19, 94:14, 94:20, 173:2, 200:8 .
**formatting** 102:10 .
**Forms** 4:8, 8:22, 62:20, 63:17, 82:22, 84:14, 86:25, 87:4, 87:8, 88:13, 88:17, 90:8, 100:8, 102:5, 106:22, 106:23, 108:14, 108:15, 109:5, 109:6, 109:9, 109:10, 109:14, 109:24, 126:8, 138:21, 142:4, 142:9, 144:4, 156:6 .
**forth** 93:21 .
**forward** 113:10, 113:12, 113:14, 113:16, 113:19, 114:1, 114:2, 120:15, 120:16, 120:17, 121:23,

122:4, 122:9, 122:11 .
**found** 40:11, 113:1, 113:25, 122:8, 122:11 .
**foundation** 3:20 .
**four** 57:19, 57:21, 65:3, 98:18, 142:17, 148:24 .
**fourth** 182:22 .
**frame** 86:18, 120:2, 142:16, 170:1 .
**frankly** 93:9, 143:3, 149:5 .
**fraudulent** 142:9 .
**free** 72:8, 135:3 .
**Friday** 193:14 .
**friends** 199:4 .
**front** 13:13, 14:12, 46:20, 46:21, 81:25, 112:13, 127:2, 138:8, 157:15, 163:21, 183:11, 183:14, 183:23, 183:24 .
**fulfilling** 55:10, 99:5 .
**full** 136:20, 137:9, 157:2, 198:25 .
**full-time** 58:16 .
**fully** 6:20 .
**function** 106:17 .
**functions** 63:7 .
**fundamental** 105:15 .
**Fundamentally** 64:5, 64:7, 105:20, 106:11 .
.

**< G >.**
**G.** 200:2, 200:16 .
**gain** 184:5 .
**Gary** 1:27 .
**Gas** 34:24, 48:18, 49:12, 49:14, 49:19 .
**gasoline** 46:2, 49:17, 49:18, 49:20 .
**gave** 12:17, 13:4, 17:4, 47:10, 47:12, 49:6, 49:20, 50:18, 50:24, 51:18, 58:15, 137:15, 149:14 .
**general** 13:20, 57:23, 118:23, 124:11, 125:23, 127:1, 127:2, 134:22,

140:25, 154:14, 170:2, 174:23, 178:6, 179:4, 179:9, 180:12, 180:13, 182:18, 183:8, 183:19, 184:19, 186:18, 192:15, 194:5, 194:11 .
**Generally** 62:17, 92:17, 93:6, 118:8, 124:17, 125:14, 126:24, 128:18, 132:17, 133:3, 133:5, 133:24, 139:7, 154:13, 157:23, 158:19, 160:19, 167:14, 169:14, 169:21, 176:25, 178:5, 179:7, 181:14 .
**generate** 75:23, 75:25, 83:6, 86:10, 88:13 .
**generated** 82:23, 83:20, 87:4, 88:18, 89:24, 90:3, 109:24, 187:20, 188:25 .
**gentlemen** 9:15, 91:24, 135:12, 198:15 .
**Gerald** 1:40, 1:41, 3:12 .
**gets** 108:1, 131:20, 145:11, 155:8, 162:23, 170:2, 184:18, 185:4, 188:22, 189:3, 190:9 .
**getting** 9:17, 16:23, 94:13, 94:20, 99:2, 109:17, 138:25, 145:5, 151:13, 174:13 .
**gifts** 17:1 .
**gist** 12:17 .
**Give** 12:19, 13:6, 17:5, 18:12, 19:25, 44:25, 47:17, 53:20, 53:22, 82:21, 92:6, 94:4, 104:15, 106:6, 109:8, 115:6, 120:14, 135:15, 135:17, 137:14, 141:24, 149:1, 159:14, 187:15, 190:16, 192:13, 193:17, 194:11 .
**given** 50:25, 130:7, 132:18, 133:13, 143:3 .
**gives** 67:24, 69:2, 163:11 .
**giving** 15:11, 49:9 .

**goods** 160:23 .
**Gotcha** 119:14 .
**gotten** 198:17 .
**governed** 16:16 .
**GOVERNMENT'S** 10:1,
  60:13, 123:4 .
**grab** 7:17, 144:3 .
**graduate** 124:7 .
**graduated** 124:5 .
**Grand** 52:22, 75:25,
  196:18, 197:7 .
**grands** 39:9 .
**grant** 10:24, 21:12, 27:24,
  27:25, 28:10, 32:24,
  33:3, 36:13, 36:16,
  37:1 .
**granted** 6:9 .
**grants** 55:10 .
**graphical** 137:19 .
**grasp** 6:20 .
**Great** 44:21, 94:19, 146:2,
  155:23 .
**greater** 158:5 .
**Greenbelt** 1:16, 1:30 .
**grounds** 142:8 .
**group** 153:2, 153:4,
  185:5 .
**groups** 71:19 .
**grow** 16:10 .
**guess** 97:8, 97:22, 105:25,
  136:18, 138:2, 139:8,
  141:3, 141:7,
  149:21 .
**Guidance** 159:17 .
**guidelines** 197:20 .
**guys** 40:11, 52:6 .
          .
          .
**< H >.**
**habit** 116:21 .
**hair** 45:20, 45:22 .
**half** 91:25, 92:3, 118:7,
  120:25, 162:4, 164:3,
  165:7, 165:23, 167:21,
  172:21, 173:24 .
**Hand** 9:25, 60:12, 123:3,
  146:12, 146:13 .
**hand-carried** 15:15 .
**handed** 51:18 .
**handful** 3:17 .

**happen** 69:16, 112:3,
  142:7, 187:22,
  198:16 .
**happened** 19:6, 109:14,
  113:18, 114:15, 173:9,
  173:12, 189:14,
  196:15 .
**happening** 20:2, 140:3,
  140:6 .
**happens** 69:5, 74:10, 79:6,
  79:21, 86:1, 111:21,
  154:6, 154:8, 166:24,
  188:21 .
**Happy** 150:15 .
**hard** 49:4, 131:2,
  149:13 .
**harder** 98:4 .
**head** 67:5, 110:10,
  127:17 .
**heads** 149:1 .
**heads-up** 78:12 .
**hear** 109:3, 125:8, 190:10,
  190:15, 192:8 .
**heard** 41:12, 93:7, 96:12,
  198:17, 199:8 .
**hearing** 143:11 .
**held** 200:7 .
**Help** 16:8, 16:9, 16:13,
  16:17, 16:18, 16:22,
  63:10, 63:13, 63:14,
  65:3, 65:18, 65:22, 84:6,
  85:1, 107:11, 169:6,
  170:6, 170:13,
  196:6 .
**helped** 193:25 .
**helpful** 148:25, 149:19 .
**helps** 117:13, 192:21 .
**hereby** 200:4 .
**heroic** 94:17 .
**higher** 134:23 .
**highlighted** 66:13, 85:5,
  127:14 .
**hire** 142:5 .
**history** 8:21, 104:8,
  136:13 .
**hit** 23:2, 65:10, 68:9, 69:6,
  69:15, 89:9, 113:18,
  121:24 .
**hobby** 160:13 .
**Hockett** 32:2 .

**Hold** 7:17, 141:25, 152:19,
  184:4 .
**holder** 93:1 .
**homeless** 16:6, 16:11 .
**Honorable** 1:22, 100:23,
  152:7, 199:17 .
**honorary** 11:9 .
**hope** 9:15, 118:5, 186:23,
  192:13, 192:21,
  199:3 .
**hopefully** 152:15 .
**horribly** 148:21 .
**Horseback** 39:1, 39:4,
  39:22, 40:7, 57:7 .
**hotel** 17:6, 17:7, 48:14,
  48:18, 48:20, 48:23,
  48:24, 50:18 .
**hotels** 48:19 .
**hours** 63:24 .
**house** 25:24, 54:24 .
**household** 67:5,
  127:17 .
**hub** 78:2 .
**huge** 140:15 .
**human** 125:24 .
**humanities** 11:9 .
**hurdle** 94:21 .
          .
          .
**< I >.**
**I.** 167:14 .
**ice** 57:16, 57:17 .
**icon** 65:11, 70:19,
  84:12 .
**icons** 63:15, 65:3, 65:16,
  65:20, 65:21 .
**idea** 41:9, 44:17, 49:11,
  170:2, 193:25 .
**identification** 4:14, 4:15,
  42:6, 42:7, 181:8 .
**identified** 47:14, 93:14,
  93:21 .
**identifies** 68:17, 71:7 .
**identify** 3:8, 42:8, 91:4 .
**identifying** 149:23 .
**IDRS** 8:21 .
**II** 161:2, 161:4, 161:12,
  161:13, 162:5, 162:6,
  164:4, 165:8, 166:17,
  167:21, 167:25, 170:19,

  172:2, 174:10, 179:2,
  195:2 .
**implications** 48:12 .
**implicit** 6:25 .
**important** 128:8,
  155:15 .
**improper** 6:12, 7:5,
  7:6 .
**improved** 101:5 .
**in.** 9:1, 25:16, 118:8,
  152:11, 190:16,
  193:9 .
**inaccurate** 41:10,
  73:15 .
**inclined** 146:1 .
**include** 28:24, 37:3, 125:1,
  137:3, 144:25,
  161:13 .
**included** 28:21, 37:3,
  93:16, 104:18, 144:22,
  169:3 .
**including** 21:10, 32:22,
  144:14, 145:8,
  150:25 .
**income-producing**
  161:25 .
**income.** 33:6, 130:25,
  131:10, 132:10, 132:22,
  154:2 .
**inconsistent** 95:25 .
**incorporate** 106:15 .
**incorporated** 107:12 .
**incorrect** 73:6 .
**increase** 158:10 .
**increases** 106:3,
  106:4 .
**increasing** 181:4 .
**incur** 179:20 .
**incurred** 27:23, 36:24,
  178:9 .
**INDEX** 2:1 .
**indicate** 111:7, 117:24 .
**indicated** 52:16, 65:25,
  91:8 .
**indicates** 156:5 .
**indication** 125:21 .
**indirect** 194:22 .
**Individual** 4:25, 11:25,
  20:7, 31:14, 67:8,
  103:20, 124:12, 124:21,

125:7, 125:10, 125:23,
126:3, 126:9, 126:11,
127:11, 127:15, 129:5,
133:18, 185:8 .
**individuals** 32:1, 32:3,
185:3 .
**industry** 190:1 .
**inflated** 140:1 .
**information.** 179:4 .
**initial** 69:11, 172:24,
189:8 .
**initial.** 171:7 .
**injecting** 98:4 .
**ink** 30:10, 30:12, 40:23,
40:25 .
**input** 76:21, 78:13, 80:6,
80:18 .
**inputted** 66:16, 78:6 .
**Insert** 70:10 .
**inside** 47:24, 47:25, 63:12,
90:13, 91:7, 91:17 .
**insofar** 139:24 .
**install** 89:24, 111:15,
112:21 .
**installation** 114:11 .
**installing** 68:14 .
**instance** 127:14, 128:20,
183:17 .
**instances** 184:25 .
**instead** 68:22, 138:9,
175:20, 175:21 .
**instructed** 178:18 .
**instruction** 148:16, 159:10,
159:13, 159:14, 159:15,
159:18, 160:5 .
**Instructions** 4:8, 63:16,
84:14, 85:16, 85:18,
85:20, 86:3, 86:7, 86:12,
86:14, 86:17, 107:1,
150:20, 159:9, 159:23,
169:3 .
**instructions.** 86:8, 161:22,
166:4, 177:20 .
**insufficient** 141:21 .
**insurance** 167:15,
167:16 .
**integrity** 189:15 .
**intend** 148:21 .
**intended** 149:1, 150:7 .
**intent** 5:1, 140:20 .

**interact** 64:8 .
**interaction** 189:5 .
**interest** 179:22 .
**interested** 136:15,
138:17 .
**interface** 108:1,
117:12 .
**interfaces** 105:20 .
**Internal** 104:4, 123:18,
123:22, 182:13 .
**international** 11:8 .
**internet** 23:23, 23:25, 24:2,
24:4, 24:6, 24:9, 24:13,
35:2, 35:7, 56:20,
56:21 .
**internet.** 23:19 .
**interrupt** 188:6 .
**interview** 184:4, 184:5,
189:8, 189:14 .
**introduce** 7:15, 8:21,
143:23 .
**introduced** 12:16,
13:23 .
**inventory** 166:3 .
**investigated** 41:18 .
**investigated.** 41:17 .
**investigation** 98:17,
98:21 .
**investigator** 41:15 .
**investment** 38:9, 179:17,
179:22 .
**investments** 179:22 .
**invoice** 90:7, 110:13,
110:16 .
**invoices** 63:5, 63:8 .
**involve** 33:3 .
**involved** 119:10, 120:15,
160:10, 193:9 .
**involves** 150:13 .
**Iras** 155:7 .
**irrelevant** 145:12 .
**issue** 4:9, 5:19, 6:13, 9:3,
92:13, 135:25, 139:3,
140:13, 140:15, 141:1,
141:7, 141:17, 143:6,
143:7, 144:20, 146:16,
147:3, 148:16, 150:7,
151:6 .
**issued** 8:22, 100:11,
100:12 .

**issues** 6:18, 6:20, 6:21,
7:2, 7:10, 9:5, 101:5,
150:21, 182:1 .
**item** 7:17, 49:12, 50:6,
50:10, 143:7,
145:11 .
**itemize** 75:21, 134:9,
134:11, 134:12 .
**Itemized** 26:12, 26:23,
34:20, 35:13, 35:22,
78:17, 82:1, 82:6, 82:12,
96:2, 128:10, 133:1,
134:4, 134:5, 134:12,
134:20, 135:5, 153:15,
153:21, 176:17, 176:18,
178:19, 181:1 .
**items** 7:6, 48:16, 48:17,
51:23, 81:14, 124:23,
160:24, 162:13, 183:21,
184:9, 186:13,
192:10 .
**itself** 19:16, 19:17, 64:5,
94:9, 107:7, 107:21,
109:20, 121:20, 186:4,
191:2 .
**Ivy** 1:29 .

.

.

**< J >.**
**Jeep** 23:4, 52:22 .
**jeez** 144:15 .
**Job** 12:20, 27:6, 28:17,
29:18, 36:2, 36:15, 38:6,
54:10, 54:20, 54:23,
58:12, 61:17, 79:5,
79:18, 126:23, 177:18,
177:19 .
**joint** 67:5, 127:20, 133:16,
134:24, 135:2,
135:4 .
**jointly** 135:1, 149:19 .
**Jones** 126:21, 164:24,
176:11, 178:7, 183:15,
185:9 .
**Judge** 5:20, 6:1, 7:11,
116:21, 118:20, 122:20,
141:9, 142:5 .
**Judicial** 200:8 .
**Jury** 3:7, 7:22, 8:25, 9:7,
9:8, 9:13, 11:7, 28:6,

64:24, 92:8, 94:10, 95:1,
99:23, 101:20, 101:21,
127:1, 135:21, 148:16,
149:6, 150:13, 150:20,
151:25, 152:11, 152:12,
199:12 .
**JURY TRIAL** 1:21 .
**Justice** 1:33 .

.

.

**< K >.**
**Keep** 120:11, 120:13,
122:3, 128:1, 135:19,
156:11, 162:1, 176:25,
199:7 .
**keeping** 93:3 .
**key** 70:10 .
**keyboard** 65:7, 65:10,
68:10, 69:7, 70:11,
75:21 .
**kick** 115:13 .
**kid** 47:2 .
**kids** 39:16, 39:19 .
**kinds** 7:25, 62:21, 74:6,
96:3 .
**knowledge** 24:8, 30:18,
43:22, 125:18, 140:20,
143:15, 181:23, 184:5,
191:19 .
**knowledge.** 191:16 .
**known** 89:25, 91:10,
125:12 .
**knows** 73:2, 108:19,
137:18 .

.

.

**< L >.**
**L.** 1:32 .
**labeled** 15:22 .
**labor** 100:13, 143:6 .
**lack** 7:16, 119:11 .
**Ladies** 9:15, 91:24, 135:12,
198:15 .
**laid** 3:20, 150:19 .
**lamp** 25:16 .
**landing** 64:17 .
**Lane** 1:29 .
**language** 42:24, 186:10,
192:24 .
**laptop** 14:8, 14:10, 25:23,

54:23, 55:2, 55:22,
55:25, 56:1 .
**large** 5:10, 5:23, 124:23,
183:21, 185:6 .
**larger** 119:12, 191:8 .
**last** 10:3, 10:5, 10:22,
41:14, 53:18, 57:19,
60:15, 60:17, 120:18,
122:8, 122:16, 123:6,
123:9, 147:16, 182:7,
182:22, 185:18 .
**late** 93:11, 98:8, 98:14,
98:15, 98:25, 99:1, 99:2,
99:3 .
**later** 98:18 .
**launch** 17:8, 65:22,
65:23 .
**LAW** 1:41, 106:5, 106:20,
107:20, 124:22, 137:20,
173:6, 197:18,
199:17 .
**lawn** 115:1, 115:7 .
**laws** 11:22, 52:8, 106:2,
196:5 .
**lawsuit** 7:18 .
**lead** 84:12, 138:18,
144:16 .
**leads** 96:19, 168:20 .
**learn** 16:24 .
**learned** 124:21 .
**lease** 22:4, 22:10,
25:10 .
**leasing** 76:22 .
**least** 50:25, 95:10, 143:9,
151:25 .
**leave** 90:3, 95:8, 159:21,
173:18, 178:25,
179:25 .
**leaves** 150:14 .
**left** 13:12, 19:17, 51:17,
59:1, 65:12, 65:15,
70:19, 78:16, 92:8,
131:10, 133:17, 135:21,
153:10, 199:12 .
**left-hand** 70:21, 81:23,
82:16 .
**legal** 106:17, 151:17 .
**lemon** 33:20 .
**length** 72:14, 115:20 .
**less** 22:1, 139:19, 170:3,

176:3, 191:24 .
**letter** 184:12, 184:21,
186:15, 186:16, 186:18,
186:21, 187:19, 187:20,
188:16, 188:23 .
**letters** 115:23, 183:25,
188:25, 192:18 .
**level** 118:23, 127:1,
127:2 .
**lie** 56:13 .
**lied** 99:19 .
**life** 169:16, 169:17, 190:18,
195:14 .
**likely** 151:9 .
**Likewise** 29:11, 29:18,
35:1, 59:18 .
**limine** 3:25, 4:23, 95:23,
96:7 .
**limit** 195:23 .
**limitation** 176:1 .
**limitations** 133:17, 167:7,
175:25, 176:2,
195:20 .
**limited** 72:11, 100:1 .
**lines** 28:22, 37:3, 75:11,
117:4, 157:4, 161:13,
163:6, 163:8, 166:5,
167:8, 167:10 .
**link** 63:13, 63:15, 85:5,
85:14, 86:2, 86:6 .
**links** 84:22, 115:7,
159:2 .
**listing** 70:22, 71:7, 72:22,
82:22, 88:15, 102:7,
102:13, 102:18, 102:19,
103:3, 108:13, 109:22,
110:13, 138:9, 160:19,
168:3, 175:20 .
**lists** 8:15, 71:20, 88:17,
90:23, 108:14, 109:24,
110:11 .
**literally** 111:19, 127:4 .
**little** 4:22, 13:8, 25:15,
30:3, 31:20, 42:21,
65:17, 65:19, 82:4, 84:8,
92:2, 101:14, 130:18,
145:7, 147:25, 149:9,
152:14, 153:24, 154:16,
156:2, 168:22, 173:2,
191:7, 198:23 .

**lived** 25:15 .
**living** 13:18, 106:3 .
**Loan** 8:23, 10:24, 11:3,
27:24, 27:25, 28:10,
36:13, 36:16, 37:1,
100:17 .
**loans** 55:10 .
**located** 46:18 .
**location** 168:12, 179:9,
184:20 .
**lodge** 193:12 .
**log** 28:10, 28:11,
51:15 .
**logical** 89:20 .
**long** 10:19, 14:2, 39:15,
61:12, 91:25, 105:15,
123:19, 123:23, 135:12,
143:19, 144:17, 148:19,
195:20, 196:3 .
**longer** 143:18, 152:14 .
**looked** 25:13, 40:25, 74:15,
81:19, 105:5, 110:14,
114:23, 126:3, 132:23,
163:25, 167:23 .
**Looks** 41:2, 42:9, 67:13,
71:2, 90:7, 104:12,
104:18, 106:9, 117:10,
128:17, 131:4, 137:9,
164:23, 167:8, 171:5,
171:15, 172:22, 173:2,
173:11, 173:19,
175:16 .
**lose** 52:5, 169:23 .
**loses** 169:18, 169:21 .
**losses** 51:25, 157:14 .
**lost** 52:2, 149:9 .
**lot** 5:11, 33:21, 137:6,
143:1, 169:6, 169:24,
176:5, 180:1, 189:9,
189:18, 190:8,
191:10 .
**lunch** 92:2, 135:9, 135:14,
135:17, 150:14,
152:14 .

. 

. 

**< M >.**
**Ma'am** 9:12, 9:24, 10:9,
20:7, 21:3, 26:12, 42:4,
43:21, 44:23, 45:5,

45:23, 46:11, 47:22,
48:16, 49:3, 49:20, 50:3,
50:10, 52:19, 53:18,
54:9, 55:15, 57:2,
123:12, 183:4, 183:6,
188:4, 191:10, 192:22,
194:12 .
**machine** 111:24 .
**Mahoney** 1:47, 94:16, 95:7,
126:17, 128:2, 130:22,
131:22, 132:8, 135:9,
144:3, 154:15, 154:25,
156:17, 160:2, 160:15,
161:1, 161:16, 162:3,
162:25, 163:22, 164:21,
165:6, 165:12, 170:8,
171:3, 171:9, 172:7,
175:1, 176:8 .
**mail** 14:25, 63:3 .
**mailing** 183:25 .
**main** 4:22, 54:20, 64:17,
65:3, 74:11, 74:13,
76:11, 77:16, 78:24,
79:25, 81:9, 81:18,
114:22, 140:14, 147:11,
147:15, 147:17 .
**mainly** 12:23 .
**maintain** 15:23 .
**maintenance** 22:23, 33:15,
33:17, 167:15 .
**maintenance.** 22:16,
33:13 .
**major** 12:22, 12:24, 14:17,
17:6, 50:19, 151:20 .
**making.** 21:12, 32:24 .
**management** 11:8,
63:7 .
**manager** 185:4 .
**mandated** 58:12 .
**marked** 42:6, 181:8,
181:10 .
**market** 16:18, 16:24 .
**marking** 59:1, 59:2,
59:18 .
**marks** 91:9 .
**Married** 67:4, 67:5, 127:16,
127:19, 127:20, 133:15,
133:16, 133:25, 134:24,
135:1, 135:2, 135:4 .
**Mary** 32:2 .

**Maryland** 1:2, 1:16, 15:24, 124:7, 200:4 .
**massive** 139:9 .
**master** 11:8 .
**match** 163:25, 184:22 .
**matches** 71:8, 76:19 .
**matching** 87:17 .
**mathematical** 116:1, 116:4, 116:11 .
**Matt** 3:10 .
**matter** 3:4, 92:5, 125:23, 148:2, 200:7 .
**matters** 141:7, 199:16 .
**Matthew** 1:32 .
**maximum** 115:19 .
**MD** 1:30, 1:43 .
**Meals** 28:24, 29:12, 29:19, 37:4, 37:11, 37:15, 37:22, 80:6, 80:9, 80:14, 80:19 .
**mean** 19:24, 25:22, 39:13, 44:22, 54:21, 55:21, 58:16, 103:14, 104:14, 112:11, 113:17, 118:2, 119:9, 129:17, 134:14, 145:19, 146:22, 148:3, 155:3, 155:11, 161:8, 169:19, 188:6, 194:1, 197:4, 198:12 .
**meaning** 88:2 .
**means** 43:7, 116:6, 119:2, 119:5, 121:19, 141:2, 191:18 .
**medical** 101:5 .
**Medstar** 10:18, 10:21 .
**meet** 12:10, 12:12, 13:6, 15:5, 151:11 .
**meeting** 14:21, 15:7, 19:12, 19:20, 44:12 .
**meetings** 12:15, 13:15, 13:22, 14:2, 14:20 .
**mention** 57:11 .
**mentioned** 9:16, 19:2, 19:7, 21:15, 28:3, 48:17, 57:13, 84:5, 106:1, 110:2, 121:1, 164:19, 184:12, 185:18, 186:15 .
**mentioning** 72:17 .
**menus** 62:19, 64:10, 65:18,

65:19, 82:25, 117:10 .
**mere** 6:10 .
**Merit** 200:2 .
**met** 44:1, 44:11, 44:14, 46:6, 48:3 .
**meter** 168:8 .
**method** 91:10, 161:22 .
**methodology** 96:2 .
**meticulous** 143:20 .
**Michael** 1:27, 3:9 .
**microphone** 4:3, 10:3, 42:17, 60:15, 81:5, 116:19, 123:6 .
**mid** 148:4 .
**mid-size** 185:6 .
**middle** 70:20, 71:15, 72:18, 78:3, 85:23, 93:15, 98:9, 139:11, 139:22, 140:3 .
**mileage** 17:19, 17:20, 17:21, 46:4, 48:14, 51:5, 51:6, 51:10, 51:13, 51:15 .
**miles** 179:11 .
**millions** 142:6 .
**mind** 50:11, 85:24, 102:25, 135:13, 135:19, 195:6, 199:3, 199:8 .
**minds** 149:8 .
**Mine** 31:18 .
**minimum** 64:1 .
**ministry** 16:22 .
**minus** 154:18, 154:19, 163:10, 163:11 .
**minute** 47:14 .
**minutes** 7:21, 9:6, 14:3, 92:7, 92:11, 135:16, 183:16, 199:16 .
**mirror** 106:10 .
**miscellaneous** 38:7, 72:5 .
**mischaracterized** 8:5 .
**mismatch** 188:24 .
**missed** 137:14 .
**missing** 136:20 .
**mistake** 5:2, 133:22, 140:7 .
**mistaken** 14:8 .
**Mitchell** 200:2, 200:16 .

**mixed** 14:24 .
**Mm-hmm** 52:15 .
**model** 145:6 .
**modern** 91:11 .
**module** 119:1 .
**moment** 58:1, 118:18, 182:5, 188:7 .
**Monday** 193:14 .
**money** 16:14, 17:2, 17:11, 50:6, 110:1, 122:13, 129:19, 145:3, 145:21, 146:7, 158:23, 190:6, 190:14 .
**month** 24:10, 98:22 .
**morning** 3:9, 3:11, 3:13, 3:14, 9:12, 10:13, 10:14, 42:4, 42:5, 60:21, 61:8, 61:9, 91:25, 92:1, 148:10, 199:1 .
**mostly** 3:24, 5:3 .
**motion** 3:24, 4:23, 5:2, 6:10, 95:10, 95:23, 96:7, 143:12 .
**motivation** 147:18 .
**motive** 145:5, 147:8 .
**move** 3:23, 42:14, 54:23, 59:12, 68:9, 101:11, 116:19, 149:19, 150:20, 150:21, 152:18, 155:17 .
**moved** 86:12, 101:10, 113:9, 113:10 .
**moves** 60:22, 101:4, 181:25 .
**moving** 135:7, 149:1 .
**MR. MORGAN** 102:3 .
**multiple** 68:15, 117:2 .
**multiplied** 182:23, 182:24 .
**myself** 7:3, 16:24, 68:18, 185:1, 197:6 .
.
.
**< N >.**
**N-a-t-h-a-n** 60:19 .
**named** 11:25, 103:20 .
**Names** 31:24, 111:13, 111:16, 149:13, 164:23 .
**narrow** 197:18 .

**Nathan** 2:15, 60:8, 60:13, 60:16 .
**nature** 23:17, 34:25, 45:4, 56:22, 133:18, 185:22, 189:10 .
**navigate** 68:5 .
**navigating** 90:14 .
**NE** 1:35 .
**near** 109:20 .
**necessarily** 54:17, 103:14, 126:2, 197:3 .
**necessary** 62:23 .
**need** 7:3, 16:11, 44:24, 51:13, 68:5, 87:21, 92:1, 92:5, 93:10, 94:10, 95:15, 98:2, 106:9, 117:14, 135:10, 135:15, 136:11, 136:17, 148:16, 149:14, 149:17, 154:12, 166:9, 166:12, 184:23, 194:3, 194:16, 196:1, 198:21 .
**needed** 16:9, 44:18, 55:25, 87:14, 107:21, 192:20, 193:14 .
**needing** 33:20 .
**needs** 70:16, 99:10, 100:2, 107:6 .
**Negative** 20:25, 32:14, 139:9, 157:12, 157:22, 163:13, 163:18, 171:12, 175:7, 180:5, 180:18 .
**nephews** 39:9 .
**New** 41:22, 56:17, 65:8, 65:25, 66:11, 67:2, 69:10, 70:10, 85:10, 106:22, 111:16, 114:7, 119:20, 120:5, 138:11, 196:20 .
**nieces** 39:9 .
**nine** 74:3 .
**nines** 72:4 .
**No.** 1:9, 3:5, 19:24, 35:9, 39:6, 40:11, 41:11, 52:12, 103:18, 104:14, 110:25, 117:19, 166:25, 185:10 .
**nobody** 112:21 .
**noncash** 45:7 .

**None** 97:14, 185:14, 187:11 .
**nonetheless** 196:25 .
**normal** 34:3, 94:16 .
**Normally** 169:23, 179:21, 189:8 .
**Northern** 1:34 .
**note** 143:17 .
**noted** 92:18 .
**notes** 1:49, 14:14, 14:18, 14:19, 46:6, 51:21, 56:11, 56:14 .
**Nothing** 6:6, 12:23, 16:21, 17:6, 106:2, 111:13, 112:1, 142:13, 146:24, 163:16, 198:2 .
**notice** 14:14, 82:3 .
**notices** 87:9 .
**notion** 7:4 .
**number.** 141:24 .
**numbered** 78:16 .
**Numbers** 6:3, 38:2, 67:17, 95:14, 100:6, 111:13, 117:2, 117:3, 120:4, 120:19, 120:22, 126:13, 137:13, 140:2, 146:25, 147:7, 156:3, 163:25, 164:10, 180:11, 191:25 .
**numerous** 98:25 .
.
.
**< O >** .
**oath** 190:23 .
**object** 141:18, 142:19, 151:23 .
**objected** 6:1, 149:24 .
**Objection** 4:17, 5:14, 42:15, 59:14, 60:25, 101:17, 142:22, 143:16, 149:22, 150:5, 188:17, 192:2, 192:3 .
**objections** 153:3 .
**objects** 144:14 .
**obtain** 63:20 .
**obviously** 106:24, 141:6, 142:21, 143:14, 149:14, 149:21, 151:13, 198:15, 199:8 .
**occasion** 19:3, 19:12,

56:10 .
**occasional** 121:2 .
**occasionally** 28:3 .
**occasions** 19:19 .
**Occupation** 27:22, 36:24, 67:17, 79:19, 79:20, 80:2 .
**occurs** 168:6 .
**Ocwen** 8:23, 100:17 .
**odometer** 51:11 .
**offer** 100:3, 141:15, 146:18, 146:20, 147:1, 149:15, 152:23 .
**offered** 93:8, 95:16 .
**offerings** 45:3, 45:9, 45:14 .
**offhand** 194:15 .
**Office** 1:28, 1:41, 5:11, 12:11, 12:16, 13:4, 13:7, 13:8, 13:9, 14:25, 19:6, 19:10, 25:10, 44:2, 44:10, 58:16, 68:16, 88:21, 94:17, 111:10, 168:7, 185:1, 187:8 .
**officer** 188:8 .
**Official** 200:1, 200:17 .
**often** 54:22, 104:15, 115:18 .
**oftentimes** 192:18 .
**old** 76:22, 118:6, 118:9, 118:11 .
**older** 118:7, 170:2 .
**Once** 23:3, 39:8, 50:17, 56:5, 63:2, 70:14, 77:1, 81:22, 82:5, 82:21, 86:6, 183:24, 184:4, 185:4, 192:16 .
**one-page** 173:15 .
**ones** 4:6, 86:15, 98:6, 118:5, 151:1 .
**open** 64:2, 64:17, 79:10, 84:22, 85:6, 85:10, 85:13, 86:2, 114:12, 135:19, 199:7 .
**opened** 48:1 .
**opens** 86:6 .
**operate** 105:18, 161:9, 193:13 .
**operated** 160:7 .
**operates** 193:10 .

**operating** 63:24, 162:8 .
**operation** 193:1 .
**opine** 141:21 .
**opinion** 141:25 .
**opportune** 198:19 .
**opportunity** 198:18 .
**opposed** 136:23 .
**opposite** 6:15 .
**option** 58:13, 71:14, 79:11, 80:14, 81:22 .
**options** 63:12, 65:1, 65:20, 69:2, 72:21, 73:17, 88:3, 133:10 .
**order** 70:8, 81:1, 82:13, 95:19, 97:10, 97:23, 99:22, 104:8, 107:9, 107:12, 188:9, 193:3 .
**ordinarily** 192:9 .
**organization** 45:6, 45:7, 48:1, 48:6 .
**organizations** 33:3 .
**original** 98:10 .
**otherwise** 69:14 .
**ourselves** 12:17 .
**outside** 14:12, 57:3, 57:6, 57:21 .
**outweighed** 140:21, 143:5 .
**overall** 158:1, 189:14, 190:3 .
**overlapping** 96:8 .
**overlooked** 118:13 .
**overnight** 199:7 .
**overpaid** 156:16 .
**overreporting** 6:18 .
**overrule** 142:23, 143:16 .
**Overruled** 188:19, 192:5 .
**oversight** 94:8 .
**overstating** 6:3 .
**owe** 129:10, 129:13, 129:24, 130:1, 130:2, 130:5, 156:23, 157:2, 190:6 .
**owed** 90:23, 156:25, 158:3, 158:9, 158:10, 178:22 .

**own** 3:25, 6:16, 11:16, 107:10, 140:3, 143:9, 145:10, 145:11 .
**owned** 54:18 .
**owner** 61:15, 197:22 .
**owning** 175:12 .
.
**< P >** .
**p.m.** 135:21, 152:9, 152:12, 199:12, 199:19 .
**Pages** 18:21, 18:22, 47:12, 127:4, 127:6, 130:15, 130:17, 136:22, 137:15, 138:10 .
**paginated** 137:15 .
**paid** 16:24, 30:24, 45:14, 53:10, 53:14, 53:17, 77:2, 91:2, 104:16, 104:17, 110:18, 111:5, 111:8, 129:7, 129:21, 156:25, 157:2, 158:5, 177:4, 187:17 .
**paid.** 104:13 .
**painting** 13:11 .
**Paper** 23:17, 49:7, 51:1, 53:2, 54:7, 66:22, 94:16, 103:13, 144:3, 190:5 .
**papers** 127:5 .
**paperwork** 12:17, 12:19, 13:4, 13:6, 19:16, 19:17, 19:19, 53:10 .
**Paralegal** 1:47 .
**parcel** 99:21 .
**parent** 122:6 .
**Park** 71:10, 124:7 .
**parking** 34:24, 46:3, 48:18 .
**Particularly** 6:17, 100:2, 137:8 .
**particulars** 25:16 .
**partly** 140:12 .
**partnerships** 63:18, 111:1, 125:4, 175:4 .
**parts** 112:19, 126:14 .
**party** 90:24, 129:11 .
**passed** 137:20 .
**past** 112:4 .
**path** 151:23, 151:24 .

Patricia 200:2, 200:16 .
pause 129:12, 158:22,
198:21 .
Pause. 58:4, 118:19, 136:7,
198:1 .
pay 16:16, 48:19, 111:7,
129:3, 129:8,
190:14 .
paying 77:3, 111:2 .
payment 8:18, 49:25,
96:23, 97:4, 97:9, 98:1,
99:19, 99:24, 100:17,
110:21, 136:14, 139:13,
140:16, 155:19, 155:21,
155:22 .
Payments 8:16, 97:6,
128:25, 129:3, 130:8,
143:7, 154:11, 156:1,
156:9, 156:15,
157:1 .
Payments. 129:1 .
PC 1:41 .
PDF 70:21, 70:22, 71:2,
71:4, 71:6, 72:12, 83:7,
83:20, 84:4, 85:6,
88:13 .
peculiar 5:18 .
pen 30:10, 30:12, 40:23,
41:1 .
penalties 30:16, 43:4 .
pending 3:4 .
pensions 131:16 .
People 5:11, 6:14, 16:5,
16:18, 18:6, 41:19,
97:14, 104:5, 129:2,
129:3, 131:2, 131:11,
135:13, 139:16, 142:5,
155:17, 166:12, 168:4,
168:7, 169:21 .
per 108:15, 110:11, 110:16,
182:16 .
percent 18:6, 34:11, 69:13,
79:5, 80:16, 125:21,
170:13, 196:21 .
percentage 34:9, 166:7,
166:9, 167:4, 167:5,
167:13, 196:21 .
percentages 18:8, 18:10,
18:11, 24:4, 24:6,
35:10 .

perform 178:9 .
performed 167:3 .
performing 107:10 .
perhaps 19:2, 137:18,
139:12, 147:8,
152:3 .
period 140:6, 140:12 .
perjury 30:16, 43:5 .
permission 149:6 .
permit 5:25, 115:12,
115:23, 118:14 .
person 13:23, 13:25,
14:13, 44:21, 75:5,
76:10, 112:12, 112:15,
113:2, 118:11, 133:14,
133:24, 140:24, 149:11,
190:23, 194:13,
195:18 .
personal 6:16, 33:24, 68:2,
68:16, 69:1, 87:15,
87:21, 113:6, 134:5,
143:14, 161:11, 166:7,
166:14, 178:19, 189:10,
196:22 .
perspective 198:23 .
pertaining 13:21, 23:3 .
phase 124:20, 125:1 .
Philadelphia 1:42 .
phone 13:3, 17:22, 17:23,
18:1, 18:3, 18:5, 18:9,
23:19, 23:23, 24:1, 24:5,
24:7, 24:9, 24:14, 35:1,
35:7, 44:4, 55:17, 55:18,
55:19, 55:21, 56:21,
56:23, 67:17, 88:22 .
pick 14:23, 15:1, 19:10,
19:13, 71:14 .
picking 72:5 .
picture 47:2, 62:3 .
piece 8:20, 49:6,
146:1 .
PIN 91:10, 91:12 .
place 54:22, 87:17, 93:1,
106:8, 108:3, 114:20,
114:23, 117:17, 117:21,
196:19, 197:13 .
placed 47:23, 50:23, 53:6,
108:4, 117:1, 189:23,
191:25, 192:10,
196:20 .

places 16:13, 63:14,
115:10 .
Plaintiff 1:7, 1:25 .
plan 136:3, 136:8,
148:18 .
planning 94:4, 138:14,
149:15, 150:25 .
point 3:23, 41:21, 64:5,
68:6, 69:3, 70:6, 73:2,
73:15, 86:11, 87:8, 90:4,
91:14, 91:16, 95:2,
95:24, 99:13, 103:14,
112:23, 113:24, 135:11,
141:15, 142:10, 142:15,
179:7, 188:22, 189:3,
190:4, 190:9,
195:24 .
pointed 4:4 .
pointing 139:24,
145:24 .
points 113:11 .
pony 39:9, 39:11 .
pop 67:3, 78:9, 111:11 .
pops 67:12, 117:13 .
popular 118:25 .
populate 121:20 .
portion 20:5, 21:2, 23:11,
26:22, 27:14, 30:13,
32:16, 34:19, 36:18,
65:15, 70:19, 70:20,
71:2, 71:3, 104:1,
162:22, 166:10, 167:4,
190:20, 191:5 .
portions 131:1 .
position 61:14,
184:24 .
positions 61:21 .
positive 180:21, 181:3 .
possession 186:7 .
possibly 145:21 .
post-grad 124:6 .
potential 143:12 .
potentially 140:19 .
pothole 23:2 .
pound 115:18 .
powers 133:13 .
practice 190:1 .
practiced 160:8 .
practitioner 91:10 .
precise 198:16 .

predicted 152:15 .
prefill 113:7, 115:5 .
prejudice 140:22,
143:5 .
preliminary 184:3 .
premise 4:25 .
premium 62:15, 104:23,
105:3, 105:6 .
preparation 8:4, 11:11,
11:14, 62:4, 107:13,
144:9, 145:15, 146:8,
171:19, 174:4, 182:15,
182:18, 182:20 .
prepare 44:25, 62:5, 62:11,
108:6, 112:7, 184:11,
186:10 .
prepared 11:16, 12:3,
41:19, 91:3, 103:3,
144:8, 181:15, 182:14,
191:20, 192:15 .
preparers 52:7, 57:1, 62:7,
62:11, 63:10, 68:15,
96:24 .
preparing 15:7, 47:9, 63:5,
112:3 .
prepopulated 71:23 .
prescription 20:2 .
Present 1:46, 44:8,
198:19 .
presentation 173:8 .
presented 197:21,
197:22 .
Press 66:1, 70:10, 75:21,
77:7 .
presumably 45:20,
146:8 .
presumptively 9:5 .
pretrial 4:23, 5:2, 5:7, 8:9,
144:3 .
Pretty 6:21, 16:21, 45:10,
56:24, 61:24, 64:12,
67:23, 91:25, 143:20,
145:24, 159:12 .
previewed 5:7 .
previous 103:7, 113:13,
114:9, 120:5, 159:24,
165:4, 173:3,
182:23 .
previously 100:19, 101:8,
195:25 .

primary 160:9 .
Principal 21:10, 32:22,
71:16, 71:22, 72:2,
72:18, 73:2, 73:5,
174:3 .
Print 42:25, 63:3, 65:3,
87:1, 87:5, 87:6, 87:24,
88:2, 88:3, 88:6, 88:7,
88:8, 88:9, 88:11, 90:7,
102:4, 102:14,
103:12 .
printed 66:21, 75:25,
94:10, 94:11, 94:20,
94:25, 102:17, 103:4,
103:10, 103:13,
137:11 .
printed-out 47:10 .
printer 13:12, 25:17, 47:1,
52:25, 54:3, 54:4,
95:6 .
printers 23:16 .
printing 64:11, 94:6, 94:9,
94:15 .
prints 88:17, 102:20 .
prior 5:14, 44:11, 104:16,
110:5, 112:6, 112:10,
112:16, 112:25, 113:1,
113:18, 113:20, 113:21,
113:22, 113:25, 114:5,
114:6, 114:15, 120:19,
122:5, 126:6,
143:11 .
private 63:19 .
Pro 7:18, 61:20, 62:8, 62:9,
62:10, 62:13, 62:17,
62:21, 63:10, 86:16 .
probably 7:22, 12:20,
39:20, 64:9, 67:14,
92:17, 93:6, 98:5,
104:17, 108:12, 142:25,
145:23, 148:3, 148:18,
149:4, 151:8,
199:13 .
probative 99:10, 139:5,
140:4, 140:21, 143:4,
143:10, 143:15,
146:15 .
problem 5:16, 66:22,
94:15, 115:17 .
problematic 140:10 .

problems 7:25,
138:15 .
procedure 14:4, 183:9,
183:18 .
procedures 124:22,
183:12, 187:11,
197:20 .
PROCEEDINGS 1:20,
200:6 .
process 94:3, 119:23,
124:22, 125:4, 127:9,
152:1, 184:12, 184:18,
185:18 .
processed 94:18, 111:2,
187:14 .
Processing 94:13 .
produce 170:6,
170:13 .
produced 128:21 .
product 21:11, 32:23,
61:15, 62:23, 63:11,
105:1, 166:3 .
production 179:20,
187:5 .
products 61:16, 111:6 .
profession 21:10, 32:22,
73:6, 160:8 .
professional 30:23,
61:15 .
professionals 52:13,
62:5 .
proffer 7:1 .
Profit 17:7, 21:3, 32:17,
85:22, 158:14, 159:6,
160:6, 160:10, 163:13,
172:10 .
program 61:25, 64:4,
105:14, 105:17, 106:14,
106:15, 106:21, 107:7,
107:12, 107:21, 108:3,
108:9, 108:18, 111:10,
111:11, 111:13, 114:8,
114:9, 115:12, 115:23,
116:7, 118:4, 118:22,
150:8 .
project 183:20 .
promoted 10:24 .
prompt 113:7, 113:18,
114:19 .
prompted 19:5 .

prompts 112:19 .
proof 45:1 .
propensity 97:11,
99:8 .
proper 7:19 .
properly 84:1, 190:15 .
property 5:23, 12:21, 22:4,
22:11, 22:14, 76:22,
76:23, 77:3, 119:13,
170:12, 175:12, 175:18,
175:21 .
proprietor 21:6, 32:20,
160:8, 171:16,
174:1 .
prove 99:19, 143:8 .
proven 141:23 .
provide 51:5, 53:13, 62:6,
107:25, 186:11 .
provided 51:14, 53:16 .
provides 54:23, 62:3,
116:2, 142:8 .
providing 55:10,
160:25 .
proving 145:25 .
provisionally 95:10 .
PTIN 4:14, 68:17,
68:19 .
public 106:24 .
publication 70:22, 84:15,
84:22, 84:23, 85:3, 85:4,
85:14 .
Publications 4:11, 63:16,
84:13, 84:17, 84:20,
86:12 .
pubs 84:21 .
pulled 83:8 .
pulling 120:3, 121:22 .
pump 49:19 .
purchase 104:15,
106:1 .
purchased 103:21, 104:5,
104:11 .
purchases 12:22,
104:20 .
purpose 3:6, 25:20, 35:8,
107:22, 140:14, 147:2,
147:15, 147:17,
160:9 .
purposes 17:19, 17:25,
106:24, 139:2, 139:3,

147:7, 151:25, 166:8,
194:21 .
pursuant 200:5 .
putting 6:19, 62:19, 64:10,
71:14, 81:17, 155:3 .

.

.

< Q > .
qualified 45:6, 154:1 .
qualifies 160:9 .
qualify 127:17, 160:14,
193:3 .
qualifying 67:6 .
questionable 124:23,
183:21, 184:9,
190:3 .
questions 13:21, 41:24,
43:2, 46:13, 58:5, 60:2,
63:21, 74:4, 74:15,
105:9, 119:15, 121:9,
126:13, 151:15, 165:22,
182:25, 190:2,
194:5 .
quick 126:18, 129:12,
136:5, 150:20 .
quicker 69:13 .
quickly 92:12, 128:1 .
quiet 54:22 .
quite 91:22, 149:5 .
quote 192:25 .

.

.

< R > .
R-a-d-i-a-h 123:11 .
Radiah 2:25, 123:1, 123:4,
123:8 .
raise 9:25, 60:12,
123:3 .
raised 148:17 .
random 96:15 .
rather 11:20, 148:17,
198:22 .
reading 30:21 .
ready 8:25, 68:9, 86:21,
89:2, 89:9, 101:20,
101:23, 199:9 .
real 78:21, 126:18, 129:12,
175:4 .
realize 129:9, 139:12 .
realizes 91:14, 102:20 .

**Really** 4:7, 16:25, 25:22, 30:23, 33:21, 44:18, 47:4, 48:21, 56:14, 64:7, 72:5, 88:19, 95:21, 116:6, 138:24, 139:15, 139:23, 140:22, 140:23, 147:25, 149:21, 169:14, 186:3, 187:25 .
**realm** 100:4 .
**Realtime** 200:3 .
**reason** 6:1, 6:2, 7:14, 99:20, 102:22, 106:12, 115:12, 141:19, 144:25, 183:20, 190:12 .
**reasons** 143:2, 183:22 .
**recall** 6:9, 15:14, 18:10, 25:4, 35:6, 46:9, 46:11, 46:25, 47:3, 48:4, 51:20, 51:25, 54:4, 54:14, 56:7, 56:10, 56:15, 57:10, 57:19, 57:24, 99:1, 114:23, 144:7, 153:14, 194:12, 194:15 .
**receipt** 48:20, 48:23, 48:24, 53:16, 53:19, 53:20, 53:23, 53:24, 54:4, 89:6, 89:11, 89:14, 108:20, 160:21 .
**receipts** 8:8, 48:18, 48:23, 49:14, 49:16, 49:18, 49:21, 75:13, 75:20, 76:8, 145:9, 145:14, 145:15, 147:16 .
**receive** 17:1, 49:25, 118:12, 127:5, 129:2, 129:19, 131:12, 175:12 .
**received** 11:10, 50:6, 50:15, 103:15, 110:23, 111:6, 124:15, 124:18, 160:22, 187:14 .
**receiving** 110:21 .
**Recess** 100:24, 100:25, 152:8, 152:9, 199:18, 199:19 .
**recognize** 59:4, 59:8, 102:11, 103:24, 124:23, 181:11 .
**recollection** 185:16, 185:17 .

**record** 3:8, 10:6, 60:18, 123:10, 141:18 .
**records** 3:18, 4:5, 4:16, 5:3, 100:8, 104:19 .
**recreate** 189:13 .
**RECROSS-EXAMINATION** 2:23, 121:14 .
**redact** 99:18 .
**REDIRECT** 2:13, 2:21, 58:7, 58:9, 119:16, 119:18, 198:4 .
**reduce** 158:4, 164:9, 164:12, 164:13, 178:21 .
**reduced** 96:19, 164:12 .
**reduces** 133:5, 133:9, 154:14, 157:25, 158:1, 158:2, 170:25, 171:1, 178:22 .
**Reducing** 133:8, 154:24, 180:15, 181:4, 181:6 .
**reduction** 158:4 .
**refer** 65:21, 149:21 .
**reference** 195:1 .
**referenced** 159:11 .
**referencing** 124:22, 186:19, 189:1, 191:9 .
**referred** 44:20, 159:24 .
**referring** 8:11, 85:7, 110:25, 119:3 .
**refunded** 31:5, 40:16, 129:16 .
**refunds** 96:20, 97:18, 97:25 .
**regard** 48:16 .
**regarding** 3:25, 57:15, 90:25, 104:20 .
**Registered** 200:2 .
**regular** 63:23, 75:5, 193:23, 194:2, 194:9 .
**regularity.** 160:11 .
**regularly** 166:2, 166:3, 166:11, 167:4, 193:1, 193:2, 193:15, 193:19, 194:7 .
**regulations** 200:8 .

**reimburse** 179:10 .
**reimbursed** 29:7, 178:9 .
**reimbursement** 179:9 .
**reject** 115:24 .
**related** 22:23, 24:9, 25:2, 29:5, 33:15, 37:11, 48:18, 101:12, 126:6, 183:22 .
**relates** 140:20, 141:3, 141:19, 150:12 .
**relationship** 189:4 .
**relative** 51:6 .
**release** 106:22, 106:23 .
**released** 62:24, 199:3 .
**relevance** 143:3, 145:8, 188:18 .
**relevant** 3:21, 139:15, 141:6 .
**Religious** 21:12, 32:24, 33:3 .
**relying** 143:13 .
**Remain** 60:11, 123:3 .
**remaining** 3:18 .
**remains** 113:6 .
**remember** 13:11, 15:17, 15:18, 17:10, 19:4, 22:13, 23:24, 24:14, 26:2, 29:9, 29:22, 30:11, 33:14, 37:10, 39:21, 45:19, 46:23, 49:4, 52:18, 53:21, 54:2, 57:7, 86:10, 98:22, 110:10, 117:9 .
**remembered** 57:9 .
**reminder** 131:4 .
**remove** 149:18 .
**Rent** 22:4, 22:10, 25:10, 167:15, 167:16, 168:11 .
**Rental** 76:23, 77:2, 175:4, 175:12, 175:18, 175:21 .
**renting** 22:14, 76:21 .
**repair** 167:15 .
**repaired** 23:2, 23:3 .
**Repairs** 22:15, 22:23, 33:13, 33:15, 33:17, 33:19, 33:20, 52:16,

167:16 .
**repayment** 17:1 .
**repeat** 185:24, 188:14, 192:1 .
**repetitive** 65:2 .
**repetitively** 194:8 .
**report** 26:4, 69:23, 132:19, 160:7, 161:20, 168:13, 179:10, 186:12 .
**reported** 8:18, 125:16, 131:9, 140:16, 158:7, 192:20 .
**Reporter** 200:1, 200:2, 200:3, 200:17 .
**reporting** 7:6, 145:10 .
**reports** 63:5, 63:8 .
**represent** 131:7, 154:3, 154:17, 176:16 .
**representation** 70:7, 75:10, 78:4, 84:9, 137:20 .
**represented** 53:14, 163:14 .
**representing** 68:1, 74:5 .
**represents** 106:7, 131:9, 154:4, 154:18, 154:19, 176:17 .
**request** 8:19, 55:11, 185:21 .
**requested** 188:16 .
**require** 120:9 .
**required** 27:7, 69:23, 91:4, 119:25, 177:20, 179:8, 194:13 .
**requirements** 99:5 .
**requires** 115:2 .
**research** 63:19, 92:4, 184:3 .
**resemble** 140:25 .
**residence** 166:7 .
**resolve** 144:13, 144:21, 188:9 .
**resources** 159:1 .
**respect** 8:9, 140:2, 144:21, 182:11 .
**respects** 140:4 .
**response** 95:20, 99:12 .
**responsibility** 148:22 .

responsible 168:12 .
rest 3:21, 4:16, 143:20,
    199:6, 199:11 .
restate 102:25, 163:8 .
resting 198:12 .
RESTS 2:33, 198:13 .
result 8:7, 176:2,
    190:8 .
Results 65:3, 81:23, 82:15,
    82:21, 83:13, 86:24,
    87:3, 87:12, 190:5 .
retreat 17:3 .
return. 43:10 .
returned 56:2 .
Revenue 123:18, 123:22,
    123:23, 123:25, 124:11,
    124:14, 125:6, 125:9,
    125:22, 136:11, 182:13,
    183:9, 184:25, 185:1,
    187:8, 188:8, 188:23,
    189:3, 189:25,
    195:8 .
review 73:12, 84:15, 85:16,
    86:21, 86:25, 125:15,
    126:6 .
reviewing 83:22, 87:8,
    89:2 .
ridden 39:14 .
ride 39:15 .
riding 39:4, 39:8, 39:9,
    39:11, 39:12, 39:14,
    39:22, 40:7, 57:7 .
riding. 39:1 .
right-hand 65:5, 82:3 .
rink 57:16, 57:18 .
rise 100:23, 152:7 .
RMR 200:16 .
Road 1:42 .
role 123:21 .
roll 138:1 .
roller 57:17, 57:18 .
Ronald 1:10, 3:6, 3:12,
    11:25, 31:1, 103:20,
    171:8, 171:17, 171:21,
    172:25, 174:2,
    174:6 .
room 25:9, 25:14, 25:17,
    25:18, 25:20, 44:9,
    54:17 .
roughly 24:1 .

royalties 175:4 .
rule 55:9 .
ruled 95:9 .
rules 138:7, 139:23 .
ruling 95:25, 96:5, 141:19,
    142:19, 151:12 .
rulings 151:25 .
run 25:7, 63:8, 114:13 .
running 71:9 .
.
.
< S > .
safe 38:10, 179:17,
    179:23 .
sailing 151:25 .
sales 61:24, 63:22, 75:14,
    75:20, 104:5,
    160:21 .
sample 66:15, 80:4 .
samples 166:4 .
satisfy 190:11 .
saw 42:10, 46:7, 73:5,
    74:19, 105:3, 111:25,
    113:5 .
saying 7:9, 7:11, 82:10,
    82:13, 95:10, 99:17,
    108:25, 110:8, 110:10,
    114:7, 118:4, 118:11,
    142:4, 142:18, 147:4,
    186:7, 190:6, 193:4 .
schedules 4:9, 7:13, 30:18,
    43:15, 51:24, 126:8,
    127:5, 130:16, 137:4,
    159:2, 169:6,
    197:22 .
Scope 121:12, 188:17 .
scratch 113:3 .
screens 68:3 .
screenshots 93:13,
    93:23 .
scroll 20:16, 21:17, 23:10,
    27:3, 28:19, 30:3, 30:5,
    31:19, 32:6, 33:5, 33:12,
    35:25, 82:4, 82:5, 82:10,
    84:24, 154:15, 155:23,
    156:17, 161:16, 165:6,
    172:7, 172:15, 174:7,
    174:19 .
Scrolling 21:23 .
se 7:18 .

season 193:12 .
seasonal 193:11 .
seated 3:3, 3:13, 9:14,
    10:2, 46:22, 60:14, 92:9,
    101:1, 101:22, 123:5,
    135:22, 152:10,
    152:13 .
Second 5:6, 14:21, 14:23,
    19:12, 87:23, 90:16,
    91:25, 92:3, 97:3, 136:5,
    136:25, 152:19, 178:21,
    182:8, 185:11, 191:12,
    191:13, 193:21,
    197:25 .
secretary 13:3, 44:4, 44:8,
    44:19, 56:9 .
secrets 151:21 .
sections 90:22, 127:13,
    130:21 .
Security 14:16, 66:12,
    67:16, 112:24, 118:7,
    118:8, 118:11, 118:12,
    127:12, 127:15 .
seeing 47:4, 64:25, 66:4,
    67:1, 67:22, 68:24, 69:9,
    69:20, 72:19, 74:12,
    79:8, 79:24, 80:12, 81:8,
    83:5, 86:5, 131:2 .
seek 143:23, 189:5 .
seeking 185:25 .
seem 140:10, 140:24 .
seems 118:5, 133:10,
    140:14, 178:3 .
seen 5:19, 96:3, 96:4,
    106:6, 140:9, 191:8,
    191:10, 191:16 .
sees 73:16, 113:12,
    151:23 .
Select 71:16, 72:18, 75:6,
    75:15, 76:14, 76:23,
    80:9, 82:15, 82:21, 83:2,
    83:14, 85:13, 85:18,
    85:22, 87:14, 87:24,
    88:1, 88:9 .
selected 67:13, 70:18,
    71:19, 75:18,
    102:14 .
selection 83:6 .
self-employed 185:2,
    185:3, 185:7 .

self-employment 128:20,
    128:22 .
selling 160:24 .
send 118:15, 148:18,
    187:18, 192:17 .
sense 97:8, 116:5, 118:5,
    148:19, 150:16 .
sent 91:18, 93:4, 94:2,
    103:4, 115:19, 124:19,
    188:16, 188:24, 188:25,
    190:6 .
sentence 160:12 .
sentences 160:5,
    161:19 .
separate 8:14, 17:13, 25:8,
    25:10, 25:14, 25:18,
    67:5, 71:18, 75:1, 99:16,
    114:13, 127:20, 133:16,
    159:8, 168:7, 168:8,
    168:11 .
separated 96:10 .
separately 14:1, 75:24,
    133:25 .
series 62:18 .
serves 50:11 .
Service 3:19, 21:11, 32:23,
    123:18, 160:25, 171:19,
    174:4, 182:13,
    196:20 .
services 50:1 .
Servicing 8:23 .
session 91:25, 135:13 .
set 16:22, 25:16, 68:14,
    68:18, 86:6, 93:23,
    108:18, 108:22,
    109:16 .
Setting 24:25 .
seven 169:24 .
seven-year 169:25 .
several 3:22, 9:18, 51:23,
    140:4, 196:19 .
shape 94:19 .
shared 161:10, 168:5 .
sheet 51:10, 51:15,
    94:16 .
ship 88:3 .
shop 33:21 .
shortcut 65:21, 84:12,
    88:20 .
shorter 92:1, 92:2 .

**show** 42:6, 58:17, 65:20,
66:7, 75:11, 77:18, 78:5,
81:17, 82:11, 88:24,
96:17, 96:18, 102:10,
109:19, 110:16, 110:18,
126:11, 145:19, 147:16,
147:18, 181:7 .
**showed** 51:24, 53:10,
72:21, 108:20, 108:23,
197:13 .
**showing** 8:13, 78:3, 90:21,
99:14, 99:21, 108:16,
139:25, 145:18, 147:7,
150:8, 182:11,
182:16 .
**shown** 50:5, 51:23, 58:17,
111:12 .
**shows** 8:22, 66:2, 71:17,
76:1, 77:16, 108:20,
110:1, 110:4, 110:9,
113:16, 136:13, 140:6,
143:24, 144:7, 145:2,
145:9, 145:20 .
**shrink** 137:21 .
**side** 52:5, 65:5, 70:21,
78:16, 81:23, 82:4,
82:16, 158:23, 187:24,
187:25, 189:22,
199:8 .
**sides** 4:6 .
**Sign** 18:16, 18:17, 18:21,
18:25, 30:10, 30:12,
30:21, 40:25, 47:13,
59:10, 60:1, 90:18,
91:2 .
**signature** 18:22, 30:16,
41:2, 41:3, 42:9, 42:12,
42:22, 42:24, 47:12,
58:21, 58:24, 91:1 .
**signed** 19:20, 30:13, 30:20,
40:22, 43:10, 43:11,
43:16, 43:19, 43:23 .
**significant** 106:3 .
**significantly** 145:21 .
**signing** 30:9, 91:11 .
**signs** 115:18 .
**similar** 59:18, 64:23, 96:14,
99:4, 140:1, 140:17 .
**similarity** 97:16 .
**similarly** 4:11, 100:12 .

**simple** 120:12, 120:14 .
**simplified** 161:22 .
**Simply** 49:7, 84:17, 186:6,
193:25 .
**single** 67:4, 67:8, 67:9,
67:14, 68:22, 127:16,
127:17, 127:19, 133:15,
133:24, 134:25 .
**sit** 13:13, 110:8,
187:19 .
**sit-down** 187:7 .
**sits** 13:10 .
**sitting** 199:6 .
**situation** 16:7, 154:9,
184:6, 193:8 .
**six** 124:21 .
**six-digit** 70:23, 71:8, 72:3,
72:9, 114:24, 115:8 .
**size** 94:16 .
**skate** 57:16, 57:17,
57:18 .
**skating** 57:8, 57:12,
57:15 .
**ski** 193:12 .
**skip** 69:14, 132:25 .
**skipped** 164:17 .
**slash** 154:11 .
**slate** 111:19 .
**slide** 64:19, 67:11 .
**slides** 105:3 .
**slightly** 144:4, 155:23,
172:8 .
**small** 16:15, 17:4, 42:25,
50:19, 185:2, 185:6 .
**smaller** 158:7, 158:8 .
**smooth** 151:24 .
**snippet** 71:2 .
**Social** 14:16, 66:12, 67:16,
112:24, 113:9, 118:6,
118:8, 118:10, 118:12,
127:12, 127:15 .
**sold** 160:23 .
**sole** 160:8 .
**somebody** 55:25, 90:24,
106:17, 118:9,
194:6 .
**somehow** 106:13, 106:14,
115:13, 142:8 .
**someone** 77:20, 80:6,
85:20, 91:3, 98:12,

107:2, 107:5, 112:4,
125:23, 193:10,
193:13 .
**Sometimes** 25:23, 49:25,
54:19, 106:2, 133:17,
149:8, 161:9, 187:13,
195:13 .
**somewhere** 108:4, 168:12,
197:18 .
**son** 13:19, 13:20, 14:15,
32:2, 45:10 .
**soon** 93:20, 93:23, 94:2,
95:5, 95:7, 151:11,
169:23 .
**sooner** 148:17 .
**Sorry** 36:14, 38:5, 40:24,
57:18, 67:21, 77:12,
77:22, 78:21, 80:17,
84:8, 87:2, 116:21,
125:8, 132:18, 133:21,
135:13, 145:17, 155:17,
155:19, 155:21, 163:7,
163:8, 167:11, 173:10,
179:14, 185:24, 188:4,
188:14, 192:8,
193:20 .
**sort** 7:23, 8:5, 15:11, 58:23,
96:4, 98:21, 137:9,
147:10 .
**sorted** 152:1 .
**sorts** 179:19 .
**sound** 21:24 .
**sounds** 193:5 .
**sources** 181:20,
189:12 .
**SOUTHERN** 1:3 .
**space** 25:10, 168:6,
168:11 .
**speaking** 25:4, 62:17,
92:17, 93:6, 93:12,
105:1, 125:14,
133:24 .
**Special** 1:46, 98:20,
115:17, 119:2, 137:18,
195:8, 195:14,
196:8 .
**specialist** 10:25, 11:3 .
**specific** 5:16, 6:3, 50:22,
62:6, 64:19, 65:22, 97:2,
102:11, 107:22, 116:17,

116:18, 119:12, 120:4,
131:18, 134:9,
186:13 .
**Specifically** 120:21,
170:10 .
**specifics** 148:2 .
**speculate** 14:22 .
**speculation** 192:4 .
**Spell** 10:5, 60:17,
123:9 .
**spelled** 87:15 .
**spent** 39:18, 39:19, 49:15,
143:15, 176:5,
180:1 .
**split** 35:9 .
**spoke** 17:3, 41:14, 41:22,
44:19, 56:7 .
**sporadic** 160:13 .
**spot** 40:22 .
**spots** 168:19 .
**spouse** 67:14, 91:1, 91:12,
127:22, 153:25 .
**spring** 193:12 .
**square** 98:9, 166:13 .
**squarely** 139:11,
139:21 .
**staff** 100:2, 150:11 .
**stage** 188:7 .
**stand** 9:24, 60:11, 96:25,
123:3 .
**standard** 26:13, 35:14,
62:14, 106:3, 128:10,
133:2, 133:10, 133:12,
134:1, 134:8, 134:13,
134:20, 134:23, 135:4,
153:15, 177:5,
183:25 .
**standards** 194:4 .
**standing** 60:11, 123:3 .
**standpoint** 64:8, 147:20,
148:12 .
**stands** 100:24, 152:8,
199:17 .
**Stanley** 126:21, 164:24,
176:10, 178:7 .
**start** 45:11, 51:11, 65:8,
65:25, 66:11, 67:2,
70:14, 79:22, 106:22,
112:11, 122:23, 127:8,
127:11, 130:12, 131:25,

132:22, 148:9, 148:10,
148:12, 199:9 .
**started** 16:5, 16:6, 66:7,
66:9, 123:24,
137:21 .
**Starting** 15:21, 74:2,
111:19, 155:22, 162:4,
164:3, 179:3, 191:12,
191:13 .
**starts** 70:14, 106:17,
197:22 .
**startup** 15:21, 16:13 .
**State** 10:3, 15:23, 60:15,
62:22, 63:4, 88:5,
108:14, 123:6, 124:5,
186:11 .
**stated** 195:12 .
**Statement** 38:18, 38:19,
48:13, 76:1, 106:18,
107:18, 146:22, 147:3,
189:19, 191:23,
193:1 .
**statements** 30:18, 96:15,
140:18, 140:24, 141:1,
145:25 .
**States** 1:1, 1:5, 1:28, 3:5,
3:10, 9:22, 55:11, 60:8,
60:22, 101:4, 122:25,
152:18, 200:3,
200:9 .
**status** 67:4, 67:13, 127:14,
133:15 .
**statuses** 127:16 .
**stay** 33:21, 141:4 .
**stenographically-reported**
200:6 .
**stenotype** 1:49 .
**step** 60:6, 67:12, 69:10,
70:14, 89:20, 92:10,
95:7, 122:22, 135:23,
189:24, 198:7 .
**steps** 190:8, 190:10,
190:13 .
**stickler** 115:8 .
**sticks** 57:8 .
**stop** 78:11 .
**stopping** 135:11 .
**storage** 166:3 .
**storefront** 77:2 .
**story** 199:8 .

**strategy** 93:13 .
**Street** 1:35, 16:9,
16:11 .
**stretch** 197:17 .
**string** 115:22 .
**stuck** 88:21 .
**studies** 124:6, 124:8,
124:9 .
**study** 123:25 .
**stuff** 7:8, 14:16, 88:23,
98:4, 105:5, 106:8,
108:2, 109:9,
190:16 .
**subcategories** 72:20 .
**subcategory** 71:20,
72:21 .
**subject** 80:15 .
**subjects** 71:17 .
**submenu** 80:24 .
**submit** 142:18 .
**submits** 102:22 .
**submitted** 29:25, 92:23,
93:17 .
**subsequent** 126:6 .
**substantially** 140:21,
143:5 .
**substantiating** 184:10 .
**substantive** 142:8 .
**Subtract** 153:18, 153:19,
162:21, 172:11 .
**subtracted** 163:9 .
**subtracting** 131:19,
153:21, 174:15 .
**successive** 140:6 .
**Suite** 1:29, 1:42 .
**sum** 146:23 .
**summaries** 102:5,
140:9 .
**summarize** 105:25 .
**summarized** 127:6,
181:16 .
**summary** 67:25, 68:1,
68:3, 68:25, 70:5, 73:1,
73:11, 73:12, 73:20,
88:15, 102:7, 102:13,
102:18, 102:19, 103:3,
109:20, 109:22, 110:3,
110:13, 113:8, 130:15,
143:24, 181:15 .
**super** 143:19 .

**support** 50:14, 50:22,
61:24, 63:15, 63:23,
104:5 .
**supported** 49:6,
157:19 .
**supposed** 6:11, 97:21,
116:16, 118:21, 157:19,
163:25 .
**surprised** 92:18 .
**SWORN** 10:1, 60:13,
123:4 .
**symbol** 65:23 .
**system** 184:23,
187:18 .
**systems** 103:20,
187:14 .

.

. 

**< T >.**
**table** 25:16, 38:23, 76:3,
88:16, 88:19 .
**talked** 12:16, 13:19, 17:23,
22:14, 54:17, 74:14,
109:20, 122:6, 144:11,
151:16, 156:2, 157:9,
184:4 .
**tax.** 154:6, 155:11 .
**Taxable** 96:19, 128:12,
129:20, 154:2, 154:4,
154:7, 158:2, 158:4,
170:25, 178:22, 179:21,
180:15 .
**taxation** 124:10 .
**taxed** 154:5 .
**Taxes** 11:10, 11:13, 11:16,
12:3, 12:10, 12:13,
12:21, 13:21, 13:25,
15:7, 41:19, 62:5, 62:11,
107:10, 128:13, 128:17,
128:19, 128:22, 129:9,
129:10, 129:22, 155:1,
155:2, 155:4, 158:8,
158:10, 175:22, 187:23,
192:15, 192:16 .
**taxpayer's** 68:1 .
**taxpayers** 6:22, 62:4,
62:11, 126:23, 141:24,
161:9, 192:15 .
**TDC-21-0449** 3:5 .
**teach** 16:18 .

**tech** 27:25, 28:10, 36:13,
36:16, 37:1 .
**tech.** 27:24 .
**technical** 94:7, 94:8 .
**tedious** 148:22 .
**teens** 16:12 .
**telecom** 55:9 .
**telephone** 187:2 .
**telework** 55:7 .
**teleworked** 25:22, 28:7,
54:15, 54:16, 55:24 .
**teleworking** 55:5 .
**tells** 190:13 .
**Temporary** 16:1, 16:2,
16:3, 16:8, 18:7, 22:10,
22:24, 23:13, 24:9,
24:12, 25:2, 25:7, 25:21,
33:2, 33:15, 34:6, 34:10,
34:23, 35:8, 48:2, 48:7,
50:2 .
**Temporary.** 21:14,
33:1 .
**ten** 135:16 .
**tendered** 146:14 .
**tentative** 172:9 .
**term** 195:8 .
**terms** 50:21, 51:5, 136:17,
139:5, 139:17,
146:16 .
**test** 66:9, 66:14, 73:7, 73:8,
120:2 .
**testified** 98:12 .
**testify** 60:6, 148:7,
198:7 .
**testifying** 151:18 .
**testimony** 101:23, 122:22,
135:18, 136:1, 139:16,
144:21, 150:12, 150:13,
152:16 .
**testing** 120:1 .
**tethered** 100:18 .
**text** 30:15, 41:3, 65:16 .
**themselves** 5:12,
191:25 .
**THEODORE** 1:22 .
**theory** 98:18, 99:4,
99:9 .
**they'll** 169:22 .
**They've** 135:5, 148:23,
189:23, 195:25,

197:23 .
thin 145:24 .
thinking 52:6, 56:9 .
thinks 145:12, 145:24 .
Third 23:18, 90:24, 129:11,
    179:1, 182:22 .
third-party 189:2,
    189:12 .
though 46:11, 57:15,
    103:9, 196:25,
    198:20 .
Thousands 126:5,
    190:17 .
three 4:13, 8:3, 8:6, 48:17,
    64:9, 120:13, 125:21,
    138:10, 138:13, 139:10,
    147:17, 148:24, 160:4,
    161:18, 166:5 .
throughout 54:13, 55:11,
    95:6 .
tied 3:24, 122:1, 122:2 .
timing 139:20, 198:16,
    198:23 .
tire 23:2 .
tithe 45:3, 45:14 .
Tithes 45:9 .
Title 84:22, 106:13 .
titles 71:17 .
Today 3:6, 94:12, 101:6,
    147:21, 148:9, 185:16,
    194:12, 198:7,
    199:6 .
together 23:25, 24:2,
    24:14, 24:15, 68:16,
    115:22, 126:14, 139:11,
    148:13 .
toll-free 63:22 .
tolls 17:21, 34:24, 45:25,
    48:14, 48:18 .
Tom 3:19 .
tomorrow 148:10, 148:12,
    199:1, 199:9 .
took 5:25, 39:8, 39:11,
    39:17, 56:24, 94:14 .
Tools 65:18 .
topic 5:15, 48:6, 111:9 .
totally 47:17, 98:3,
    140:9 .
totals 76:2 .
touch 133:20, 135:3,

184:1 .
toward 14:13, 48:15,
    50:18 .
towards 17:5, 60:10,
    123:2 .
town 49:19 .
tracks 104:5 .
training 11:10, 124:15,
    124:17, 124:20, 124:21,
    125:21 .
TRANSCRIPT 1:20, 98:11,
    98:13, 200:6, 200:7 .
transcription 1:49 .
transcripts 100:5 .
translates 62:20 .
transmission 111:4 .
transmit 90:14 .
Travel 27:6, 33:25, 36:2,
    56:23, 177:18, 179:11,
    179:12 .
treated 118:22 .
treating 7:16 .
trial 3:7, 92:24, 93:10,
    93:13, 93:15, 93:17,
    93:25, 94:2 .
triangle 58:23 .
tried 115:17, 118:3, 137:21,
    138:8, 149:23 .
Trixy 150:9 .
truck 162:12 .
true 8:1, 30:19, 43:15,
    43:22, 111:12, 192:9,
    200:5 .
trust 20:1 .
trusted 19:24, 20:3, 30:22,
    30:23, 41:7, 41:12 .
trusts 175:5 .
Try 19:5, 42:17, 107:11,
    112:19, 115:20, 147:19,
    149:6, 149:7, 149:10,
    151:22, 189:11,
    195:4 .
trying 6:15, 15:22, 16:14,
    17:8, 49:5, 49:8, 78:10,
    112:23, 130:5, 148:1,
    150:10, 150:18,
    189:5 .
turn 20:4, 21:1, 67:10,
    128:2, 132:8, 132:15,
    158:2, 158:12, 159:20,

164:19, 164:25, 165:12,
    167:20, 169:7, 170:25,
    171:13, 173:17, 175:8,
    176:11, 176:21, 178:1,
    180:6, 190:3,
    190:16 .
turned 5:24, 111:11 .
Turning 37:15 .
turns 111:24 .
twice 12:14 .
Two 7:21, 13:13, 14:20,
    17:22, 32:3, 47:7, 64:9,
    72:2, 75:19, 79:5, 88:4,
    101:11, 108:8, 108:11,
    125:1, 127:4, 127:6,
    130:4, 130:17, 133:10,
    144:13, 144:23, 145:13,
    163:6, 180:11, 180:12,
    180:16, 182:23,
    193:16 .
type 6:17, 38:10, 38:25,
    68:22, 70:17, 72:3, 72:8,
    72:13, 73:8, 74:4, 74:5,
    78:18, 84:2, 96:2, 105:1,
    114:25, 115:1, 115:5,
    115:6, 115:21, 137:9,
    141:1, 143:12, 179:18,
    186:24, 196:23 .
types 7:2, 7:5, 7:6, 69:22,
    70:23, 71:7, 71:18,
    71:21, 79:20, 131:18,
    177:14 .
typically 97:7, 169:4 .
typing 72:8 .
.
.
< U > .
U.S. 1:33, 31:14 .
ultimately 46:15, 75:23,
    106:21, 130:13 .
umbrella 16:17 .
unable 101:5 .
unclear 101:14 .
uncovering 144:18 .
underlying 181:20 .
underneath 20:10,
    30:24 .
understanding 6:25,
    19:21, 45:8, 52:3,
    191:18 .

Understood 47:9, 48:22,
    49:5, 49:11, 52:14,
    112:5 .
unfair 140:22, 143:5 .
Unh-unh 57:22 .
union 27:6, 36:2,
    177:18 .
unique 97:8 .
United 1:1, 1:5, 1:28, 3:5,
    3:10, 9:22, 60:8, 60:22,
    101:4, 122:25, 152:17,
    200:3, 200:9 .
University 124:5,
    124:6 .
unless 146:1, 161:21 .
Unreimbursed 6:19, 27:5,
    28:13, 28:16, 29:19,
    36:1, 36:7, 37:12, 37:22,
    77:20, 78:13, 79:2, 80:7,
    177:18 .
until 9:5, 58:16, 76:2,
    100:25, 135:17,
    152:9 .
unusual 124:23,
    183:21 .
update 86:13, 149:14,
    149:17 .
updated 64:7, 92:21, 93:2,
    98:13, 144:4 .
Updates 65:6, 106:19,
    119:21 .
upset 150:4 .
urge 148:11 .
URL 86:13 .
usage 34:8 .
useful 169:16, 169:24 .
user 64:8, 88:4, 108:1,
    111:16, 117:12 .
uses 62:18, 114:25,
    117:16 .
using 51:11, 63:11, 63:21,
    75:3, 87:5, 105:6,
    111:10, 118:25, 130:19,
    136:16, 161:21,
    183:24 .
utilities 164:6, 166:22,
    166:23, 167:1, 167:6,
    167:12, 168:2, 168:3,
    168:9, 168:12 .
utilities. 166:18 .

**utility** 167:23, 168:14 .
**utilizing** 196:6 .
.
**< V >** .
**value** 139:5, 140:21, 143:4,
    143:16, 146:15, 169:18,
    169:20, 169:22,
    169:23 .
**values** 83:20 .
**variables** 189:18 .
**varies** 154:1 .
**various** 4:8, 50:15, 51:15,
    62:13, 139:24,
    199:16 .
**Vehicle** 22:25, 23:1, 34:8,
    52:16, 52:18, 179:2,
    179:6, 196:23 .
**vehicles** 17:15, 17:17 .
**verbally** 18:25 .
**verification** 119:23 .
**verified** 189:24 .
**verify** 113:8, 181:19,
    189:25 .
**version** 62:14, 62:15,
    104:16, 105:7, 105:24,
    119:20 .
**versions** 62:13, 66:22,
    66:23, 105:4, 144:14,
    144:23 .
**versus** 3:6, 35:8, 64:11,
    104:23, 111:25, 134:20,
    160:24, 168:3, 168:15,
    187:25, 197:14 .
**View** 8:4, 65:18, 81:23,
    82:15, 82:21, 83:13,
    86:23, 86:24, 87:3, 87:4,
    87:12 .
**viewing** 68:7 .
**vis-a-vis** 188:16 .
**visit** 41:15 .
**visited** 50:16, 98:20 .
**visual** 106:7 .
**Visually** 64:7, 105:1 .
**VOLUME** 1:12 .
**vs** 1:8 .
.
.
**< W >** .
**W-2** 8:16, 69:12, 69:15,

97:7, 113:24, 129:2,
    131:12, 156:6, 187:15,
    187:16, 187:18 .
**W-2s** 12:20, 12:23, 44:20,
    44:24, 88:19, 100:12,
    113:25 .
**W-a-n-a-m-a-k-e-r**
    60:19 .
**W2s** 113:14 .
**wages** 131:12, 143:6 .
**wait** 47:20, 136:4, 152:19,
    184:1, 198:22 .
**waited** 19:17, 149:24 .
**wake** 197:9 .
**walk** 13:9, 60:10, 123:2,
    130:20, 164:10 .
**walked** 44:9 .
**walking** 128:1 .
**wall** 13:10 .
**walled-off** 25:18 .
**Wanamaker** 2:15, 60:9,
    60:10, 60:13, 60:16,
    92:10, 93:14, 93:16,
    101:24, 102:4,
    122:21 .
**wants** 93:10, 114:14 .
**warning** 78:8, 115:13,
    117:24, 118:10 .
**warnings** 78:9 .
**warranted** 96:20 .
**Washington** 1:36 .
**water** 56:18, 56:19 .
**Watson.** 171:8 .
**ways** 71:13, 86:23, 89:23,
    108:8, 108:11,
    140:13 .
**web-based** 62:16 .
**website** 86:10 .
**Wednesdays** 28:7,
    28:8 .
**week** 54:12, 54:15 .
**weekend** 9:3, 9:16, 94:1,
    94:17 .
**weekends** 64:2 .
**weekly** 194:10 .
**weeks** 124:21 .
**Weishaar** 1:46, 98:20,
    137:18 .
**Welcome** 9:15, 152:14 .
**wet** 40:22, 40:25 .

**Whatever** 47:22, 69:4,
    71:9, 72:8, 72:13, 73:8,
    77:4, 86:16, 87:21,
    88:11, 102:21, 109:19,
    115:14, 119:21, 122:6,
    136:23, 143:6, 183:19,
    184:7, 190:12, 193:2,
    196:16 .
**whenever** 135:3 .
**whichever** 87:14 .
**whoever** 196:6 .
**whole** 17:12, 54:13, 100:4,
    132:16, 144:18, 146:23,
    156:18, 158:17, 162:4,
    165:7, 173:18,
    183:8 .
**widower** 67:6, 135:4 .
**willfulness** 140:20 .
**Williamson** 101:12 .
**willing** 96:1, 148:18 .
**winter** 120:1, 193:12 .
**wise** 102:10 .
**withheld** 156:6 .
**withholding** 8:16 .
**withholdings** 97:7, 129:1,
    158:5 .
**within** 96:5, 121:12 .
**without** 30:21, 72:9,
    146:25, 151:20,
    179:9 .
**WITNESS** 2:5, 3:19, 9:10,
    9:21, 10:1, 10:4, 10:7,
    60:7, 60:13, 60:16,
    60:19, 85:8, 85:25,
    93:14, 93:17, 96:25,
    122:23, 122:24, 123:4,
    123:8, 123:11, 136:2,
    136:16, 150:19, 150:20,
    151:18, 181:10,
    198:8 .
**witnesses** 9:19, 96:21,
    138:22, 148:4 .
**women** 16:6, 16:11, 16:22,
    17:3 .
**wonder** 99:25 .
**word** 7:16, 44:21, 52:3,
    84:17, 119:11,
    191:13 .
**worked** 14:8, 28:7, 28:10,
    47:2, 54:10, 55:7, 55:24,

61:12, 94:3, 109:4,
    179:8 .
**worker.** 80:3 .
**working** 10:18, 14:7,
    36:10, 54:20, 55:9,
    55:13, 55:17, 55:18,
    58:11, 94:12, 119:23,
    146:5 .
**works** 61:25, 64:10, 67:23,
    106:11, 122:4, 162:6,
    167:14 .
**worth** 24:8, 37:11, 166:22,
    167:23, 170:3 .
**write** 11:23, 12:20, 14:15,
    46:12, 54:1, 117:3 .
**written** 46:8, 50:24 .
**wrote** 14:18, 46:9, 46:10,
    46:12, 51:22, 54:2 .
**www.irs.gov/schedulec.**
    159:9 .
.
.
**< X >** .
**Xs** 18:16, 18:17, 18:21,
    19:1, 47:13, 59:9,
    59:10 .
.
.
**< Y >** .
**year-to-year** 120:10 .
**Yep** 89:9 .
**yes-or-no** 192:12 .
**you-all** 9:1, 45:13, 45:18,
    45:20, 127:5, 151:10,
    151:21 .
**you.** 129:16 .
**younger** 16:12 .
**yourself** 11:21, 39:11,
    127:22 .
**yourselves** 3:8, 92:3,
    93:3 .
.
.
**< Z >** .
**zero** 164:7, 164:12 .
**Zoom** 104:7, 126:18,
    126:22, 128:15, 131:22,
    131:23, 154:25, 155:1,
    155:18, 158:16, 159:3,
    160:2, 161:1, 161:2,

162:3, 162:25, 166:16,
169:8, 170:8, 170:14,
171:9, 171:22, 172:2,
173:1, 174:9, 177:7,
177:13, 178:10, 178:24,
180:4.
**zoomed** 131:4, 159:21,
176:25, 179:25.