**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CASE NO. TDC-21-0449** |
| | * | |
| **RONALD EUGENE WATSON,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |
| | ******* | |

### SENTENCING MEMORANDUM FOR THE UNITED STATES OF AMERICA

A jury convicted the Defendant, Ronald Eugene Watson, of twenty-three counts of aiding and assisting the preparation of false tax returns on behalf of clients in his role as a professional tax return preparer. But while the jury was only asked to weigh-in on twenty-three of the false returns prepared by Watson, his fraudulent conduct did not stop there. On the contrary, the evidence shows that Watson has a general disregard for the nation's tax laws and has repeatedly defrauded the United States and its taxpayers, by filing false returns for other clients as well and repeatedly flouting his own tax obligations.

In order to hold Watson accountable for his crimes and to deter others from similar conduct, a substantial term of imprisonment is warranted. Accordingly, the United States requests that the Court sentence Watson to 51 months of imprisonment, followed by one year of supervised release. As part of the terms of his supervised release, the United States also requests that the Court order Watson to pay restitution to the Internal Revenue Service ("IRS") in the amount of $268,634.35. This sentence is within the Guidelines range and is well-supported by the sentencing factors located at 18 U.S.C. § 3553(a).

## <u>TABLE OF CONTENTS</u>

I.     FACTUAL BACKGROUND ...................................................................................................... 3

    A. Procedural History ............................................................................................................ 3

    B. Offense Conduct and Trial Evidence ............................................................................... 3

    C. Watson's Preparation of Additional False Client Tax Returns ........................................ 4

       1. Twenty-Two Additional False Tax Returns ................................................................. 4

       2. Two False Trust Tax Returns for Sandra Curl and Percy Jacobs ................................. 5

    D. Watson's Individual Income Tax Returns ........................................................................ 7

    E. Watson's Personal Gain and Lifestyle ............................................................................ 10

II.    APPLICABLE LEGAL STANDARDS ............................................................................... 10

III.   STATUTORY MAXIMUM PENALTIES ........................................................................... 11

IV.   SENTENCING GUIDELINES CALCULATION ............................................................... 11

    A. Base Offense Level .......................................................................................................... 11

       1. Offense Conduct: Tax Loss from Counts of Conviction - $205,115 ....................... 12

       2. Relevant Conduct: Additional False Tax Returns - $120,215 ................................. 14

       3. Relevant Conduct: Watson's Preparation of False Tax Returns for Sandra Curl and Percy Jacobs - $518,845 ............................................................................ 15

    B. Specific Offense Characteristics: Adjustment for Being in the Tax Preparation Business ........... 17

    C. Total Offense Level ........................................................................................................ 18

    D. Criminal History Category ............................................................................................. 18

    E. Final Guidelines Calculation ......................................................................................... 18

V.    CONSIDERATION OF THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) ............................ 18

    A. Watson's Tax Crimes Are Extensive and Serious ........................................................ 18

    B. A Significant Sentence Is Necessary to Achieve General Deterrence ............................ 20

    C. Avoiding Unwarranted Sentencing Disparities ............................................................. 21

    D. Watson's History and Characteristics Support a 51-month Sentence ........................... 22

    E. Restitution ...................................................................................................................... 23

VI.   CONCLUSION ................................................................................................................... 23

# I.     FACTUAL BACKGROUND

## A.     Procedural History

On November 11, 2021, Watson was indicted on twenty-eight counts of aiding and assisting in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2). Presentence Investigation Report ("PSR") ¶ 1. Each count pertained to a single false tax return that had been prepared by Watson in his capacity as a professional tax return preparer. *Id.* ¶ 11.

Trial was set for February 27, 2023. During trial, five of the twenty-eight charged counts were dismissed by the Government because the two clients associated with those five returns were physically unavailable to testify. On March 9, 2023, Watson was found guilty by a jury of the twenty-three remaining counts. *Id.* ¶ 2.

## B.     Offense Conduct and Trial Evidence

As proven at trial, Watson was a professional tax return preparer whose business model was based on fraud. In order to grow his business through repeat customers and word-of-mouth referrals, Watson falsified his clients' tax returns to either fraudulently reduce the amount of taxes they owed the IRS, or—as was more often the case—to fraudulently generate refunds paid by the IRS to the clients that they were not lawfully entitled to receive. *Id.* ¶ 8.

Watson's typical method of falsifying tax returns included: (1) reporting entirely fictitious or falsely inflated business losses on Schedules C, and/or (2) deducting false or inflated itemized deductions on Schedules A (e.g., false gifts to charity or unreimbursed employee expenses). PSR ¶ 9. For example, one of Watson's clients who testified at trial was Darlene Hall. *Id.* ¶ 10. On Hall's tax returns for 2015, 2016, and 2017, Watson included a Schedule C for a "Day Care Services" business purportedly operated by Hall. *Id.* As Hall testified, however, she had no such day care business. *Id.* She had told Watson merely that she helped babysit her grandchildren and

that her daughter would reimburse her about $100 a month for gas and food expenses. *Id.* Unbeknownst to Hall, Watson falsely converted this information into a Schedule C daycare business and claimed tens of thousands of dollars in business losses on her tax returns. *Id.* ¶ 10 & n.2.

In total, the jury heard from nine of Watson's clients about similar falsities on twenty-three tax returns that he prepared and filed between tax years 2015 and 2017. *Id.* ¶ 11. After concluding that Watson willfully falsified each return, the jury convicted him on the twenty-three charged counts. *Id.* ¶¶ 1-2.

### C.      Watson's Preparation of Additional False Client Tax Returns

#### 1.      Twenty-Two Additional False Tax Returns

The twenty-three false tax returns presented at trial represent only a small sample of Watson's fraudulent and unlawful conduct. The Government's investigation of Watson began following a referral from the IRS's Scheme Development Center ("SDC"), which uses data analysis to identify suspicious patterns among tax returns filed by professional preparers. *Id.* ¶ 5. Analyzing 1,896 tax returns that Watson prepared and filed from 2013 through 2016, the SDC identified that 1,077 (57%) of those returns included a Schedule C to report profit or loss from a business. *Id.* Of those 1,077 returns, the average reported Schedule C profit or loss was -$11,587 (i.e., a loss of $11,587), with 83% of the returns reporting a loss. *Id.* In contrast, of all the tax returns filed nationwide by professional preparers over that same period, only approximately 20% included a Schedule C. *Id.* ¶ 6. And of those returns, the average reported profit or loss was approximately $3,200 (i.e., a *profit* of $3,200), with less than 25% of such returns reporting a loss. *Id.*

Because the data from the SDC showed significant indicia of fraud amongst the hundreds of tax returns prepared by Watson, the IRS interviewed nineteen of Watson's clients in the course of auditing forty-five individual tax returns that he had prepared. *Id.* ¶ 15. This includes the twenty-three tax returns that were the subject of the counts presented at trial, as well as twenty-two additional tax returns that were not presented at trial, but were previously provided to the defense in discovery. *Id.* The latter category of returns includes tax returns that Watson prepared for the clients that testified at trial, but that were in years outside the statute of limitations, such as 2013 and 2014. *Id.* It also includes tax returns for additional clients of Watson who did not testify at trial (such as the two witnesses who were unavailable to testify and were the subject of the five dismissed counts). *Id.* All of the twenty-two additional returns contained similar falsities as the twenty-three returns that were presented at trial (e.g., false Schedules C and Schedules A). *Id.*

## 2.    Two False Trust Tax Returns for Sandra Curl and Percy Jacobs

In the course of investigating Watson's preparation of the false tax returns just discussed, the Government also uncovered evidence revealing that Watson prepared false tax returns for trusts controlled by Sandra Curl and Percy Jacobs. *Id.* ¶ 17. Curl and Jacobs were recently tried, convicted, and sentenced for filing false trust tax returns that resulted in a significant tax loss to the Government. *See United States v. Curl, et al.*, No. 19-CR-444 (D.Md.).

Watson prepared the two trust tax returns that were the subject of Counts 6 and 7 of the Curl/Jacobs trial.[1] *Id.* ¶ 18; *see also* Ex. 15 at 12 (Curl/Jacobs Indictment). The first return (Count 6), filed on March 17, 2016, was for a purported trust controlled by Curl named Women's Health Relations Trust. PSR ¶ 18; Ex. 16 (Women's Health 2015 Form 1041). The second return (Count

---

[1] Counts 6 and 7 alleged violations of 26 U.S.C. § 7206(2), aiding and assisting in the filing of false tax returns. Ex. 15 at 12.

7), filed on April 28, 2016, was for a purported trust named Land and Sea Global Enterprises Trust controlled by Jacobs. PSR ¶ 18; Ex. 17 (Land and Sea 2015 Form 1041). Both trust returns falsely claimed that the purported trusts had made well over $200,000 in federal tax payments to the IRS via tax withholdings when, in fact, there were no such withholdings or payments. *See* Ex. 16 at 3; Ex. 17 at 3. Each false return then relied on the false withholdings to fraudulently claim a $250,579 refund for the Women's Health return and a $265,273[2] refund for the Land and Sea return. PSR ¶ 18; Ex. 16 at 3; Ex. 17 at 3.[3]

In support of their efforts to claim these fraudulent refunds, Curl and Jacobs appeared to have filed false Forms W-2 and/or Forms 1099 with the IRS that reflected that the relevant (but false) tax withholdings had been paid to the IRS. *See* Ex. 18 at 2 (Account transcript for Women's Heath return); Ex. 19 at 2 (Account transcript for Land and Sea return). It is not known to the Government whether Curl or Jacobs provided Watson with the false W-2s or 1099s, or with any other documentation that purported to support the false withholdings and refunds claimed on the two returns prepared by Watson.

The jury convicted Curl on Count 6 and Jacobs on Count 7, (*see United States v. Curl et al*, No. 19-CR-444 (D.Md.), ECF 175 (Verdict Form)), necessarily concluding that each of the relevant trust tax returns was materially false, *see* 26 U.S.C. § 7206(2).

---

[2]     In its letter to Probation for preparation of the PSR, the Government mistakenly stated that the Land and Sea tax return claimed a refund of $268,266. The correct figure as shown on the return is $265,573. *Compare* PSR ¶ 18 ($268,266), *with* Ex. 17 at 3 ($265,573).

[3]     The refund claimed for the Women's Health return was issued by the IRS; however, the IRS rejected the Land and Sea return and did not issue the claimed refund. PSR ¶ 18 n.4.

### D.   Watson's Individual Income Tax Returns

In addition to filing false tax returns on behalf of his clients, Watson has also committed tax fraud with respect to his own individual taxes. This includes willfully failing to file individual income tax returns in multiple years as well as willfully filing multiple false individual returns.

Watson failed to file individual income tax returns in 2015 and 2016 despite earning substantial income as a tax return preparer.  PSR ¶ 21. According to data from the IRS and TaxSlayer—the tax preparation software used by Watson—Watson charged approximately $123,969.78 (2015) and $211,911.70 (2016) in preparation fees each year, respectively. *Id.* ¶ 21 n.6; Trial Ex. 79W. This is well above the threshold requirement to file an individual tax return, which Watson, as an experienced professional tax return preparer, surely knew.[4]

For tax years 2013, 2017, and 2018, Watson filed individual tax returns for himself which appear to contain numerous falsities, including falsities similar to the falsities he reported on his clients' false tax returns, as described below. PSR ¶ 22.  In each of those three years, Watson reported receiving significant gross income in connection with his tax preparation business on Schedules C. However, as detailed in the table below, Watson ultimately claimed a net loss or minimal net profit as the result of reporting significant business expenses.

| Year | Gross Income Reported on Schedule C | Net Profit or (Loss) Reported on Schedule C |
|---|---|---|
| 2013 | $113,241 | ($409) |
| 2017 | $127,992 | ($7,748) |
| 2018 | $125,986 | $4,039 |

Ex. 21 at 12 (2013); Ex. 22 at 10 (2017); Ex. 23 at 14 (2018).

---

[4] *See* PSR ¶ 21 n.7 ("In 2015, a taxpayer filing as head of household was required to file a tax return if their gross income was greater than $13,250. For self-employed persons whose income would be reported on a Schedule C (as Watson's tax preparation income would be reported), gross income does *not* include any losses." (citing IRS Publication 501 (2015), https://www.irs.gov/pub/irs-prior/p501--2015.pdf)).

Watson claimed contract labor expenses of $40,204 in 2013, $23,150 in 2017, and $36,520 in 2018. PSR ¶ 23. Yet despite purportedly paying tens of thousands of dollars for contract labor, Watson never filed—as required—any Forms 1099 to report compensation paid to contractors in any of those three years. *Id.* Moreover, according to trial testimony and interviews with Watson's clients, Watson prepared tax returns by himself at an office space that he shared with other professionals. *Id.* Multiple witnesses described a receptionist at the office, but there is no record of Watson having issued this person a Form 1099 or Form W-2. *Id.* Therefore, the evidence indicates that the claimed contract labor expenses are false.

Watson also claimed several other business expenses that are implausible in the context of a self-employed tax return preparer who appears to work alone and meet with his clients in a rented, local, shared office space. These expenses include (but are not limited to):

| Expense Claimed | 2013 | 2017 | 2018 |
|---|---|---|---|
| Car and truck expenses | $12,294 | $9,036 | $16,218 |
| Depreciation | $4,243 | $7,846 | $3,262 |
| Other business property | $7,800 | $13,495 | $0 |
| Repairs and Maintenance | $4,521 | $13,850 | $14,526 |
| Supplies | $2,512 | $10,326 | $25,596 |
| Deductible meals and entertainment | $2,400 | $3,060 | $0 |
| Other expenses | $13,206 | $37,554[5] | $0 |

Ex. 21 at 12 (2013); Ex. 22 at 10 (2017); Ex. 23 at 14 (2018).

In addition, Watson's 2019 and 2020 individual tax returns are dated as having been prepared in August 2021 and July 2021, respectively. Ex. 24 at 2 (2019); Ex. 25 at 2 (2020). That was a few months before Watson was indicted in this case and well after he was aware that he

---

[5] This total includes a reported $9,815 for "Gas," and $4,321 for "Cellphone."

was being criminally investigated by the IRS.[6]   Notably, he reported far fewer Schedule C expenses in these two years, including no contract labor costs. *See* Ex. 24 at 12; Ex. 25 at 15. For example, for 2018, Watson claimed $121,947 in total Schedule C expenses (on $125,986 gross income); for 2019, he claimed only $33,906 in Schedule C expenses (on $182,928 gross income). *Compare* Ex. 23 at 14, *with* Ex. 24 at 12. The significant shift in reported Schedule C losses that occurred once Watson was aware of his legal jeopardy further supports the conclusion that his 2013, 2017, and 2018 Schedule C losses are false.

Finally, on his 2013 return, Watson reported that he had made $128,140 in tax payments (despite only reporting $176,591 in total income).  PSR ¶ 27; Ex. 21 at 3, lines 38 and 72. As a result, Watson claimed a refund of $88,201 for tax year 2013. *Id.* But the IRS has no record of Watson having made any tax payments to the IRS, or any other entity having made tax payments to the IRS on Watson's behalf. In fact, IRS records reflect that Watson was purportedly issued a Form 1099-C by Ocwen Loan Servicing LLC reflecting that it had cancelled $128,140 of debt owed by Watson. Ex. 26 at 3 (Watson IDRS History). Typically, if a taxpayer has debt cancelled, the amount of debt cancelled is treated as taxable income.[7]   But regardless of whether the cancelled debt is additional taxable income to Watson, it does not represent a tax payment to the IRS.

---

[6] Watson was approached as early as October 2018 by IRS-CI agents. (His 2018 tax return is dated as having been prepared in January 2019.)

[7] *See Topic No. 431 Canceled Debt – Is It Taxable or Not?*, IRS (Feb. 1, 2023), https://www.irs.gov/taxtopics/tc431#:~:text=In%20general%2C%20if%20you%20have,the%20 year%20the%20cancellation%20occurs.

### E.      Watson's Personal Gain and Lifestyle

Watson's fraud was lucrative. Based on data from TaxSlayer, Watson charged approximately $791,938 in preparation fees between 2015 and 2018. *Id.* ¶ 4; Trial Exs. 72, 83C. In January 2022—two months after being indicted in this case—Watson purchased a four bedroom, four-and-a-half bathroom house for $685,000. Ex. 20.

## II.      <u>APPLICABLE LEGAL STANDARDS</u>

Sentencing the defendant begins with a properly calculated Guidelines range. *Gall v. United States*, 552 U.S. 38, 48-50 (2007). The applicable Guidelines range and policy statements "seek to embody the [18 U.S.C.] § 3553(a) considerations" and "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 348-49 (2007). After calculating the Guidelines range, the sentencing court must consider the resultant sentencing range along with factors listed in 18 U.S.C. § 3553(a) before arriving at the final sentence.

To the extent the Court is called upon to make findings of fact relevant to sentencing, those findings must only satisfy the preponderance of the evidence standard. *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008). In making such findings, "a sentencing court may give weight to any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy." *United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010). The Court may also rely on undisputed factual findings set forth in the Presentence Investigation Report. *United States v. Holman*, 354 F. App'x 791, 793-94 (4th Cir. 2009) (per curiam) (citing *United States v. Morgan*, 942 F.2d 243, 245 (4th Cir. 1991)).

## III.   <u>STATUTORY MAXIMUM PENALTIES</u>

Watson was convicted of twenty-three counts of aiding and assisting in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2). Each count carries a maximum sentence of three years' imprisonment, one year of supervised release, a $250,000 fine (or a fine that is twice the gross gain or loss of the offense), the costs of prosecution, and a $100 special assessment. 26 U.S.C. § 7206; 18 U.S.C. § 357; 18 U.S.C. § 3583.

## IV.   <u>SENTENCING GUIDELINES CALCULATION</u>

### A.   **Base Offense Level**

Guidelines section 2T1.4 governs the calculation of the Guidelines range for violations of 26 U.S.C. § 7206(2). U.S.S.G. § 2T1.4 cmt. (2021).  The base offense level is calculated by determining the tax loss and selecting the offense level associated with that loss in the Tax Table at section 2T4.1. *Id.* § 2T1.4(a)(1). Tax loss is defined as "the total amount of loss that was the object of the offense (*i.e.*, the loss that would have resulted had the offense been successfully completed)." *Id.* § 2T1.1(c)(1); *see also id.* § 2T1.4(a)(1) (incorporating the definition of "tax loss" set forth in section 2T1.1).  Accordingly, a proper calculation of tax loss includes intended loss as well as actual loss. *United States v. Delfino*, 510 F.3d 468, 472-73 (4th Cir. 2007).

The tax loss calculation also includes tax loss resulting from relevant conduct, including uncharged conduct. *United States v. Baucom*, 360 F. App'x 457, 462 (4th Cir. 2010). For tax offenses, the Guidelines defines relevant conduct broadly: "In determining the total tax loss attributable to the offense, *all conduct violating the tax laws* should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1 cmt n. 2 (citing *id.* § 1B1.3(a)(2)) (emphasis added); *see also, e.g.*, *United States v. Twieg*, 238 F.3d 930, 930-32 (7th Cir. 2001) (holding that

failing to pay self-employment taxes was relevant conduct to filing false tax returns that underreported business receipts); *United States v. Hendrickson*, 822 F.3d 812, 829-30 (6th Cir. 2016) (holding that fraudulently received refunds qualified as tax loss in a failure to file case). This broad mandate also comports with the general definition of relevant conduct because the IRS is the common victim of tax offenses. *See* U.S.S.G. § 1B1.3 cmt. n.5(B)(i) ("For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as *common victims*, common accomplices, common purpose, or similar *modus operandi*." (first emphasis added)); *see also, e.g.*, *United States v. Leonard*, 289 F.3d 984, 988 (7th Cir. 2002) (holding that uncharged tax offenses constituted relevant conduct in part because "the I.R.S. was a common victim in every instance").

The Government bears the burden of establishing the tax loss by a preponderance of the evidence. *United States v. Mehta*, 594 F.3d 277, 282 (4th Cir. 2010). But "[t]he amount of tax loss is not always a precise figure, and 'the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts.'" *Id.* (citing U.S.S.G. § 2T1.1, cmt. n.1).

Here, the total tax loss is **$844,175.** This figure includes tax loss associated with the offense conduct as well as relevant conduct, as described below. The resulting base offense level is **20**. U.S.S.G. § 2T4.1(H) (tax loss more than $550,000 but no more than $1,500,000).

### 1. Offense Conduct: Tax Loss from Counts of Conviction - $205,115

As discussed above, each of the twenty-three counts of Section 7206(2) of which Watson was convicted at trial relates to a specific tax return that was falsified by Watson. PSR ¶ 12. Because proving an additional tax due and owing is not an element of a Section 7206(2) offense, there was no calculation made at trial regarding the tax loss associated with Watson's preparation of each of the false returns. *Id.* During the Government's pre-trial investigation, however, each

of the twenty-three tax returns associated with the counts of conviction was audited by an IRS Revenue Agent based on interviews with the respective taxpayer(s). *Id.* In the interviews, the taxpayer(s) were shown their tax returns that had been prepared by Watson and asked about the accuracy of information included on the return and whether they had provided such information to Watson. After correcting the false information that Watson included on the tax returns with the correct information provided by the taxpayers, the corrected tax due and owing for each return was calculated. The IRS Revenue Agent's tax loss calculations are recorded in a separate Revenue Agent Report ("RAR") for each return.[8]

In addition, the IRS Revenue Agent reviewed the trial transcripts of the client-witnesses who testified at trial in order to ensure that there are no inconsistencies between their initial interviews and their trial testimony that would affect the calculations made in the RARs. Following that review, no adjustments were required.

As calculated by the IRS Revenue Agent, the total tax loss associated with the twenty-three counts of conviction is **$205,115**. PSR ¶ 13; Ex. 1.

---

[8] It is the Government's understanding that the Defense has not objected to the calculation of the various tax loss figures cited in the PSR (although it objects to certain categories of tax loss being included as relevant conduct, as a legal matter). Nevertheless, out of an abundance of caution and to meet the Government's burden, attached to this memorandum are several sealed exhibits supporting the Government's tax loss calculation. Exhibit 1 is a summary chart that lists the tax loss associated with each of the 23 tax returns that comprise the counts of conviction, as well as the 22 additional tax returns discussed *infra* Section IV.A.2. Exhibits 2 through 13 are individual exhibits for each taxpayer(s) that contain all of the supporting documents that establish the tax loss calculation for that taxpayer(s) tax returns (as summarized in Exhibit 1). Specifically, each of Exhibits 2 through 13 contains (in the following order): (1) the Memorandum of Interview for the taxpayer(s), (2) the Revenue Agent Report (i.e., Forms 4549) for each of the associated returns, and (3) the tax returns themselves.

### 2. Relevant Conduct: Additional False Tax Returns - $120,215

As discussed above in Section I.C.1, the Government also audited an additional twenty-two false tax returns that had been prepared by Watson. *See also* PSR ¶¶ 14-16. These twenty-two returns include tax returns that Watson prepared for clients that testified at trial, but that were filed outside of the statute of limitations period (e.g., tax years 2013 and 2014). *Id.* ¶ 14. They also include tax returns for clients of Watson who did not testify at trial but whose returns fit the pattern and timeframe of the charged scheme (such as the two witnesses who were unavailable to testify at trial and associated with the five dismissed counts). *Id.* The tax loss associated with these twenty-two additional false tax returns is **$120,215**. Ex. 1; PSR ¶ 16; *see also supra* n.10.[9]

The tax loss associated with these additional twenty-two false tax returns falls squarely within the definition of relevant conduct. As previously described, the returns contain similar falsities as the tax returns that are the subject of the counts of conviction and are part of the same course of conduct as well as the same common scheme or plan to defraud the IRS in order to grow Watson's tax preparation business. *See United States v. Osuala*, 553 F. App'x 80, 81 (2d Cir. 2014) (holding that the district court "properly considered uncharged conduct and conduct that fell outside the relevant statute of limitations" in determining tax loss); *Mehta*, 594 F.3d at 281-82 (holding that the sentencing court properly relied on civil audits of uncharged tax returns in calculating tax loss).

---

[9] In its letter to Probation for preparation of the PSR, the Government mistakenly stated that the total tax loss associated with the twenty-two additional tax returns is $117,620. The correct total is $120,215. *Compare* PSR ¶ 16 ($117,620), *with* Ex. 1 ($120,215). This error was caused by an incorrect totaling of the tax loss for the twenty-two returns; no underlying errors were discovered with the original calculation of the tax loss for each discrete return.

### 3.   Relevant Conduct: Watson's Preparation of False Tax Returns for Sandra Curl and Percy Jacobs - $518,845

As discussed above in Section I.C.2, Watson prepared two false trust tax returns for Sandra Curl and Percy Jacobs. The tax loss associated with those two returns for guidelines purposes is **$518,845** and should be included as relevant conduct here because (1) the preponderance of the evidence shows that Watson willfully aided and assisted in the preparation of the two false returns, in violation of 26 U.S.C. § 7206(2), and (2) that criminal conduct is *not* clearly unrelated to the offenses of conviction.

First, Watson prepared the two false returns at issue. Both returns list Watson as the preparer and use his identifying information, such as his Preparer Tax Identification Number ("PTIN"). Ex. 8 at 3; Ex. 9 at 3. In addition, there are emails between Sandra Curl and Watson regarding the preparation of tax returns in the same period, indicating that Curl had used Watson to prepare tax returns.[10] Ex. 14. It is thus more likely than not that Watson actually prepared the two returns at issue, rather than some alternative possible scenario where Curl, Jacobs, or some other person fraudulently listed Watson's information on the returns as the paid preparer.

Second, the returns are false. As described above, both tax returns at issue were each the subject of a count alleging the violation of Section 7206(2) at the trial of Curl and Jacobs. By convicting Curl and Jacobs on each respective count, the jury necessarily concluded beyond a reasonable doubt that each tax return was materially false.

Third, and finally, the preponderance of the evidence shows that Watson willfully prepared the two false trust returns. *See United States v. Cheek*, 498 U.S. 192, 201 (1991) (describing willfulness as the "voluntary, intentional violation of a known legal duty"). Broadly

---

[10] The emails cited here are between Curl and Sabir Muhammad, which—as multiple witnesses in *this* trial testified—is an alias of Watson.

speaking, there are two possibilities: (1) either Watson was an unwitting co-conspirator in the fraudulent scheme perpetrated by Curl and Jacobs, or (2) in actuality he knew the two tax returns he prepared were false and that it was unlawful to file them. While the Government is unaware of any direct evidence of the latter, the circumstantial evidence clearly shows, by a preponderance of the evidence, that Watson knew the returns were false and that it was unlawful to file them. First, as the evidence cited throughout this brief makes clear, Watson was in the business of willfully preparing false tax returns for clients when he prepared the two false returns for Curl and Jacobs.  He clearly had no compunction with being involved in a scheme to defraud the IRS. Second, the returns that Curl and Jacob hired Watson to prepare were egregiously false: the two returns collectively claimed over $500,000 in refunds from the IRS. Any law-abiding tax return preparer acting in good faith would have asked serious questions of the client asking for such returns. Thus, Curl and Jacobs had every incentive to find a tax return preparer who would *not* ask such questions; a preparer who instead would be willing to participate in an unlawful scheme. The preponderance of the evidence supports the conclusion that the fact that they found such a tax return preparer was not a coincidence.[11]

Because the preponderance of the evidence demonstrates that Watson violated the criminal tax laws when he prepared the Curl and Jacobs tax returns, it should be considered relevant conduct. The Guidelines do not require relevant conduct to be identical, or even similar,

---

[11] To be clear, the Government's argument is not that Watson has the propensity to defraud the IRS and thus it can be concluded that he did so again with respect to the Curl/Jacobs returns. Rather, it is that the evidence shows that Curl and Jacobs had the incentive to find a tax return preparer who was willing to participate in a fraudulent scheme and that Watson was such a return preparer. But to the extent that evidence of Watson's criminal character is probative of the likelihood that he willfully participated in the Curl and Jacobs fraud, it is permissible to consider such evidence at sentencing. *See United States v. Breedlove*, 431 F. App'x 323, 325 (5th Cir. 2011) ("Rule  404(b) does not apply to sentencing proceedings." (citing Fed. R. Evid. 1101(d)(3))).

to the offense conduct.[12] Rather, the Guidelines expressly state that relevant conduct for tax offenses includes "*all* conduct violating the tax laws . . . unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1 cmt n. 2 (emphasis added). And the conduct at issue here is *not* "clearly unrelated" under the plain meaning of that language.

Both sets of conduct are part of the same larger scheme with a common purpose and have the same victim: Watson's business of defrauding the IRS by preparing false tax returns on behalf of his clients. Whether his clients knew it or not, Watson did not sell honest services. He sold fraud. He prepared false tax returns to fraudulently siphon money from the IRS into the pockets of his clients, whether by falsely lowering the taxes his clients owed or generating refunds to which they were not entitled. That Watson might falsify different IRS Forms (or different parts of the same Forms) for different clients to achieve this same goal of defrauding the IRS does not make that conduct "clearly unrelated."  Moreover, Watson's preparation of the false trust tax returns for Curl and Jacobs was concurrent with the offense conduct—the two trust returns were for tax year 2015, as were several of the tax returns comprising the offense conduct.

Accordingly, the tax loss associated with Watson's fraudulent preparation of the Curl and Jacobs trust tax returns should be included as relevant conduct.

**B.    Specific Offense Characteristics: Adjustment for Being in the Tax Preparation Business**

Because Watson was in the business of preparing or assisting in the preparation of tax returns, he must receive a two-level upward adjustment pursuant to U.S.S.G. § 2T1.4(b)(1)(B).

---

[12] In the general definition of relevant conduct, a similar *modus operandi* is only one possible "common factor" that links two crimes such that they can be considered part of a common scheme or plan. U.S.S.G. § 1B1.3 cmt. n.5(B)(i) ("For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by *at least one* common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." (first emphasis added))

*See United States v. Aragbaye*, 234 F.3d 1101, 1106-07 (9th Cir. 2000) (upholding tax preparer enhancement for a defendant who is in the business of preparing fictitious tax returns).

### C.      Total Offense Level

Based upon the foregoing and in line with the recommendation in the PSR, the Government's recommendation is that the Defendant's total offense level is **22**. *See* PSR ¶ 47.

### D.      Criminal History Category

The Government agrees with the recommendation in the PSR that Watson has a zero-point criminal history score and that his Criminal History Category is I. PSR ¶ 51.

### E.      Final Guidelines Calculation

With a total offense level of 22 and a Criminal History Category of I, Watson's advisory Guidelines range is **41-51 months' imprisonment**. U.S.S.G. Ch. 5 Pt. A.

## V.      CONSIDERATION OF THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

After calculating the applicable Guidelines range, the sentencing court must then consider "the factors set forth in [18 U.S.C.] § 3553(a)." *Peugh v. United States*, 569 U.S. 530, 536 (2013). Here, consideration of the Section 3553(a) sentencing factors further emphasizes the need for a sentence of 51 months.

### A.      Watson's Tax Crimes Are Extensive and Serious

Tax fraud is serious. It is theft from the pockets of every taxpaying citizen of the United States and it undermines the integrity of the tax system upon which our nation and society depend. *See Compania general de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting) ("Taxes are what we pay for civilized society . . . ."). It contributes to a significant, tangible problem: the "tax gap"—the difference between what is owed

and what is paid nationwide—is projected to be $540 billion, as of the IRS's latest estimate. *See* The Tax Gap, IRS (last accessed August 17, 2023).[13]

That is why, as the Fourth Circuit has explained, "the policy statements issued by the Sentencing Commission make it clear that the Commission views tax evasion as a serious crime and believes that, under the pre-Guidelines practice, too many probationary sentences were imposed for tax crimes." *United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010) (citing U.S.S.G. Ch. 1., Pt. A, introductory cmt. 4(d) (1998)); *see also* 18 U.S.C. § 3553(a)(5) (directing sentencing courts to consider applicable policy statements issued by the Sentencing Commission).

Watson's tax crimes are especially serious. At the very least, Watson was preparing false tax returns for clients from 2013 through 2017. This was a long-running and wide-ranging fraudulent scheme, not an isolated incident. And while the quantifiable tax loss associated with his offenses and relevant conduct amounts to $841,580, the evidence strongly indicates that this figure is likely dramatically under-inclusive. As discussed above in Section I.C, the IRS's Scheme Development Center identified over a thousand tax returns prepared by Watson over a three-year period with suspicious Schedule C losses. Given the evidence presented at trial, which demonstrated the routine and cavalier process by which Watson would add false Schedule C losses to his clients' tax returns (not to mention other false items), it would be difficult to conclude that the 45 tax returns audited by the Government in this case (not including the Curl/Jacobs returns) represent the only false returns prepared by Watson.

Moreover, the preponderance of the evidence also demonstrates that Watson willfully failed to file tax returns for two years and willfully filed false tax returns in three other years. *See*

---

[13] Available at https://www.irs.gov/newsroom/the-tax-gap#:~:text=Based%20on%20the%20projections%20for,projected%20to%20be%2085.1%20percent.

*supra* section I.D. Because the Government is unable to quantify the tax loss associated with this uncharged conduct, these crimes are not reflected in the advisory Guidelines range.  Therefore, due to this conduct, combined with the other conduct and considerations described herein, a sentence at the top of the guidelines of 51 months is amply warranted.  Even if the guidelines were lower it would justify a variance upward to 51 months to result in a sentence that is sufficient, but not greater than necessary to meet the goals of sentencing.

### B.    A Significant Sentence Is Necessary to Achieve General Deterrence

Watson's crimes were not spur-of-the-moment, irrational acts committed in the heat of passion. They were the result of a rational calculation made year after year—that the benefit of the fraud outweighed the risk of getting caught and significantly punished.

For this reason, deterrence is of paramount importance for white-collar offenses. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'  Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting in part Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L. REV. 721, 724 (2005)).

This is especially true of criminal tax cases, which are relatively rare. "Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines." U.S.S.G. ch. 2, pt. T, introductory cmt. Echoing this concern, the Fourth Circuit has emphasized the need for sentencing courts to consider and respect the Sentencing Commission's focus on general deterrence when sentencing defendants for tax crimes:

> Given the nature and number of tax evasion offenses as compared
> to the relatively infrequent prosecution of those offenses, we believe
> that the Commission's focus on incarceration as a means of third-
> party deterrence is wise. The vast majority of such crimes go
> unpunished, if not undetected. Without a real possibility of
> imprisonment, there would be little incentive for a wavering would-
> be evader to choose the straight-and-narrow over the wayward path.

*Engle*, 592 F.3d at 502.

Anything less than a significant prison sentence in this case would actively undermine the

goal of general deterrence. As the Eighth Circuit stated in vacating a non-prison sentence in a

$240,000 tax evasion case, "the goal of deterrence rings hollow if a prison sentence is not imposed

in this case." *United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006); *see also* 18 U.S.C. §

3553(a)(2)(B).

### C.    Avoiding Unwarranted Sentencing Disparities

In addition to achieving the goal of deterrence, a sentence in line with the Government's

recommendation will help prevent unwarranted sentencing disparities. *See* 18 U.S.C. §

3553(a)(6).  A sentence below the guidelines risks not accomplishing this goal.  In fashioning the

Guidelines for tax offenses, the Sentencing Commission sought not only to achieve consistent

sentences for similar tax crimes, but also to eliminate disparities in sentencing between white-

collar offenses and equally serious *non* white-collar offenses. As former Justice Breyer, an

original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between
> pre-Guideline punishment of certain white-collar crimes, such as
> fraud, and other similar common law crimes, such as theft.  The
> Commission's statistics indicated that where white-collar fraud was
> involved, courts grant probation to offenders more frequently than
> in situations involving analogous common law crimes; furthermore,
> prison terms were less severe for white-collar criminals who did not
> receive probation.  To mitigate these discrepancies, the Commission
> decided to require short but certain terms of confinement for many
> white collar offenders, including tax, insider trading, and antitrust

offenders, who previously would have likely received only probation.

See Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 HOFSTRA L. REV. 1, 20 (1988).

Eliminating unwarranted sentencing disparities not only makes the criminal justice system more fair, it promotes respect for and faith in the law. *See* 18 U.S.C. § 3553(a)(2)(A). Simply put, when the public sees a defendant who has committed a serious white-collar offense walk away without a commensurate punishment, it fosters the belief that two systems of justice exist: one for the advantaged and one for the disadvantaged. *See United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) ("[I]t has been noted that probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class."); *United States v. Muffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (emphasizing the need for "the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").

### D.   Watson's History and Characteristics Support a 51-month Sentence

Section 3553(a)(1) also instructs the Court to consider a defendant's history and characteristics in fashioning a reasonable sentence. Unlike many criminal defendants, Watson's decision to commit crime is not mitigated by a significantly disadvantaged background, such as a childhood marred by abuse or a broken family structure. To the contrary, Watson reported to probation that he was raised by both of his parents and his brothers, and that he was well-provided for. PSR ¶ 60. He reports sharing a close relationship with his family and that he was never abused in any manner. *Id.*

In addition, while Watson appears to make poor financial decisions, *see* PSR ¶ 72, it appears his decision to commit fraud is not motivated by an effort to avoid destitution but rather

to help fund his desired lifestyle. As discussed in section I.E above, Watson's tax preparation business earned approximately $200,000 per year. In January 2022—after being indicted in this case—Watson bought a four bedroom, four-and-a-half bathroom house in Maryland for $685,000. Ex. 20.

### E.   Restitution

Restitution to the IRS is also warranted in this case. *See* 18 U.S.C. § 3553(a)(7). As set forth in the Government's separate memo addressing restitution, the Government recommends ordering Watson to pay restitution in the amount of $268,634.35 as a condition of his supervised release. *See* 18 U.S.C. §§ 3583(d), 3563(b); *see also* PSR ¶ 85.

## VI.   **CONCLUSION**

For the reasons stated herein, the Government recommends sentencing the Defendant to 51 months' imprisonment, followed by one year of supervised release.

Respectfully submitted,

Erek L. Barron
United States Attorney

*G. Michael Morgan, Jr.*  Digitally signed by GARY MORGAN
Date: 2023.09.08 19:14:57 -04'00'

G. Michael Morgan, Jr.
Assistant United States Attorney
Matthew L. Cofer
Trial Attorney
U.S. Department of Justice, Tax Division

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification to counsel of record for the defendant.

Digitally signed by GARY
MORGAN
Date: 2023.09.08 19:15:18 -04'00'

G. Michael Morgan, Jr.
Assistant United States Attorney