```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND
 2                      SOUTHERN DIVISION

 3   _____
                                     )
 4   UNITED STATES OF AMERICA        )
            v.                       )   Case No. 8:21-cr-00449-TDC-1
 5   RONALD EUGENE WATSON,           )
                      Defendant.     )
 6   _____)

 7                                       Greenbelt, Maryland
                                         February 23, 2023
 8                                       2:49 p.m.

 9                      PRETRIAL CONFERENCE
            BEFORE THE HONORABLE THEODORE D. CHUANG
10

11                  A P P E A R A N C E S

12   ON BEHALF OF THE GOVERNMENT:

13        U.S. ATTORNEY'S OFFICE
          6406 Ivy Lane, Suite 800
14        Greenbelt, Maryland  20770
          BY:  GARY MICHAEL MORGAN, JR., ASSISTANT U.S. ATTORNEY
15             (301) 344-0106
               Michael.Morgan5@usdoj.gov
16
          U.S. DEPARTMENT OF JUSTICE
17        Tax Division, Northern Criminal Enforcement Section
          150 M Street, N.E.
18        Washington, D.C.  20002
          BY:  MATTHEW L. COFER, TRIAL ATTORNEY
19             (202) 305-9814
               Matthew.L.Cofer@usdoj.gov
20

21                      (Continued)

22
          ***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***
23
                      PATRICIA KLEPP, RMR
24                   Official Court Reporter
                  6500 Cherrywood Lane, Suite 200
25                   Greenbelt, Maryland  20770
```



1          A P P E A R A N C E S:   (Cont'd)

2    ON BEHALF OF THE DEFENDANT:

3          LAW OFFICE OF GERALD C. RUTER PC
           9411 Philadelphia Road, Suite O
4          Baltimore, Maryland  21237
           BY:  GERALD C. RUTER, ESQUIRE
5               (410) 238-8000
                ruterlaw@verizon.net
6
     ALSO PRESENT:  RONALD WATSON
7                   SPECIAL AGENT CHARLES WEISHAAR - IRS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2        (Call to order of the Court.)

3            THE COURTROOM DEPUTY:  All rise.  The United States

4    District Court for the District of Maryland is now in session,

5    the Honorable Theodore D. Chuang presiding.

6            THE COURT:  Thank you, everyone.  Please be seated.

7            THE COURTROOM DEPUTY:  The matter now pending before

8    this Court is Criminal Action No. TDC-21-0449, United States of

9    America v. Ronald Eugene Watson.  We are here today for the

10   purpose of a pretrial conference.

11           Counsel, please identify yourselves for the record.

12           MR. MORGAN:  Good afternoon, Your Honor.

13           Michael Morgan on behalf of the United States.  I'm

14   joined at counsel table by Matt Cofer from the Department of

15   Justice Tax Division and also by Special Agent Charles Weishaar

16   from the IRS.

17           THE COURT:  Good afternoon.

18           MR. COFER:  Good afternoon, Your Honor.

19           MR. RUTER:  Gerald Ruter on behalf of

20   Mr. Ronald Watson.  He is seated to my right.  Good afternoon,

21   Your Honor.

22           THE COURT:  Good afternoon.

23           Good afternoon, Mr. Watson.

24           THE DEFENDANT:  Good afternoon.

25           THE COURT:  So we're here for a pretrial conference.

```
 1    Sorry for the delay; we actually have a deliberating jury right
 2    now, and that creates some issues and potentially could create
 3    some interruptions, so hopefully you'll bear with us.
 4          So we have our trial starting on Monday, and I
 5    think -- I wanted to cover with you, first off, to the extent we
 6    can resolve any of the motions in limine, we'll talk about that.
 7    Also, I want to talk about the voir dire questions and that
 8    process, the jury instructions -- as much as we can agree on the
 9    better -- and the verdict form as well, and then also the
10    mechanics of things like exhibits, witnesses, schedule, and the
11    like.
12          I thought we could start with the motions.  There's
13    dueling motions on effectively other acts, 404(b)-type evidence
14    or intrinsic evidence.  We have the government's motion
15    regarding various categories of uncharged tax issues, and then
16    Mr. Ruter has a motion on behalf of the defendant regarding what
17    they say are sort of good acts or better examples of
18    non-problematic tax issues.  And we can to some degree address
19    both them at the same time, but I know they are different
20    issues.
21          The first question I had for the government is, I see
22    four different categories here.  I see the false client tax
23    returns for different years; I have the client's own allegedly
24    false tax filings; a fact that the government -- that Mr. Watson
25    did not file tax returns in certain years; and then I have this
```

```
1    other case, the Curl and Jacobs case.

2              And one issue I think is relevant to all four of them

3    is, how similar or how different is the conduct in those cases

4    from this one, other than just being alleged false statements or

5    false tax returns, but are they similar or different in terms of

6    the taxpayer, the type of alleged false statement, whether it

7    relates to deductions, expenses, something else, how related or

8    unrelated is it to the facts of our case?

9              So can someone, perhaps, provide me a little more

10   guidance on that?

11             MR. MORGAN:  Yes, Your Honor, thank you.

12             We do have, by way of update on at least two of those

13   categories --

14             THE COURT:  Okay.

15             MR. MORGAN:  We are intending to not introduce the

16   Curl-Jacobs materials.  You'll see it's --

17             THE COURT:  Okay.

18             MR. MORGAN:  We have provided an exhibit, and we will

19   do that -- so digitally as well on the docket as Exhibit No. 1,

20   but we do not intend to introduce those in the government's case

21   in chief at all under 404(b), and we would ask the Court to just

22   reserve on final -- on a ruling depending on whether or not

23   there is a defense case, and what the defense might be, and what

24   the testimony might be.  It may, again, become relevant, but

25   until such time, we would ask the Court to reserve ruling on
```

```
 1   that.
 2           THE COURT:  Meaning it might be relevant to
 3   cross-examine or in rebuttal, or you don't --
 4           MR. MORGAN:  Correct.
 5           THE COURT:  Okay.
 6           MR. MORGAN:  And likewise, with the prior client
 7   returns that were uncharged, we intend to do the same,
 8   Your Honor; we do not intend to ask the Court any longer to have
 9   those introduced as 404(b) in the case in chief, but we do ask
10   the Court to just hold it in abeyance in case it becomes
11   relevant.
12           THE COURT:  So these are the returns of the same
13   taxpayers that are subject to the charges but either earlier or
14   later years?
15           MR. MORGAN:  Yes, Your Honor.
16           THE COURT:  Okay.  Well -- when did you guys decide on
17   all this?  Because -- just a little time thinking about this
18   yesterday, but --
19           MR. MORGAN:  I'm sorry, Your Honor.  Quite recently.
20           THE COURT:  Okay.  Well, that's fine; just keep us
21   updated when --
22           MR. RUTER:  It's made me happy so far, Judge.
23           MR. MORGAN:  Yes.  We're trying to streamline as best
24   we can, Your Honor, and --
25           THE COURT:  No, I appreciate it; better late than
```

1    never.  I understand.

2             MR. MORGAN:  Yes.

3             So that just leaves the remaining two, I believe, the

4    failure to file from the defendant as well as the false returns

5    from the defendant.

6             THE COURT:  Okay.  So just on that category, taking

7    the false returns as one example, I mean, are the issues in his

8    tax returns similar, different, or somewhere in between to the

9    issues in the charged counts?  And I don't know a ton about the

10   charged counts either, so you have to walk me through a

11   comparison if they're the same or different and how they're the

12   same or how they're different.

13            MR. MORGAN:  Your Honor, I got easy job so far to

14   stand up and say we'd ask those first two to be held in

15   abeyance.  My co-counsel here will be addressing those two other

16   remaining issues.

17            THE COURT:  Okay.  Well, Mr. Cofer, this could be lot

18   easier if you just took same approach as Mr. Morgan, but --

19            MR. COFER:  Sure.

20            Your Honor, so speaking to the false returns, the

21   alleged false returns, first, obviously, their falsity would be

22   a conditional fact that the government would have to prove at

23   trial, but as far as what we allege to be similar in the

24   falsities, so the charged returns as far as the clients, which

25   will make up all the counts and the witnesses at trial, in

```
1    general, there's basically two falsities that are alleged and
2    charged in most of the counts; it's either false deductions in a
3    Schedule A, such as -- and this is the main example --
4    unreimbursed employee expenses.  So you work at a government
5    job, for example, say the DOJ, and you claim $30,000 in expenses
6    you have for your job that weren't reimbursed.
7              Separate from that -- and this is what's more related
8    to Mr. Watson's returns at issue here -- is what shows up on the
9    Schedule C.  Schedule C is an attachment to the Form 1040, the
10   individual return, which describes business income and losses.
11   So if you have a business, you're a sole proprietor, that is
12   where your list your gross receipts, your profit, and then your
13   business expenses.
14             For many if not all of the clients, what the
15   government's main case will be is that Mr. Watson falsely
16   included either completely made-up expenses on Schedule Cs, or
17   greatly exaggerated expenses, or he invented a business.  And
18   what this did was, it drove up the losses on the Schedule C,
19   that flows up to the 1040, and all sudden, your income is
20   subtracted by whatever those losses are, and that lowers your
21   taxable income.
22             THE COURT:  So let me just -- let me just interrupt
23   for a second.
24             So the tax returns or the taxpayer -- the clients, I
25   guess you want to call them -- I hesitate to call them victims
```

1   because I don't know where they fit into this.  Are they all

2   people who had a business of some kind, either as a sole

3   proprietor or otherwise?

4               MR. COFER:  No.  So --

5               THE COURT:  Or claim to have?

6               MR. COFER:  No, Your Honor.

7               So some did have legitimate businesses or things that

8   could be fairly construed as businesses, others did not.  And so

9   for many of the counts, the government's evidence will show that

10   these businesses that are listed on the Schedule Cs aren't

11   really businesses.

12               To use one example, for one client or victim witness,

13   what's listed on the Schedule C is a day care service.  But when

14   you talk to her, what she actually did is, she's a grandmother

15   and she took care of her grandkids, just as any grandmother

16   would.  And she occasionally would get paid about 100 bucks a

17   month from her daughter, the mother of the children, to

18   reimburse her gas and food she bought for the kids.

19               And she had a conversation about with that Mr. Watson

20   but did not describe it as a business, and then sure enough,

21   without her knowledge, it shows up on her tax returns as

22   Schedule C day care business where a $30,000 loss is reported.

23   So in that case, the business is just not true; that's not a

24   real business, and these expenses are invented.

25               There are other client victims who have something that

1    may -- you know, give them the benefit of the doubt -- be fairly

2    construed as businesses, but the expenses that are reported on

3    the Schedule C are totally made up or oftentimes are life

4    expenses that are being mischaracterized willfully by Mr. Watson

5    as business expenses.

6         So that's -- there's a bit of a range with the client

7    witnesses.  As far as Mr. Watson --

8         THE COURT:  Before you get to Mr. Watson --

9         MR. COFER:  Sure.

10        THE COURT:  -- do they all have a Schedule C and all

11   have claimed business expenses, or not?

12        MR. COFER:  I want to say all the accounts charged are

13   false.  So the line that shows up -- and it's what you're going

14   see in the indictment, Your Honor, as the false line related to

15   the Schedule C -- is line 12.  So that's the line on the 1040

16   that flows -- that the Schedule C flows up into.

17        THE COURT:  Right.

18        MR. COFER:  And so I believe -- and Mr. Morgan is

19   helpfully pulling up right now -- yes.

20        There may be a few counts.  And so generally, the way

21   the counts are broken up is, you have one witness, and then

22   it's -- each count is by tax year.  So for instance, like client

23   victim No. 1 is going have three counts associated with that

24   person, and it's their 2015, 2016, 2017.

25        So we're double-checking right now to see if there's

```
 1   any witness that's not going have any Schedule Cs.

 2             MR. MORGAN:  Two of 28 -- witness?

 3             MR. COFER:  I guess, just two --

 4             MR. MORGAN:  Only two counts.

 5             THE COURT:  So we have 17 clients, correct, total?

 6             MR. COFER:  Yeah, seventeen clients.  Several of them

 7   or a handful of them were joint returns, so husband and wife,

 8   and we might not have both testify, but yes, that's correct.

 9             And Mr. Morgan just informed me that two of the 28

10   counts do not charge a false Schedule C.  So 26 of the 28 counts

11   do charge a false Schedule C.

12             THE COURT:  Meaning false expenses on the business

13   line?

14             MR. COFER:  Yes.

15             THE COURT:  And are all of them -- is there a claimed

16   business, or is it someone who maybe claims to be sort of an

17   independent -- I mean, I don't even know how these things work

18   exactly, but my understanding is, sometimes, if you're just kind

19   of a -- whether you call it a business or you're just saying you

20   work for yourself as an independent contractor of some kind, you

21   might deduct -- put some things down, saying your expenses were,

22   you know, you bought a car because you use it for your business.

23             So they're all using Schedule C other than two?

24             MR. COFER:  Yes, Your Honor.  So they're all using

25   Schedule C.  I believe Schedule C is used primarily for kind of
```

13

```
 1  sole proprietorships, so not like you have an LLC or something
 2  like that.  There are separate tax returns you file with that.
 3          The Schedule C is just where you're attaching your
 4  personal returns, so yes.  They're sole proprietorships, and
 5  they range everything from -- so for example, one client victim
 6  witness will have -- she has a legitimate contracting business;
 7  she does fitness health instruction, she contracts with the City
 8  of Baltimore to do fitness classes.  So that -- those expenses,
 9  to the extent she has some, she does have some expenses, that
10  would be properly reported on a Schedule C.  In her case, the
11  expenses that are reported in connection with that actual sole
12  proprietorship contractor work are falsely inflated.
13          In addition, there's additional Schedule Cs on her
14  joint return with her husband that are just totally made up.
15          THE COURT:  Different businesses?
16          MR. COFER:  Different businesses.
17          So you can attach multiple Schedule Cs for however
18  many supposed businesses you have, but they're all basically
19  sole proprietorship in nature.  And it can be anything from --
20  you know, there are rules about what constitutes a business that
21  we could get into, but for the ones that are legitimate, they
22  can be things -- they don't have to necessarily be your
23  full-time job, but they do have to be engaged in with ...
24          THE COURT:  Okay.  Then tell me about Mr. Watson's
25  returns.
```

1          MR. COFER:  All right.  So Mr. Watson's returns, the

2     returns that we would allege and intend to show to the jury as

3     false returns, are three returns.  It's his 2013 tax return, his

4     2018 -- sorry, his 2017, and his 2018.  So those three.  And I

5     know we've gotten this to Your Honor belatedly, but on the

6     exhibit list and what you should have in front of you, those are

7     Exhibits 4 -- I'm sorry -- 5, 6, and 7.

8          Each of them is similar, and what the government is

9     alleging Mr. Watson falsified is, he has a Schedule C, which in

10     his case is entirely proper.  He is a tax return preparer, he

11     works for himself; that's exactly how you should report the

12     income you receive from his tax preparation business and how you

13     should report the expenses that you incur to show your overall

14     business income or loss.

15          As we describe in our motion and as you'll be able to

16     see from just glancing at the Schedule Cs, the expenses that are

17     listed in his Schedule C -- and there's various categories --

18     are all -- or most of them the government would allege are

19     false.

20          So I think in each of those three years, he's claiming

21     an overall loss for those three years.  And then there's many

22     categories, several of which the government pointed to in its

23     brief that are false, and I'm happy to kind of get into what we

24     think our supporting evidence or what our evidence will be at

25     trial that will demonstrate their falsity.

1          But basically, just to say that at a very high level,

2     he's doing the same sort of thing on his own returns as he did

3     on many of his clients' returns that are going to testify, which

4     is, report extremely high false Schedule C losses that are not

5     true, and to the extent he did have some of those expenses in

6     some of those categories that might have been true, what he's

7     reported on the return is false in that it's just grossly

8     inflated.

9          THE COURT:  Okay.  So how are you going to prove that?

10         MR. COFER:  So I think it will come in a few different

11    forms.  So there's some evidence that will be kind of more

12    general that's going to show the nature of his business.  So

13    I'll talk about that first.

14         And -- so what each of these -- most if not all of the

15    client victim witnesses who are going to testify in the case in

16    chief, they're all going describe a very similar process for how

17    they met with Mr. Watson and worked with him to prepare his

18    returns.

19         They would go in, they would meet with him at his

20    office.  His office was in a kind of shared office space where

21    there were other independent professionals who were doing work

22    there, but he basically, had his one room where he had a desk,

23    he had a computer.  There was a receptionist that seemed to work

24    for kind of all the different professionals in the building that

25    could direct people to Mr. Watson.  And they would come in, they

```
 1    would sit down for 30 minutes to an hour, maybe longer in some

 2    cases, and he would have his conversation with them, and he

 3    would basically prepare their tax returns right there on his

 4    computer.

 5            So -- and then, they also will testify that they never

 6    worked or saw anyone working with Mr. Watson.  He didn't send

 7    them to someone else to do intake or have another tax preparer

 8    that worked for him.  So that's all painting a general picture

 9    of his business, which is a man who works in a single office

10    with a computer to prepare tax returns using commercial tax

11    preparation software.  All these clients are going testify to

12    that, and then, the jury's going be able look his Schedule Cs,

13    where he's claiming, for example, I think in one year,

14    $25,000 -- let me not guess; let me pull to it, Your Honor, if

15    you'll give me one moment.

16            So there's a table on page 10 of the government's

17    motion.  So for example in 2018, Mr. Watson is claiming as

18    expenses, with this sole proprietorship tax preparation business

19    that I just described, $14,500 of repairs and maintenance

20    expenses.  He's claiming $25,000 worth of supplies; $16,000

21    worth of car and truck expenses; and he's also claiming,

22    I think, in that year, $36,520 in contract labor expenses.  And

23    there's others there, and -- but at the end of the day, what

24    he's reporting in 2018 -- and that's what those numbers are

25    from -- he's claiming he made only $4,000 in profit from his tax
```

1    preparation services.

2          So at a very general level, this would be step one.

3    I think the jury will understand that someone who runs a

4    business of that nature, these expenses just are completely

5    fabricated and don't make sense; there's nothing from what they

6    would understand about his business that would suggest that.

7          Stepping back from that more general point about the

8    nature of his business and do these expenses, this high make

9    sense, there's a few specific things, specific items on each of

10   those returns that I think the government has more direct proof

11   are false.  So on each return Mr. Watson claims he -- as I just

12   mentioned before with respect to 2018 -- he has contract labor

13   expenses, which is contractors he's hiring to do something for

14   his business that he's paying.  In 2013, he claimed $40,000 of

15   contract labor expenses; $23,000 in 2017; and again, 36,000,

16   roughly, in 2018.

17         One of our witnesses from the IRS will testify that

18   when you're a business and you pay a contractor to do something

19   for you, whether it's anything from a nanny to a contractor

20   who's going to do construction work for you, you have to issue

21   them and report to the IRS a Form 1099.  That's how the

22   contractor can report to the -- in lieu of, say, a W-2 which

23   shows kind of salary wages, 1099 is contractor payments.  So the

24   IRS keeps records of businesses who issue Forms 1099, and

25   I think, Your Honor sees where I'm going with this; when the IRS

1    searches its database to see if Mr. Watson or his business has

2    issued any Forms 1099 in those years to contractors, it comes

3    back with nothing.  It's of course possible that he did pay

4    contractor expenses and didn't file Forms 1099, but that is at

5    least probative of the falsity.

6            And I would also add there, to go back to the general

7    story, all of the witnesses who are going testify, other than

8    this receptionist that seemed to work for the shared space,

9    don't -- had never met with anyone else who seemed to have

10   worked for Mr. Watson in this capacity.

11           THE COURT:  Okay.  So in general, then -- and are

12   there other categories where you have direct proof, besides the

13   contract labor?

14           MR. COFER:  Just -- just one.

15           So on the 2013 tax return, Mr. Watson claims a refund,

16   as in, IRS, I want you to write me a check for approximately

17   $88,000.  What's driving that is, he's reporting he had $128,140

18   in tax payments that he made to the IRS that were withheld --

19   I think he described them as withholdings -- despite reporting

20   $176,000 in total income.  So you know, withholding as if, I'm a

21   W-2, I have salary, my company or the government withholds money

22   from my paycheck that represents what I owe for my income taxes,

23   and that's paid over to the IRS.  And if you -- if too much is

24   withheld, he gets some of it back; that's the refund.

25           So not only is there no evidence on IRS records that

 1  any amount of money was withheld from any payments made to

 2  Mr. Watson in 2013 -- for that same dollar figure which he is

 3  claiming is withholding is -- shows up on a Form 1099 that was

 4  issued to him from Ocwen Loan Servicing, which is for canceled

 5  debt in the amount of $128,140.  Canceled debt is typically

 6  treated as income to the taxpayer, but even if you don't treat

 7  it as income, it's certainly not something that the government

 8  has to pay you back, because it's not a tax payment you made.

 9           And so if -- again, Mr. Watson may argue that that was

10  just a typo, but as the jury will be well aware by the end of

11  this trial, Mr. Watson is a professional tax return preparer

12  who's prepared, for many years, hundreds of returns a year.  And

13  so the idea that he's preparing his own taxes, and when he's

14  reviewing the bottom of the 1040, and the dollar figure that

15  he's asking to get back is not to pay any taxes but to get back

16  $88,000, I think that's probative that that is not some sort of

17  mistake but that is yet another falsity.  So that would be one

18  specific one to 2013.

19           THE COURT:  So do any of the clients who are in the

20  charged counts have the same categories of expenses, such as

21  contract labor that's inaccurately reported, vehicles, any of

22  these same categories you're pointing to on Mr. Watson's

23  returns?

24           MR. COFER:  Yes, Your Honor.  So there's -- there's

25  some that show up relatively consistently across the client

1    returns.  I think contract labor may be one that is not coming

2    up a lot, but in general, it's kind of spread out across the

3    expense categories.  So I think there is overlapping categories,

4    but in general, what it is, is, you know, if you look at many of

5    the expenses that are listed in Mr. Watson's returns, many of

6    them seem patently false, or at least, grossly inflated.

7            THE COURT:  Well, I'm just saying, are they the same

8    categories as the clients?  Again, you mentioned vehicles, you

9    mentioned contract labor.  There's also, like, supplies.  I

10   mean, there's different categories.  I mean, when these -- the

11   particular types of expenses getting reported on the clients'

12   Schedule Cs, are they in the same buckets, or are they

13   different?

14           MR. COFER:  So I don't want to say there's perfect

15   overlap, because it varies from client to client, but yes, there

16   is substantial overlap.  So it's not just that there's one

17   bucket of expenses that is showing up as the one that's false.

18   Each client kind of has one that's more egregious, and then

19   there's many that seem inflated.  So we intend to focus on kind

20   of a few rather than drawing on every single one.

21           THE COURT:  Right.  I'm just saying -- I mean --

22           MR. COFER:  Yes.

23           THE COURT:  As an example, though, you gave me

24   vehicles, and you gave me contract labor.  Are there any of the

25   clients where the evidence is going to be that those numbers

 1    were inaccurate or false in their -- those line items on the

 2    Schedule C?

 3              MR. COFER:   I don't know about contract labor.

 4    Vehicles, I believe, yes.

 5              One thing that shows up, it's a slight different line,

 6    is depreciation of vehicles.   I think there will be repairs and

 7    maintenance that shows up in at least some of the clients.

 8    There will be supplies as well.   And then, one -- one big kind

 9    of bucket category is the category Other Expenses, and then you

10    kind of flip to the next page, and there's kind of some listed

11    out.

12              So often, what he's doing -- and it will depend on how

13    much we drill down to all these specifics, but the jury will see

14    them on these returns and hear from the clients, is, whether

15    they're clearly personal expenses for, say, your cell phone

16    bill -- that you may use, sometimes, for your business -- are

17    showing up there in inflated numbers.

18              So if you look, for example -- I believe it's his 2017

19    return, there is a $37,000 in Other Expenses is deducted; and

20    within that, there is almost $10,000 for gas; $4,000 from

21    cell phone.

22              I'm hesitant to say what the perfect overlap is,

23    because as I said, Your Honor, with each client, we're going to

24    kind of focus on some of the big ticket items that are just

25    patently and -- very clear to the jury, but I think as -- what

1    the jury will glean from just looking at these tax returns for

2    all these witnesses and hearing them describe what they told

3    Mr. Watson and what their business was, they're going to have a

4    good sense, too, that all these other expenses that are showing

5    up there are inflated.

6         So again, we would describe what the -- what the

7    pattern is, here, his modus operandi, is to inflate a bunch of

8    expenses, spread them out a bit, but what he wants to do is, he

9    wants that total expenses, line 28, which all these things

10   funnel into, to be high as possible, because that's the line

11   that's going to flow up to line 12.

12        THE COURT:  So a couple other questions.  One is, if

13   this is so bad, is this the subject of any other charge

14   anywhere, or why is it even just part of this case, these

15   alleged false tax returns by Mr. Watson of his own.

16        MR. COFER:  Your Honor, so the -- fair question.  It's

17   not part of any charged case anywhere else.  And I think,

18   typically -- I think there's very strong indicia here that

19   this -- with the whole separate investigation into his own

20   returns is the sort of thing that could be investigated and

21   might possibly be the sort thing in a different world that would

22   lead to charges.

23        Much of the corroboration of this came after,

24   basically, the direction of the investigation was focused on his

25   preparation business.  I'm sorry, I think a bit of that gets

 1   into the charging decision but also, you know, where do we want

 2   focus the resources of the investigation.  And so I would say as

 3   far as why they aren't charged or whether they would be charged,

 4   I think it's more -- a lot more would have to be done to fully

 5   prove them beyond a reasonable doubt to corroborate them, if we

 6   were bringing this as, let's say, a stand-alone tax evasion

 7   case.

 8           But as far as whether or not they kind of meet the

 9   burden is relevant, an additional relevance.

10           THE COURT:  So then why are we looking at 2013, which

11   is three years before the events that are charged, when you

12   actually -- you have some from 2017 and '18, which is the same

13   time period?

14           MR. COFER:  So I think all of the charged returns are

15   from 2015, '16, and '17.  And so really, this gets to, you know,

16   why do we want to demonstrate their falsity and what does 2013

17   tell us?  So although we don't intend to -- as Mr. Morgan

18   stated, Your Honor, we don't intend to introduce the very

19   similar client returns from 2013 and 2014 that weren't charged.

20   Many of the client victims that will testify, will testify that

21   they met Mr. Watson as early as 2013, sometimes earlier, and

22   that he prepared their tax returns within that range.

23           But more to the point, his twenty- -- the probative

24   value of his 2013 return, all of these build towards what we

25   think they're relevant to show the jury, which is absence of

1   mistake, kind of modus operandi that -- what it gets to as far

2   as the element of the charged offenses is willfulness.

3          I think that is what is going to be the key dispute at

4   this trial between the government and the defense, which is, did

5   Mr. Watson know what he was doing, did he know that categorizing

6   these expenses, putting them on here in this way, and even more

7   egregiously, that making numbers up, is that something he could

8   not do?

9          And so showing that he's doing it for his personal

10  gain demonstrates that this is something he has a motive to do

11  to enrich himself, and it also proposes a slightly different

12  defense as well, which is, what he may very well argue is,

13  you know, these numbers may seen high on my client's returns,

14  but this is what they told me.  I'm not an accountant, it's not

15  my job to audit what they tell me; it's my job to correctly

16  input the information that they tell me.

17         And so to the extent, Jury, you see crazy expenses on

18  these clients' Schedule Cs, it's because that's what they told

19  me.  So that's a defense he may also pursue.  And seeing very

20  similar inflated false expenses on his own returns shows that it

21  was not the clients who are feeding him these expenses, it was

22  Mr. Watson who was doing the exact same thing that he was doing

23  on his own returns, which is, he knows he can't do this, he's

24  trying to drive down that income to drive up refunds, both for

25  himself and for his clients.

1      THE COURT:  So then, are you still pursuing the fact

2  that he didn't file returns in certain years, which presumably,

3  you would also try to argue or show that he was required to and

4  did not, that there was --

5      MR. COFER:  Yes.

6      THE COURT:  Why is that?  I mean, that all -- I

7  understand at least some argument that the '13, '17, and '18

8  years are similar in the -- but this is sort of a different kind

9  of violation, to say, he just didn't file anything at all.  And

10 you don't have any counts, I don't believe, in which the issue

11 is that he advised someone not to file anything at all when they

12 really needed to.

13     MR. COFER:  That's right, Your Honor.

14     I think it is slightly different than the false

15 returns we're alleging.  So I think, of the two kind of defense

16 theories I just laid out, I think the false returns gets

17 particular to one, and that's, again, to this general absence of

18 mistakes.

19     So you can imagine Mr. Watson -- or -- again, he

20 doesn't have to testify, of course, but in his closing argument,

21 if he makes a defense case, he may argue that, look, I am a

22 scrupulous tax return preparer.  Again, I'm a professional, I do

23 this year after year.  The government has cherry-picked 28

24 returns out of hundreds, and I do my best every year to follow

25 the tax laws and tax codes as I understand it.  And yeah, they

1    may have just demonstrated that I was wrong about how to

2    characterize certain business expenses or whether to depreciate

3    a vehicle, but I truly believed at the time that I could do this

4    and that's something I could do.

5         And I can say from the bottom of my heart that I do my

6    best, as a professional and as a citizen, to follow the tax laws

7    and to do what I think is right.

8         And so where his failure to file comes in is,

9    Mr. Watson knows -- and I do not think he could even come

10   remotely close to convincingly explain to a jury that he didn't

11   think he had to file tax returns for 2015 and 2016, because he

12   was working as a tax return preparer, he was earning income

13   similar to the other years, which, again, is a fact that I can

14   get into, which the government will have conditionally show at

15   trial and intends to do so.

16        But it's going to show that he knew he had to file tax

17   returns and he didn't, and what that shows is, he's not

18   scrupulous, he doesn't care about following the tax laws; what

19   he really cares about is avoiding his legal duty to pay taxes

20   for himself and to promote his business by doing the same sort

21   of things for his clients, which, again, speaks to his motive,

22   which is to get happy clients who get returns, who come back,

23   who recommend him to their friends and family.

24        Every client witness who is going to testify, I

25   believe every single one of them if not most, will say they were

1      referred to him by a friend or family member who said, yeah this

2      guy's great.  And they went to him, and this is how he drives

3      his business.  It's a volume business.

4            So there are two intertwined things, there.  Again,

5      they're different responsibilities.  One is to file tax returns

6      for yourself, that you know you have to do; the other is to, as

7      a preparer, accurately prepare returns and to follow the tax

8      laws as you understand them.

9            THE COURT:  I guess what I'm trying to understand is,

10     if he doesn't file a return, how is that showing an absence of

11     mistake, or intent, or willfulness, or -- certainly, not modus

12     operandi, because it's a different approach -- versus just bad

13     character and propensity.

14           MR. COFER:  I think the -- right, Your Honor.

15           So I think it's -- again, you know, I understand the

16     wrong way to make this argument.  The impermissible way of the

17     argument would be, like, look at this guy, this sort of guy

18     doesn't file his tax returns, doesn't prepare returns

19     accurately.  So they're -- you can see how it's similar, but

20     it's distinct.

21           So this is all about his intent, and so it's -- what

22     the failure to file returns is, is, I think we will prove -- and

23     I think we will prove it beyond a reasonable doubt -- that

24     Mr. Watson knows he has to file tax returns for himself in these

25     two years.  That is a legal duty that he knows.  There's no

1  confusion about what the tax laws require, and he's not --

2        THE COURT:  Honestly, I don't know the answer to that.

3  I know as an individual, if you don't make a certain amount

4  money, you don't have to file, so --

5        MR. COFER:  Right.

6        THE COURT:  And he's a sole proprietor, so he has a

7  business, but he's not incorporated.  So does he have to file

8  even if he's losing money?  I actually don't know the answer to

9  that.

10        MR. COFER:  So individuals have to file an individual

11  tax return regardless of where the income comes from if they

12  make, basically, above what the standard deduction amount is,

13  which is -- it varies a little bit from year to year, but it's

14  about $12,000.  So if you've made more than $12,000, you have to

15  file a tax return, and we're going to have an IRS witness

16  explain what the filing requirements are.

17        Mr. Watson, through evidence that, again, we plan to

18  introduce in trial -- that would be evidence intrinsic to the

19  charged counts -- will demonstrate that in 2015 and 2016, he's

20  preparing taxes; we have IRS data that shows, I think, he's

21  preparing roughly 450 to 500 returns in those years.  And we

22  have information from the commercial software company he uses to

23  prepare his returns for his clients, which is TaxSlayer.  It's

24  basically the same thing as TurboTax.  It lists what -- the fee

25  he is reporting there for each of these returns.  So his basic

```
 1   average fee -- and some of this will come from the witness
 2   as well, but he -- charges on average is about $400 -- actually,
 3   a little more than that, but we'll round down to 400.
 4         And so if you multiply 500 times 400 -- so 500
 5   returns, $400 a pop, that's getting you above $12,000.  It's
 6   getting you to what he's consistently earning across these years
 7   where he is filing, which is over $100,000 in income.
 8         So that is a conditional fact.  There's basically two
 9   conditional facts that the government will have to prove at
10   trial for this to be admitted, even if it is relevant under --
11   and permissible under 404(b); it's that -- what's the filing
12   requirement for an individual such as Mr. Watson, and what is
13   the evidence that shows he had that filing requirement and that
14   he knew he had the duty to file tax returns in those years.
15         To that point, I think, it's rather straightforward.
16   He's filing in other years where he's making very similar money,
17   and he's a tax return preparer; it's his job to file taxes.
18         THE COURT:  I mean, is it that simple?  I mean, this
19   is how much he's charging in fees.  We don't have anything on
20   expenses or anything like that.  Don't you have to put something
21   in on that side of the ledger?
22         MR. COFER:  For his expenses?
23         I think, again, this is -- so the -- as far as the
24   conditional fact being that he had a duty to file because he
25   earned above $12,000, let's just call it that, and obviously,
```

1    one side of the ledger which we just talked about as you point

2    out, Your Honor, is, what's the money coming in, what's the

3    money going out, so I think for similar reasons, in which we

4    will be able to demonstrate that the expenses he's claiming on

5    his filed returns are false and grossly exaggerated, the

6    understanding of what his expenses are will be able to give a

7    reasonable juror an ability to conclude that his expenses,

8    for example, are not over $100,000 a year.

9            This is an individual who rents an office space, has a

10   computer, files taxes through TaxSlayer.  You know, I'm sure

11   there's fees that come with that, there might be registration

12   fees, but this is not a -- he's not moving goods and lots of

13   overhead, this is not $100,000 of expenses.

14           So I think that Your Honor is right that we will have

15   to demonstrate at some level that his receipts coming in are

16   higher than his expenses, but I think that the standard for

17   conditional relevance for that to go to the jury, that's going

18   to go more to towards weight rather than admissibility.

19           THE COURT:  Okay.

20           MR. COFER:  I have that standard for what that is if

21   Your Honor would like it, but that's part of it, I think.

22           THE COURT:  Okay.  I think I understand.  Let me go to

23   Mr. Ruter for a minute on these points.

24           And so I have a couple different issues for you,

25   Mr. Ruter, first of all, what response you may have to

```
 1    Mr. Cofer, but I'll tell you where I am currently thinking, is
 2    it sounds like they've got a pretty good argument on the prior
 3    years -- on Mr. Watson's own tax returns, when he inflated
 4    expenses, at least under their view.  It's similar enough --
 5    it's the same time frame, at least '17 and '18, but arguably
 6    '13 -- to be relevant on absence of mistake or intent.
 7            And in fact, I think, they cited a case in which it
 8    was sort of a similar question about what could happen if he
 9    claimed he just didn't understand that these numbers he got from
10    the -- his clients were inaccurate, that the taxpayer himself
11    was -- where the tax preparer was inflating his own.
12            I'm much more skeptical of their argument on the
13    not-filing-at-all years.  I think I'm perhaps not inclined to go
14    with that, but I think they've got a stronger argument on the
15    years in which he did file.  So do you have any good argument
16    why I shouldn't go with that?  And then -- then we'll go to the
17    next step, which is your motion about the sort of positive
18    returns that he's filed.
19            MR. RUTER:  Well, Your Honor, I don't disagree with
20    the way you see the difference between those two different
21    situations for sure.  The way that I understand the law, in
22    terms of it being introduced as actual evidence, is whether or
23    not, somehow, this -- as the government actually quoted from I
24    think U.S. v. Kennedy, but does it tell the rest of the story,
25    or is it -- is it evidence which will -- which is somehow the
```

```
 1    same as a series of transactions similar to the charged

 2    offenses, and --

 3              THE COURT:  That would be if they're trying to argue

 4    it's intrinsic, and I guess they're probably going make both

 5    arguments, but --

 6              MR. RUTER:  I'm not too sure.  It seemed to me,

 7    though, that there was a --

 8              THE COURT:  Let's just ask.

 9              Are you arguing this is intrinsic to the offense, or

10    are you arguing it's admissible under 404(b)?

11              MR. COFER:  For the false returns, 404(b), as well as

12    the failure to file.  I think the intrinsic argument was more

13    about the clients, not charging --

14              THE COURT:  Right, okay.  So they're not trying argue

15    that it's part of the same story, which I would agree with you

16    it probable isn't, and they seem to agree as well, but they're

17    arguing that it goes to one of the 404(b) categories,

18    particularly intent, absence of mistake, and there is

19    certainly -- at least they're alleging some similarity in the

20    conduct.  So why isn't that enough to get it in, in a case

21    where, you know, state of mind is often the whole

22    shooting match?

23              MR. RUTER:  Your Honor, the -- I think my papers

24    suggested it's a tough row to -- it's a tough row for the

25    defense to hoe, I understand that, and so I will make no further
```

1    argument on that point.  I don't think it's -- that there's any

2    way that we can avoid those kinds of -- that kind of evidence

3    coming in.

4            I did, Judge, wonder about counsel's argument about

5    the similarity of the issues, because when you look at

6    Schedule A, as an example, or Schedule C, there's only a finite

7    number of places to put various kinds of expenses that you might

8    have; it's not as if there's 150 different things you could

9    write.  And so I don't see that as being an important issue for

10   the Court to try to figure out, the so-called similarities in

11   the matters.

12           The difference, Your Honor, between those returns of

13   the charged conduct and Mr. Watson's, as an example these three

14   years we're talking about, there is nowhere on the other charged

15   conduct returns where there's anywhere near any kind of charged

16   labor, not even remotely close, much, much smaller.  It --

17   that --

18           THE COURT:  I'm sorry, which returns are you saying

19   have nothing on contract labor?

20           MR. RUTER:  I'm talking about the charged -- the

21   counts have very, very -- if they have any at all, it's very

22   small amounts of money, and the reason being, Your Honor, is

23   because in all instances, Mr. Watson's position is, they were

24   very small quite frankly mom-and-pop businesses.  They did their

25   own labor; they didn't have anybody to help them.

1          THE COURT:  Like this grandmother daycare business?

2          MR. RUTER:  As an example.  She didn't have anyone

3   helping her; she's one who took care of the children that she

4   had, and that was the end of it.

5          And I think that fact alone, Your Honor, would,

6   you know, perhaps shock a juror when it shouldn't, but it sticks

7   out so greatly that it's hard to avoid it.  There's no doubt in

8   my mind that will be the primary thing if the government will

9   and should argue as to why they should believe that those

10   particular returns that they want to introduce should be

11   considered fraudulent.

12          Secondly, I would point out, Your Honor, as far as

13   proof is concerned, the way in which the government intends on

14   proving the charged conduct is because they believe that their

15   witnesses, that is, the taxpayers, will take the stand and they

16   will simply say, I never told him that, or I didn't do that.

17   And that's the starting point for the government's argument that

18   the tax returns are fraudulent.

19          It's not my understanding, Judge, that the government

20   is alleging that if the taxpayers had told them in their

21   interview process or they had testified in the grand jury that

22   they did tell him those things and those numbers were placed on

23   the returns, that no crime had been committed.  I think that's

24   what -- I think that's what they would cite.

25          Therefore, it's not a matter of whether or not the

1    numbers are in the proper place or whether or not the amount of

2    deductions are actually correct; rather, it's whether or not

3    Mr. Watson was told what Mr. Watson, if he testifies, would say

4    he was told; they're going to testify that, I never told him I

5    had this, I never told him I had that, I never -- I never said

6    that.  So that's the falsity.  I don't see how they could prove

7    it against Mr. Watson unless you took the witness stand.

8            So what I'm really saying about that, Judge, is,

9    I think the Court should reserve until or unless Mr. Watson

10   decides to testify.  Maybe then the Court should make a ruling,

11   a hard ruling, on whether or not these three returns should be

12   admissible.

13           THE COURT:  Well, either way, they have to prove that

14   he had the requisite intent.  You are certainly free to argue

15   based on cross-examination or just the absence of certain

16   things; you're free to argue, well, all they have is what these

17   individuals have said, and who knows if you can believe that,

18   and therefore, you haven't shown intent, so --

19           MR. RUTER:  And I guess, all we'll have really, Judge,

20   is the returns.  It's not clear to me exactly what else the

21   government can show, except to put big circles around $40,000 in

22   contract labor and say, this can't be right.

23           THE COURT:  So do you agree -- do you disagree with

24   Mr. Cofer that there's at least some overlapping categories

25   between the clients' returns, Schedule Cs, and Mr. Watson's?

```
 1              MR. RUTER:  There was overlapping.

 2              THE COURT:  Okay.  In the categories.

 3              MR. RUTER:  And again, Your Honor, it's because the

 4   way the returns are set up --

 5              THE COURT:  You're right; there's only certain places

 6   you can go.

 7              MR. RUTER:  I think there's like maybe 10 or 12

 8   different things you can write down.  Now, there's other --

 9   whatever that means, but there's not many.

10              THE COURT:  Sure, okay.  So let me ask you this,

11   then -- hold on one second.

12        (Pause.)

13              THE COURT:  Sorry, we're getting a note from the jury,

14   but it's about a technical issue which I don't know if I need

15   to -- I don't think I need to do anything right now on, but

16   maybe just keep -- get them some assistance from IT on it.

17              So -- okay.  So I think I understand where you are on

18   that.  Now, let me ask -- because I think they're at least not

19   unrelated.  You have an argument that you want to offer examples

20   of times when Mr. Watson did a return and it was never deemed to

21   be false in some fashion.  And what I want to understand is,

22   first of all, what is the scope of this?  I mean, how many

23   different returns are you talking about putting on; is it the

24   returns, is it the taxpayers testifying?

25              And then if so, similar to what I asked of the
```

1    government is, how similar are those situations; are they just

2    the fact that they're tax returns that no one raised any

3    questions about, or are they ones in which it's the same

4    categories of information on the Schedule Cs?

5            And I think you may also have indicated in the motion

6    that there -- maybe there is some argument that the IRS, through

7    an audit or otherwise, affirmatively effectively said that this

8    is good, or it's done properly, or something like that; is there

9    anything like that --

10            MR. RUTER:  Yeah, Your Honor --

11            THE COURT:  -- beyond just the mere fact that he had

12    some returns that were not found to be fraudulent, which -- that

13    by itself is probably not enough under the case law, but if

14    there's something that sends him a direct message that his

15    methodology or his approach is okay, you have a perhaps better

16    argument.

17            MR. RUTER:  Your Honor, the starting point is, we have

18    no taxpayers that will come into court and testify as to what

19    I'm about to argue.  We've made efforts, and as the Court may

20    guess -- I think it's irrelevant -- a lot of folks are not going

21    to want to come in here and -- to discuss their tax issues.

22            And I've made the determination that given the way the

23    case is, we think it might go, they may have a constitutional

24    right not to come in and testify at all.  And so I've chosen not

25    to go any further with those who will not come in.

1          So we don't have anybody to come in and say that.

2          THE COURT:  Okay.

3          MR. RUTER:  The testimony would come from Mr. Watson

4  himself if chose to take the witness stand, and what I would

5  expect he would testify to is, if there had been some of his

6  taxpaying clients who were W-2 employees, just like all of the

7  people in this case -- I think maybe one was just retired;

8  I think all the rest of them have W-2s, and just like all the

9  people in this case, minus a couple, they had small businesses,

10  and they filed Schedule Cs.  And like almost everybody in this

11  case, they had unreimbursed employee expenses, and like many of

12  those in this case, depreciation was made on automobiles and

13  other assets which Mr. Watson thought they were entitled to.

14          THE COURT:  Can I just pause you for second.

15          MR. RUTER:  You may.

16          THE COURT:  Reimbursed employee expenses, that's

17  non-Schedule C; those are expenses related to their W-2 jobs?

18          MR. RUTER:  That's a different form, Your Honor.

19          THE COURT:  That's a different -- it's part of this

20  case but not the Schedule C part.

21          MR. RUTER:  That's right.

22          THE COURT:  Okay, go ahead.

23          MR. RUTER:  And so, Judge, I would expect that --

24  Mr. Watson to testify further that after having completed those

25  tax returns, several -- I don't want to say -- I will say

```
 1    several -- I don't have a real number, an actual number --

 2    called him and said they got a letter from the IRS, questioning

 3    various items.

 4            I'd expect him to testify, Judge, that the items we're

 5    talking about are the very same kind of items that are at issue

 6    here before this Court, and I would expect that Mr. Watson would

 7    testify, if permitted, that he gave them advice concerning what

 8    to do about a phone call or a letter that they may have received

 9    or did receive from the IRS and that on more than one occasion,

10    he actually offered them advice, prepared a letter for them that

11    could be sent to the IRS for the purpose of trying to persuade

12    the IRS as to the properness, if you will, the appropriateness

13    of the tax return that was filed by him, and that after having

14    done so, no action was taken by the IRS as it relates to that

15    return, or those returns.

16            THE COURT:  You mean, the letter was sent out?

17            MR. RUTER:  Yes.

18            THE COURT:  Or at least he believes it was sent out by

19    the taxpayer?

20            MR. RUTER:  Yes.

21            Now, Judge, that's vague, as -- the government used

22    the word paucity, and I can't argue that.  I did give them four

23    or five names of people that I knew, in fact, had returns

24    prepared by Mr. Watson, and all of whom had been contacted by

25    the IRS, and those are the four folks that I -- we've tried to
```

1    reach.  One is deceased, another one sort of hung up there too

2    and we've not been able to reach.  So those were four we were

3    sure that actually this had happened.

4            And so that, Judge, would be -- and the reason,

5    of course, we would offer that, Your Honor, is not a showing of

6    prior good acts, although, you know, I have to say, it's -- it's

7    always struck me as being a bit unfair that you somehow can show

8    bad conduct of a defendant, but you have no right to show good

9    conduct.  Nonetheless, that's not the status of the law.

10           We believe that with that kind of testimony, what had

11   happened as relates to Mr. Watson is, he knew that what he was

12   putting on those returns, absent the testimony of the lies of

13   the people who are going to come in and say that I didn't tell

14   him to put that on there -- that's a different issue; it's not a

15   legal issue, that's a fact issue.

16           But he would be able to tell you -- he would be able

17   to testify that given that as an example, he knew that the

18   numbers that he was putting on those returns, if in fact, they

19   were properly given to him -- that's the dispute here, Judge;

20   I think that's the only dispute -- would mean that we wouldn't

21   be here today at all.  And he believed -- he was assured by that

22   kind of result for his clients that he, in fact, had done

23   exactly what he should have done, which is to try to get the

24   largest refund he can for his taxpaying clients.

25           THE COURT:  So -- just so I understand, you're saying,

1   you think there's at least four examples of this?

2          MR. RUTER:  Yeah.

3          THE COURT:  You have a name, but not a witness.  Do

4   you have any of the documents from those returns, for some

5   reason, or not?

6          MR. RUTER:  We -- no.  We have parts of the returns,

7   Your Honor -- we have all the returns, because Mr. Watson has

8   most of them on his computer, and I have the returns.  They all

9   show exactly what I've proffered to the Court; they're the same

10  kind of things that have happened in this case.

11         What I don't have is the taxpayer and one key element,

12  which I don't think defeats what I'm attempting to do, which is,

13  well, maybe in that case, those people actually gave him the

14  proper numbers, whereas in these cases, the taxpayers are going

15  to say -- or at least the government believes -- that, I did not

16  give them those numbers.

17         THE COURT:  And you don't have a letter or anything

18  from the IRS saying this is all okay; you're just saying he

19  said, no news is good news.  I was told that they were -- the

20  IRS was interested, and now, of all of a sudden, they've

21  stopped -- no one's told me that there's a problem.

22         MR. RUTER:  Your Honor, that -- again, that's exactly

23  right.  There's nothing in Mr. Watson's files that we have at

24  all --

25         THE COURT:  Do you have the letters that he sent for

```
 1   the taxpayer to send to the IRS?
 2            MR. RUTER:  Judge, I do have one, which I will show
 3   the Court.
 4        (Pause.)
 5            MR. RUTER:  I'm going to advise the Court right now,
 6   Your Honor, that -- you all have a -- may I approach,
 7   Your Honor?
 8            THE COURT:  Yes.
 9            MR. RUTER:  So full disclosure, Judge Chuang, I found
10   out today from the government that this particular letter, which
11   I think I gave you the original, I hope, Judge --
12            THE COURT:  Do you want it back?
13            MR. RUTER:  Does it have a -- no.  Does it have the
14   original signature?
15            THE COURT:  Let me look.  It may well, yes.  It looks
16   like it could be; it's blue ink.
17            MR. RUTER:  Yeah, I think -- it's in blue ink, Judge,
18   I believe.
19            THE COURT:  Mm-hmm, yes.
20            MR. RUTER:  But I want the Court to know, Your Honor,
21   the government counsel advised me an hour ago that the social
22   security number referenced on this letter --
23            THE COURT:  Yes, for the taxpayer.
24            MR. RUTER:  Yes -- was, in fact, the wrong social
25   security number, and they gave to me today the -- this is from
```

1   the IRS, I think.  Ms. Carson, who I think might be testifying

2   in this case gave a document here which indicates that

3   particular social security belongs to a different person.

4            THE COURT:  Are the numbers close or off by a digit or

5   just totally different?

6            MR. RUTER:  Let me go see, Judge.

7         (Pause.)

8            MR. RUTER:  I'm looking to see -- is the social on

9   here?

10        (Conference between Mr. Ruter and Mr. Morgan.)

11           MR. RUTER:  Yeah.  Counsel says, Your Honor, they

12  don't have the social security number.  They -- they put in

13  other kinds of identifiers.

14           THE COURT:  They just have something saying that that

15  number's not matching the person, but they -- we don't know how

16  close the real number is.

17           MR. RUTER:  Yeah, that's what this document says, and

18  comes from the IRS, just given to me today.

19           THE COURT:  Okay.

20           MR. RUTER:  So the point being, Your Honor -- and

21  obviously, there couldn't be a worse start for the argument.

22           THE COURT:  Well --

23           MR. RUTER:  But I've seen bunch of these in his files,

24  Judge, just a large number of these.

25           THE COURT:  Letters to the IRS on --

1          MR. RUTER:  To the IRS, and the ones that I've seen,

2    primarily, are the same kinds of business-type expenses

3    everyone -- I can't think of any that are different -- that are

4    the same things, of course, complained of in this indictment.

5          THE COURT:  Okay.  I think I understand the argument.

6          So you were saying, it goes to his state of mind about

7    whether his approach was lawful or not, the way he was doing

8    these things.

9          MR. RUTER:  It does, and Judge, we're not -- we can't

10   negate the issue of willfulness by these letters alone, and

11   that's because if taxpayers come and take the witness stand and

12   say that what he put on there is a lie, and I didn't tell the

13   lie, he must have told the lie, or however they testify to it,

14   that's a credibility issue that we have to handle at the time of

15   trial, has nothing to do with this argument and this issue,

16   which is, he believed that he had the right, assuming that the

17   numbers are -- that he put on there were correct, to do exactly

18   what he did.

19         I don't know, Judge, whether or not the government

20   agrees with that.  I don't know whether or not their case is

21   only the fact that the numbers placed on these returns are false

22   because the taxpayers say they're false or whether or not their

23   argument is expanded by saying, well, when he entered this stuff

24   on this particular return, that's not appropriate; he did

25   something which the tax code does not permit.

1    I don't think that's part of their case.  I think it's

2    strictly the alleged falsities which they believe are

3    perpetrated by Mr. Watson.

4    THE COURT:  Okay.  And then, the last point is, I

5    believe you said, you don't -- this evidence isn't going to get

6    offered unless Mr. Watson testifies; is that correct?  You don't

7    see another way that it would come in?

8    MR. RUTER:  No, Your Honor, I would see no way.  The

9    only way, Judge, would have been if any of these taxpayers

10   themselves --

11   THE COURT:  Sure.

12   MR. RUTER:  I am not aware of that, but I -- quite

13   frankly, I may cross-examine on that, because I don't know -- in

14   terms of what the IRS has given -- what the government has given

15   us in discovery, they've given us the returns, properly so.

16   THE COURT:  Sure.

17   MR. RUTER:  And I don't have -- I don't see that in

18   Mr. Watson's records either as to any other way of knowing if

19   these people themselves were audited, or got a call, or any kind

20   of question about these returns.

21   THE COURT:  So am I correct -- and I think you said

22   that no final decision's been made on whether Mr. Watson is

23   going to testify; is that correct?  Or do we know one way or the

24   other?

25   MR. RUTER:  At least in my world, Judge, there's never

```
 1   a finality to it until the government rests.

 2            THE COURT:  I understand that, but I had -- I just had

 3   a trial where the defense counsel said in opening, he's going

 4   testify.  So that's pretty committing.  I'm not saying you would

 5   do that, but others have.

 6            MR. RUTER:  I probably will not do that.

 7            But nonetheless, Judge, I know that Mr. Watson has

 8   been leaning towards testifying, and not being born yesterday, I

 9   recognize that in terms of the way the case is setting up, he

10   probably would be the best witness to be able to refute, if he

11   can, the statements made by the taxpayers.

12            THE COURT:  Okay.  So I may be inclined, at this

13   point, since it seems a little bit unclear how this evidence

14   intersects with the government's case, I might prefer to defer

15   on ruling on this point.  Does that create issues for you with

16   things like opening statements or cross-examination, or do

17   you -- is your powder dry no matter what either way if I don't

18   make a final decision on this right now?

19            MR. RUTER:  No, Your Honor, I would stay away from

20   that, and I am -- right now, I -- although I certainly --

21            THE COURT:  Well, because if he's not going to

22   testify, then it doesn't come in, so it's not the kind of thing

23   that you would -- I would think that would you want to commit to

24   in your opening.

25            MR. RUTER:  That's exactly right; I don't see it being
```

1    an issue at all.

2              THE COURT:  Okay.

3              Let me turn to the government.  I don't know if it's

4    Mr. Cofer or Mr. Morgan on this particular issue, but -- so I

5    know you cite at least one case in which the concept is, you

6    can't just put in things where there was no criminal violation

7    associated with it.

8              On the other hand, I think there is at least a basis

9    to argue that again, just as with your issues, if it goes to

10   state of mind in some fashion, more specific than just a general

11   situation, then it may be admissible.  And here, it's not just

12   that he did a tax return for someone that didn't end up getting

13   audited or didn't end up getting found to have been false, but

14   he ended up actually sort of making an argument indirectly,

15   albeit to the IRS, on what he says is a similar set of issues

16   and at least got no response.

17             Leaving aside the admissibility of various pieces

18   here, whether the letter is admissible, the testimony, and so

19   forth, but just on the point of, if this theory could be proven,

20   do you see a problem or an argument on why it could not be

21   admitted as going to the state of mind of the defendant,

22   particularly given that you're trying to put in statements, or

23   returns, or issues, again, on the very same point?

24             And while you could say it's -- I mean, there's always

25   some element that may or may not relate to state of mind, but

```
 1   if -- to the extent there's some element of state of mind for
 2   your evidence and for theirs, why is this distinguishable?
 3            MR. MORGAN:  So I would just -- firstly, I don't think
 4   there's any way that they can get over the admissibility hurdles
 5   here, for numerous reasons, including authenticity and various
 6   things.  They perhaps could get a little bit closer.  Could they
 7   bring in individual taxpayers to testify to some of this stuff?
 8   But a lot of it just seems like basic hearsay and otherwise
 9   completely inadmissible.
10            THE COURT:  Well, they would argue that it's not
11   necessarily hearsay if it's just how -- its effect on
12   Mr. Watson.
13            MR. MORGAN:  It's hard to say, Your Honor, because
14   it's so vague at this point exactly what it is we're talking
15   about.  For example, we just got this letter yesterday
16   afternoon, the one he was just -- that I gave Your Honor, and we
17   had -- we don't really know much about it.  I mean, we had our
18   revenue agent just run it, and it's got the wrong social
19   security number on it.  It also postdates all of the conduct in
20   this charged case, and so it would be, I just think, flatly
21   irrelevant to begin with about his intent or state of mind
22   during the charged conduct.
23            So I honestly don't know how it would come in without
24   more information.  And so it's hard for me to say, specifically,
25   if he could hypothetically come up with some evidence that would
```

```
 1    thread that needle that is admissible, not hearsay, and also
 2    goes to the state of mind but doesn't run afoul with that case
 3    law that we gave you, right?
 4          I mean, it's -- obviously, in a bank robbery
 5    situation, you can't have a bank robber just say, the five other
 6    times I went into the bank, I didn't rob it, and show that as
 7    proof that he didn't commit this crime.  But it's hard for me to
 8    even give Your Honor a straight answer because I don't know
 9    exactly what it is that they're -- I could try to come up with
10    hypotheticals for them, but I don't -- I'm having hard time
11    coming up with anything that would actually come in.
12          THE COURT:  Well, I'm just hearing about this for the
13    first time now as well, so in terms of the admissibility, I'm
14    obviously not going make a determination right now.  I think
15    you're right, and Mr. Ruter has acknowledged, if he had the
16    taxpayer, it would be a lot easier.  I don't know whether there
17    are hurdles or whether the hurdles could be surmounted.  I think
18    part of it would be to what extent evidence can be accepted,
19    again, not for the truth of the matter asserted but for its
20    effect on Mr. Watson in terms of what he was being told, not,
21    again, whether the taxpayers are even being truthful to him but
22    just what they said.  So maybe there's an argument there.
23          Again, if it's his own records, he may be able to say
24    that these letters he sent out are authentic and that they
25    were -- again, not -- we're not asking or they're not
```

1   necessarily arguing it's offered for its truth but just its

2   impact.

3          I mean, so for example, if there had been a letter

4   coming back from the IRS, saying, we've looked into this, and,

5   you know, you're right, it's all -- your approach on putting

6   numbers in these deductions categories is okay, I mean, if they

7   gave a clean bill of health on something that was in dispute,

8   where this -- the issues were substantially similar -- and I'm

9   not saying that that's the facts, but if that were the

10  situation, what would be the problem with that?

11         MR. MORGAN:  Hypothetically, speaking, Your Honor, if

12  he did produce something from 2013, '14, '15 that sort of

13  predates this charged conduct, that was from the IRS, that said,

14  yes, you can, you know, do what you're doing, put a

15  grandmother's care of her grandchildren and convert that to a

16  day care business, for example, or whatever it might be, if he

17  can find the document from the IRS that said that,

18  hypothetically, then yes, I think that would be admissible.

19  It -- but I'm not sure we would necessarily be here if something

20  quite like that fits the bill.

21         THE COURT:  Let me ask a different point.  It's a good

22  point, perhaps, that this letter postdates -- you're saying it

23  postdates the last filing of a return?

24         MR. MORGAN:  I believe the last filings that are

25  charged are in April of 2018, around about, and the date of this

```
 1   letter is October 28th, 2018.
 2            THE COURT:  So April 2018 for tax year '17, basically?
 3            MR. MORGAN:  Correct.
 4            MR. RUTER:  '16 and '17.
 5            MR. MORGAN:  '16 -- right.
 6            THE COURT:  Okay.  So let me flip it around.  You're
 7   trying to offer his tax return from 2018, which was presumably
 8   filed in, perhaps, early 2019; why is that relevant, given that
 9   it's after all the conduct here?
10            MR. MORGAN:  It bookends, Your Honor; it would -- just
11   like before and after.  It shows it's not a mistake, that
12   this -- he knew exactly what he was doing, that it wasn't an
13   aberration that is -- you know, that it continued throughout,
14   and therefore, it's clearly a lack of --
15            THE COURT:  So if Mr. Ruter had a letter that predated
16   this one, bookended it so to speak, would it be the same
17   argument on it not being admissible, if he just wanted -- so
18   this was something he was hearing about repeatedly?  Again, I'm
19   not sure he has it, but if he had another letter that predates
20   this one -- predates the conduct, as you said, what would be
21   wrong with having a series of letters, including this one, as
22   part of that argument?
23            MR. MORGAN:  Your Honor, I think that if he had one
24   that predated the charged conduct and that was -- addressed
25   relevant issues to the charged conduct and cleared all the
```

 1   admissibility hurdles, it -- you know, that would be present,

 2   and we could -- that they could show are authentic, right, and

 3   not -- there's some questions, certainly, about these kinds of

 4   letters.

 5          It's possible, depending on how the case has gone at

 6   that point, and what testimony has been introduced, and what

 7   arguments are being made, and whatever, that it's possible that

 8   it could come in, but again, I'm speculating.  But yes, I could

 9   see a universe in -- where it is theoretically possible.

10          THE COURT:  Okay.  So I think where I am on this

11   issue -- and again, these are overlapping issues that --

12   basically 404(b) or intrinsic evidence, as I understand it,

13   there were four categories of evidence referenced in ECF No. 51,

14   which is the government's motion in limine regarding uncharged

15   acts.  And then we also have the defendant's motion in limine

16   regarding evidence of lawful acts, which is ECF No. 50.  As was

17   stated by Mr. Morgan, the government at this point is not

18   planning to offer or at least -- the evidence of uncharged tax

19   filings on behalf of the same clients who are referenced in the

20   indictment.

21          So while they're saying that -- and they're not

22   planning to offer those in the case in chief.  So I'm going

23   to -- I guess the way I would look at it is, I'm technically

24   going to deny that motion as moot in terms of asking for a

25   pretrial ruling, but the question of admissibility is still a

```
 1    live one which can be addressed if we get to the point of the
 2    government wanting to use them for some other purpose, whether
 3    it's cross-examination or rebuttal.
 4            The same is true of the category of the evidence
 5    regarding the Curl and Jacobs tax offense.  That also has been
 6    withdrawn, and so that part of the motion, again, denied as
 7    moot, but the issue of potential admissibility for a later stage
 8    of the case remains open for discussion.  I guess it's denied
 9    without prejudice as moot, however you want to put it.
10            On the issues of the defendant's own personal tax
11    filings and the defendant's failure to file tax returns in
12    certain years, based on the proffer from the government that the
13    tax returns for -- well, I guess I would start off by saying
14    there -- you know, government has made a proffer saying that
15    there were some similarities between the tax returns filed by
16    Mr. Watson on his own behalf and the tax returns filed by
17    Mr. Watson for other taxpayers in the charged conduct,
18    particularly the issues of alleged misreporting of expenses on
19    Schedule C in different categories, some of which overlap among
20    the charged tax returns and Mr. Watson's tax returns.
21            I think Mr. Ruter acknowledged that there was some
22    overlap, although I think he argued that there is no overlap on
23    the contract labor category.  Based on that proffer and, again,
24    not having looked at all the charged tax returns, I do see a
25    path by which these tax returns would be admissible.
```

1          In United States v. Watson, 433 F.App'x 284 (5th Cir.

2     2011), that Court upheld the admission of evidence of false

3     statements on the defendant's own -- defendant tax preparer's

4     own tax personal tax filings, where the defendant was on trial

5     for filing false returns on behalf of his clients and found that

6     his own tax filings were relevant to intent and absence of

7     mistake in the filing of his clients' false tax returns,

8     particularly where he claimed he had just -- was just following

9     the instructions of his own clients.

10          The key question here is how clearly false his own tax

11    returns were and how similar this conduct is to the charged

12    offenses.  As I've stated, based on the proffer, there's at

13    least some similarities in terms of the types of alleged false

14    statements, meaning, figures reported in Schedule C for sole

15    proprietor of businesses, either of the taxpayer or Mr. Watson.

16          So based on that, I do find that the issue of

17    Mr. Watson's false tax returns is sufficiently similar to be

18    probative on the issues of intent and absence of mistake and

19    that based on what I know now are admissible under 404(b).  I

20    also would find they're not subject to exclusion as unduly

21    prejudicial under Rule 403, given the importance of state of

22    mind evidence in a case like this.

23          So within the framework of 404(b), United States v.

24    Johnson, 617 F.3d 286 (4th Cir. 2010), the evidence is relevant

25    to one of the identified issues, in this case, intent and

 1   absence of mistake.  It is necessary and it's probative on an

 2   essential element, which is the willfulness.  At this point, I

 3   would -- from what I know, the evidence is reliable and that

 4   it's based on actual tax returns.

 5          The falsity issue is based on what Mr. Cofer said,

 6   that there will either be witness testimony about how his

 7   business operated or perhaps IRS records on the lack of 1099s

 8   or otherwise, but it seems sufficiently reliable at this point.

 9   And the probative value I don't believe is substantially

10   outweighed by the danger of unfair prejudice, although, I would

11   say, as with all these cases, there is some danger of prejudice

12   here associated with the possible view of this as propensity

13   evidence, but I do find that overall, as state of mind evidence,

14   the probative value outweighs the -- you know, is not

15   substantially outweighed by the danger of unfair prejudice.

16          I would also note, though, that this is somewhat based

17   on the notion that the ability to prove the falsities of these

18   tax returns is going to be viably done in an efficient manner.

19   I would have some concerns if this was going to require

20   effectively a whole separate trial on this issue.  So to the

21   extent that the witnesses covering this fraud, the charges here

22   in the case already, meaning the taxpayers, can't prove this up

23   by themselves, I think there's some limit to how much I would

24   admit in terms of additional evidence to show the falsity of

25   Mr. Watson's tax returns.

1          We can't have, you know, another ten witnesses and,

2     you know, documents from -- we can't have the tail wag the dog,

3     here.  So I'll allow at least some evidence to try to establish

4     falsity, but it's going be -- there's going to be a limit on

5     that where it can't overtake the rest of the case.

6          As for whether 2013, and 2017, 2018 are probative, I

7     may want to look at these documents one more time before I lock

8     in on that.  I do think '17 and '18 are from this exact time

9     period, 2013 is a little earlier.  I understand the government's

10    point that it's the series that may be relevant, and so I think

11    I would be inclined to include 2013 so long as when I look at

12    it, I see sufficient similarities, but I'm going reserve on that

13    exact issue.

14         Now, on the question of whether the evidence that

15    Mr. Watson failed to file a tax return for himself at all in

16    certain years should be admitted, I do not find that that's

17    sufficiently similar to be relevant on the issues of intent, or

18    knowledge, or absence of mistake.  It's certainly not --

19    although I didn't say that the false statements in Mr. Watson's

20    own returns was necessarily modus operandi, it was a little bit

21    closer to it in terms of the same approach of filing returns

22    with false entries and Schedule C.

23         Here, the alleged falsity, or misconduct, or false

24    statements are different in nature, it's the omission of any

25    kind of tax return at all, so it really isn't the same modus

1   operandi.  It wasn't as if he advised the taxpayers, just don't

2   file a return at all, so it's not similar in that regard.  I

3   understand that it can be relevant on the issue of -- arguably

4   relevant on the issue of intent, but at the same time, it's also

5   highly likely to be viewed as character evidence or propensity

6   evidence to make false statements to the IRS more generally.

7        But the conduct is not sufficiently similar to be

8   particularly probative on the issues of intent here in terms of

9   how -- whether there was a mistake in the way he handled the

10   Schedule C entries or otherwise.

11        Now, in United States v. Maxwell, 643 F.3d 1096 (8th

12   Cir. 2011), the Court admitted evidence of the defendant's

13   failure to file a tax return as relevant to show his involvement

14   in a conspiracy with others, but in doing so, the Court noted

15   that absent the specific conspiracy charge at issue in that

16   case, the evidence of the defendant's personal filing history

17   was relevant only by way of a prohibited inference, that because

18   he had -- they had previously engaged in other misconduct with

19   the IRS, he was probably doing it again.  That is, again,

20   impermissible propensity evidence.

21        So the failure to file, because it's a different form

22   of misconduct, is more likely to be viewed as bad character or

23   propensity evidence.  So one, I don't find it to be particularly

24   probative on knowledge, intent, or absence of mistake, but even

25   to the extent it is, I do find that under the 403 prong of the

1   404(b) argument that the probative value is substantially

2   outweighed by the danger of unfair prejudice, and so at least as

3   of now, I will exclude that evidence.

4          Now, as with all these things, of course, I haven't

5   seen any of the evidence in the case, so we'll see where we are

6   as we go along.  Maybe there's another argument or situation

7   under which that would come up again, in the same way that if

8   the evidence surprises me, then some of these other returns I

9   may have to revise where I am, but that's where I am as of now.

10  And the Curl piece, I think, was not included.

11         As for the -- and so that's ECF No. 50, where it's

12  granted -- 51.  It's granted in part and denied in part, granted

13  in terms of a pretrial ruling provisionally allowing the Watson

14  tax returns, denied in the sense of provisionally concluding

15  that the failure to file is not going to be allowed, and then,

16  again, denied as moot as to the other two points because the

17  government is withdrawing those for their case in chief.

18         On ECF No. 50, the motion in limine regarding the

19  defendant's own lawful acts, as I indicated to Mr. Ruter, I'm

20  going to defer and not rule on this right now.  Just to give you

21  some guidance, which I think I've already done, I do think that

22  while the government has cited United States v. Dobbs, 506 F.2nd

23  445 (5th Cir. 1975) for the proposition that evidence of

24  noncriminal conduct such as filing correct tax returns does not

25  generally negate the inference of criminal conduct, here, there

1    is a more specific theory being offered than just that.

2         The argument is that Mr. Watson had an understanding

3    of how the IRS would handle or view certain types of

4    submissions, effectively arguing that to the extent that he had

5    taxpayers who had similar returns -- but again, I haven't seen

6    those exactly -- but similar issues with -- I don't think it was

7    the Schedule C issue, but it was the expenses for employees,

8    which may be another part of this case.

9         They were -- received inquiries from the IRS, and the

10   IRS -- he helped submit an argument to the IRS on why these

11   entries were appropriate, and at least his state of mind is that

12   the IRS accepted the argument, because he never heard from them

13   again.

14        I'm agreeing with the government that there are some

15   challenges on the admissibility of this type of evidence, and I

16   have to see, if we get to that point, exactly what the arguments

17   would be on why this or other letters are admissible and hear

18   arguments as to why statements he may make about what he heard

19   from his client or otherwise would be admissible.  So there's

20   some challenges there.

21        That's why I'm not -- certainly not going to admit it

22   right now, but I'm not going exclude it either, because I do

23   think there's at least a theoretical possibility that this type

24   of evidence could be admissible if it can be shown that it

25   affected his state of mind as to how the IRS -- whether they

1   agreed or disagreed with the way he was approaching these

2   returns.

3          I think there are two main factors there:  One is the

4   admissibility of all this evidence; secondly, the evidence that

5   the IRS actually did bless these returns affirmatively as

6   opposed to -- or at least gave some -- there was some evidence

7   that Mr. Watson had a reason to believe that the IRS had blessed

8   those returns; and then also, just the understanding of what was

9   in these returns and whether they're similar enough -- the

10  issues were similar enough to the ones in the charged conduct to

11  allow for that inference that it could affect his state of mind

12  and negate willfulness in some fashion.

13         So I'm going to deny the motion in the sense that I'm

14  not going give a pretrial ruling admitting this evidence, but

15  I'm going keep the issue open until we see, first off, if

16  Mr. Watson is going to testify, which as Mr. Ruter said, that's

17  sort of a prerequisite for this.  But we can have a further

18  discussion later on in the case if you have that evidence pulled

19  together more specifically, Mr. Ruter, as to what it is, and

20  then also, we can see how it aligns with the evidence in the

21  government's case.

22         So I think that's a long way of addressing those two

23  major motions.  There were two other issues that were raised by

24  way of either motions in limine or otherwise, and I'm not sure

25  exactly whether there's major disagreements here or not.

```
 1              Hold on one second; just a minute.
 2         (Pause.)
 3              THE COURT:  Sorry, just dealing with some issues with
 4    the jury.
 5              So the government had a motion regarding the use of a
 6    summary witness.  I think the specific issue in the motion was
 7    whether this witness can sit in the courtroom and sort of
 8    basically be an exception to the sequestration rule.
 9              My impression, Mr. Ruter, was that I didn't see a
10    specific argument stating that there's any problem either with a
11    summary witness generally or -- I'm not sure I saw an argument
12    saying that the summary witness shouldn't be allowed to sit in
13    the courtroom.  I think you have some issues more generally
14    about what is this witness going to actually say and what kind
15    charts the witness is going to use.
16              But on those first two points, is there a dispute or
17    not?
18              MR. RUTER:  Your Honor, I really did not have any
19    strong position about the nonexpert witness being here, a reason
20    being, evidently, the government wants to do math throughout the
21    course of the trial on what it believes the new number should
22    have been on each tax return, given the testimony of the
23    taxpayers; I guess that's what they're doing.
24              I had a discussion with the government about the fact
25    that that's -- the amount of money that may have been lost to
```

1    the Treasury is not even an element of the offense, much like in

2    a drug case, you know, if there's no quantity stated, it doesn't

3    make any difference about those matters.  And financial crime

4    problems issues, the amount of money converted, the amount of

5    money that was subject to some scheme, not an element; it's not

6    necessary to go through all that.

7          And so I -- as a general proposition, I might very

8    well be objecting to the summary of all the differences and how

9    much money is actually due the Treasury, given what the

10   taxpayers have said, which I think is the only way that it can

11   be calculated.

12         And that's a different issue, Judge, in terms of

13   whether she should be here, but I think that's the reason they

14   want her to be sitting in the courtroom throughout the

15   proceedings.

16         THE COURT:  Okay.  So you have a relevance objection

17   rather than a process objection of having a summary witness who

18   could do calculations, that kind of thing.

19         MR. RUTER:  Yeah.

20         THE COURT:  Okay.

21         So, Mr. Morgan, first of all, I don't know if

22   Mr. Ruter is characterizing it correctly or my understanding is

23   correct.  I wasn't really clear, exactly, on -- I hadn't thought

24   about Mr. Ruter's question -- point about whether this is

25   relevant or not.  I also wasn't clear on why we need to have

1   realtime calculations as opposed to just knowing right know what

2   the alleged tax loss is based on documents or other information.

3   It seems -- frankly, I, personally, never liked the idea as an

4   attorney of things happening on the fly, generally, but it

5   sounds like that's what you want to do.

6          Maybe you can explain what actually you want to do and

7   why it is necessary as opposed to some other approach.

8          MR. MORGAN:  And I'm sorry, this is why I was standing

9   up, is because Mr. Ruter and I, we have had discussions about

10  this, and as our trial approach and trial strategy, you know,

11  evolves, as we get closer and closer to it, we are -- and this

12  may become moot entirely, most likely will be.

13         THE COURT:  Okay.

14         MR. MORGAN:  And so we're probably not going to be

15  going down that route.  Special Agent Radiah Carson most likely

16  will testify to talk about just generally what some of these

17  documents are, as an IRS representative in addition to a

18  custodial representative from IRS, but as far as doing

19  calculations and things like that, I'm comfortable in saying I

20  think that that's not probably going to be going forward at this

21  time.

22         THE COURT:  Okay.  Well --

23         MR. MORGAN:  We'll revisit it with Mr. Ruter and the

24  Court if necessary.

25         THE COURT:  Okay.  Well, that's helpful to know.  I

1    mean, I -- my general understanding, just again, to the extent

2    that this is helpful to anybody, is that it's not unusual to

3    have IRS witnesses, agents, et cetera as summary witnesses.

4    There is precedent for that as a general matter, because these

5    cases are complicated.  I think the cases do give, perhaps, a

6    little more leeway than in other cases on where the line is

7    between summary testimony and expert testimony.

8            I think there are cases in which some calculations are

9    done by a so-called summary witness, where frankly, if I, just

10   sort of looking at it at first glance, might think anybody who's

11   trying to calculate tax liability must be an expert; otherwise,

12   we would all just kind of do it in our head.  But the cases do

13   seem to allow that, but I think the cases seem to allow it in

14   relatively elementary situations, and I don't have a good sense

15   of how complicated these issues are.

16           I think there's probably some point at which the

17   calculations are simple and fit within the case law, where it is

18   just actual -- certainly, if it's adding up the liability from

19   ten different years, that's, you know, easy.  If it's actually

20   doing a calculation of what happens if you add or subtract a

21   deduction, maybe that's relatively basic.

22           There's probably some point at which you need an

23   expert to do certain types of tax liability calculations; I just

24   don't know where we are on that spectrum.  But I would say the

25   fact that cases say you can't have a summary witness do some

1    calculations, I would agree with -- that they say that, but

2    I think they also at least implicity say there's a limit, and it

3    can't be too complicated.  And so that's generally where I think

4    I am now.  If it's pretty simple, we -- it might be okay, but if

5    it's getting into complicated analysis, then it might require an

6    expert.

7            But as of now, I would say, again, if the issue is

8    whether we can have a summary witness, I would say yes.  The

9    calculations we're all going to defer on because I don't know

10   the nature of the calculations that are being proposed, and it

11   sounds like the government may not even do that.

12           In terms of sitting through the trial, which is the

13   only other issue, do you anticipate that need, Mr. Morgan?

14           MR. MORGAN:  May I have just one brief moment?

15           THE COURT:  Sure.

16       (Conference between Mr. Morgan and Mr. Cofer.)

17           MR. MORGAN:  Your Honor, I think -- for trial strategy

18   purposes, I think we're not going to go that route, and so I

19   don't think she would be -- it would be proper for her to be in

20   the courtroom unless she's going to be an expert doing that kind

21   of thing.  And so if she's just going to be a regular witness,

22   then she will not be present in the courtroom.

23           THE COURT:  Okay.  So should we work under the

24   understanding that right now, you're not planning to need her to

25   watch these witnesses testify, so she's not going to be in the

```
 1    courtroom, that she'll be part of the rule on sequestration.  If
 2    for some reason you change your mind on that midway through, you
 3    could discuss it with Mr. Ruter, see if there's agreement, and
 4    if not, you can bring it to me before she comes in?
 5              MR. MORGAN:  Certainly, Your Honor.
 6              THE COURT:  Okay.  And then the last
 7    motion-in-limine-like issue is, I notice that, you know, the
 8    government gave the required notice under Rule 1006 and also
 9    Rule 611(a) on the use of summary charts, and I notice,
10    Mr. Ruter, you, in your -- one of your filings did raise some
11    objections to that, although it seemed like the objection was
12    more you either don't have the records yet or you haven't had
13    the opportunity to do the comparison.  So you have some concerns
14    about whether these charts should be admissible, but you didn't
15    have a final answer on that.  Where are we on that issue, would
16    you say, at this point?
17              MR. RUTER:  Your Honor, if I understand, the charts
18    we're talking about -- and Counsel, please correct me if I'm
19    wrong.  At least one of the charts I think we're speaking about
20    deals with the number of returns Mr. Watson has prepared during
21    the time frame, the amount of refunds, the -- I think, the
22    number of returns that was subject with Schedule C and with big
23    totals and so on.
24              What concerned me primarily, Your Honor, was, there
25    was -- and counsel was kind enough to send me a -- what it might
```

1 look like is -- of course, you might know I have not found it in

2 these such charts.  They can maybe help me if they have a copy,

3 but they use the word on the chart, "questionable" ...

4     (Conference among Mr. Morgan, Mr. Ruter, and Mr. Cofer.)

5     MR. RUTER:  So I'm told that the one that I didn't

6 like, Judge, is not going to be used, and so therefore, I don't

7 have to worry about that.

8     The one that I think that -- does the Court have a

9 copy of that?  This is the one we're referring to under 1006.

10     MR. MORGAN:  Did you want me to give the Court a copy?

11     MR. RUTER:  He may want to see it just so he can see

12 what we're talking about.

13     MR. MORGAN:  Your Honor, may I approach?

14     THE COURT:  Yes.

15     This isn't one of the exhibits that you gave me a pile

16 of today?

17     MR. COFER:  Your Honor, I do not think this one was

18 put in.

19     THE COURT:  Okay.

20     MR. COFER:  But here's a copy.  And this is in a bit

21 of a draft stage, I should add, but this is roughly what we're

22 going to admit.

23     After Mr. Ruter, I can explain.

24     MR. RUTER:  And Your Honor, again, counsel, again,

25 kindly sent me an e-mail, advised me, I think, as to you

```
 1   probably have four -- five different pages, Your Honor?
 2            THE COURT:  Mm-hmm.
 3            MR. RUTER:  And tell me if I'm wrong again, but
 4   I think it's the third one that you really wanted to --
 5            MR. COFER:  Yes, Your Honor, we're fo- -- I think we
 6   would want to admit --
 7            MR. RUTER:  Page 3?
 8            MR. COFER:  -- the page 3, and I can explain why --
 9            THE COURT:  I think I only have three pages; is that
10   right?
11            MR. COFER:  There are only three, yes, so the last
12   one.
13            THE COURT:  Okay.
14            Average preparation fee, estimated total preparation
15   fees -- I'm assuming that's cumulative of all of them.
16            MR. COFER:  Your Honor, I'm happy to give a bit of
17   background of what exactly what we're looking at.
18            THE COURT:  Go ahead, yes.
19            MR. COFER:  And so this summary you're looking at on
20   page 3 comes from two different sources, and the first two
21   charts are the independent sources.  So basically what we want
22   to do, what you're looking at is, we want to show for those
23   years the number of returns that Mr. Watson prepared and filed
24   with the IRS, and so that's that first column there.
25            And the source of that is from the IRS.  So there are
```

1    preparer information reports which show how many returns have

2    been filed with his PTIN, which is his preparer identification

3    number.

4            THE COURT:  Okay.

5            MR. COFER:  So I think that's pretty straightforward.

6            The next column, the third column is just the second

7    column times the first column.  So the second column is the only

8    real other piece of information.  So that comes from TaxSlayer.

9    That's the commercial tax preparation software, that's very

10   similar to TurboTax, that Mr. Watson used to prepare his

11   clients' returns and to submit them to the IRS.  And so as part

12   of the investigation, we subpoenaed TaxSlayer, they provided

13   those in a business records certification under 902(11).

14           And Your Honor, basically what that is, is an Excel

15   spreadsheet, and it's about 2,600 rows and about 150 columns.

16   And what we understand it to be, from the records custodian, is,

17   it is all of the returns that were submitted to the IRS by

18   Mr. Watson through TaxSlayer.

19           And so it's hard to introduce an Excel sheet that big,

20   so the only real information we would want to admit as evidence

21   through Rule 1006 and put in this chart is the average

22   preparation fee by year.  So there are --

23           THE COURT:  Well, how does it -- who calculates this

24   fee, TaxSlayer does?

25           MR. COFER:  This fee is -- so basically, what the --

```
 1   what the return -- each line in an Excel sheet is, so you know,
 2   when you're typing in answers to -- and let's say you're using
 3   TurboTax or TaxSlayer, you type in your income, you type in all
 4   the boxes that would be a Form 1040, but you're doing it in
 5   their software format.
 6           And so that just goes into a database, and when it's
 7   recreated, it can print it on a Form 1040.  So this is just the
 8   underlying data of return information, and in TaxSlayer's
 9   software -- and this is one of the columns -- there is a box
10   where you enter the preparation fee.
11           And so Mr. Watson, as we understand it, is -- when
12   he's filing out these returns using TaxSlayer, there's a box
13   that TaxSlayer has you fill out, that says Preparation Fee.  So
14   he's typing in the preparation fee for each return, and so
15   that's just one of the data points for all of these returns.
16           THE COURT:  So this information is stored by
17   TaxSlayer?
18           MR. COFER:  Yes.  And so --
19           THE COURT:  And the source would be Mr. Watson,
20   originally?
21           MR. COFER:  Yeah, so it would be -- that's right.  So
22   I mean, he is the one entering in this information into these
23   forms, and that's -- it's transmitted to TaxSlayer.  So
24   TaxSlayer keeps all this, but it's coming from him.
25           THE COURT:  And so has Mr. Ruter received the
```

1    underlying source information, whether it's the IRS records and

2    the number of returns, or the TaxSlayer spreadsheet on the --

3    how much is being charged?  I take it this is how much

4    Mr. Watson charges his clients; that's what the number is

5    supposed to represent?

6          MR. COFER:  Yes.  And the TaxSlayer Excel sheet, so --

7    database, I believe that was turned over with the very initial

8    production.  It is a big Excel sheet, so you know, it is a bit

9    cumbersome to walk through, and that's part of the reason we

10   want to introduce it through this chart.

11         Originally, the -- as far as the number of returns

12   filed with the IRS, that was information we got very recently;

13   I think maybe even yesterday we turned that over to Mr. Ruter.

14   We had originally used -- and this is what the preceding chart

15   shows.  We originally were planning on using the number of

16   returns as listed in TaxSlayer.

17         There is a bit of a discrepancy between the number of

18   returns that were filed as the IRS have it and what TaxSlayer

19   has it, and it's not 100 percent clear why that is at this time.

20   It's possible -- I found a very few instances in which, like

21   initially, Mr. Watson might have submitted a return but there

22   was a typo in the social security number, so the IRS kicks it

23   back.  So he submits it again from TaxSlayer.

24         So that in like one or two years, it's higher, the

25   number of returns through TaxSlayer.  So I know it's getting a

1    bit convoluted, but what we've taken is a conservative approach,

2    because the estimated total preparation fee per year, the kind

3    of number that's going to drive that is the number of returns

4    filed with the IRS.  So we're going with the number of returns

5    filed with the IRS because that's kind of, I think, definitive

6    evidence from the IRS.

7              THE COURT:  Okay.  So let me just stop you for a

8    minute.

9              MR. COFER:  Sure.

10             THE COURT:  Mr. Ruter, is there an objection to this

11   now that we're talking about it, or do you still need to check

12   the backup, or where are you on this?

13             MR. RUTER:  Well, Your Honor, first of all, counsel

14   did give me the spreadsheet, and again, correct me if I'm wrong;

15   I think it's 2,900 pages wide.  Why a human being or a machine

16   would make it like that is beyond me.  It can't -- it can't be

17   seen.

18             THE COURT:  Mm-hmm.

19             MR. RUTER:  That's a problem.  I've seen it, I've

20   moved across the screen.  I found some of the things that

21   were -- are important.  I don't disagree with the method that

22   they did it.  Part of my problem, Judge, is this; it more than

23   bothers me that for the year 2015, that TaxSlayer says that

24   Mr. Watson filed 571 tax returns, if I'm understanding this, but

25   if I also understand it, the IRS says that he filed -- I just

```
 1    saw it -- 319 I think it was.

 2              THE COURT:  Right.

 3              MR. RUTER:  How is that possible?  I just --

 4              THE COURT:  So Mr. Cofer, I mean, you said there was a

 5    slight discrepancy; that seems like a pretty -- a larger

 6    discrepancy than slight.  And again, I'm not even sure -- why is

 7    one number relevant and the other one not?  Because -- I think

 8    the jury might be confused by having two different numbers, and

 9    I don't know which one is more relevant.  It seemed like you

10    thought the IRS number was more relevant, but yet, you still

11    have -- on page 1, you have a TaxSlayer number.

12              MR. COFER:  Right, your Honor.  So I think -- let me

13    clarify few things.

14              So first, the only chart we would want to show the

15    jury is this last one.  The reason why I did three of these was

16    to help show the differences between the two for Mr. Ruter, and

17    I think part of the problem with viewing it is, if you were to

18    try to open it up as a PDF, it's going to look incomprehensible,

19    because you have to view it in Excel, which I realize is

20    painstaking.

21              So again, we basically want this to show two things,

22    which is -- just one, the number of returns filed with the IRS.

23    And then we want to demonstrate, based on the average

24    preparation fee, what it's estimated that he's earning each year

25    from this, which just demonstrates the volume of his business.
```

1          So again the TaxSlayer one, the reason why it's

2     higher -- and it's a subtle difference, but I don't mean to

3     enlighten it; it's the number of returns --

4          THE COURT:  It's 200 different, though.

5          MR. COFER:  Sorry, I'm speaking to it -- I mean, the

6     number of returns prepared.  So based on our -- and we are still

7     in discussions with our -- the records custodian of TaxSlayer.

8     It's number of returns prepared, not necessarily filed.  So

9     initially, we thought it represented filed, and that's why we

10    were going to go with it, but we are not putting that in there.

11    So that's why we want to go with the third chart, which is --

12         THE COURT:  And so you're not using the first chart

13    after all, page 3?

14         MR. COFER:  We are not using the first chart to show

15    it.  We need to get the TaxSlayer data into evidence, which we

16    have the Excel sheet.

17         THE COURT:  You just said the Excel sheet is -- I

18    mean, nobody's going to want to use that, according to

19    Mr. Ruter, so --

20         MR. COFER:  Right, so here's what we want to do.  We

21    made the Excel sheet available, we've put it on a disk, we've

22    marked it as an exhibit for identification.  We realize the jury

23    is not going to look at that.  I'm sorry, Your Honor.  We

24    realize the jury is not going to look at an Excel sheet.  All we

25    want to do is introduce this last chart.

 1            THE COURT:  The third chart.

 2            MR. COFER:  And the only information coming from that,

 3    from TaxSlayer, is the average preparation fee per TaxSlayer.

 4            THE COURT:  Okay.  I guess I'm just not sure what the

 5    dispute is, then.  I mean, it sounds like Mr. Ruter has yet to

 6    be able to verify this information, so we have to give him some

 7    time to do that.  If the government wants to help it along by

 8    making an offer to sit down with Mr. Ruter and go through the

 9    records together, I think, you know, he can take you up on that

10    or not, but that might be a good idea.

11            I haven't heard an objection on relevance, and I

12    haven't heard -- I mean, obviously, you still would need to have

13    a witness or somebody, either -- no objection from the defense

14    or some witness who can lay the foundation for this, since you

15    can't do it yourself as an attorney.  I'm assuming you'll have

16    somebody for that, whoever actually prepared the chart.  So

17    that's just foundation which we can get later.

18            So is there anything I need to decide today on this

19    issue?

20            MR. COFER:  Nothing from the government, Your Honor.

21            MR. RUTER:  You know, I think we can wait, Judge.  We

22    might -- we may or may not work it out, but I don't think it's

23    going to come up immediately, is it, in the course of the trial?

24            This is going to be a summary, I believe, in some way.

25            MR. COFER:  I think it would be at the end,

```
 1   Your Honor.  The underlying information is self-authenticating
 2   under 902(11), so -- but we can -- we can discuss how it would
 3   come in through a witness or otherwise, so I think we can work
 4   out exactly how this can work, but it's not going to be in the
 5   opening statement.
 6          THE COURT:  I guess I don't -- I mean, obviously,
 7   902(11) assumes, Mr. Ruter, you know, accepts the authenticity
 8   of your certifications.  Average preparation fee listed, I got
 9   the impression that that's not something TaxSlayer just creates
10   on their own, right, don't they have the exact number, and then
11   someone has to add it all up?
12          MR. RUTER:  Your Honor, TaxSlayer does that.
13          THE COURT:  Okay.
14          MR. RUTER:  I think, when you use TaxSlayer, that's
15   part of the software program.  The -- Mr. Watson can't decide
16   what the fee's going to be.
17          THE COURT:  Okay.  Well, in any event, I would just
18   ask, if there's a dispute on whether this third page or
19   whichever page you plan to use is going to come in, we should
20   discuss that in advance of the moment you're planning to offer
21   it.  And again, you know, under 1006, the underlying backup
22   needs to be provided to the defense.  It looks -- sounds like it
23   has been.  In terms of whether there is a debate about whether
24   the calculations are correct, some of that can be solved by
25   having a witness testify as to how the numbers were created,
```

```
 1    particularly someone who was involved in creating the table.   So
 2    those are all things that can happen.
 3              Any other issues on evidence at this point?
 4              MR. RUTER:  No, Your Honor.
 5              MR. MORGAN:  Not on evidence, thank you.
 6              THE COURT:  Okay.  So why don't we go sort of in
 7    chronological order of other things that might come up.  One is
 8    the -- starting with the voir dire process for Monday.  The
 9    general approach -- before we get to the questions that were
10    submitted, I'll give you a sense of what the process has been
11    and will be, is, we're now back to the mode where we're bringing
12    the venire into the courtroom as we used to.
13              We seat them in numerical order, starting with the row
14    behind the defense table.  The first juror to be considered
15    would be against the wall, left to right -- from my left to
16    right, they fill the various rows on the left-hand side; then we
17    move over to the right-hand side, starting with the first row
18    behind the government.  The person closest to the wall is the
19    lower number or the next person to be considered, and then we
20    move from right to left.  Again, this is just more about seating
21    convenience till we get to the back of the room.
22              I will ask the questions of all -- I'll go through the
23    30-odd questions we have.  They're all yes-or-no questions;
24    they've been phrased, if necessary, or rephrased to do that.  I
25    think our plan is, we would give them a questionnaire with
```

 1  just -- or an answer sheet, really, with just a yes or no for

 2  all these questions, and they would write down -- check off yes

 3  or no for all these questions.  And then, we would go through

 4  with each of the jurors one by one in individualized voir dire

 5  and follow-up on any questions for which they answer a yes to.

 6          We would stop once we have the right number of jurors

 7  to exercise the peremptory challenges and know we'll have enough

 8  jurors.  So I think we're planning to call in about 50 jurors.

 9  Once we've cleared 32 or 35, whatever the right number is, we'll

10  stop the individualized voir dire and go straight, then, to the

11  peremptory challenges, which will be done on paper.  The Clerk

12  will give each side a chart that -- or the -- you know, the list

13  of jurors with -- identifying which can be struck for the main

14  jury, which can be struck as alternates.  You do it

15  simultaneously.

16          If you strike the same person as the other side, you

17  don't get an extra strike.  If there's no objections to the

18  strikes in any fashion, then the first 12 on the list who have

19  not been struck are the jury.  The first two or three on the

20  alternate list become the alternates.

21          First off, does anyone have a view on how many

22  alternates we should have?  My understanding is, we're down to a

23  two-week trial, is that correct, eight days, including the jury

24  selection, or is it still up in the air?

25          MR. MORGAN:  Your Honor, I believe that should still

```
 1   be okay.  We've just -- we've received word that we may not be

 2   reaching some stipulations, and so that may change the number of

 3   witnesses, but I still think we're in that range, yes.

 4            THE COURT:  So my plan would be to sit four days a

 5   week and take Friday off, because we need to move other

 6   proceedings, guilty pleas, sentencings, and other things.  I

 7   still ask everybody to keep the Fridays open in case we get

 8   seriously behind, but that would be the general plan.

 9            So would those two weeks -- the week of the 27th and

10   the following first week of March, can we tell the jury that

11   we'll be done in those two weeks?  Do we need to at least

12   prepare them for the possibility of part of the third week?

13            MR. RUTER:  Your Honor, I would ask that the Court

14   consider, perhaps, suggesting it's possible we might not get

15   done in those two weeks, especially because if we don't, the

16   last people to go probably will be the defendant.  I don't want

17   them feeling ill about us holding up the fact that the two weeks

18   was not met, so --

19            THE COURT:  Okay.  So I mean, we originally blocked

20   off three, but I heard from somebody here that it was down to

21   eight days.  So does the government agree with that, that

22   there's a potential to go into a third week?

23            MR. MORGAN:  Your Honor, it's possible, given the --

24   if we don't have stipulations, that could increase it, as well

25   as I obviously don't know at all how long that any cross of the
```

 1     witnesses would be by the defense, which could be very short or

 2     very long.  So yes, I suppose it is possible we could go that

 3     long.

 4               THE COURT:  Okay.  I think what we should tell the

 5     jury, then, is, we'll go into the Tuesday of the third week

 6     potentially.  Implicitly, that should include deliberation time,

 7     but at least the evidence should be done by then, and the

 8     arguments, and so forth.  And again, I'm going to tell them to

 9     keep the Fridays open, and we might add a Friday if we really

10     are seriously behind schedule.  Ideally, I would prefer not to

11     do that.

12               Given that length of trial, I might suggest three

13     alternates.  I think we usually would go with two, but in the

14     age of COVID, I think a third might make sense.

15               Anybody have any objections to three alternates?

16               MR. RUTER:  No, Your Honor.

17               MR. MORGAN:  No, Your Honor.

18               THE COURT:  Now, so that means six strikes for the

19     government, so ten for the defense, and then, for the

20     alternates, two each, to select 3.

21               One other piece which may or may not be relevant in

22     this case, but I do -- and I think it's in the standard

23     instructions I give out now, but it might not be in the ones in

24     this case, because this case was filed a little while ago.

25               I do not allow anyone to use any source -- first of

1   all, to transmit the names of the potential jurors outside the

2   courtroom in any fashion, by phone, by e-mail, or anything like

3   that, by runner, and I don't allow anybody to use the Internet

4   or any other sources to research who the jurors are or anything

5   about them during jury selection.  You're limited to what's on

6   the sheet, and the questions you get, and to some degree,

7   whatever else you observe about them.

8          We tell the jurors that they can't do any research on

9   anything about this case, including who the lawyers are or their

10  backgrounds, and I don't think it's appropriate to do the same

11  in reverse without their knowledge, or even with their

12  knowledge.  So that's becoming more prevalent now, but I am

13  instructing everyone they can't do that in this case.

14         And then, the other issue I wanted to get to was

15  vaccination.  We have, in some cases -- although, I know times

16  are shifting and maybe it's becoming less and less significant,

17  but in other cases, we have had a question of whether the

18  parties would agree that we should strike jurors who are not

19  vaccinated for cause.

20         Some of it is just increasing the risk that we'll have

21  an outbreak or something on the jury, some of it is just also to

22  the extent that fellow jurors think their fellow jurors are more

23  of a risk, it could distract them or create more reluctance

24  among them to sit on the jury.  We don't typically require masks

25  of the jurors in the courtroom after the first day, which is the

1    voir dire day, but I'll say -- you know, we haven't always

2    gotten an agreement on that.

3            My first question is, does anyone -- do the parties

4    have a view on whether we would all agree that we would strike

5    those jurors, or would you rather not make a blanket rule such

6    as that?

7            MR. RUTER:  Your Honor, on behalf of Mr. Watson, I

8    don't think that I can agree to strike anyone who has chosen,

9    for whatever reason, not to be vaccinated.  And I know there's

10   been some back-and-forth on that issue.  I'm not even too sure,

11   Judge, if that's made it's way up to the Courts of Appeal yet.

12   I thought that maybe it had, but I'm not too clear about that.

13           THE COURT:  Well, we haven't been requiring it in a

14   criminal case, so it was really more about if the parties

15   jointly agree, and it sounds like we don't.  So that's fine; I

16   just wanted to ask.  Sometimes the parties do all jointly agree.

17           MR. RUTER:  Yes, sir.

18           THE COURT:  Now, I guess, a related issue is, as you

19   saw -- again, because we're not going to have a blanket rule on

20   that, but it still might be relevant in terms of other issues,

21   does anyone object to us having a question on the voir dire list

22   of questions about vaccination?

23           MR. MORGAN:  No objection from the government.

24           MR. RUTER:  No objection, Your Honor.

25           THE COURT:  Okay.  And then, as I understand it, there

1    may be individuals in the case -- or are there witnesses who are

2    not going to be vaccinated, or I believe we might have parties

3    in that category?

4            MR. MORGAN:  Yes, Your Honor, there are some witnesses

5    who are not fully vaccinated.

6            THE COURT:  Okay.  Is it possible -- as again, I think

7    the target continues to move -- that unvaccinated people can be

8    tested before they testify?

9            MR. MORGAN:  Yes, Your Honor, we can arrange that.

10           THE COURT:  Okay.  And does anyone have a view on

11   whether if you're unvaccinated there should be issues about

12   either they should or should not wear masks, or face shields, or

13   anything like that during testimony?

14           MR. RUTER:  I would leave that to the Court totally,

15   Your Honor; I have no preference.

16       (Consult between Mr. Morgan and Mr. Cofer.)

17           MR. MORGAN:  Your Honor, I just have some concern that

18   in other situations in other cases, the argument has been raised

19   that if they are wearing a mask, it would be difficult or could

20   be difficult for the jury to judge credibility, they need to see

21   their reactions and things like that, and so ...

22           THE COURT:  How many witnesses are we talking about on

23   your side?

24           MR. MORGAN:  Court's indulgence, please.

25       (Consult between Mr. Morgan and Special Agent Weishaar.)

```
 1              MR. MORGAN:   Three, Your Honor.

 2              THE COURT:   Lengthy witnesses or short witnesses?

 3              MR. MORGAN:   They're all more or less the same,

 4   Your Honor, for the taxpayers, in length, but they could be in

 5   here for an hour or so, so ...

 6              THE COURT:   You're saying the taxpayers are among some

 7   of these?

 8              MR. MORGAN:   Two are taxpayers, and one is not a

 9   taxpayer client, and -- some of them could be lengthy, yes.

10              THE COURT:   Anybody from your side, Mr. Ruter?

11              MR. RUTER:   Your Honor, if -- I'll be scouring

12   diligently on the issue that you have reserved on, and there

13   could be a couple of character witnesses as well as Mr. Watson.

14              THE COURT:   Who are not vaccinated?

15              MR. RUTER:   Well, I know Mr. Watson's not.

16              THE COURT:   But he may or may not testify.

17              MR. RUTER:   He may or may not.

18              THE COURT:   Okay.  Well, I'm going to take back that

19   issue.

20              What we did in the last trial was -- we didn't have as

21   many people in the picture.  I think we had some unvaccinated

22   folks wearing face shields as opposed to masks.  We would ask

23   the parties to provide their own if it got to that point.  It's

24   a moving target, as you know, what we do in these things, so I

25   will perhaps get back to you on Monday about that.
```

1          But the -- I would say that sort of the -- for the

2     government, certainly, the testing of jurors -- or the witnesses

3     before they -- on the days they're coming is -- I'm going to ask

4     you to do that, I'm going to require you to do that, and

5     obviously, that will improve the odds of us getting to use them

6     in the most flexible way as possible.

7          I'm going suggest but not require, Mr. Ruter, that

8     Mr. Watson do the same on any days he might be testifying.

9     Obviously, he's in a different category, because he certainly

10    would not have chosen to be here, but I think, again, it might

11    just be a good thing for all of us.  And also, again, you know,

12    to the extent that you want the jurors to see his face while

13    he's testifying, I think that also improves the -- the

14    likelihood of that is doable.

15          MR. RUTER:  Yes, Your Honor.

16          THE COURT:  So -- but I'll give you a more specific

17    answer early next week.  Okay.

18          Hold on one second.

19       (Pause.)

20          THE COURT:  Okay.  So let's go to the questions, then.

21    I think I sent you a track changes version from the version

22    you all sent me.  I think we just said we should change the

23    date.  I think it might be March 14th now; is that correct?  Let

24    me see if I have that.  Yeah, and I always want to overestimate

25    with them and not underestimate.

1          Right, so March 14th.  So I guess it's ten or,

2    perhaps, twelve days we would list.  Ten trial days, but with

3    those Fridays.  And then -- any other suggested changes on

4    either I or II, which are sort of the general background

5    questions about this case?

6          MR. MORGAN:  Not from the government, Your Honor.

7          MR. RUTER:  No, thank you.

8          THE COURT:  Can I get -- it may or may not be the same

9    as the witness list, but I would like to have a list of anyone

10   who should be -- the jury should be alerted to as somebody who

11   might come up in the case either as a witness or someone whose

12   name is prominent in the case so that if they know them, we

13   would want to inquire about that.  And again, as you can see

14   here, I'd like to get the city and state of residence or the

15   employer if they're here for work reasons.  Can I get that list

16   on Monday morning, first thing?

17         MR. MORGAN:  Yes, Your Honor.

18         THE COURT:  And it goes for both sides, Mr. Ruter;

19   even if you don't have a final witness list, just anybody who

20   you think might come up, can you provide that?

21         MR. RUTER:  Yes, sir.

22         THE COURT:  Okay.  And then what about III, which is

23   issues in this case, some about the government, some about tax

24   issues; any issues with the revised version?  Some of this is

25   just moving it to a different part of the list, and some of it

```
1    is rewording it to track some of the other language.
2             MR. MORGAN:  Not from the government, Your Honor.
3             MR. RUTER:  None.
4             THE COURT:  Okay.  And then the last part, IV, any
5    issues with that?
6             MR. MORGAN:  Not from the government, Your Honor.
7             MR. RUTER:  No, thank you, Your Honor.
8             THE COURT:  Okay.  So again, just as the process,
9    we'll do individualized voir dire.  I think -- we've been
10   experimenting, I think, with perhaps doing it with -- obviously,
11   Mr. Watson can have a headset to listen in on what we're saying.
12   I think the last trial, we did it up here as we did it in the
13   old days, we still had the plexiglass in place, but because of
14   the proximity, we've asked people to wear masks during that
15   portion.  It's not the easiest to hear, but that's what we did.
16            We were exploring the idea of perhaps having everyone
17   wear headsets and staying where they are, but I'm not totally
18   sure we're ready do that, in part because you're so close to the
19   jurors where you are right now, so I haven't quite figured out
20   whether we can try something like that.  If we can, we'll let
21   you know about that on Monday morning; otherwise, we'll do it
22   the old-fashioned way.
23            Anything else on voir dire?
24            MR. MORGAN:  Not from the government, thank you.
25            THE COURT:  Okay.  And typically, as with everything
```

1    else, but just to clarify, one is that if you're going to move

2    to strike for cause, you need to do it before we -- during the

3    individualized voir dire, after the juror has been questioned,

4    after they leave our area and before the next person comes up;

5    otherwise, you've waived it.

6          And then it's one attorney per juror, really, per

7    issue, generally, but I'll take it juror by juror.  I don't need

8    one attorney for one side handling necessarily all of the

9    jurors, but once somebody speaks on a particular juror, I just

10   want to hear one person for each side for that particular juror,

11   out of fairness to the side that has fewer attorneys.

12         Okay, let's see.  While we're -- just to take an

13   easier issue, any issues with the verdict form?  This is, again,

14   for later.  Other than some formatting issues, at this point, I

15   haven't changed anything substantive.

16         MR. MORGAN:  Not from the government, Your Honor.

17         MR. RUTER:  No objections, Judge.

18         THE COURT:  Okay.  And then, on the -- the way I

19   usually approach it is, we do the voir dire, and then we move

20   to -- basically, immediately, we do the preliminary jury

21   instructions, which I've given you a copy of.  Most of it's the

22   same in every trial.  I do try to include the elements of the

23   offenses in the case, which are basically cut and paste from the

24   broader instructions.  Any questions about or issues with the

25   preliminary jury instructions?

1        I try to do them right after voir dire, even before a

2   break, because a large part of it is the warning not to do any

3   additional research or anything like that on the Internet about

4   the case, which they could, in theory, start doing immediately.

5   Some people might be inclined to do that, so -- any issues with

6   those instructions?

7        MR. RUTER:  No, sir.

8        MR. MORGAN:  Not from the government, thank you.

9        THE COURT:  Okay.  So then let's talk about the main

10  jury instructions, which again, I took your version and have

11  given you a track changes version.  There's only -- although,

12  there's 28 counts, there's really only one substantive cause of

13  action, so it might make it a little easier.  Why don't we just

14  start -- does anyone have any issues with the more general

15  instructions, either I or II, which is mostly standard language?

16        And -- the only thing I'll highlight is, I feel like

17  to avoid confusing the jury -- you see I have a placeholder for

18  it -- I would prefer that we have a separate instruction on a

19  summary witness rather than to lump it together.  I haven't

20  crafted that yet; I was going suggest the parties try come up

21  with something.  But I just think it's easier that way for the

22  jury to understand.

23        MR. MORGAN:  It may also be mooted, depending on

24  whether we actually go that route, to have a summary witness.

25        THE COURT:  Okay.  So I know you -- so you may not

1    even use her after all?

2              MR. MORGAN:  No, just we -- not as a -- not to

3    summarize and do calculations and that kind of thing, but she

4    may discuss some forms and about how they work, but not to

5    summarize the testimony.

6              THE COURT:  Okay.  Well, you're right; if it's moot,

7    then we'll take it out, obviously, but if it looks like we're

8    going to have that witness, I would ask the parties to try to

9    submit something in advance, and then, if it's agreed upon or --

10   either way, I'll want to vet it, but -- so I left a placeholder

11   for that at Instruction 21, but anything in Instructions 1

12   through 24, which are sort of general background instructions?

13             MR. MORGAN:  Not from the government, Your Honor.

14             MR. RUTER:  No, Your Honor.

15             THE COURT:  Okay.  So then we get to the charges.

16   Now, the first part of that is basically Instructions 25 --

17   these are the ones that -- before we get to the substantive

18   counts -- 25 through 30.  Again, these are pretty standard

19   language.  The only thing that I would highlight for you is,

20   Instruction 26 has a line in there about other acts committed by

21   the defendant.

22             Now, at this point, we may have some other acts in the

23   form of the tax returns.  On the one hand, that makes this

24   instruction relevant; on the other hand, I think of it really as

25   404(b) evidence.  We often will have something more robust than

1    this itself.  So we may want to put a placeholder in for a

2    404(b)-type instruction, but -- anybody see any issues with

3    Instruction 26, whether we would expand this to be a 404(b)-type

4    instruction or whether there's some other place you'd want to

5    put something like that?

6            MR. MORGAN:  No, Your Honor.  I think the government

7    has no objection to how it is.

8            THE COURT:  I may just put a placeholder here for

9    myself, to say if we need a 404(b)-type instruction, we'll have

10   one, because this is the closest thing we have right now, but

11   sometimes, we need more than that.

12           MR. RUTER:  I have made a note, Judge, just in case.

13           THE COURT:  Okay.  So other than that -- that's

14   Instructions 25 through 30.  Starting with 31 of the substantive

15   counts, and my -- other than some formatting issues, my main

16   question for Instruction 31 is -- and you'll note, when I put

17   something in italics here, it's the things I want to ask you

18   about.

19           I do read these instructions to the jury and then we

20   give them a written copy.  It's hard to read a box to the jury,

21   because I have to describe what the box looks like.  In some

22   cases, I sort of turned a box like this into a sentence, but we

23   have 28 counts here, and I'm not sure it's productive to read

24   for the jury everything in the 28 counts.

25           What I think we might want to do in a case like this,

1   first off, I know we don't always send the full indictment to

2   the jury, but this might actually be a case in which it would

3   make sense to send the indictment to the jury, because when you

4   look at it, almost all of it is already in Instruction 31.   And

5   I think there's a couple other paragraphs which I don't think

6   are particularly prejudicial.

7           So Mr. Ruter, would it be more efficient to just give

8   them the indictment, or do you have an objection to giving them

9   the indictment?

10          MR. RUTER:  Judge, I do not.  I know that -- I think

11  we had discussed the -- even the possibility of making sure

12  that, I think, names of the taxpayers were attached.  We don't

13  want to manipulate the indictment itself, but for the jurors'

14  sakes, to make sure they could hook up the account with the

15  actual taxpayer's name may help them, and I think we had

16  discussed that.

17          I'm not exactly sure whether the Court would agree or

18  exactly -- or whether it would be a separate paper, but I think

19  it might be some kind of a separate paper.

20          Is that a fair statement, counsel?

21          MR. COFER:  Yes, Your Honor.  I think there's two ways

22  of doing it.  One initial way we had discussed is admitting as

23  another chart we would put into evidence with -- I can approach

24  the bench and give you an example if you'd prefer, Your Honor.

25          THE COURT:  What was the other way, first, just while

1    we're at it?

2              MR. COFER:  Well, the other way -- I don't know if --

3    basically, the problem is, we have the client number instead of

4    name in the counts, so there's no way for the jury to know who

5    we're talking about without poring over their tax returns, and

6    so I think we had discussed either by doing a chart we could

7    admit, where they could just compare client number, and name,

8    and count.  We could, if we were inclined to give them back

9    either the indictment or maybe just this chart, add a column for

10   name and they would just be able to track the count, the client

11   number, and the name.

12             THE COURT:  Right.  So I mean, those of you who have

13   had cases here know that I understand the reasons why we

14   anonymize, at least at certain stages of the case, but I think

15   once we get to the trial, I think it is confusing to the jury,

16   and the -- whatever value there was in anonymizing is, to me,

17   outweighed by precision and accuracy and not creating potential

18   misunderstandings.

19             So I agree with everyone that the jury does need to

20   have these names.  In fact, in something like this in the

21   instructions, I typically swap out references in the

22   indictment -- I mean, put them in brackets, from Client 1 to a

23   name.

24             I mean Mr. Ruter's point about not necessarily

25   changing the indictment, I've heard people make that argument.

1    I would say, one option -- I think the first question I would

2    say is, we should decide, is it more efficient just to give the

3    jury the indictment itself, and that could be a revised version

4    where we have swapped in the actual names; or it could be the

5    original version, and we give them a chart to go along with it;

6    or if there's some problem with giving them the full indictment,

7    then I would still propose we give them a chart, basically the

8    table from the indictment, as an attachment to the jury

9    instructions.

10           I wouldn't have read to them, but we could say there's

11    a table that tells you exactly which count involves which

12    client, et cetera, and they can just look at it.

13           So I would say we should either do a chart or the

14    indictment itself.  Does anyone have a preference between those

15    two options?  And then we can get to the issue of what we do

16    with the client names.

17           MR. MORGAN:  Your Honor, we do have a preference not

18    to modify the indictment itself.  If the defense and the Court

19    are okay with having the indictment as it is go back, then the

20    government certainly is fine with that too.  We would prefer to

21    just do a chart.  We have an example that we could propose

22    that's pretty straightforward; it lists the client number, the

23    client name, and the counts, and I think that that would be the

24    most efficient way.  It's just one -- rather than having to edit

25    things and change things, it would just give them one clear

          1    chart.

          2              THE COURT:  Do you have a view, Mr. Ruter?

          3              MR. RUTER:  I agree with that.

          4              THE COURT:  With the chart and the indictment, or with

          5    the ...

          6              MR. RUTER:  With both.

          7              THE COURT:  Okay.  So you think we can give them the

          8    full indictment.  Because again, it's really not that different

          9    than what's in this table; there's like two extra --

         10              MR. RUTER:  No, that's exactly right.

         11              THE COURT:  Okay.  So what we'll do is, we'll give

         12    them the full indictment.  I mean, personally, my preference

         13    would be to put the names in the indictment so it's easier for

         14    them, but if the government doesn't like that and the chart -- I

         15    mean, it's just a two-step process instead of one.  I think I'm

         16    okay with that, since both sides agree with that.  So that will

         17    be either an exhibit or -- I mean, I guess it'll have to be an

         18    exhibit of some kind that we all stipulate to.  It's like a

         19    stipulation, basically, so that the jury will have it.

         20              But because of that, what I would suggest doing in the

         21    instruction is -- I'll still read the paragraphs that are listed

         22    here, paragraph 7 and 8, just the core of the indictment, just

         23    so that they know what we're talking about, but I mean I'll --

         24    then we'll excise the chart from the instructions, and it will

         25    just say the indictment lists each numbered count, et cetera,

1  and I'll reference them to the indictment, which they'll also

2  have.

3          Any problems with that for how we handle

4  Instruction 31?

5          MR. MORGAN:  Your Honor, I did want to just flag a

6  possibility, Your Honor.  We are still exploring whether or not

7  we will be able to have certain witnesses arrive to testify or

8  if we will be able to have them provide depositions via Rule 15.

9  It's -- we're up against hard deadlines here, and so there is a

10 possibility that we may have to dismiss some counts if we can't

11 have one or possibly two witnesses testify, which that could

12 impact, just slightly, some of the -- some of what we're

13 discussing here.  We could just redact out in the indictment the

14 counts that are dismissed and just move on.

15         THE COURT:  That wouldn't be that hard, because they

16 only come up in the table; they don't come up anywhere else.

17         MR. MORGAN:  Exactly.

18         THE COURT:  Okay.

19         MR. MORGAN:  Thank you.

20         THE COURT:  And then looking at the substantive

21 language for let's say Instructions 31, 32, 33, 34, basically --

22 really everything else up till, let's say, 39, anybody have any

23 proposed edits or objections to what we have there now?

24         MR. MORGAN:  Court's brief indulgence, please.

25         THE COURT:  Mm-hmm.

1          MR. MORGAN:  Your Honor, it might be on the Court's

2     copy, 34, perhaps, but with the -- the instruction about

3     willfulness.

4          THE COURT:  35, I think.

5          MR. MORGAN:  35?  Thank you.

6          THE COURT:  Mm-hmm.

7          MR. MORGAN:  We had provided -- it should be up by the

8     bench -- an additional instruction, Instruction 32(a)(2) which

9     is Conscious avoidance:  Deliberately closing eyes, that we

10    would propose to read after No. 35 as it relates to willfulness

11    and only if it's raised by the testimony, the evidence, and how

12    the trial plays out.  So we would prefer it just to be

13    bracketed, like some of the other stuff is, for good faith, just

14    to be read if and when it's appropriate depending on upon how

15    things go.

16         THE COURT:  Okay.  Well, on the one hand, I mean, this

17    is basically the willful blindness instruction.  I've given this

18    in cases, and I have some pretty standard language I use which

19    is very similar to this but not exactly.  It includes some

20    references from cases.  The one concern I have with this,

21    sometimes, is, as I understand it, this whole conscious

22    avoidance, deliberately closing eyes, willful blindness is

23    another form -- another way to define part of knowledge.  So did

24    you know something, including Was this false, what have you.

25         So when the element is knowledge, this is part of the

1   definition of knowledge.  I think what gets tricky is, when you

2   get into things like willfulness, or specific intent to defraud,

3   or other higher standards of mens rea, I don't think it's

4   sufficient to be willfully blind to something; you still have to

5   have, you know, willfulness in the sense of doing something that

6   the defendant knew was his legal duty not to do so, et cetera,

7   or intent to defraud, or a higher standard.

8          So I -- in other cases, I have tried to make it clear

9   that this is part of the knowledge definition, but it does not

10  establish willfulness or whatever else the higher standard is,

11  intent to defraud or otherwise.

12         For better or for worse, we don't have the term

13  "knowledge" listed in here yet, although I'm sure implicity,

14  there is a knowledge element to some things, like knowing that

15  the statements were false, for example, but I'm not so sure it's

16  as simple as just tacking it onto willfulness, because I really

17  think this goes to the issue of knowledge more than will- -- and

18  so -- and it may be something that -- and we're probably not

19  going solve it today, and I'm not sure -- I mean, what would

20  this go to; would it be knowing that the information in the

21  return is false or that -- what would you be using this

22  instruction for?

23         MR. MORGAN:  Just, for example, closing his eyes to

24  what would otherwise have been obvious to him.  So for example,

25  someone who is a Secretary at the Housing and Urban Development

1    trying to claim $30,000 in unreimbursed job expenses when there

2    were no job expenses, for example, something that just

3    completely -- he would have to close his eyes deliberately to

4    that fact and still put it on a Schedule A despite -- I think it

5    falls within this instruction, but again, it does depend on the

6    testimony, what comes up exactly.

7            But to the extent he tries to claim, oh, I just

8    thought you could do that, that would raise an instruction like

9    this.

10           THE COURT:  You could do that legally or that

11   factually, that those expenses actually occurred?

12           MR. MORGAN:  It could be both, depending on the -- it

13   could be both, depending on how the testimony comes out, right?

14   So for example, the government -- or the witnesses could say,

15   yes, I did tell him various numbers.  I told him I had this

16   expense, I told him I had a cell phone, I told him I had a

17   mortgage.  The numbers are potentially correct on certain

18   aspects, but I never told him that it was an unreimbursed job

19   expense, or that it was a business expense, or something like

20   that.

21           And he -- while the number -- there's no lie.  The

22   numbers aren't wrong factually, but his determination to put it

23   on something that's clearly inappropriate and closing his eyes

24   to the fact that that is just deliberately avoiding where it

25   should go and putting it in another form -- excuse me -- could

1    come up.

2           THE COURT:  Well, first of all, you know, as you

3    probably know, this instruction doesn't occur in every case; it

4    has to match the evidence in the case.  So I definitely think

5    we're going to need to defer at this point and wait to see what

6    the evidence is.  I guess, again, the caution I have is, I see

7    this as only something that's -- and it says in your first line,

8    in determining whether the defendant acted knowingly.

9           MR. MORGAN:  Right.

10          THE COURT:  It does not say, this is a way to define

11   willfulness and I'm not sure there is -- I don't think any case

12   says that.  So this is about knowledge and not willfulness.  So

13   I don't think a substitute or even an add-on to the willfulness

14   instruction; I think it's part of a knowledge instruction which,

15   frankly, is implicit in this somewhere.  So I could see if this

16   becomes relevant, we would need to add an instruction or part of

17   an instruction that describes when knowledge is required in this

18   case and that this is a way to establish knowledge.  I would be

19   okay with that if it matched the facts.

20          I do have some concern -- I'm not sure from what you

21   and Mr. Cofer have said whether the issue here is that these

22   taxpayers lied to Mr. Watson and he should have understood that

23   they were lying or whether they're telling the truth and he's

24   doing something else with the information.  I'm not sure which

25   scenario you're referring to, but I think it's one thing to say,

1   someone gave me facts that were so unbelievable, or you know, I

2   should have inquired and I did inquire, but I deliberately

3   avoided knowing whether they really had such a business or

4   really had incurred such expenses as a factual matter.  That --

5   I could perhaps see willful blindness in that situation.

6         I would need a lot -- it would require a lot more

7   convincing to get me to conclude that you can use willful

8   blindness on the question of, he should have known that he

9   should have looked further into the IRS Code and determined that

10   this belongs in this column versus that, because that's really

11   more of a legal conclusion, not a factual conclusion about what

12   he should be doing as sort of a -- whether his actions are

13   violating the law or not.  That's not the typical usage of

14   willful blindness; it's usually about a factual question of

15   knowledge or not knowledge.

16         And so let's defer on this.  I see that it's an issue

17   that you want to raise; I would just -- I gave that to you as

18   guidance on when you think it should come back, and I do think

19   we're going to have to craft something that includes knowledge

20   as a part of the instructions to which this could be added.  I

21   don't think we can just add it straight to willfulness and leave

22   it just at that, but I understand it's here, and we'll see if

23   the evidence comes in in a way that meets that.  And it would be

24   in this ballpark, it would be either before 35 or part of 35,

25   but again, clearly delineating it.

1          I think the instruction I gave, actually, in the trial

2     in which there's deliberations right now, I gave this -- I said

3     knowledge is basically acting voluntarily and not by mistake,

4     and one way to do it is this, and at the end, I say, you

5     should -- I'm directly instructing you that this is not going

6     to -- this does not apply to the term "willfulness," and that's

7     defined separately, and it is defined separately.  So that's

8     just the background on that.

9          So other than that, other than potentially adding the

10    willful blindness instruction, anybody have anything else on 1

11    through 39?

12               MR. MORGAN:  No, Your Honor.

13               THE COURT:  Mr. Ruter, the government offered what I

14    have in brackets in 37, something about disagreement with the

15    law, including a belief the law is unconstitutional, is not a

16    defense, do you have a sense of whether that's going to be

17    relevant in this case or not?

18               MR. RUTER:  No.  I think that's the Kennedy case,

19    Your Honor, but no, we're not -- that's not going to be an

20    issue.

21               THE COURT:  Okay.  Well, I know the government gave us

22    that language, but we can at least put it more into the category

23    of unlikely, if not moot for this case.

24          And then the defense is suggesting in 40 through 43

25    some information about Schedule A, and C, and so forth, and I

1    reframed it a little bit, but it's basically the same.  I did

2    have question on 43.  The last line, it says, in most cases, a

3    taxpayer's federal income tax due will be less if the taxpayer

4    takes the larger of their itemized deductions or the standard

5    deduction.  I think this does come from the form itself, but

6    one, I wasn't sure why this is relevant, here, and then

7    secondly, I'm not actually sure what we're trying to say.

8            I mean, the standard -- are you trying to say that

9    your tax goes down if you take more deductions, or are you

10   trying to make an argument that the itemized deduction versus

11   the standard deduction leads to different results, even though

12   that -- I'm just trying to understand why we need this line and

13   try to craft it to match the situation in our case.

14           MR. MORGAN:  May I have the Court's brief indulgence,

15   please?

16       (Conference between Mr. Morgan and Mr. Cofer.)

17           THE COURT:  Sorry.  Go ahead, Mr. Morgan.

18           MR. MORGAN:  Your Honor, we have no problem with

19   removing that last sentence.  I think, it is somewhat relevant,

20   but I think it would unnecessarily confuse the jury.  So -- and

21   I think it's a nuanced point that doesn't need to be raised.

22           THE COURT:  Okay.  I mean, we can always come back to

23   it if it becomes more important later in the case.

24           Any problems with that, Mr. Ruter?

25           MR. RUTER:  No, sir.

1          THE COURT:  Okay.  I think that covers the jury

2   instructions, other than flagging the willful blindness issue.

3   We're in pretty good shape.  I do typically read the

4   instructions before the closing arguments but then save the very

5   last one on deliberations for after we have the closing

6   arguments because just tees up the deliberations themselves.  So

7   beyond that, I think that that covers all the documents we need

8   to review.

9          A couple of just housekeeping matters.  Am I correct

10  everyone's agreeing on sequestration of witnesses other than

11  parties?

12          MR. RUTER:  Yes, Your Honor.

13          MR. MORGAN:  Yes, Your Honor.

14          THE COURT:  And is the government going to have a

15  representative, and you know who it is?

16          MR. MORGAN:  So we will have an agent,

17  Charles Weishaar, here.

18          THE COURT:  Okay, yeah.  The -- okay.  A couple other

19  things I meant to mention earlier.  There's a chance, depending

20  on staffing, we might try to do the voir dire in the room next

21  door.  Usually, the lawyers prefer that, where we all sit there

22  and they get brought in one by one.  We'll let you know on

23  Monday.

24          If you're going use electronic exhibits, please, if

25  you haven't already done so, connect with us on getting trained

1    on the equipment so we have no issues with that.

2           On exhibits, there is guidance in the trial scheduling

3    order on exhibit numbering, on numbers of copies I need, exhibit

4    lists.  Any questions about that?  My general view is, if it's

5    not on the original exhibit list that comes in the first day of

6    trial, it really shouldn't come in, unless you have an argument

7    as to why it's newly discovered in some fashion.

8           But any questions about exhibits?

9           MR. MORGAN:  Not from the government, Your Honor,

10   thank you.

11          MR. RUTER:  Your Honor, I had told the Courtroom

12   Deputy that we have numbered separately 353 pages of material.

13   Each page has come from the records of Mr. Watson's accounting

14   practice, all of which deal, of course, with these particular

15   counts of -- against -- you know, against him.  What I did not

16   want to do, Your Honor, is to have my assistant have to identify

17   353 separate papers on the exhibit list.  We have tagged every

18   single piece of paper with a separate identifier, 101, 102, 103,

19   and so on, because unlike the instructions that you have given

20   us, none of these have paginations, none of them are related,

21   other than the fact that they're to a certain taxpayer and so

22   on.

23          So I was going to ask the Court whether or not it

24   would meet your requirements, Judge, if we were to take -- as an

25   example, if Taxpayer No. 1, for his or her 2015 tax return, had

1   nine documents, and Mr. Watson's file on that person that we

2   wish to attempt to admit -- would it be adequate to indicate

3   that the exhibit is Exhibit 1 through 10, 2015 tax return, and

4   then name the -- and what count or the name of the taxpayer

5   rather than then to designate what each piece of paper actually

6   is for.

7                THE COURT:  Okay, why don't we do this.

8                There was a request to take a short break.  Let me

9   just -- we'll come back.  I know we're pretty close to the end,

10  here, but there's a few more things I think I just want to

11  review.  So can we just take a ten-minute break, and then we'll

12  be back just to wrap up.  But I think I understand what you're

13  saying, and hopefully, I'll have an answer for you when we come

14  back.

15               MR. RUTER:  Okay.

16               THE COURT:  Thank you very much.

17               THE COURTROOM DEPUTY:  All rise.  This Honorable Court

18  stands in recess.

19       (Recess taken from 5:18 p.m. - 5:35 p.m.)

20               THE COURTROOM DEPUTY:  All rise.  This Honorable Court

21  resumes in session, the Honorable Theodore D. Chuang presiding.

22               THE COURT:  Okay, hold on one second.

23               Thank you.  Please be seated.

24               So Mr. Ruter, just to understand the situation, here,

25  what you're referring to is, you have records for one taxpayer,

```
1    I take it --
2              MR. RUTER:  For one -- for one year, then the next
3    year, then the next year.
4              THE COURT:  And it's -- they match up to the clients
5    in the indictment, or are these different?
6              MR. RUTER:  Oh, yes, they're only -- no, no, no,
7    Judge, only deals with the clients that are involved in this
8    particular indictment.
9              THE COURT:  So what you would like to do is basically
10   have like one exhibit number for each client, effectively?
11             MR. RUTER:  Well, again, Judge, we have already put
12   stickers on 353 separate pages, because based upon my
13   understanding of your direction, I thought, because they were
14   not paginated --
15             THE COURT:  Paginated, yep.
16             Well, you're doing it the right way, but it sounded
17   like you -- now you've already done it; why not just kind of
18   stick with it?
19             MR. RUTER:  Well, Judge, we're talking -- I'm talking
20   now about the actual exhibit list, which means, we'd have to --
21             THE COURT:  Oh, I see, you just don't want to have to
22   write it into the list.
23             MR. RUTER:  Yes, sir.
24             THE COURT:  So you just want to be able so say, 1
25   through 50 is Client 1, and 1 through --
```

1        MR. RUTER:  Whatever you let me get away with, Judge,

2   that would allow the jury, yourself, and anybody else to find

3   the documents that we might be trying to talk about.

4        THE COURT:  So the only issue -- one of the issues is,

5   I mean, do we know if the government's going to object these

6   exhibits?  Because that's sometimes the problem, is, once you

7   get to a lot of pages, or a lot of entries, if we know 1 through

8   50 are all coming in, it's just as easy to check one box as 50,

9   but if they're going say, well, no, no, no, you know, 2, 8, 25,

10   and 74 we're going object to and somehow get excluded, but the

11   rest of them come in, then gets a little trickier, so -- I don't

12   know if you all know whether --

13        MR. RUTER:  I don't know.

14        THE COURT:  Yeah, I don't know.  I mean -- I take it

15   you don't know what this is, at this point?

16        MR. MORGAN:  I have a general idea of the documents.

17   We have some documents, but we don't have the actual exhibits,

18   so I don't know specifically which ones he's talking about.

19        MR. RUTER:  Well, they came to my office, Judge, and I

20   sat there all that day long, going through every single file

21   that I took documents from, and they copied them, so they know

22   precisely what I'm talking about.

23        MR. MORGAN:  No, no, no, I didn't -- yes, we have the

24   documents --

25        THE COURT:  But in terms of whether they have an

1   objection to any of them and --

2           MR. RUTER:  No, in terms of objection, I have no idea.

3           MR. MORGAN:  Right, that's what I mean, is that we're

4   not going -- I don't anticipate there being necessarily an

5   objection.  I would like to see the exhibits and the list, just

6   to make sure we're all on the same page on exactly which ones

7   they are, but we do have -- we went to the office, we have some

8   documents; I just want to be precise about what it is we're

9   talking about, but --

10          THE COURT:  And the individual -- like, let's take one

11  example.  Client 1, for example, how many documents do you have

12  of that?  Like, out of 353, how many are that client?

13          MR. RUTER:  What probably happens, Judge, is this.

14  Probably each tax return in Mr. Watson's files may have as

15  little as four or five pages for one tax year but maybe

16  sometimes as many as maybe 20.  Probably -- 20 is a big number,

17  but you know, there's whole lot of files, and that's why you get

18  to 353 exhibits pretty quickly.

19          So what I was thinking, Your Honor, was being a bit

20  more discrete than your thought, which is, taxpayer or --

21  Count One, name of the taxpayer, tax year 2015, and that's it.

22  So you'd have no more than 4 or 5, 6 papers -- pages, you know,

23  pages 101 through 106 will be contained, you know, in that

24  exhibit, and then the next one would be 107 to, you know, 112,

25  with some kind of a very short description about what that

1   exhibit is.  It'll simply be, though, a tax year, a taxpayer,

2   and what count on the indictment.  That means a person may have

3   to look at four or five different pages in that exhibit to get

4   to the one that we're talking about, but --

5        THE COURT:  Are you talking about in the exhibit list

6   or in like a binder or something?

7        MR. RUTER:  They're in binders already.  I will be

8   producing, I guess, what --

9        THE COURT:  Right, so --

10       MR. RUTER:  -- five or six binders on Monday.

11       THE COURT:  Okay.  So you seem to be ahead of the

12  game, which is terrific, but again -- I guess I'm trying to

13  understand -- I know you're looking for a process efficiency

14  here, and I'd like to help you out.  I guess I'm just trying to

15  understand, what is the efficiency that we need now?  It's not

16  the stickers, because those are done.

17       MR. RUTER:  They're done.

18       THE COURT:  It's not really the binders either;

19  they're done.

20       MR. RUTER:  That's right.

21       THE COURT:  It's just the list.

22       MR. RUTER:  It's just the exhibit list itself.

23       THE COURT:  1 through 353 -- instead having 1 through

24  353, you want to have like 20 chunks of like 1 through 20, 21

25  through 40, et cetera, et cetera.

1          MR. RUTER:  I mean, quite frankly --

2          THE COURT:  And are they all basically the exact same

3  documents for each chunk, like you've got a return, and you've

4  got a this, and you've got a that?

5          MR. RUTER:  Yes, essentially, yes.

6          THE COURT:  You know, it's hard to tell without seeing

7  it.  Like I said, to me, the biggest concern would be if they

8  object to one portion and then have you track what's in and

9  what's out within that chunk at the same time.

10          MR. RUTER:  We'll have them, of course, Judge, Monday

11  morning.  And if I recall your instructions, they wouldn't be --

12  mine would not be due until the close of the government's case,

13  if my recollection is ...

14          THE COURT:  Technically, yes.

15          Are you planning to try to offer any through

16  government witnesses to your knowledge, or they would all come

17  in in your own case?

18          MR. RUTER:  Your Honor, it's possible that I might

19  show a taxpayer whether or not one of the exhibits I would have

20  is his or her actual original signature on signing the

21  tax return itself.  I've done that in prior cases, Your Honor,

22  and I usually ask the taxpayer to read what is directly above

23  their signature, which of course is a penalties of perjury, I

24  have examined, reviewed, and everything, you know --

25          THE COURT:  Okay.  I mean, I -- like I say, I don't

1   want create extra work.  I think a lot of this does depend,

2   though, on whether there's going to be objections, which

3   admittedly, I'm not sure the government could even really tell

4   us right now.

5          MR. RUTER:  Yes.

6          THE COURT:  Why don't do this, because again, as you

7   said, it's not due until your case in chief, which is like ten

8   days away.  So if you want, you can submit something on Monday,

9   since that's ahead of the game, broken up the way you would like

10  to.  That way, I can see it, and then (a) if it looks okay, and

11  (b) as we're going along, if it's pretty clear there's not going

12  to be objections to these documents, maybe we're fine, but if I

13  looked at it like and I'm like, eh, this isn't really working,

14  and/or it's pretty clear we're going to have a lot of disputes

15  over this, then you have additional time to adjust it later.

16         One thing I would -- so is that okay?

17         MR. RUTER:  It is.

18         THE COURT:  Let's start with that.

19         And -- but the bigger question I should raise, does

20  the government know how many exhibits you have?

21         MR. MORGAN:  Yes, I think within -- I think we will be

22  adding one or two here or there, but -- what are we up to now?

23         MR. RUTER:  I think it was 76, I believe.

24         MR. COFER:  I think we're now currently up to -- I

25  think we're now up to around 90.  I don't think we're going to

1   hit 100.

2          THE COURT:  He's got more than you do; that's kind of

3   unusual.

4          MR. MORGAN:  We didn't independently number every

5   single page, Your Honor.  They're paginated appropriately,

6   but --

7          THE COURT:  Okay.  So it fits the rule, okay.

8          So the numbering won't -- where do you start; do you

9   start at 1, or do you start at --

10         MR. RUTER:  101.

11         THE COURT:  Okay, so that's fine.  The only reason I

12  raise this is, in a high-volume document case, where this might

13  be -- tax case, it sounded like it might be, although the number

14  of exhibits isn't that high, we've sometimes gotten requests

15  from the jury for an index or an exhibit list.

16         We typically don't give them the list, because the

17  parties don't typically prepare it with an eye towards the jury,

18  and so what ends up happening at the end of the case is,

19  you know, the government puts something -- you know, they'll

20  name an exhibit, you know, "smoking gun," for example, and

21  you know, the defense will have an exhibit called "exculpatory

22  evidence," and then people argue about what the description

23  should be that the juries see.

24         And so -- and then we just say, we're just not giving

25  them anything, but then they're unhappy, because they're like, I

1    know there was an exhibit here, and if we had an index, we could

2    easily find it.  Now we're combing through the whole thing.

3         So in a case that has paper like this one might be, it

4    actually would be ideal if the parties going into this could at

5    least try to reach some understanding of like what these things

6    are being called, having them be as bland as possible so that if

7    the jury asks for the exhibit list -- or even if we just all

8    agree in advance, we'll give it to them voluntarily because

9    everyone's vetted it, that could be a good thing to think about

10   in advance, of what we're calling these things, so that we could

11   either decide at the end on our own or upon request and quickly

12   give them an index, which is just going to help them.

13        They're never happy when you -- you know, I've gone in

14   afterwards, and they're like, how come we couldn't get a list?

15   And I explained this whole thing about how like the naming, it's

16   not like it's really prejudicial, but there has to be a

17   discussion, and not it's not worth it, and they're like, okay,

18   well, you guys should have thought about that.

19        So I'm thinking about it now, so -- just give you

20   guys -- I'm giving you the time to think about it, obviously,

21   how you name things, perhaps think about whether there's any

22   reason it would be objectionable, maybe swap them, or you see

23   the first day, if anybody sees something, hey you could just

24   reword this, then we can change it before we get to the end of

25   the trial so we could quickly give it to somebody.

1          And on that point, Mr. Ruter, it would be just be

2    like, look, depending on how this is set up, maybe we do need a

3    name for each document, maybe we don't, but just keep that in

4    mind as part of it, it's not just for me, might be for the jury,

5    too, and what do we call it.

6          MR. RUTER:  Understood.

7          THE COURT:  And if it is client A tax documents from

8    Mr. Watson's files, if by the end of the trial it's clear that

9    they're unlikely to need more than that, maybe we can be okay

10   with it, I'm not sure, but just keep that other piece in mind,

11   what the jury could find useful.

12         MR. RUTER:  Yes, sir, thank you.

13         THE COURT:  Okay.  Witnesses, we talked about

14   sequestration.  I just wanted to make sure everyone

15   understands -- well, on the exhibits, just again -- and this is

16   in the instructions, a little bit off the local rules; please

17   offer each exhibit so the record is clear, because sometimes

18   people mention a record for identification only, but they don't

19   say that, and then it's unclear whether it's in or not, so you

20   do need to offer the exhibits, but it's not intended to make

21   this cumbersome.

22         I think the ideal scenario would be, everyone knows

23   that there's no objection, that the parties have conferred

24   enough that if there's a witness who's going to talk about ten

25   exhibits, at the very beginning, the government or whoever could

1    just say, we're moving 1 through 10 in, there's no objection,

2    then they're all in quick; it's quick.

3         I don't mean to say we need to say we need to do the

4    complete blow-by-blow foundation for every document.  Actually,

5    that's not the ideal.  It would seem like you would only need to

6    do those for ones where there's a potential objection and we'll

7    have to see if you have enough foundation.

8         So I'd like us to try do that from both sides.

9         MR. RUTER:  And if I understand what you're saying,

10   Your Honor, is that -- take the easy one, that all the tax

11   returns that the government has, that's the vast majority,

12   of course, of their exhibits.  I think the Court's suggesting

13   that it would not be permissible for the government to move all

14   of them in at the beginning of the trial and it's done.  It's on

15   the record, they've been moved in, and then they just go ahead

16   and they call their witnesses.  Is that what the Court --

17        THE COURT:  That would be permissible if there is no

18   objection, but ideally, you've conferred enough that they can

19   offer 1 through 50, or you can offer your 1 through 50 without

20   even having a line item on the exhibit list, and the other side

21   said it's okay, so then we're all fine.  Where it gets messy is

22   if the government tries to offer 1 through 50, and you say,

23   well, wait minute, I don't like 49 and 37, the rest of them are

24   fine.  Then we would have to start over again and kind of go in

25   smaller chunks.

1    MR. RUTER:  It's just much easier to indicate about

2 the government's exhibits, because the vast majority are tax

3 returns.  We've had them for a long time, we've reviewed them,

4 we know that they're --

5    THE COURT:  Right, so if you tell them 1 through 50

6 are fine, they can do that all at once, and if you say you have

7 an objection to 51, then they shouldn't try to put that in under

8 a big group, they should do it individually.

9    MR. RUTER:  Right, understood.

10    THE COURT:  Or even have a pre-moving -- a pre- -- you

11 know, a discussion outside the presence of the jury to sort that

12 out.

13    I do like to you let the other side know who the

14 witnesses are for the next day and ideally any exhibits that are

15 going to be offered through them so we can get this exhibit

16 process as efficient as possible.  I really do try to avoid

17 bench conferences, and particularly with COVID and things like

18 that, it's just better do everything when the jury's not here

19 and also not putting them in a position where they're sitting

20 around waiting for us.

21    So if there are evidentiary issues, whether --

22 regarding exhibits or witnesses, if you let me know in advance,

23 both I can be better prepared to answer the questions and we can

24 time it so that we do it even before the trial day, the end of

25 the trial day, or during lunch.  We can make lunch a little

1  longer, we can have people come in a little later or leave a

2  little earlier if we have to have such a discussion, but the

3  more advance notice I have, the better able we are to do that.

4       Because I do treat the jury as effectively my client;

5  I'm looking out for their interests, and part of that is making

6  sure that they're not waiting around for things that they don't

7  need to wait around for.  And so again, when we start, trying to

8  have everyone back in time after breaks or the beginning of the

9  day so we're not keeping jury waiting.

10      Does anyone have any other questions about process,

11  exhibits, witnesses, otherwise?

12      MR. MORGAN:  Not from the government, Your Honor,

13  thank you.

14      MR. RUTER:  No.  Thank you, Judge.

15      THE COURT:  Okay.  So as I understand it, typically,

16  the jury is ready around 9:30 on the first day.

17      Do you think that's the case?

18      We've got another trial starting with another judge on

19  Monday, so it might be a little bit later, but just in case -- I

20  guess what I would say with that 9:30 -- and at this point I'm

21  not hearing really any major disagreements that we need sort out

22  on Monday -- I think maybe should all just plan to be here ready

23  start at 9:00.  Inevitably, there is something we should be

24  discussing, so we can do that, and if not, we'll take a break

25  before the jury actually gets here.  And to the extent there is

1    anything else, like whether it's exhibit related or otherwise,

2    we can sort that out.

3           Ordinarily, I think, like I said, to try to keep

4    things moving, we'll probably try to start at 9:00, and what

5    that means is that if we have any issues to discuss before the

6    trial day, we might meet as early at 8:30.  If it's -- if we're

7    moving along at a decent pace on the trial, we could say, well,

8    we'll meet at 9:00 and start the tes- -- tell the jury to come

9    at 9:30, but it sort of depends on whether we're moving along

10   enough that we can have them start a little bit later.  But each

11   day, we'll just try to talk about what the timing is for the

12   next day.

13          And that first day, like I said, we'll do the jury

14   instruction, we'll do the preliminary instructions.  The last

15   few trials, I would say, with the three alternates, we haven't

16   gotten -- we've gone through the jury selection the first day

17   but without a lot of extra time.  However, ideally, again,

18   because we're potentially looking at a third week but I think

19   everyone would try to avoid it if we could, any reason why we

20   shouldn't be able to do openings and the first witness on Monday

21   if we have the time?

22          MR. MORGAN:  That should be fine from the government,

23   Your Honor.

24          MR. RUTER:  Agreed.

25          THE COURT:  Do you know how long the openings will be?

 1            MR. MORGAN:  I don't think my opening will be that

 2   long, maybe 10, 15 minutes, Your Honor.

 3            THE COURT:  Okay.  Mr. Ruter, about the same, or

 4   longer?

 5            MR. RUTER:  Unless you stop me, Your Honor, from

 6   giving a slight history lesson, which you haven't done in the

 7   past, but I don't think it would be more than 20 minutes, I

 8   don't think.

 9            THE COURT:  Okay.  I think I'm familiar with the

10   history lesson, but I understand the jury isn't, so I think

11   that's okay.

12            So -- okay, so we'll be ready to do that if we need to

13   or if we have time, and then, would your first witness be

14   somebody who -- a government witness or somebody who we're not

15   going to inconvenience too much if they're here?

16            MR. MORGAN:  Yes, it would be the IRS records

17   custodian, essentially.

18            THE COURT:  Okay.  And they certainly wouldn't need to

19   come -- I mean, frankly, at lunchtime, you could tell them what

20   our situation is, whether they need to come and when.  I don't

21   think they need to worry about the morning or even -- you know,

22   I think it would be probably, you know, midafternoon at the

23   earliest, probably, particularly with the openings.

24            And we will typically stop at 5:00 sharp, not just for

25   the court staff but so the jury can plan their days.  So I'd ask

1    both sides, particularly the government, since you usually have

2    more witnesses, just stack your witnesses in a way that

3    whoever's at the end of the day can come back the next day.

4           I don't want to put anybody in a position where, even

5    with an extra ten minutes, we could be done, and then you say

6    the person needs to be on a plane the next morning, or that

7    evening, but to me, it's really the parties' planning that's the

8    problem, not me, if I tell them, look, sorry, you're coming back

9    the next day, because again, I know jury sometimes -- some have

10   to drive over an hour to get home, to St. Mary's County, and

11   they certainly are making childcare and other arrangements

12   predicated on a 5:00 time, so I'm not going to upset that.

13          I just want to ask you plan so that, you know,

14   whatever happens at the end of the day doesn't offend any of

15   your own witnesses; just try to stack them in a way, and

16   hopefully, the parties will be accommodating.  If it means

17   taking somebody out of order, I think that would be ideal; we

18   don't want to inconvenience people any more than we need to.

19          Okay, anything else until Monday?

20          MR. MORGAN:  Not from the government, thank you.

21          MR. RUTER:  Thank you very much, Your Honor.

22          THE COURT:  Okay, thank you.  The only thing I would

23   say is, if for some reason, there are -- sometimes there are --

24   any ongoing discussions about resolving the case, if --

25   certainly let me know if anything like that happens, but if it's

```
 1   starting to look like it's -- something's promising, if you
 2   could just shoot us an e-mail.  Again, it may affect the
 3   sequence of things we do in preparation; not expecting it, but
 4   sometimes that does happen, so --
 5              MR. COFER:  Thanks, Your Honor.
 6              MR. RUTER:  Thank you Your Honor.
 7              THE COURT:  Thank you all very much.
 8              MR. MORGAN:  Thank you, Your Honor.
 9              THE COURTROOM DEPUTY:  All rise.  This Honorable Court
10   stands adjourned.
11        (The proceedings were adjourned at 5:54 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    CERTIFICATE OF OFFICIAL REPORTER

2        I, Patricia Klepp, Registered Merit Reporter, in and for

3    the United States District Court for the District of Maryland,

4    do hereby certify, pursuant to 28 U.S.C. § 753, that the

5    foregoing is a true and correct transcript of the

6    stenographically-reported proceedings held in the above-entitled

7    matter and the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9                              Dated this 3rd day of February, 2024.

10

11

12    _____/s/_____
      PATRICIA KLEPP, RMR
13    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25